Nos. 04-805C, 04-806C (consolidated)
(Judge Lettow)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STATESMAN II APARTMENTS, INC.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(FAX)(202) 514-8624

Attorneys for Defendant

OF COUNSEL:

C. ALLEN VILLAFUERTE
Trial Attorney
Office of General Counsel
Department of Housing
and Urban Development
Washington, DC

NOVEMBER 5, 2004

## TABLE OF CONTENTS

Page

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT . . . . . . 2

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. The Section 8 Housing Assistance Payments (HAP) Program . . . . . . . . . . . . . . . 3

A. The Section 8 Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B. The Section 8 HAP Programs For New Construction And Substantial Rehabilitation . . . . . . . . . . . . . . . . . . . . . . 4

C. Rent Subsidy Payments Under The Section 8 HAP Program . . . . . . . . . . 5

D. The 1994 Amendments To The Section 8 Statute . . . . . . . . . . . . . . . . . . . 6

E. HUD Notice 95-12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

F. The Statesman II And Beach House HAP Contracts . . . . . . . . . . . . . . . . . 9

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I. Statesman II Apartments, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II. Beach House Development Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III. Annual Adjustment Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV. Fair Market Rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I. Summary Judgment Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**TABLE OF CONTENTS (CONT'D)**

Page

II. The Jurisdiction Of Court Of Federal Claims Is Limited . . . . . 17

III. Contract Interpretation Standards . . . . . 17

IV. The Court Lacks Jurisdiction To Entertain The Owners' Breach-Of-Contract Claims Based Upon HUD's Failure To Adjust Contract Rents Under The Owners' HAP Contracts On The HAP Contract Anniversary Dates For The Years 1995, 1996, And 1997, Inasmuch As Those Claims Accrued More Than Six Years Before This Suit Was Commenced . . . . . 19

V. The Court Lacks Jurisdiction To Entertain The Owners' Breach-Of-Contract Claims Based Upon HUD's Publication, In 1995, 1996, 1997, And March 1998, Of Different Annual Contract Rent Adjustment Factors For "Turnover" And "Non-Turnover" Units, Inasmuch As Those Claims Accrued More Than Six Years Before This Suit Was Commenced . . . . . 20

VI. HUD's Publication Of Different Annual Rent Adjustment Factors For "Turnover" And "Non-Turnover" Units Did Not Breach The Owners' HAP Contracts . . . . . 21

VII. The Failure Of HUD, After 1994, To Adjust Contract Rents Under The Owners' HAP Contracts Annually On The Contract Anniversary Dates Did Not Breach The HAP Contracts . . . . . 22

A. The Requirements Of The 1994 Amendments To The Section 8 Statute, As Implemented By HUD Notice 95-12, Are Consistent With The Terms Of The Owners' HAP Contracts . . . . . 22

B. Assuming For The Sake Of Argument That The 1994 Amendments To The Section 8 Statute Conflict With The Owners' HAP Contracts, The Latter Are Nevertheless Subject To The 1994 Amendments . . . . . 26

CONCLUSION . . . . . 27

# TABLE OF AUTHORITIES

## FEDERAL CASES


*Alaska Pulp & Lumber Co. v. Madigan*, 2 F.3d 389 (Fed. Cir. 1993) .......... 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 15,16

*Appalachian Regional Healthcare, Inc. v. United States*,
999 F.2d 1573 (Fed. Cir. 1993) .......... 17

*Booth v. United States*, 990 F.2d 617 (Fed. Cir. 1993) .......... 17

*Bowen v. Public Agencies Opposed to Social Security Entrapment*,
477 U.S. 41 (1986) .......... 26

*Brighton Village Associates v. United States*, 52 F.3d 1056 (Fed. Cir. 1995) .......... 19

*Brown Park Estates-Fairfield Development Co. v. United States*,
127 F.3d 1449 (Fed. Cir. 1997) .......... 19,20

*Celotex Corp. v. United States*, 477 U.S. 317 (1986) .......... 16,17

*Cisneros v. Alpine Ridge Group*, 508 U.S. 10 (1993) .......... 9,23,24

*Commodities Recovery Corp v. United States*, 34 Fed. Cl. 282 (1995) .......... 15,16

*Cuyahoga Metropolitan Housing Authority v. United States*,
57 Fed. Cl. 751 (2003) .......... 25,26

*Federal Housing Partners IV v. Cisneros*, 55 F.3d 362 (8th Cir. 1995) .......... 23

*Firestone Tire & Rubber Co. v. United States*, 195 Ct. Cl. 21, 444 F.2d 547 (1971) ... 17

*Franconia Associates v. United States*, 44 Fed. Cl. 315,
aff'd on other grounds, 240 F.3d 1358 (Fed. Cir. 2002),
rev'd on other grounds, 536 U.S. 129 (2002) .......... 26

*Government Systems Advisors, Inc. v. United States*,
847 F.2d 811 (Fed. Cir. 1988) .......... 16

*Grumman Data Systems Corp. v. Dalton*, 88 F.3d 990 (Fed. Cir. 1996) .......... 18

*Hart v. United States*, 910 F.2d 815 (Fed. Cir. 1990) .......... 17,19

*Hol-Gar Manufacturing Corp. v. United States*,
169 Ct. Cl. 384, 351 F.2d 972 (1965) .......... 18

*Hunt Construction Group, Inc. v. United States*, 281 F.3d 1369 (Fed. Cir. 2002) .......... 18

## TABLE OF AUTHORITIES (CONT'D)

## FEDERAL CASES (CONT'D)

*Keco Industries, Inc. v. United States*, 176 Ct. Cl. 983, 364 F.2d 838 (1966), cert. denied, 386 U.S. 958 (1967) .................... 17

*Kinsey v. United States*, 852 F.2d 556 (Fed. Cir. 1988) .................... 20

*L. W. Matteson, Inc. v. United States*, 61 Fed. Cl. 296 (2004) .................... 16

*Massachusetts Port Authority v. United States*, 197 Ct. Cl. 721, 456 F.2d 782 (1972) .................... 17

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .................... 16

*Mayflower Transit Co. v. United States*, 162 Ct. Cl. 233 (1963) .................... 18

*McAbee Construction, Inc. v. United States*, 97 F.3d 1431 (Fed. Cir. 1996) .................... 18

*National Leased Housing Association v. United States*, 22 Cl.Ct. 649 (1991) .................... 25

*National Leased Housing Association v. United States*, 105 F.3d 1423 (Fed. Cir. 1997) .................... 8,23

*Park Village Apartments v. United States*, 25 Cl.Ct. 729 (1992) .................... 20

*Park Village Apartments v. United States*, 32 Fed. Cl. 441 (1994), aff'd, 152 F.3d 943 (Fed. Cir.) (Table), cert. denied, 525 U.S. 962 (1998) .................... 8

*Reynolds v. AAFES*, 846 F.2d 746 (Fed. Cir. 1988) .................... 17

*San Carlos Irrigation and Drainage District v. United States*, 877 F.2d 957 (Fed. Cir. 1989) .................... 21

