CALABRESE, RACEK & MARKOS, INC.

16024 Lake Shore Boulevard
Cleveland, Ohio

## CERTIFICATE OF VALUE

I hereby certify that I have personally inspected the subject property being appraised, and the comparable properties; that the statements contained in this appraisal and upon which the opinions expressed herein are based, are true and correct to the best of my knowledge and belief, subject to limiting conditions herein set forth; and that to the best of my knowledge and belief no pertinent information has been overlooked in the appraisal of the following property:

**Lakeshore Village**
**16024 Lake Shore Boulevard**
**Cleveland, Cuyahoga County, Ohio**

The undersigned hereby certify that, to the best of my knowledge and belief; except as otherwise noted in this appraisal report:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
3. I have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.
4. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
5. My engagement in this assignment was not contingent upon developing or reporting predetermined results.
6. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
7. My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
8. I have made a personal inspection of the property that is the subject of this report.
9. No one other than the undersigned prepared the analyses, conclusions, and opinions concerning the real estate that are set forth in this appraisal report.
10. Disclosure of the content of this appraisal report is governed by the by-laws and regulations of the Appraisal Institute.
11. I certify that, to the best of my knowledge and belief, the reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

12. I certify that the use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13. As of the date of this report, I, Richard G. Racek, Jr., MAI, have completed the requirements of the continuing education program of the Appraisal Institute.

Respectfully submitted,

Richard G. Racek, Jr., MAI
Appraiser

:ra
6218
5392

## LIMITING CONDITIONS AND SPECIAL ASSUMPTIONS

(Unless specifically stated otherwise in this report.)

This rent survey covers the property as described within this report. The areas and dimensions as shown herein are assumed to be correct. The information identified in this report as being furnished by others is believed to be reliable, but no responsibility for its accuracy is assumed.

Responsible ownership, competent management, and a marketable title to the property are assumed, and that it is free and clear of all liens and encumbrances, unless otherwise stated. No responsibility is assumed for matters involving legal or title considerations.

The parcel dimensions and sketches in this report are included to assist the reader in visualizing the property. No land survey was ordered or made by the appraiser, and no responsibility is assumed for such matters. Any sketch or identified survey of the property included in this report is only for the purpose of assisting the reader.

The appraiser was not provided with any sub-surface reports in which to determine the stability of the soil, thus it is assumed that the subject soils and conditions are adequate to support the improvements.

No opinion is expressed as to the value of sub-surface oil, gas or mineral rights or whether the property is subject to surface entry for the exploration or removal of such materials.

The measurements of the improvements were taken by the appraiser and/or from architectural drawings furnished by the client. Additional maps and exhibits found in this report are for the readers reference purposes only. No guarantee as to the accuracy is expressed or implied.

The appraiser, by reason of this rent survey, is not required to give testimony or attendance in court, unless arrangements have been previously made therefore.

Possession of this report, or a copy thereof, does not carry with it the right of publication, nor may it be used for any purpose by anyone but the client for whom it was made without the consent of the appraisers and the client.

Neither all nor any part of the contents of this report shall be conveyed to the public through advertising, public relations, news, sales or other media, or publication without the written consent of the authors, particularly as to valuation conclusions, the identity of the appraiser or firm with which I am connected, or reference to any professional organization to which I am associated.

The Americans with Disabilities Act ("ADA") became effective January 26, 1992. No specific compliance survey and analysis of this property has been made to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this fact could have a negative effect upon the value of the property. As there is no direct evidence relating to this issue, possible non-compliance with the requirements of ADA was not considered in estimating the market rent for the property.

The market rent estimated in this report is based on the assumption that the property is not negatively affected by the existence of hazardous substances or detrimental environmental conditions. The appraiser is not expert in the identification of hazardous substances or detrimental environmental conditions. The appraiser's routine inspection of, and inquiries about the subject property did not develop any information that indicated any apparent significant hazardous substances or detrimental environmental conditions which would affect the property negatively. It is possible that tests and inspections made by a qualified hazardous substance and environmental expert would reveal the existence of materials and environmental conditions that are considered hazardous by the environmental protection agency on or around the property that would negatively affect the marketability of the individual units.

