**IN THE UNITED STATES**

**FOR THE COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STATESMAN II APARTMENTS, INC.,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **THE UNITED STATES OF AMERICA,** <br><br> **Defendant.** | ) | **CASE NO. 04-805C and No. 04-806C** <br><br> **JUDGE LETTOW** <br><br> **PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS** |

A. Statesman II Apartments, Inc.

1. Plaintiff, Statesman II Apartments, Inc. (Statesman II), owns Statesman Apartments, a low-income rental housing project located at 16705-16825 Van Aken Boulevard, Shaker Heights, Ohio, having acquired that property on or about November 18, 1993, from Statesman Apartments Development Company II, an Ohio limited partnership (the Partnership). Statesman II Compl. ¶ 4; Statesman II Answer ¶ 4. Statesman Apartments consists of 20 one-bedroom apartments and 27 two-bedroom apartments. Id.

*Plaintiff agrees.*

2. In 1980, the Partnership, Statesman II's predecessor-in-interest, and the United States, acting through the Department of Housing and Urban Development (HUD), entered a Housing Assistance Payments Contract with respect to Statesman Apartments (the Statesman II

HAP Contract). Statesman II Compl. ¶ 6 (first sentence); Statesman II Answer ¶ 6 (first sentence), Def. App. 61-73. The Statesman II HAP Contract, which was executed in stages beginning with Stage 1 effective on November 14, 1980, applied to all 47 apartments of which Statesman Apartment consists. Statesman II HAP Contract, "Execution of Contract with respect to Contract Units Completed and Accepted in Stages", Stage 1, Stage 2, Stage 3, and Exhibit A, Def. App. 66, 70. Statesman Apartments was developed by the Partnership under the Section 8 Housing Assistance Payments Program for Substantial Rehabilitation, the regulations for which were codified initially at 24 C.F.R. Part 881 (1979).

*Plaintiff agrees, except that said regulations were a modification of regulations initially issued in 1974.*

3. The Statesman II HAP Contract was for an initial term of five years, renewable for three additional terms of five years each at the owner's option, for a maximum of 20 years. See Statesman II HAP Contract, Part I, §§ 1.1c, 1.4a (Alternative 2), Def. App. 61, 62. The anniversary date of the Statesman II HAP Contract was November 14. The Statesman II HAP Contract was terminated on November 30, 2000. Statesman II Compl. ¶ 6 (fifth sentence); Statesman II Answer ¶ 6.

*Plaintiff agrees.*

4. The initial monthly contract rents under the Statesman II HAP Contract were $370 for each of the one-bedroom apartments and $424 for each of the two-bedroom apartments. Statesman II Compl. ¶ 8 (first sentence); Statesman II Answer ¶ 8; Statesman II HAP Contract, Exhibit A, Def. App. 70.

*Plaintiff agrees.*

5. With respect to rent adjustments, section 1.8 of Part I of the Statesman II HAP Contract provided, in part:

> b. <u>Automatic Annual Adjustments</u>
>
> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.
>
> * * * * *
>
> d. <u>Overall Limitation</u>. Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

Def. App. 64.

*Plaintiff agrees.*

6. The last rent adjustment received by Statesman II for Statesman Apartments under the Statesman II HAP Contract was effective on November 14, 1992. As of that date and during the period from November 14, 1992, to November 30, 2000, when the Statesman II HAP Contract was terminated, the monthly contract rents were $586 for one-bedroom apartments and

$671 for two-bedroom apartments. See Rent Schedule for Statesman Apartments effective on November 14, 1992, Def. App. 74.

*Plaintiff agrees.*

7. On March 7, 1995, HUD issued Notice H 95-12 (HUD), concerning "Annual Adjustment Factor Rent Increase Requirements Pursuant to the Housing Appropriations Act of 1995" (HUD Notice 95-12), which implemented the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298 (the 1994 Act). See Def. App. 1-24. HUD Notice 95-12 recited that, "[a]mong the many measures developed by the [1994 Act], emphasis was placed on utilizing the mechanism in the Section 8 contract language which permits an analysis on the reasonableness of the [annual adjustment factor (AAF)] formula as it is applied to each project unit type." Def. App. 1. HUD Notice 95-12 announced that "review of AAF under the Overall Limitation clause of the HAP Contract would apply to Section 8 New Construction and Substantial Rehabilitation Properties where Section 8 rent levels for a unit type presently exceed the published Existing Housing Fair Market Rents (FMR) . . . ." Id.