*Spirit Leveling Contractors v. United States*, 19 Cl.Ct. 84 (1989) .................... 16

*Sweats Fashions, Inc. v. Pennill Knitting Co.*, 833 F.2d 1560 (Fed. Cir. 1987) .................... 16

*Trauma Service Group v. United States*, 104 F.3d 1321 (Fed. Cir. 1997) .................... 21

*Unicon Management Corp. v. United States*, 179 Ct. Cl. 534, 375 F.2d 804 (1967) .................... 18

*United States v. City of Fulton*, 475 U.S. 657 (1986) .................... 19

*United States v. Mitchell*, 445 U.S. 535 (1980) .................... 17

## TABLE OF AUTHORITIES (CONT'D)

### FEDERAL CASES (CONT'D)

*United States v. Testan*, 424 U.S. 392 (1976) .............................................................. 17

### FEDERAL STATUTES

**United States Code:**

28 U.S.C. § 2501 (2000) ................................................................................ 19

28 U.S.C. § 2501 ....................................................................................... 20,21

42 U.S.C. § 1437a(a) (1994) ........................................................................... 5

42 U.S.C. § 1437f.................................................................................................. 3

42 U.S.C. § 1437f(a) (1970 & Supp. 1974) ........................................................... 3

42 U.S.C. § 1437f(a) ........................................................................................... 3

42 U.S.C. § 1437f(c)(1) (1970 & Supp. IV 1974) ............................................... 4

42 U.S.C. § 1437f(c)(2) (1982) ............................................................................ 4

42 U.S.C. § 1437f(c)(2)(A) .................................................................................. 2

42 U.S.C. § 1437f(c)(2)(A) ............................................................................ 6,23

42 U.S.C. § 1437f(c)(2)(A) (1994) ............................................................ 6,23,26

42 U.S.C. § 1437f(c)(2)(A) (2000) ................................................................ 7,22

42 U.S.C. § 1437f(c)(2)(A) .................................................................................. 6

42 U.S.C. § 1437f(c)(2)(A) (1994) .................................................................... 26

42 U.S.C. § 1437f(c)(3)(A) (1994) ...................................................................... 5

**Public Laws:**

Departments of Veterans Affairs and Housing and Urban Development,
and Independent Agencies Appropriations Act, 1995 ("the 1994 Act"),
Pub. L. No. 103-327, 108 Stat. 2298 ........................................................ passim

Housing and Community Development Act of 1974,
Pub. L. No. 93-383, 88 Stat. 633 ...................................................................... 3

## TABLE OF AUTHORITIES (CONT'D)

## FEDERAL STATUTES (CONT'D)

**Public Laws (cont'd):**

Housing and Urban-Rural Recovery Act of 1983,
Pub. L. No. 98-181, 97 Stat. 1155, 1183 (1983) .......... 4

United States Housing Act of 1937, as amended,
(codified at 42 U.S.C. § 1437 et seq.) .......... 3

## FEDERAL REGULATIONS

**Code of Federal Regulations:**

24 C.F.R. Part 880 (1994) .......... 4

24 C.F.R. Part 880 (1979) .......... 12

24 C.F.R. § 880.201 (1994) .......... 5

24 C.F.R. §§ 880.201 & 881.201 (1994) .......... 5

24 C.F.R. §§ 880.301-405 (1994) .......... 5

24 C.F.R. § 880.501(d)(1) (1994) .......... 5

24 C.F.R. Part 881 (1994) .......... 4

24 C.F.R. Part 881 (1979) .......... 10

24 C.F.R. § 881.201 (1994) .......... 5

24 C.F.R. §§ 881.301-405 (1994) .......... 5

24 C.F.R. § 881.501(d)(1) (1994) .......... 5

24 C.F.R. § 888.203 (1994) .......... 9

## MISCELLANEOUS

**Rules of the Court of Federal Claims:**

Rule 1(a)(2) .......... 16

Rule 56(c) .......... 15

## TABLE OF AUTHORITIES (CONT'D)

## MISCELLANEOUS (CONT'D)

**<u>HUD Notices (cont'd)</u>:**

HUD Notice 95-12 ........ passim

HUD Notice 97-14 ........ 7

HUD Notice 98-3 ........ 7

HUD Notice 99-17 ........ 7

HUD Notice 00-14 ........ 7

HUD Notice 2002-10 ........ 7

## INDEX TO DEFENDANT'S APPENDIX


| Document | Page |
|---|---|
| HUD Notice 95-12 (3/7/95) | 1 |
| HUD Notice 97-14 (3/17/97) | 25 |
| HUD Notice 98-3 (1/23/98) | 42 |
| HUD Notice 99-17 (7/8/99) | 44 |
| HUD Notice 00-14 (8/9/00) | 45 |
| HUD Notice 2002-10 (5/17/02) | 46 |
| Statesman II HAP Contract | 61 |
| Rent Schedule for Statesman Apartments effective 11/14/92 | 74 |
| Letter dated April 2, 2004, from Fred J. Livingstone, Esq., Taft, Stettinius & Hollister LLP, to Dennis G. Morton, Director, Multifamily Housing Program Center, Cleveland HUD Office re: Request for Rent Increases for Statesman Apartments | 76 |
| Letter dated April 23, 2004, from Dennis G. Morton, Director, Multifamily Housing Program Center, Cleveland HUD Office, to Fred J. Livingstone, Esq., Taft, Stettinius & Hollister LLP, re: AAF Rent Increases (Statesman Apartments, Lakeshore Village) | 121 |
| Beach House HAP Contract | 122 |
| Rent Schedule for Lakeshore Village effective 10/4/94 | 146 |
| Rent Schedule for Lakeshore Villlage effective 10/4/94 | 148 |
| Letter dated April 2, 2004, from Fred J. Livingstone, Esq., Taft, Stettinius & Hollister LLP, to Dennis G. Morton, Director, Multifamily Housing Program Center, Cleveland HUD Office re: Request for Rent Increases for Lakeshore Village | 150 |
| Annual Rent Adjustment Factors (3/7/95) | 195 |

## INDEX TO DEFENDANT'S APPENDIX (CONT'D)


| Document | Page |
|---|---|
| Annual Rent Adjustment Factors (11/3/95) | 200 |
| Annual Rent Adjustment Factors (12/16/96) | 206 |
| Annual Rent Adjustment Factors (3/11/98) | 212 |
| Annual Rent Adjustment Factors (9/24/98) | 218 |
| Annual Rent Adjustment Factors (12/28/99) | 224 |
| Annual Rent Adjustment Factors (11/7/00) | 230 |
| Annual Rent Adjustment Factors (11/26/01) | 236 |
| Fair Market Rents (8/15/95) | 242 |
| Fair Market Rents (9/18/95) | 244 |
| Fair Market Rents (2/21/96) | 246 |
| Fair Market Rents (9/20/96) | 248 |
| Fair Market Rents (9/26/97) | 250 |
| Fair Market Rents (10/1/98) | 252 |
| Fair Market Rents (10/1/99) | 254 |
| Fair Market Rents (9/25/00) | 256 |
| Fair Market Rents (10/1/01) | 258 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STATESMAN II APARTMENTS, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Nos. 04-805C, 04-806C (consolidated) |
| v. | ) | |
| | ) | (Judge Lettow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to the Court's Order filed on August 31, 2004,[1] and RCFC 56(b), defendant, the United States, requests that the Court enter judgment for the Government upon plaintiffs' first amended complaints upon the grounds that there is no genuine issue as to any material fact and that the Government is entitled to judgment as a matter of law. Rule 56(b) provides that "[a] party against whom a claim . . . is asserted . . . may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." In support of this application, we rely upon the pleadings of record, the following brief, and related appendix.[2]

---

1 The Order provides that the Government's motion for summary judgment upon issues of liability must be filed by November 5, 2004.