**Additional special assumptions incorporated into this analysis are delineated as follows:**

1. **That the real estate is free and clear of any materials or conditions that are considered hazardous by the Environmental Protection Agency. If it should be discovered that such materials or conditions exist, the appraiser reserves the right to revise the final rent conclusion.**

2. **All mechanicals are assumed to be in good working condition.**

3. **Various other assumptions, conditions, and projections as described herein.**

## MARKET RENT DEFINITION

Market rent, according to The Dictionary of Real Estate Appraisal, Third Edition, published by the Appraisal Institute is defined as follows:

> Market Rent: The rental income that a property would most probably command in the open market; indicated by the current rents paid and asked for comparable space as of the date of this appraisal.


L A K E
Cleveland Lakefront State Park Euclid Beach
Subject
EUCLID
Briardale Greens Golf Course
RICHMOND
HEIGHTS
Cuyahoga County Airport
EAST CLEVELAND
Forest Hills Park
CLEVELAND
HEIGHTS
EUCLID
SOUTH
LYNDHURST
Mayfield Country Club
Acacia Country Club
Oakwood Country Club
UNIVERSITY
Euclid Creek Reservation
MAYFIELD
CEDAR
LAKELAND
ST CLAIR
CHARDON
HIGHLAND
MONTICELLO
RIDGEBURY
WILSON
BISHOP
RICHMOND
GREEN RD
NOBLE
ANDERSON
WOODWORTH
SUPERIOR

CALABRESE, RACEK & MARKOS, INC.

16024 Lake Shore Boulevard
Cleveland, Ohio

# HUD RENT SURVEY
# OF
# A 108 Unit Apartment Building

**Owner:** Beach House Development Company
**Property Address:** 16024 Lake Shore Boulevard
**Map Ref.:** 1-C-2
**PPN:** 113-01-016

**City:** Cleveland: **County:** Cuyahoga **State:** Ohio **Zip Code:** 44110
**SMSA/Census Tract:** 1680/1172.01

**Client:** Associated Estates Management Company
**Client's Address:** 5025 Swetland Court, Cleveland, Ohio 44143-1467

**Sales History**

**Current Sale Price:** N/A **Current Sale Date:** N/A
**Previous Sale Date:** No recent arms-length transactions have occurred.
**Purpose of Analysis:** Estimate market rent.
**Intended Use of Survey:** External Reporting
**Effective Date of Survey:** January 1, 1998, January 1, 1999, January 1, 2000, January 1, 2001, January 1, 2002
**Date of Inspection:** March 18, 2002

## SCOPE OF WORK

The first section of this report will include a descriptive analysis of the general and specific neighborhood market area, the site, and improvements. This analysis will ascertain the market in which the subject units exists. The second portion of the report will include the analysis employed to estimate the market rent of the subject units within its market.

The data that was selected in developing this rent survey was considered the most pertinent available. The extent of the data verification was commensurate with what was believed necessary to complete this assignment. This typically included a review of courthouse records, actual documentation that is retained in our files, and an interview with a representative of each apartment complex surveyed.

## NEIGHBORHOOD ANALYSIS

| | | | | |
|---|---|---|---|---|
| **Location:** | Urban | | **Property Values:** | Stable to Increasing |
| **Built-up:** | 97% | | **Housing Demand Supply:** | In Balance |
| **Present Land Use:** | Single Family: | 67% | **Predominant Occupancy:** | Owner |
| | Two-Four Family: | 10% | **Change in Present Land Use:** | Not Likely |
| | Multi-Family | 15% | | |
| | Commercial: | 5% | | |
| | Vacant: | 3% | | |

**Typical Apartment**

**Type:** Walk-Up & Elevator **No. Stories:** 2-18 levels
**No. Units:** 6-300+ **Age:** 30-70 Years
**Condition:** Average **Rent Levels:** Stable to Rising **Rent Controls:** None
**Estimated Neighborhood Apartment Vacancy Rate:** 5%-10%