*Plaintiff agrees, but notes that HUD Notice 95-12 contains additional pertinent language not quoted by Defendant.*

8. HUD Notice 95-12 provided that, where existing HAP contract rents *exceeded* the applicable published, current fair market rents for the area, the Section 8 project owner would be required to submit to HUD a study of the rents charged for comparable, unassisted units. See Def. App. 3. If the owner's study indicated that comparable, unassisted rents exceeded the contract rent by more than five percent, HUD would increase contract rents to the lesser of (1) contract rents adjusted according to the applicable published annual adjustment factor or (2) the

comparable, unassisted rent plus any "initial difference" to be preserved in rent adjustments. See Def. App. 4. Where the owner provided this information at least 60 days before the HAP contract anniversary date, HUD would increase the contracts rents effective 60 days after the owner submitted the information. See Def. App. 3. If, however, the owner did not provide the rent comparability information by the *next* contract anniversary date, HUD would not increase contract rents for the preceding year. Id.

HUD Notice 95-12 provided that, where existing HAP contract rents *did not exceed* the applicable current, published fair market rents, the contract rents would be adjusted using the "appropriate AAF." Def. App. 9. In order to receive a rent adjustment, however, the owner was required to submit to HUD "the number of units in which turnover occurred since the last HAP contract anniversary date." Id. If the owner failed to submit the tenant turnover data at least 60 days before the contract anniversary date, the contract rents would not be adjusted on the contract anniversary date, but would "go into effect 60 days after" HUD's receipt of the required turnover data. Id. If, however, the owner failed to submit the turnover information by the *next* HAP contract anniversary, HUD would not increase contract rents for the preceding year. Id.

*Plaintiff agrees that these are some of the requirements of HUD Notice 95-12.*

9. After 1992, Statesman II did not submit any rent comparability information to HUD or request annual rent adjustments under the Statesman II HAP Contract until April 2, 2004, at which time, through its attorney, Statesman II submitted to HUD a request for "automatic adjustment contract rent increases" for Statesman Apartments for the years 1998 through November 30, 2002. Statesman II Compl. ¶ 28 (first sentence); Statesman II Answer ¶ 28; April 2, 2004 letter from Fred J. Livingstone, Esq., Taft, Stettinius & Hollister LLP, to Dennis G. Morton, Director, Multifamily Housing Program Center, Cleveland HUD Office, Def.

App. 76-77. That request was accompanied by information concerning comparable, unassisted rents. See Def. App. 85- 120. On April 23, 2004, HUD denied the requested rent adjustments. Statesman II Compl. ¶ 28 (second sentence); Statesman II Answer ¶ 28; April 2, 2004 letter from Dennis G. Morton, Director, Multifamily Housing Program Center, Cleveland HUD Office, to Fred J. Livingstone, Esq., Taft, Stettinius & Hollister LLP, to Def. App. 121.

*Plaintiff agrees.*

B. Beach House Development Company

10. Plaintiff, Beach House Development Company (Beach House), owns Lakeshore Village, a low-income rental housing project located at 16151 Lake Shore Boulevard, Cleveland, Ohio. Beach House Compl. ¶ 4; Beach House Answer ¶ 4. Lakeshore Village consists of 102 two-bedroom apartments and six three-bedroom apartments. Id.

*Plaintiff agrees.*

11. In October 1982, Beach House and the United States, acting through HUD, entered a Housing Assistance Payments Contract with respect to Lakeshore Village (Beach House HAP Contract). Beach House Compl. ¶ 6 (first sentence); Beach House Answer ¶ 6 (first sentence), Def. App. 122-145. The Beach House HAP Contract, which was executed in stages beginning with Stage 1 effective on October 4, 1982, covered all 108 apartments of which Lakeshore Village consists. Beach House HAP Contract, "Execution of Contract with respect to Contract Units Completed and Accepted in Stages", Stage 1, Stage 2, Stage 3, and Exhibit A, Def. App. 128, 133. Lakeshore Village was developed by Beach House under the Section 8 Housing Assistance Payments Program for New Construction, the regulations for which were codified initially at 24 C.F.R. Part 880 (1979).

*Plaintiff notes that the Beach House HAP Contract was executed in only two stages, as signified by the signature page at Def. App. 128. Otherwise, Plaintiff agrees except that said regulations were a modification of regulations initially issued in 1974.*

12. The Beach House HAP Contract was for an initial term of five years, renewable for three additional terms of five years each at the owner's option, for a maximum of 20 years. See Beach House HAP Contract, Part I, §§ 1.1b, 1.1c, 1.1d, 1.4a (Alternative 1), Def. App. 122, 123. The anniversary date of the Beach House HAP Contract was October 4.