2 In this brief, "Statesman II Compl. ¶ ____" refers to the referenced paragraph(s) of the "First Amended Complaint of Plaintiff Statesman Apartments, Inc." filed by leave of the Court on September 9, 2004; "Beach House Compl. ¶ ____" refers to the referenced paragraph(s) of the "First Amended Complaint of Plaintiff Beach House Development Company" " filed by leave of the Court on September 9, 2004; "DPFUF ¶ ____" refers to the referenced paragraph(s) of "Defendant's Proposed Findings of Uncontroverted Fact" dated November 5, 2004; and "Def. App. ____" refers to the referenced page(s) of the appendix to this brief.

BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

STATEMENT OF THE ISSUES

1. Whether the Court lacks jurisdiction to entertain plaintiffs' breach-of-contract claims based upon the failure of the Department of Housing and Urban Development (HUD) to adjust contract rents under plaintiffs' Housing Assistance Payments (HAP) contracts for the years 1995, 1996, and 1997, inasmuch as those claims accrued more than six years before this suit was commenced.

2. Whether the Court lacks jurisdiction to entertain plaintiffs' breach-of-contract claims based upon HUD's publication, in 1995, 1996, 1997, and March 1998, of different annual contract rent adjustment factors for "turnover" and "non-turnover" units, inasmuch as those claims accrued more than six years before this suit was commenced.

3. Whether HUD's publication of different annual rent adjustment factors for "turnover" and "non-turnover" units constituted a breach of plaintiffs' HAP contracts.

4. Whether the failure of HUD, after 1994, to adjust contract rents under plaintiffs' HAP Contracts annually on the contract anniversary dates breached the HAP contracts.

5. Whether the 1994 amendments to 42 U.S.C. § 1437f(c)(2)(A) and/or HUD Notice 95-12 breached or resulted in a breach of plaintiffs' HAP contracts.

STATEMENT OF THE CASE

I. Nature Of The Case

In this consolidated proceeding, plaintiffs, Statesman II Apartments, Inc. (Statesman II) and Beach House Development Company (Beach House) (collectively "the Owners"), own low-income rental housing projects in the Cleveland, Ohio area. The rents of the low-income tenants

in these housing projects are subsidized by the Government pursuant to long-term rent subsidy agreements known as "Housing Assistance Payments Contracts." The Owners seek damages for alleged breaches of contract based upon the failure of HUD to adjust the contract rents annually on the contract anniversary dates – for the years 1995-2000, in the case of Statesman II, and for the years 1995-2002, in the case of Beach House. Statesman II seeks $63,000 in damages and Beach House seeks $384,000 in damages. Statesman II Compl., at p. 6; Beach House Compl., at p. 6.

II. The Section 8 Housing Assistance Payments (HAP) Program

A. The Section 8 Statute

Section 8 of the United States Housing Act of 1937, as amended (42 U.S.C. § 1437f) (the Section 8 statute),[3] creates a statutory scheme pursuant to which the United States, through the Department of Housing and Urban Development (HUD), directly or indirectly subsidizes the rents of low-income individuals and families living in privately owned buildings. This litigation concerns claims by owners of "newly constructed" or "substantially rehabilitated" housing with respect to which, at all relevant times, the Section 8 statute provided that "assistance payments" "may be made . . . in accordance with the provisions" of that statute for "the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a) (1970 & Supp. 1974).[4]

---

[3] Section 8 was enacted as part of section 201(a) of the Housing and Community Development Act of 1974, Pub. L. No. 93-383, 88 Stat. 633, 653-67 (1974), which amended the United States Housing Act of 1937 in this and other respects.

[4] In 1983, Congress amended 42 U.S.C. § 1437f(a) by repealing the Section 8 "newly constructed, and substantially rehabilitated" programs, but grand-fathering existing Section 8

(continued...)

As originally enacted and at the time the Statesman II and Beach House HAP contracts were executed, the Section 8 statute specified that "[a]n assistance contract entered into pursuant to this section shall establish the maximum monthly rent (including utilities and all maintenance and management charges) which the owner is entitled to receive for each dwelling unit to which such assistance payments are to be made." 42 U.S.C. § 1437f(c)(1) (1970 & Supp. IV 1974). In addition, section 8(c)(2) provided, in part, with respect to the adjustment of contract rents:

> (A) The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.
>
> * * * * *
>
> (C) Adjustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary.

42 U.S.C. § 1437f(c)(2) (1982).

B. The Section 8 HAP Programs For New Construction And Substantial Rehabilitation

HUD has established by regulations a variety of programs implementing the Section 8 statute, including programs addressing "newly constructed" and "substantially rehabilitated" rental housing projects. See 24 C.F.R. Part 880 (1994) ("Section 8 Housing Assistance Payments Program for New Construction"); 24 C.F.R. Part 881 (1994) ("Section 8 Housing Assistance

---

[4](...continued)
New Construction and Substantial Rehabilitation HAP projects, such as the owners' projects in this case, as being subject to the Section 8 laws. See section 209(a)(1) of the Housing and Urban-Rural Recovery Act of 1983, Pub. L. No. 98-181, 97 Stat. 1155, 1183 (1983).

Payments Program for Substantial Rehabilitation"). In each of these programs, proposals were solicited for the construction or rehabilitation of housing the rents for which would be subsidized under agreements entered into pursuant to the Section 8 statute. Upon selection and approval of a proposal, HUD or a PHA, as the case may be, executed an "Agreement to Enter into a Housing Assistance Payments Contract" pursuant to which they agreed to execute a Housing Assistance payments (HAP) contract upon the owner's satisfactory completion of the project. See 24 C.F.R. §§ 880.301-405 & 881.301-405 (1994).

C. Rent Subsidy Payments Under The Section 8 HAP Program

The rent subsidy is provided in one of two ways. HUD enters into a Housing Assistance Payments contract directly with the owner of a housing project, or it enters into an "annual contributions contract" with a "public housing agency," which, in turn, enters into a HAP contract with a project owner. In either case, the HAP contract is the vehicle for payment of the Section 8 rent subsidy ("housing assistance payment") to the project owner.