**Overall Rating**

| | | | |
|---|---|---|---|
| **Employment Stability:** | Average | **Property Compatibility:** | Average |
| **Adequacy Of Utilities:** | Average | **Protection From Detrimental Conditions:** | Average |
| **Convenience Of Schools:** | Average | **General Appearance Of Properties:** | Average |
| **Police And Fire Protection:** | Average | **Appeal to Market:** | Average |
| **Recreational Facilities:** | Average | | |

| Accessibility To | Distance | Access Or Convenience |
|---|---|---|
| **Public Transportation:** | Immediate | Good |
| **Employment Centers:** | 1/4 - 6 Miles | Average-Good |
| **Shopping Facilities:** | Immediate to 3 Miles | Average-Good |
| **Grammar Schools:** | 1/4 Mile | Average |
| **Freeway Access:** | 1/4 Mile | Good |

**Comments:** The subject property is located in the extreme northeast corner of the City of Cleveland. Lake Erie is immediately north of this district with the City of Euclid approximately one mile northeast of the subject. This general location is residential in nature and is primarily improved with older, two story, frame colonial style dwellings. Some of these dwellings have been converted to multi-family use. Along the primary roadways such as Lake Shore Boulevard. middle-age to older, two to three story, masonry, apartment/retail buildings exist. Generally, the improvements within the area receive average to above average maintenance and care as is reflected in their general good appearance. The area benefits from good access to neighborhood shopping and services, as well as to recreational facilities found along the south shore of Lake Erie.

Additionally, access to the interstate freeway system is found within the neighborhood. The area had experienced a decline in popularity for many years, however, this trend has stabilized and it is thought to have reversed itself as is evidenced by slightly increasing property values and a decline in vacancy and credit loss factors. All things considered, the subject neighborhood should remain a desirable apartment rental area into the foreseeable future.

The subject property is considered to be a unique property for the neighborhood. Its uniqueness is due to the fact that it is a 108 unit, garden apartment building which was constructed in the early1980's and is located in an older established area of Cleveland. As is indicated above, the typical apartment building consists of an older, smaller, walk-up or garden style complex. Given the newer age of the improvements, it is concluded that the market area comprises the eastern portion of the City of Cleveland, the City of Euclid and possibly even extending as far south as the City of Richmond Heights.

**SITE ANALYSIS**

**Dimensions:** Irregular **Area:** 279,655 SF or 6.42± acres
**Topography:** Generally level.
**View Amenity:** Average - Municipal, multi family residential and commercial.
**Drainage/Flood Conditions:** None noted at the time of inspection.
**Is The Property Located In A HUD Identified Special Flood Area?** No: Zone C (CP#390104 0005 B, August 1, 1978
**Zoning:** Local Retail Business.
**Present Improvements:** Conforming use of the land.
**Highest And Best Use:** Present multi-family use.

**Off-Site Improvements**

**Electricity:** Public **Storm Sewer:** Yes
**Gas:** Public **Curb/Gutter:** Yes
**Water:** Public **Sidewalk:** Yes Concrete
**Sanitary Sewer:** Public
**Street:** Concrete Paved
**Ingress And Egress (Adequacy):** Adequate.

**Comments: (Including Any Easements Or Encroachments Or Any Nonconforming Use(s) Or Present Improvements)**
There are no apparent adverse easements or encroachments associated with the subject property. However, normal utility and driveway easements with adjoining property owners are assumed to exist.

**DESCRIPTION OF IMPROVEMENTS**

**Type:** Garden **No. Of Stories:** 3 **No. Of Bldgs.:** 5
**Bldg. Size:** 101,145± sq.ft. **Unit Mix:** 102 two bedroom; 6 three bedroom
**No. Of Rooms:** 552 **No. Of Baths:** 108 full, 6 half **Year Built:** 1982
**Basic Structural System:** Masonry & Frame **Exterior Walls:** Brick and dryvit
**Windows:** Metal frame with insulated glass **Roof:** Asphalt shingle.
**Interior Walls:** Drywall **Floors:** Carpet & tile
**Bath Floors & Walls:** Tile and drywall. **Adequacy Of Soundproofing:** Average
**Heating:** Individual Johnson units **Fuel:** Gas
**Condition:** Average **Air Conditioning:** Central **Elevator(s):** None
**Security Features:** Locking doors and windows.
**Kitchen Cabinets, Drawers And Counter Space:** Average to Fair **Condition:** Average to Fair