*Plaintiff agrees.*

13. The initial monthly contract rents under the Beach House HAP Contract were $474 for each of the two-bedroom apartments and $537 for each of the three-bedroom apartments. Beach House Compl. ¶ 8 (first sentence); Beach House Answer ¶ 8; Beach House HAP Contract,Exhibit A, Def. App. 133.

*Plaintiff agrees.*

14. With respect to rent adjustments, section 1.8 of Part I of the Statesman II HAP Contract provided, in part:

> b. <u>Automatic Annual Adjustments</u>
>
> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents

be less than the Contract Rents on the effective date of the Contract.

* * * * *

d. Overall Limitation. Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

Def. App. 125.

*Plaintiff agrees, on the assumption that this paragraph actually refers to the Beach House HAP Contract, rather than the Statesman II HAP Contract.*

15. The last rent adjustment for Lakeshore Village under the Beach House HAP Contract was effective on October 4, 1994. From that date through September 2002, the monthly contract rents for Lakeshore Village were $662 for two-bedroom apartments and $779 for three-bedroom apartments. See Rent Schedules for Lakeshore Village effective on October 4, 1994, Def. App. 146-149.

*Plaintiff agrees.*

16. After 1994, Beach House did not submit any rent comparability information to HUD or request annual rent adjustments under the Beach House HAP Contract until April 2, 2004, at which time, through its attorney, Beach House submitted to HUD a request for "automatic adjustment contract rent increases" for Lakeshore Village for the years 1998 through September 30, 2002 . . . ." Beach House ¶ 28 (first sentence); Beach House Answer ¶ 28; April 2, 2004 letter from Fred J. Livingstone, Esq., Taft, Stettinius & Hollister LLP, to Dennis G. Morton, Director, Multifamily Housing Program Center, Cleveland HUD Office, Def. App. 150-

151. That request was accompanied by information concerning com-parable, unassisted rents. See Def. App. 159- 194. On April 23, 2004, HUD denied the requested rent adjustments. Beach House Compl. ¶ 28 (second sentence); Beach House Answer ¶ 28; April 2, 2004 letter from Dennis G. Morton, Director, Multifamily Housing Program Center, Cleveland HUD Office, to Fred J. Livingstone, Esq., Taft, Stettinius & Hollister LLP, to Def. App. 121.

*Plaintiff agrees.*

C. Annual Adjustment Factors

17. Annual adjustment factors (AAFs) for contract rents under the Section 8 Housing Assistance Payments Program (Section 8 HAP Program) were published in the Federal Register on March 7, 1995. See 60 Fed. Reg. 12594 (3/7/95), Def. App. 196. Statesman Apartments and Lakeshore Village are located in the PMSA Cleveland-Lorain-Elyria, Ohio area. For a "turnover unit," the published annual adjustment factor (AAF) for that area (highest cost utility included) was 1.028 (Table 1). 60 Fed. Reg. 12596, Def. App. 198. For a "non-turnover" unit, the AAF for that area (highest cost utility included) was 1.018 (Table 2). 60 Fed. Reg. 12599, Def. App. 199.

*Plaintiff agrees.*

18. AAFs for contract rents under the Section 8 HAP Program were published in the Federal Register on November 3, 1995. See 60 Fed. Reg. 55934 (11/3/95), Def. App. 201. For a "turnover unit," the published AAF for the PMSA Cleveland-Lorain-Elyria, Ohio area (highest cost utility included) was 1.018 (Table 1). 60 Fed. Reg. 55937, Def. App. 204. For a "non-turnover unit," the AAF for that area (highest cost utility included) was 1.008 (Table 2). 60 Fed. Reg. 55940, Def. App. 205.

*Plaintiff agrees.*

19. AAFs for contract rents under the Section 8 HAP Program for fiscal year 1997 were published in the Federal Register on December 16, 1996. See 61 Fed. Reg. 66132 (12/16/96), Def. App. 207. For a "turnover unit," the published AAF for the PMSA Cleveland-Lorain-Elyria, Ohio area (highest cost utility included) was 1.023 (Table 1). 61 Fed. Reg. 66135, Def. App. 210. For a "non-turnover unit," the AAF for that area (highest cost utility included) was 1.013 (Table 2). 61 Fed. Reg. 66138, Def. App. 211.