The HAP contract specifies a monthly rent for dwelling units covered by the agreement, termed the "contract rent." 24 C.F.R. §§ 880.201 & 881.201 (1994) ("Contract Rent" defined). Under the HAP contract, the tenant pays the owner a portion of the contract rent, which is based upon the tenant's income. 42 U.S.C. § 1437a(a) (1994); 24 C.F.R. §§ 880.201 & 881.201 (1994) ("tenant rent" defined). The governmental entity with which the owner contracts (either HUD or a PHA) pays a rent subsidy to the owner equal to the difference between the tenant rent and the contract rent. 42 U.S.C. § 1437f(c)(3)(A) (1994); 24 C.F.R. §§ 880.501(d)(1) & 881.501(d)(1) (1994).

D. The 1994 Amendments To The Section 8 Statute

The Section 8 statute has been amended several times since the Statesman II and Beach House HAP contracts were executed. The present litigation concerns amendments to the Section 8 statute contained in the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298 (the 1994 Act), enacted on September 28, 1994. Among other things, the 1994 Act amended the Section 8 statute by adding two sentences to 42 U.S.C. § 1437f(c)(2)(A) so that, as amended, it provided:

> The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines on the basis of a reasonable formula. *However, where the maximum monthly rent, for a unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area , the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality , type, and age in the same market area, as determined by the Secretary. . . . For any unit occupied by the same family at the time of the last annual rental adjustment, where the assistance contract provides for the adjustment of the maximum monthly rent by applying an annual adjustment factor and where the rent for the unit is otherwise eligible for an adjustment based on the full amount of the factor, 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0.*

42 U.S.C. § 1437f(c)(2)(A) (1994) (emphasis added).

The 1994 Act provided that these amendments to the Section 8 statute "shall apply to all contracts for new construction, substantial rehabilitation, and moderate rehabilitation projects under which rents are adjusted under [section 1437f(c)(2)(A)] by applying an annual adjustment

factor," 108 Stat. at 2315, such as plaintiffs' HAP contracts. The amendments are effective prospectively "during fiscal year 1995, during fiscal year 1996 prior to April 26, 1996, and fiscal years 1997 and 1998, and during fiscal year 1999 and thereafter." 42 U.S.C. § 1437f(c)(2)(A) (2000).

E. HUD Notice 95-12

On March 7, 1995, HUD issued Notice H 95-12 (HUD), concerning "Annual Adjustment Factor Rent Increase Requirements Pursuant to the Housing Appropriations Act of 1995" (HUD Notice 95-12), which implemented the 1994 Act's amendments to the Section 8 statute. See Def. App. 1-24.[5] HUD Notice 95-12 recited that, "[a]mong the many measures developed by the [1994 Act], emphasis was placed on utilizing the mechanism in the Section 8 contract language which permits an analysis on the reasonableness of the [annual adjustment factor (AAF)] formula as it is applied to each project unit type." Def. App. 1. HUD Notice 95-12 announced that "review of AAF under the Overall Limitation clause of the HAP Contract would apply to Section 8 New Construction and Substantial Rehabilitation Properties where Section 8 rent levels for a unit type presently exceed the published Existing Housing Fair Market Rents (FMR) . . . ." Id.

HUD Notice 95-12 provided that, where existing HAP contract rents *exceeded* the applicable published, current fair market rents for the area, the Section 8 project owner would be required to submit to HUD a study of the rents charged for comparable, unassisted units. See Def. App. 3. If the owner's study indicated that comparable, unassisted rents exceeded the contract

---

[5] Although HUD Notice 95-12 expired on September 30, 1995, subsequent notices reinstated and extended its provisions. See HUD Notice 97-14 (3/17/97), Def. App. 25-41; HUD Notice 98-3 (1/23/98), Def. App. 42-43; HUD Notice 99-17 (7/8/99), Def. App. 44; HUD Notice 00-14 (8/9/00), Def. App. 45; and HUD Notice 2002-10 (5/17/02), Def. App. 46-60.

rent by more than five percent, HUD would increase contract rents to the lesser of (1) contract rents adjusted according to the applicable published annual adjustment factor or (2) the comparable, unassisted rent plus any "initial difference"[6] to be preserved in rent adjustments. See Def. App. 4. Where the owner provided this information at least 60 days before the HAP contract anniversary date, HUD would increase the contracts rents effective 60 days after the owner submitted the information. See Def. App. 3. If, however, the owner did not provide the rent comparability information by the *next* contract anniversary date, HUD would not increase contract rents for the preceding year. Id.

HUD Notice 95-12 further provided that, where existing HAP contract rents *did not exceed* the applicable current, published fair market rents, the contract rents would be adjusted using the "appropriate AAF." Def. App. 9. In order to receive a rent adjustment, however, the owner was required to submit to HUD "the number of units in which turnover occurred since the last HAP contract anniversary date." Id. If the owner failed to submit the tenant turnover data at least 60 days before the contract anniversary date, the contract rents would not be adjusted on the contract anniversary date, but would "go into effect 60 days after" HUD's receipt of the required turnover data. Id. If, however, the owner failed to submit the turnover information by the *next* HAP contract anniversary, HUD would not increase contract rents for the preceding year. Id.

---

[6] The "initial difference" to be preserved in rent adjustments is the mathematical difference, expressed in dollars, between the original HAP contract rent and the initial rental value of a comparable, unassisted unit. National Leased Housing Ass'n v. United States, 105 F.3d 1423, 1435 (Fed. Cir. 1997); accord Park Village Apartments v. United States, 32 Fed. Cl. 441, 451-52 (1994), aff'd, 152 F.3d 943 (Fed. Cir.) (Table), cert. denied, 525 U.S. 962 (1998).

F. The Statesman II And Beach House HAP Contracts

The terms of the Statesman II and Beach House HAP Contracts are similar and the rent adjustment provisions are virtually identical. With respect to rent adjustments, the Owners' HAP contracts provided:

> b. Automatic Annual Adjustments
>
> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government [[7]]. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

Statesman II and Beach House HAP Contracts, Part I, § 1.8b, Def. App. 64, 125.

The Owners' HAP contracts also contained an "Overall Limitation" provision that trumps the other rent adjustment provisions. See Cisneros v. Alpine Ridge Group, 508 U.S. 10, 17-19 (1993). It provided:

> d. Overall Limitation. Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged

[7] When contract rents are adjusted by applying published "annual adjustment factors" (AAFs), the existing rent is multiplied by the relevant AAF to arrive at the new contract rent. For example, if the monthly rent in effect during the previous HAP contract year is $100 per unit and the applicable AAF is 1.05, the monthly contract rent for the current year adjusted in accordance with the AAF would be $105 (1.05 x $100). See 24 C.F.R. § 888.203 (1994).

> for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

Statesman II and Beach House HAP Contracts, Part I, § 1.8d, Def. App. 64, 125.