**Appliances**

**Range/Oven:** 108 **Refrigerator:** 108 **Dishwasher:** 0 **Disposal:** 108
**Plumbing Fixtures:** Four fixtures per two bedroom unit and six fixtures per three bedroom unit.
**Electrical Service:** Adequate considering age.
**Recreational Facilities:** None.
**Parking Facilities:** Adequate open parking.
**Effective Age:** 25-30 Years **Estimated Remaining Economic Life:** 10-15 Years

**Overall Property Ratings**

| | |
|---|---|
| **General Appearance of Property:** | Average to Fair |
| **Quality Of Construction (Materials And Finish):** | Average |
| **Condition Of Improvements:** | Average to Fair |
| **Room Size And Layout:** | Average |
| **Closets And Storage:** | Average |
| **Plumbing-Adequacy And Condition:** | Average |
| **Electrical-Adequacy And Condition:** | Average |
| **Amenities And Parking Facilities:** | Average |
| **Appeal To Market:** | Average to Fair |

**Comments: (Special Features, Functional Or Physical Inadequacies, Repairs Needed, Modernization, Etc.)**
The subject property consists of a five building apartment complex which has been adequately maintained since it was constructed. The property contains a total of 108 suites consisting of 102 two bedroom apartments and 6 three bedroom apartments. The individual units are accessed off of common hallways. Each of these units are typically finished with carpeted and tile floors, painted drywall walls and ceilings. Each of the suites has at least one full bathroom and a kitchen with the three bedroom units also having an additional half bath. The units are heated by individual Johnson units which also provide central air conditioning. Site improvements include concrete paved drive and parking areas, as well as lawn and general landscaping.

As was indicated previously, the subject property has been adequately maintained since the improvements were constructed. Each of the units inspected were considered to be in average to fair overall condition. Items of deferred maintenance included holes in the exterior dryvit walls, as well as the fact that the windows are nearing the end of their economic lives.

**HIGHEST AND BEST USE**

Highest and best use is a fundamental concept in the valuation of real estate which is defined as follows:

> "The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability."
>
> SOURCE: The Dictionary of Real Estate Appraisal. - 3rd edition. Appraisal Institute, 1993.

The highest and best use of the land, considered separately **as if vacant** and available for development, may differ from the highest and best use of the property **as improved** with existing building improvements. Therefore, for improved properties, a separate analysis of highest and best use must be developed for each of the following:

1. The highest and best use of the site as **if vacant**.
2. The highest and best use of the site as **improved**.

The only exception in valuing land as if vacant is when the site has been developed to an intensity that is higher than would be allowed under the current zoning. If the remaining economic life of the building improvements is sufficient, the land is valued according to the intensity of development. By doing so, an economic balance is maintained between the agents of production (land, labor, capital, and coordination) which will result in a more accurate value indication.

Factors that must be taken into consideration in determining the highest and best use of the property include the following:

1. Existing land use regulations.
2. Probable modifications to the existing land use regulations.
3. Economic demand.
4. Physical adaptability of the property.
5. Neighborhood trends.
6. Optimal use of the property.

Subject Review

As was indicated previously, the subject property is an early 1980's vintage apartment complex consisting of a total of 108 suites. The units consist of 102 two bedroom suites and 6 three bedroom suites. The improvements on the property are currently in average to fair overall condition. The building improvements are considered to comprise a legal, conforming use of the land according to the City of Cleveland Zoning Department. Demand exists for such facilities as is evidenced by stable occupancy levels within the general subject market area.

Highest and Best Use as Vacant

The highest and best use of the subject site, if vacant, is considered to be for a multi-family development.

Highest and Best Use as Improved

The highest and best use of the subject site, as improved, is considered to be for its continued multi-family use. Inasmuch as the value of the subject property is significantly greater than the value of the subject site if vacant, as well as the fact that there is no reason to raze the existing improvements, it is therefore concluded that the highest and best use of the subject property is its current multi-family use.