*Plaintiff agrees.*

20. AAFs for contract rents under the Section 8 HAP Program for fiscal year 1998 were published in the Federal Register on March 11, 1998. See 63 Fed. Reg. 11956 (3/11/98), Def. App. 213. For a "turnover unit," the published AAF for the PMSA Cleveland-Lorain-Elyria, Ohio area (highest cost utility included) was 1.030 (Table 1). 63 Fed. Reg. 11959, Def. App. 216. For a "non-turnover unit," the AAF for that area (highest cost utility included) was 1.020 (Table 2). 63 Fed. Reg. 11962, Def. App. 217.

*Plaintiff agrees.*

21. AAFs for contract rents under the Section 8 HAP Program for fiscal year 1999 were published in the Federal Register on September 24, 1998. See 63 Fed. Reg. 51224 (9/24/98), Def. App. 219. For a "turnover unit," the published AAF for the PMSA Cleveland-Lorain-Elyria, Ohio area (highest cost utility included) was 1.034 (Table 1). 63 Fed. Reg. 51227, Def. App. 222. For a "non-turnover unit," the AAF for that area (highest cost utility included) was 1.024 (Table 2). 63 Fed. Reg. at 51230, Def. App. 223.

*Plaintiff agrees.*

22. AAFs for contract rents under the Section 8 HAP Program for fiscal year 2000 were published in the Federal Register on December 28, 1999. See 64 Fed. Reg. 72730 (12/28/99), Def. App. 225. For a "turnover unit," the published AAF for the PMSA Cleveland-Lorain-Elyria, Ohio area (highest cost utility included) was 1.043 (Table 1). 64 Fed. Reg. 72733, Def. App. 228. For a "non-turnover unit," the AAF for that area (highest cost utility included) was 1.033 (Table 2). 64 Fed. Reg. 72736, Def. App. 229.

*Plaintiff agrees.*

23. AAFs for contract rents under the Section 8 HAP Program for fiscal year 2001 were published in the Federal Register on November 7, 2000. See 65 Fed. Reg. 66888 (11/7/00), Def. App. 231. For a "turnover unit," the published AAF for the PMSA Cleveland-Lorain-Elyria, Ohio area (highest cost utility included) was 1.013 (Table 1). 65 Fed. Reg. 66891, Def. App. 234. For a "non-turnover unit," the AAF for that area (highest cost utility included) was 1.003 (Table 2). 65 Fed. Reg. 66894, Def. App. 235.

*Plaintiff agrees.*

24. AAFs for contract rents under the Section 8 HAP Program for fiscal year 2002 were published in the Federal Register on November 26, 2001. See 66 Fed. Reg. 59052 (11/26/01), Def. App. 237. For a "turnover unit," the published AAF for the PMSA Cleveland-Lorain-Elyria,Ohio area (highest cost utility included) was 1.057 (Table 1). 66 Fed. Reg. 59055, Def. App.240. For a "non-turnover unit," the AAF for that area (highest cost utility included) was 1.047(Table 2). 66 Fed. Reg. 59058, Def. App. 241.

*Plaintiff agrees.*

D. Fair Market Rents

25. Fair market rents published by HUD in the Federal Register during 1995-2002 for the PMSA Cleveland-Lorain-Elyria, Ohio area for one-bedroom, two-bedroom, and three-bedroom units were as follows:

| | 1-BR | 2-BR | 3-BR |
|---|---|---|---|
| August 1995 | $405 | $501 | $637 |
| September 1995 | $412 | $510 | $648 |
| February 1996 | $412 | $510 | $648 |
| September 1996 | $422 | $522 | $663 |
| September 1997 | $434 | $537 | $683 |
| October 1998 | $480 | $594 | $755 |
| October 1999 | $500 | $619 | $787 |
| September 2000 | $521 | $645 | $820 |
| October 2001 | $587 | $726 | $924 |

Def. App. 242-259.

*Plaintiff agrees.*

Respectfully submitted,

/s/ *Fred J. Livingstone*
Fred J. Livingstone (0009528)
Taft, Stettinius & Hollister LLP
3500 BP Tower
200 Public Square
Cleveland, OH 44114-2302
(216) 241-2838
(216) 241-3707 - Fax
flivingstone@taftlaw.com
Attorney for Plaintiff
Statesman II Apartments, Inc.,

Of Counsel:
Mark J. Valponi
Majeed G. Makhlouf
Taft, Stettinius & Hollister LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838
(216) 241-3707 – Fax

Dated: January 7, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that on January 7th, 2005 I electronically filed a copy of the foregoing *Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Facts* with the Clerk of the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

/s/ *Fred J. Livingstone*
Fred J. Livingstone