In addition, the HAP contracts provided that "[t]he Owner shall furnish such information and reports pertinent to the Contract as reasonably may be required from time to time by the Government." Statesman II and Beach House HAP Contracts, Part II, § 2.6a, Def. App. 68, 103.

## STATEMENT OF FACTS

### I. Statesman II Apartments, Inc.

Statesman II owns Statesman Apartments, a low-income rental housing project located at 16705-16825 Van Aken Boulevard, Shaker Heights, Ohio, having acquired that property on or about November 18, 1993, from Statesman Apartments Development Company II, an Ohio limited partnership (the Partnership). DPFUF ¶ 1. Statesman Apartments consists of 20 one-bedroom apartments and 27 two-bedroom apartments. Id.

In 1980, the Partnership, Statesman II's predecessor-in-interest, and the United States, acting through HUD, entered a HAP contract with respect to Statesman Apartments (the Statesman II HAP Contract). DPFUF ¶ 2. The Statesman II HAP Contract, which was executed in stages beginning with Stage 1 effective on November 14, 1980, applied to all 47 apartments of which Statesman Apartment consists. Id. Statesman Apartments was developed by the Partnership under the Section 8 Housing Assistance Payments Program for Substantial Rehabilitation, the regulations for which originally were codified at 24 C.F.R. Part 881 (1979). Id.

The Statesman II HAP Contract was for an initial term of five years, renewable for three additional terms of five years each at the owner's option, for a maximum of 20 years. See Statesman II HAP Contract, Part I, §§ 1.1c, 1.4a (Alternative 2), Def. App. 61, 62. The anniversary date of the Statesman II HAP Contract was November 14. The Statesman II HAP Contract was terminated on November 30, 2000. DPFUF ¶ 3.

The initial monthly contract rents under the Statesman II HAP Contract were \$370 for each of the one-bedroom apartments and \$424 for each of the two-bedroom apartments. DPFUF ¶ 4. The last rent adjustment received by Statesman II for Statesman Apartments under the Statesman II HAP Contract was effective on November 14, 1992. DPFUF ¶ 6. As of that date and during the period from November 14, 1992, to November 30, 2000, when the Statesman II HAP Contract was terminated, the monthly contract rents were \$586 for one-bedroom apartments and \$671 for two-bedroom apartments. Id.

After 1992, Statesman II did not submit any rent comparability information or tenant turnover data to HUD or request annual rent adjustments under the Statesman II HAP Contract until April 2, 2004, when, through its attorney, Statesman II submitted to HUD a request for "automatic adjustment contract rent increases" for Statesman Apartments for the years 1998 through November 30, 2002. See DPFUF ¶ 9. That request was accompanied by information concerning comparable, unassisted rents and tenant turnover data. Id. On April 23, 2004, HUD denied the requested rent adjustments. Id.

II. Beach House Development Company

Beach House owns Lakeshore Village, a low-income rental housing project located at 16151 Lake Shore Boulevard, Cleveland, Ohio. DPFUF ¶ 10. Lakeshore Village consists of

102 two-bedroom apartments and six three-bedroom apartments. Id.

In October 1982, Beach House and the United States, acting through HUD, entered a HAP Contract with respect to Lakeshore Village (Beach House HAP Contract). DPFUF ¶ 11. The Beach House HAP Contract, which was executed in stages, covered all 108 apartments of which Lakeshore Village consists. Id. Lakeshore Village was developed by Beach House under the Section 8 Housing Assistance Payments Program for New Construction, the regulations for which were codified initially at 24 C.F.R. Part 880 (1979). Id.

The initial monthly contract rents under the Beach House HAP Contract were $474 for each of the two-bedroom apartments and $537 for each of the three-bedroom apartments. DPFUF ¶ 12. The last rent adjustment for Lakeshore Village under the Beach House HAP Contract was effective on October 4, 1994. DPFUF ¶ 14. From that time through September 2002, the monthly contract rents for Lakeshore Village were $662 for two-bedroom apartments and $779 for three-bedroom apartments. Id.

After 1994, Beach House did not submit any rent comparability information or tenant turnover data to HUD or request annual rent adjustments under the Beach House HAP Contract until April 2, 2004, when, through its attorney, Beach House submitted to HUD a request for "automatic adjustment contract rent increases" for Lakeshore Village for the years 1998 through September 30, 2002 . . . ." DPFUF ¶ 15. That request was accompanied by information concerning comparable, unassisted rents and tenant turnover data. Id. On April 23, 2004, HUD denied the requested rent adjustments. Id.

III. Annual Adjustment Factors

Annual adjustment factors (AAFs) for contract rents under the Section 8 HAP Program were published in the Federal Register on March 7, 1995. DPFUF ¶ 17. Statesman Apartments and Lakeshore Village are located in the PMSA Cleveland-Lorain-Elyria, Ohio area. For a "turn-over" unit,[8] the published AAF for that area (highest cost utility included) was 1.028. Id. For a "non-turnover" unit,[9] the published AAF for that area (highest cost utility included) was 1.018. Id.

AAFs for contract rents under the Section 8 HAP Program were published in the Federal Register on November 3, 1995. DPFUF ¶ 18. For a "turnover" unit, the published AAF for the PMSA Cleveland-Lorain-Elyria, Ohio area (highest cost utility included) was 1.018. Id. For a "non-turnover" unit, the published AAF for that area (highest cost utility included) was 1.008. Id.

AAFs for contract rents under the Section 8 HAP Program for fiscal year 1997 were published in the Federal Register on December 16, 1996. DPFUF ¶ 19. For a "turnover" unit, the published AAF for the PMSA Cleveland-Lorain-Elyria, Ohio area (highest cost utility inclu-ded) was 1.023. Id. For a "non-turnover" unit, the published AAF for that area (highest cost utility included) was 1.013. Id.

---

[8] A "turnover" unit is a unit occupied by a new family since the last contract anniversary date. See DPFUF ¶ 17.

[9] A "non-turnover" unit is a unit occupied by the same family as at the time of the last contract anniversary date. See DPFUF ¶ 17.

AAFs for contract rents under the Section 8 HAP Program for fiscal year 1998 were published in the Federal Register on March 11, 1998. DPFUF ¶ 20. For a "turnover" unit, the published AAF for the PMSA Cleveland-Lorain-Elyria, Ohio area (highest cost utility included) was 1.030. Id. For a "non-turnover" unit, the published AAF for that area (highest cost utility included) was 1.020. Id.

AAFs for contract rents under the Section 8 HAP Program for fiscal year 1999 were published in the Federal Register on September 24, 1998. DPFUF ¶ 21. For a "turnover" unit, the published AAF for the PMSA Cleveland-Lorain-Elyria, Ohio area (highest cost utility included) was 1.034. Id. For a "non-turnover" unit, the published AAF for that area (highest cost utility included) was 1.024. Id.