METHOD OF ANALYSIS

As was indicated previously, the purpose of this report is to estimate the current market rent for each of the unit types located within the subject property which are participating in a HUD rent subsidy program. Provided within the addendum of this report is the U.S. Department of Housing and Urban Development (HUD) Form HUD-92273-S8 (7/01) which was used in analyzing the rents for the subject units. A total of five apartment projects located within the subject property's market area were analyzed. Adjustments were made due to the variance in the size of the individual units, the presence of balconies and patios, utility expense responsibilities, overall condition of the properties, as well as various other amenities and services which are provided. Plus adjustments were made in cases where features of the comparable property were deemed to be inferior to that of the subject and conversely minus adjustments were made when features of the comparable properties were determined to be superior to that of the subject property. As indicated on the following rent comparability grids, various adjustments were made to each of the properties surveyed. The following paragraphs will briefly describe why each of the adjustments were made.

Line Item No. 8 - Condition/Street Appeal: The five comparable properties which were surveyed are located in either Euclid or Richmond Heights. While the buildings were constructed in the 1960's, each of the complexes were considered to be in superior condition for which downward adjustments were made. Comparable No. 1 was also located in a more desirable secluded area which had greater street appeal for which an additional adjustment was made.

Line Item No. 12 - Number of Baths: When comparing the two bedroom units in the subject property to each of the comparable properties, Comparable No. 1 had an additional half bath. Therefore, a $10.00 downward adjustment was made. The remaining four comparable properties all had one bathroom which was similar to the subject. When comparing the three bedroom units to the properties that were surveyed, each complex had one and one-half baths with the exception of Comparable No. 4 which had two full baths. Therefore, a $15.00 downward adjustment was made to this property.

Line Item No. 13 - Unit Interior Square Feet: Adjustments were made to each of the comparable properties when the square footage of the suites differed from the subject property. The difference in square footage between each of the comparables and the subject was multiplied by approximately $0.15 per square foot in order to arrive at an adjustment. Thus, each comparable has a somewhat different adjustment depending on the unit size.

Line Item No. 14 - Balcony/Patio: Each of the properties surveyed with the exception of Comparable No. 5 provided either a balcony or a patio. This is superior to the subject since the subject does not have either a balcony or a patio. Thus, a $5.00 downward adjustment was made to each of the properties with the exception of Comparable No. 5 which is similar to the subject.

Line Item No. 17 - Microwave/Dishwasher: After surveying the five complexes in order to estimate rental rates for the subject suites, it was indicated that each complex with the exception of Comparable No. 4 provided dishwashers within their suites. Therefore, a $10.00 downward adjustment was made to these comparable complexes. Since Comparable No. 4 is similar to the subject, no adjustment was needed.

Line Item No. 18 - Washer/Dryer: Each of the suites within the subject property has a washer/dryer hook-up, as well as central laundry facilities in the buildings. This is superior to each of the comparable properties surveyed for the two bedroom units which only had central laundry facilities within the buildings. Therefore, a $5.00 upward adjustment was made. A $5.00 upward adjustment was also made to each of the three bedroom suites surveyed with the exception of Comparable No. 2 in that this property also had washer/dryer hook-ups in the suite.

Line Item No. 20 - Window Coverings: Of the five properties surveyed, only Comparable Nos. 1, 3 and 5 provided window blinds within the suites. This superior characteristic requires a $5.00 downward adjustment.

Line Item No. 24 - Parking: The subject property does not have any garage parking available for its tenants. While the other apartment complexes may have garages available for an extra fee, Comparable No. 1 provided one garage space in the rental rate of the suite. Thus, a $25.00 downward adjustment was made.

Line Item No. 25 - Extra Storage: Based upon the five properties surveyed, it was indicated that each property with the exception of Comparable No. 1 provided storage units for the tenants. Therefore, a $5.00 downward adjustment was made to each of these properties.

Line Item No. 27 - Clubhouse/Meeting Rooms: Each of the properties surveyed provided some type of clubhouse or meeting area for the tenants. This is superior to the subject in that no such amenity was provided within the subject buildings. Therefore, a $5.00 downward adjustment was made.

Line Item No. 28 - Pool/Recreation Areas: The five properties surveyed provided some type of pool or recreation areas for their tenants. Comparable Nos. 1, 3, 4 and 5 had far superior amenities for which a $25.00 downward adjustment was made. Comparable No. 2 was only somewhat superior to the subject for which a $10.00 downward adjustment was made.