AAFs for contract rents under the Section 8 HAP Program for fiscal year 2000 were published in the Federal Register on December 28, 1999. DPFUF ¶ 22. For a "turnover" unit, the published AAF for the PMSA Cleveland-Lorain-Elyria, Ohio area (highest cost utility included) was 1.043. Id. For a "non-turnover" unit, the published AAF for that area (highest cost utility included) was 1.033. Id.

AAFs for contract rents under the Section 8 HAP Program for fiscal year 2001 were published in the Federal Register on November 7, 2000. DPFUF ¶ 23. For a "turnover" unit, the published AAF for the PMSA Cleveland-Lorain-Elyria, Ohio area (highest cost utility included) was 1.013. Id. For a "non-turnover" unit, the published AAF for that area (highest cost utility included) was 1.003. Id.

AAFs for contract rents under the Section 8 HAP Program for fiscal year 2002 were published in the Federal Register on November 26, 2001. DPFUF ¶ 24. For a "turnover" unit, the published AAF for the PMSA Cleveland-Lorain-Elyria, Ohio area (highest cost utility included) was 1.057. Id. For a "non-turnover" unit, the published AAF for that area (highest cost utility included) was 1.047. Id.

IV. Fair Market Rents

25. Fair market rents published by HUD in the Federal Register during 1995-2001 for the PMSA Cleveland-Lorain-Elyria, Ohio area for one-bedroom, two-bedroom, and three-bedroom units were as follows:

| | 1-BR | 2-BR | 3-BR |
|---|---|---|---|
| August 1995 | $405 | $501 | $637 |
| September 1995 | $412 | $510 | $648 |
| February 1996 | $412 | $510 | $648 |
| September 1996 | $422 | $522 | $663 |
| September 1997 | $434 | $537 | $683 |
| October 1998 | $480 | $594 | $755 |
| October 1999 | $500 | $619 | $787 |
| September 2000 | $521 | $645 | $820 |
| October 2001 | $587 | $726 | $924 |

DPFUF ¶ 25.

## ARGUMENT

I. Summary Judgment Standards

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Commodities Recovery Corp. v. United States, 34 Fed. Cl. 282, 287-88 (1995). Summary judgment is not a disfavored procedural shortcut; it

is an integral part of the Court's rules as a whole, which are to be construed to secure the just, speedy, and inexpensive determination of every action. Celotex Corp. v. United States, 477 U.S. 317, 327 (1986); Sweats Fashions, Inc. v. Pennill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987); Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 89 (1989); see also RCFC 1(a)(2).

A dispute is "genuine" if, on the entirety of the record, the evidence is such that a reasonable jury could resolve a factual matter in favor of the nonmoving party. Anderson, 477 U.S. at 248; Sweats Fashions, 833 F.2d at 1562. Thus, when the record as a whole would not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Commodities Recovery, 34 Fed. Cl. at 288. A fact is "material" if it could affect the outcome of the suit and its materiality is determined by the substantive law applicable to the case. Anderson, 477 U.S. at 248; Spirit Leveling, 19 Cl. Ct. at 89. "Contract interpretation is a matter of law and thus amenable to decision on summary judgment." Government Systems Advisors, Inc. v. United States, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988); accord L. W. Matteson, Inc. v. United States, 61 Fed. Cl. 296, 307 (2004) (Contract interpretation is "an appropriate predicate for summary judgment.").

The party moving for summary judgment bears the initial burden of demonstrating either the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325; Sweats Fashions, 833 F.2d at 1563; Commodities Recovery, 34 Fed. Cl. at 288. If the moving party makes that showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute exists with respect to a material fact by

pointing to evidence of record or proffering evidence establishing an essential element of its case upon which it bears the burden of proof. Celotex, 477 U.S. at 322; Commodities Recovery, 34 Fed. Cl. at 288.

II. The Jurisdiction Of Court Of Federal Claims Is Limited.

The Court of Federal Claims "is a court of limited jurisdiction and, absent congressional consent to entertain a claim against the United States, the court lacks jurisdiction over that claim." Appalachian Regional Healthcare, Inc. v. United States, 999 F.2d 1573, 1577 (Fed. Cir. 1993) (citing United States v. Testan, 424 U.S. 392, 399 (1976)). Congressional consent to suit, thereby waiving the Government's traditional immunity from suit, must be explicit and strictly construed. United States v. Mitchell, 445 U.S. 535, 538 (1980); Hart v. United States, 910 F.2d 815, 817 (Fed. Cir. 1990). The Owners have the burden of establishing that the trial court had jurisdiction to entertain their claims. Booth v. United States, 990 F.2d 617, 619 (Fed. Cir. 1993); Reynolds v. AAFES, 846 F.2d 746, 748 (Fed. Cir. 1988).

III. Contract Interpretation Standards

The "intention of the parties to a contract controls its interpretation." Firestone Tire & Rubber Co. v. United States, 195 Ct. Cl. 21, 30, 444 F.2d 547, 551 (1971). A court's "ultimate goal is always to give effect to the expressed or implied intentions of the contracting parties." Massachusetts Port Authority v. United States, 197 Ct. Cl. 721, 726, 456 F.2d 782, 784 (1972). A contract, thus, "is to be read from its four corners." Keco Industries, Inc. v. United States, 176 Ct. Cl. 983, 990, 364 F.2d 838, 842-43 (1966), cert. denied, 386 U.S. 958 (1967) (internal quotation marks omitted).

Interpretation of a contract "[b]egins with the plain language." McAbee Construction, Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996). The language of a contract "is given its ordinary and commonly accepted meaning unless it is shown that the parties intended otherwise." Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 390, 351 F.2d 972, 975 (1965)." "A contract term is unambiguous when there is only one reasonable interpretation." Grumman Data Systems Corp. v. Dalton, 88 F.3d 990, 997 (Fed. Cir. 1996). "When the contract language is unambiguous on its face, [the court's] inquiry ends, and the plain language of the contract controls." Hunt Construction Group, Inc. v. United States, 281 F.3d 1369, 1373 (Fed. Cir. 2002); accord Alaska Pulp & Lumber Co. v. Madigan, 2 F.3d 389, 392 (Fed. Cir. 1993) ("Where contract provisions are clear and unambiguous, they must be given their plain and ordinary meaning.").

A "contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts." Hunt, 281 F.3d at 1372. An interpretation "which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible." Hol-Gar, 169 Ct. Cl. at 395, 351 F.2d at 979; see also Unicon Management Corp. v. United States, 179 Ct. Cl. 534, 537, 375 F.2d 804, 806 (1967) (Where possible, it is preferable "to interpret the provisions of a contract as coordinate and not contradictory."). Twisted or strained, out-of-context analysis is to be eschewed. Mayflower Transit Co. v. United States, 162 Ct. Cl. 233, 237 (1963).

Contract language that tracks a statute should be interpreted in light of the interpretation by the agency responsible for administering the statute. United States v. City of Fulton, 475 U.S. 657, 672 (1986).