<u>Line Item No. 33 - Heat:</u> Since the tenants within the subject property receive a utility allowance, it has been assumed that the heat is included as part of the rental payment. Therefore, when comparing the subject property to the five properties surveyed, only Comparable No. 1 required that the tenant pay for their own heat. Therefore, a $20.00 upward adjustment was made for a two bedroom suite for the years 1998 and 1999. This adjustment was increased to $25.00 for the remaining three years to account for inflationary trends. When comparing the three bedroom units in the subject property to the competition, Comparable Nos. 1 and 2 required that their tenants pay for the heat expense. Therefore, a $25.00 upward adjustment was made for the years of 1998 and 1999. This expense was increased to $30.00 for the last three years to account for inflationary trends.

<u>Line Item No. 34 - Cooling:</u> As mentioned previously, the tenants within the subject property receive a utility allowance which also covers the use of electric. However, in each of the apartment complexes surveyed, the cost of electricity was the responsibility of the tenant. While it is difficult to accurately estimate the specific dollar adjustment given the fact that different tenants run their air conditioning at different intervals which would ultimately effect their cost of electricity used, a $5.00 upward adjustment was made for the two bedroom units and $10.00 was utilized as the upward adjustment for the three bedroom units.

<u>Line Item No. 35 - Cooking:</u> This category is also difficult to quantify since some tenants cook more or less than others. However, for the purpose of this analysis, a $5.00 plus adjustment has been made to each of the properties surveyed to account for the fact that tenants are responsible for this expense category. This upward adjustment has been applied to both the two and three bedroom units of the properties surveyed.

<u>Line Item No. 36 - Hot Water:</u> As indicated by the rent comparability grid provided in the Addendum, with the exception of Comparable No. 1, each of the two bedroom units surveyed provided hot water to their tenants. Rent Comparable No. 1 had individual gas fired hot water heaters. Therefore, a $10.00 upward adjustment was made to the two bedroom apartment units. When surveying the three bedroom units within these complexes, Comparable Nos. 1 and 2 required that the tenants pay for their own hot water usage. Therefore, a $15.00 upward adjustment was made to these three bedroom suites.

<u>Line Item No. 37 - Other Electric:</u> As indicated previously, the electricity expense within the subject property is included in the utility allowance. However, each of the complexes surveyed required that their tenants pay for their own electric usage. Therefore, a $20.00 upward adjustment was made for each of the two bedroom units surveyed for the years of 1998 and 1999. This adjustment was increased to $25.00 per month for the following three years to account for inflationary trends. Wh[illegible] surveying the three bedroom units, again, the tenants were responsible for their own electricity usage. Theref[illegible] upward adjustment was made for the years of 1998 and 1999 and then increased to $30.00 per month in the fol[illegible] years.

<u>Line Item No. 38 - Cold Water/Sewer:</u> Comparable No. 1 was the only property surveyed which required that the tenants pay for their own water and sewer usage. It is estimated that a $20.00 upward adjustment is needed for a two bedroom unit and a $25.00 upward adjustment is needed for a three bedroom unit.

After a thorough inspection of the subject property, it appears that the condition and location of the subject falls within the range that has been established by competing conventional apartment buildings in the area. Thus, the rental rates for the suites within the subject property should be within the range of rental rates established by the market surveys. Therefore, it is estimated that all 102, two bedroom suites within the subject property should have a contract unit rent of $500.00 per month, as of January 1, 1998. This rental rate would include all utilities except telephone and cable television. The contract rent potential of the subject property is estimated by multiplying the contract unit rent per month by the total number of two bedroom apartment units within the complex. Thus, the monthly contract rent potential of the two bedroom apartment units, as of January 1, 1998 is developed as follows:

$500.00 x 102 units = $51,000

Based upon the market rent survey which is provided within the addendum of this report, it is estimated that the six, three bedroom apartment units within the subject property should have a contract rent of $620.00 per month including all utilities except telephone and cable television, as of January 1, 1998. Thus, the monthly contract rent potential of the three bedroom apartments is developed as follows:

$620.00 x 6 units = $3,720

Based upon the market rent survey which is provided within the addendum of this report, it is estimated that the 102, two bedroom apartment units within the subject property should have a contract rent of $510.00 per month including all utilities except telephone and cable television, as of January 1, 1999. Thus, the monthly contract rent potential of the two bedroom apartments is developed as follows:

$510.00 x 102 units = $52,020