IV. The Court Lacks Jurisdiction To Entertain The Owners' Breach-Of-Contract Claims Based Upon HUD's Failure To Adjust Contract Rents Under The Owners' HAP Contracts On The HAP Contract Anniversary Dates For The Years 1995, 1996, And 1997, Inasmuch As Those Claims Accrued More Than Six Years Before This Suit Was Commenced.

In the first, third, and fourth counts of their complaints, the Owners allege that, "for the years 1995 through 2000" (in the case of Statesman II) and "for the years 1995 through 2002" (in the case of Beach House), HUD breached their HAP contracts (a) "in failing to grant automatic annual adjustments in the Contrat Rents," (b) "by failing to apply the appropriate Overall Limitation of 120 % of the sum of comparable rent and initial difference," and (c) "by its application of [HUD Notice 95-12's] 60-day time limit and the requirement of [the Owners] to obtain comparability studies in order to obtain annual rent adjustments[.]" See Statesman II Compl. ¶¶ 20, 25, 27; Beach House Compl. ¶¶ 20, 25, 27.

The statute of limitations applicable to this litigation provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2000). The statute of limitations "is an express limitation on the Tucker Act's waiver of sovereign immunity." Brown Park Estates–Fairfield Development Co. v. United States, 127 F.3d 1449, 1454 (Fed. Cir. 1997) (citing Hart, 910 F.2d at 817). A "claim first accrues within the meaning of the statute of limitations 'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.'" Brighton Village Associates v. United States,

52 F.3d 1056, 1060 (Fed. Cir. 1995) (quoting Kinsey v. United States, 852 F.2d 556, 557 (Fed. Cir. 1988)); accord Brown Park, 127 F.3d at 1455.

Insofar as the Owners allege that HUD breached their HAP contracts by not adjusting the contract rents on the contract anniversary dates in 1995, 1996, and 1997, those claims are barred by 28 U.S.C. § 2501. These annual rent adjustment claims accrued on the HAP contract anniversary dates in 1995, 1996, and 1997 when HUD did not make annual contract rent adjustments to which the Owners alleged they were entitled. As the Federal Circuit held in Brown Park, which also concerned rent adjustment claims under HAP contracts, "[a]t each of these specific points in time, [i.e., the contract anniversary dates], the government's liability was fixed and [the project owners] were entitled to institute an action." 127 F.3d at 1455; see also Park Village Apartments v. United States, 25 Cl. Ct. 729, 733 (1992) (statute of limitations barred claims based upon rent determinations that occurred more than six years before suit was filed).[10]

The Owners commenced the present litigation on May 11, 2004. Therefore, because the 1995, 1996, and 1997 anniversary dates of the Owners' HAP contracts fell more than six years before these suits were filed, the Owners' claims for those years are barred by 28 U.S.C. § 2501.

V. The Court Lacks Jurisdiction To Entertain The Owners' Breach-Of-Contract Claims Based Upon HUD's Publication, In 1995, 1996, 1997, And March 1998, Of Different Annual Contract Rent Adjustment Factors For "Turnover" And "Non-Turnover" Units, Inasmuch As Those Claims Accrued More Than Six Years Before This Suit Was Commenced.

In the second count of their complaints, the Owners allege that, "for the years 1995 through 2000" (in the case of Statesman II) and "for the years 1995 through 2002" (in the case

[10] The "continuing claim" doctrine does not apply to Section 8 rent adjustment claims. Brown Park, 127 F.3d at 1455.

of Beach House), HUD breached their HAP contracts "by reducing the AAAF by one percent for units occupied by the same tenant[.]" See Statesman II Compl. ¶ 23; Beach House Compl. ¶ 23.

Insofar as the Owners allege that HUD breached their HAP contracts by publishing, in 1995, 1996, 1997, and March 1995, different annual contract rent adjustment factors, for "turn-over" and "non-turnover" units, those claims also are barred by 28 U.S.C. § 2501, the six-year statute of limitations applicable to this litigation.

It is undisputed that HUD did not adjust the Owners' HAP contract rents after 1994. See DPFUF ¶¶ 6, 15. The Owners' claim in regard to annual adjustment factors, therefore, can only be that the mere publication of those factors breached their HAP contracts. These annual-adjustment-factor claims, thus, accrued upon the dates of publication of the annual adjustment factors in the Federal Register, which preceded the commencement of this litigation by more than six years. Accordingly, those claims are barred by 28 U.S.C. § 2501.

VI. HUD's Publication Of Different Annual Rent Adjustment Factors For "Turnover" And "Non-Turnover" Units Did Not Breach The Owners' HAP Contracts.

To recover for breach of contract, the Owners "must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." San Carlos Irrigation and Drainage District v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989); accord Trauma Service Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("[A] breach of contract is a failure to perform a contractual duty when it is due.").

HUD's issuance of different annual adjustment factors (AAFs) for "turnover" and "non-turnover" units, which the 1994 Act required, did not breach the Owners' HAP contracts because

the HAP contracts do not require that HUD use only one factor to adjust the contract rent for a given type of dwelling unit such as, for example, a one-bedroom apartment. The rent adjustment provision contained in the Owners' HAP contracts provided, in relevant part:

> Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register.

Statesman II and Beach House HAP Contracts, Part I, § 1.8b(1), Def. App. 64, 125. The wording of this provision is consistent with the Section 8 statute, which gives HUD the discretion to adjust contract rents "on the basis of a reasonable formula." 42 U.S.C. § 1437f(c)(2)(A) (2000).

During 1995-2002, HUD satisfied the requirements of section 1.8b(1) of the Owners' HAP contracts by determining AAFs annually and publishing those factors "and the basis for their determination" in the Federal Register. See DPFUF ¶¶ 17-24. Nothing in section 1.8b(1) prohibited HUD from determining and publishing different AAFs for "turnover" and "non-turnover" units. HUD's publication of separate AAFs for "turnover" and "non-turnover" units did not breach the Owners' HAP contracts. The second count contained in the Owners' complaints, accordingly, is without merit and it should be dismissed.

VII. The Failure Of HUD, After 1994, To Adjust Contract Rents Under The Owners' HAP Contracts Annually On The Contract Anniversary Dates Did Not Breach The HAP Contracts.

A. The Requirements Of The 1994 Amendments To The Section 8 Statute, As Implemented By HUD In Notice 95-12, Are Consistent With The Terms Of The Owners' HAP Contracts.

The Owners contend that their HAP contracts entitled them to receive "automatic" rent adjustments annually on the contract anniversary dates for the years 1995-2000, in the case of

Statesman II, and for the years 1995-2002, in the case of Beach House. See Statesman II Compl. ¶¶ 16, 17; Beach House Compl. ¶¶ 16, 17. According to the Owners, HUD's failure, after 1994, to adjust the HAP contract rents annually on the contract anniversary dates breached the HAP contracts. See Statesman II Compl. ¶¶ 18, 20; Beach House Compl. ¶¶ 18, 20. We disagree.

The HAP contracts do not give the Owners a right to AAF-based rent adjustments, annually or otherwise. The overall limitation clause contained in the rent adjustment provision of the Owners' HAP contracts, which prohibits rent adjustments that result in rents which are "materially different" than rents charged for comparable, unassisted units, is a mechanism that operates independently of "automatic annual adjustment factors," limiting both rent adjustments and rent payments under the HAP contracts. National Leased Housing, 105 F.3d at 1434. Thus, a project owner "cannot claim entitlement to formula-based rent adjustments that materially exceed market rents for comparable units." Alpine Ridge, 508 U.S. at 19; accord Federal Housing Partners IV v. Cisneros, 55 F.3d 362, 367-68 (8th Cir. 1995).

The Owners' HAP contracts provided for annual contract rent adjustments, as required by the Section 8 statute. See 42 U.S.C. § 1437f(c)(2)(A). Where, however, existing contract rents exceed applicable current, published fair market rents, the 1994 amendments to the Section 8 statute, implemented by HUD in HUD Notice 95-12, conditioned the receipt of an annual rent adjustment upon the Owners' demonstration, through a study of rents charged for comparable, unassisted units, "that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary." 42 U.S.C. § 1437f(c)(2)(A) (1994). And, where existing contract rents did not exceed applicable current, published fair market rents, the owner was still required to submit the tenant turnover data to

receive a AAF-adjusted rent. It was the Owners' repeated failure to provide the required rent comparability information and tenant turnover data to HUD that was responsible for any lost contract rent increases.[11]

The Owners allowed the HAP contract anniversary dates for the years 1995-2002 to pass without even so much as requesting an annual rent adjustment, much less providing HUD with the required rent comparability information and tenant turnover data that HUD needed to adjust contract rents. The Owners delayed ten years after 1994 – until April 2004 – in requesting those rent adjustments and providing the Government with rent comparability information and turnover data. The Owners, therefore, are not entitled to any rent increases for those years.

Contrary to the Owners' claim, see Statesman II Compl. ¶ 27; Beach House Compl. ¶ 27, neither the 1994 Act's amendment of the Section 8 statute nor HUD Notice 95-12 conflicts with the Owners' HAP contracts. The overall limitation upon rent adjustments contained in the HAP contracts affords HUD the "discretion to design and implement comparability studies as a reasonable means of effectuating [the overall limitation provision's] mandate." Alpine Ridge, 508 U.S. at 21. The HAP contracts "do not contain any provision limiting HUD to any particular method-

---

[11] The rents under the Statesman II HAP Contract that were effective on November 14, 1992, and which continued in effect until the HAP Contract was terminated on November 30, 2000, exceeded the relevant fair market rents every year from 1995 through 1998. See DPFUF ¶¶ 6, 25. Similarly, the rents charged for two-bedroom units under the Beach House HAP Contract that were effective on October 4, 1994, and which continued in effect until October 2002, exceeded the relevant fair market rents every year from 1995 through 2000 and the rents charged for three-bedroom units exceeded the relevant fair market rents every year from 1995 through 1998. See DPFUF ¶¶ 15, 25. However, rents charged for two-bedroom units under the Beach House HAP Contract did not exceed relevant fair market rent published October 1, 2001, and rents charged for three-bedroom units under the Beach House HAP Contract did not exceed the relevant fair market rents as of October 1, 1999. Id.

ology for making its comparability determination." National Leased Housing Ass'n v. United States, 22 Cl. Ct. 649, 659 (1991). Nor do the HAP contracts state who shall conduct rent comparability studies. The Owners' assumption that they are entitled to rent comparability studies performed by the Government, thus, is not rooted in the language of the HAP contracts.

The phrase "as determined by the Government" contained in the HAP contracts' overall limitation upon rent adjustments, fairly read, gives the Government the right to determine the process for applying the rent comparability restriction. The HAP contracts, moreover, imposed upon the Owners the duty to "furnish such information and reports pertinent to the Contract as reasonably may be required from time to time by the Government." See Statesman II and Beach House HAP Contracts, Part II, § 2.6a, Def. App. 68, 130. The requirement that the Owners provide rent comparability information to HUD is reasonable because that information is necessary for the Government to make the ultimate determination of whether an AAF-based rent adjustment would differ materially from rents charged for comparable, unassisted housing.

Consequently, the requirement in the 1994 Act's amendments that owners demonstrate that AAF-adjusted rents would not materially differ from the rents for comparable, unassisted units does not violate the Owners' HAP contracts.[12/] Pursuant to the 1994 amendments and HUD Notice 95-12, HUD continues to determine the validity of rent comparability studies and to evaluate whether, upon the basis of such studies, assisted rents materially differ from comparable,

---

[12] We note that, in Cuyahoga Metropolitan Housing Authority v. United States, 57 Fed. Cl. 751, 762 (2003), the court held otherwise. The Cuyahoga decision does not account for the Owners' contractual duty to provide the Government with "information and reports" discussed above. For that reason and the other reasons set forth in this brief, Cuyahoga is wrong and it should not be followed.

unassisted rents. The first, third, and fourth counts contained in the Owners' complaints, accordingly, are without merit and should be dismissed.

B. Assuming For The Sake Of Argument That The 1994 Amendments To The Section 8 Statute Conflict With The Owners' HAP Contracts, The Latter Are Nevertheless Subject To The 1994 Amendments.

Contracts with the Government are subject to later contrary legislation unless there is a clear promise otherwise in the contract itself. Franconia Associates v. United States, 44 Fed. Cl. 315, 316 n.1 (citing Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 52 (1986)), aff'd on other grounds, 240 F.3d 1358 (Fed. Cir. 2002), rev'd on other grounds, 536 U.S. 129 (2002). The Owners' HAP contracts provided for annual rent adjustments, where appropriate, on the contracts' anniversary dates. As discussed above, however, the 1994 Act amended the Section 8 statute to provide that where HAP contract rents exceeded fair market rents, HUD could adjust a contract rent only if "the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area . . . ." 42 U.S.C. § 1437f(c)(2)(A) (1994). Thus, even assuming for the sake of argument that the 1994 amendment to the Section 8 statute was inconsistent with the terms of the Owner's HAP contracts, the 1994 amendment relieved HUD of any obligation to increase contract rents on contract anniversary dates in cases where owners whose contract rents exceeded fair market rents did not timely demonstrate that adjusted rents would not exceed comparable, unassisted rents. But see Cuyahoga, 57 Fed. Cl. at 759-80 (holding that unmistakability doctrine does not apply to 1994 amendments to the Section 8 statute).

CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment should be granted and plaintiffs' first amended complaints should be dismissed.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(FAX)(202) 514-8624

Attorneys for Defendant

OF COUNSEL:

C. ALLEN VILLAFUERTE
Trial Attorney
Office of General Counsel
Department of Housing
and Urban Development
Washington, DC

NOVEMBER 5, 2004

**DEFENDANT'S APPENDIX**