IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **STATESMAN II APARTMENTS, INC.,** | ) | CASE NOS. 04-805C and No. 04-806C |
| | ) | (Consolidated) |
| Plaintiff, | ) | |
| | ) | JUDGE LETTOW |
| v. | ) | |
| | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | **<u>PLAINTIFFS' CROSS-MOTION FOR</u>** |
| | ) | **<u>SUMMARY JUDGMENT</u>** |
| Defendant. | ) | |
| | ) | |

Pursuant to Rule 56(c) of the Rules of the Unites States Court of Federal Claims (RCFC), Plaintiffs, Statesman II Apartments, Inc. and Beach House Development Company (collectively, "the Properties"), respectfully request that this Court deny Defendant's Motion for Summary Judgment and move this Court for an order granting summary judgment on the issue of the Government's liability for its breach of the Housing Assistance Payment Contracts at issue. In support of its request and motion, the Properties submit herewith a memorandum of authority, Proposed Findings of Uncontroverted Fact pursuant to RCFC 56(h)(1), and an appendix of exhibits.

Respectfully submitted,

*<u>/s/ Fred J. Livingstone</u>*
Fred J. Livingstone (0009528)
Taft, Stettinius & Hollister LLP
3500 BP Tower
200 Public Square
Cleveland, OH 44114-2302
(216) 241-2838
(216) 241-3707 – Fax
flivingstone@taftlaw.com

Attorney for Plaintiff
Statesman II Apartments, Inc.,

Of Counsel:
Mark J. Valponi
Majeed G. Makhlouf
Taft, Stettinius & Hollister LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838
(216) 241-3707 – Fax

Dated: January 7, 2005

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... ii

APPENDIX ..... iv

INTRODUCTION ..... 1

STATEMENT OF THE ISSUES ..... 2

STATEMENT OF FACTS AND STATEMENT OF THE CASE ..... 3
A. The Housing Assistance Payment Contracts ..... 3
B. Legislative Amendments and HUD Notice 95-12. ..... 5
1. Amendments to 42 U.S.C. §1437f: ..... 5
2. HUD Notice 95-12 (Def. App. 1-24): ..... 6
C. HUD's Failure To Provide Automatic Annual Rent Increases to the Properties. ..... 7
D. The Properties' Correspondence With HUD Regarding Requests For 1998-2002 Rent Increases. ..... 9
E. The Lawsuits. ..... 9

LAW AND ARGUMENT ..... 10

I. THE PROPERTIES ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE HUD HAS BREACHED THE EXPRESS TERMS OF THE HAP CONTRACTS. ..... 11
A. Construing The Express Terms Of A Lawful Contract. ..... 12
B. The Government Cannot Avoid Its Congressionally Mandated Obligations To The Properties Embodied In The Express Terms Of The HAP Contracts. ..... 13
1. The Deduction Of 1% From The AAAF Factor For Non-Turnover Units Is A Breach Of The HAP Contracts. ..... 14
2. The 60-Day Requirement In HUD Notice 95-12 Is Unlawful. ..... 16
3. The Omission By Notice 95-12 Of A 20% Material Difference Factor In Defining The Overall Limitation Results In A Breach Of The HAP Contracts. ..... 17
4. The Requirement That Owners Submit A Comparability Study Is An Unlawful Attempt to Amend the HAP Contracts. ..... 18

II. THE UNMISTAKABILITY DEFENSE IS NOT AVAILABLE WHERE GOVERNMENT LEGISLATION TARGETS CERTAIN OF ITS CONTRACTS IN ORDER TO SAVE MONEY. ..... 19

III. THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT SHOULD ALSO BE DENIED BECAUSE THE PROPERTIES ARE ONLY CLAIMING DAMAGES FOR 1998 THROUGH THE END OF EACH RESPECTIVE HAP CONTRACT ..... 22

CONCLUSION ..... 24

# TABLE OF AUTHORITIES

CASE LAW

*Acacia Villa v. United States*, 36 Fed. Cl. 277 (1996) .......... 4-5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 10, 11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 10

*Cisneros v. Alpine Ridge*, 508 U.S. 10 (1993) .......... 16

*Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751 (2003) .......... 2, 11, 13, 16-19, 21, 22

*FDIC v. Singh*, 977 F.2d 23 (1st Cir. 1992) .......... 15

*General Dynamics Corp. v. United States*, 47 Fed. Cl. 514 (2000) .......... 12, 20, 21

*Government Sys. Advisors, Inc. v. United States*, 847 F.2d 811 (Fed. Cir. 1988) .......... 10

*Grass Valley Terrace v. United States*, 51 Fed Cl. 436 (2002), *rev'd on other grounds*, 536 U.S. 129 (2002) .......... 21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .......... 10-11

*McAbee Construction, Inc. v. United States*, 97 F.3d 1431(Fed. Cir. 1996) .......... 12

*National Leased Housing v. United States*, 105 F.3d 1423 (Fed. Cir. 1997) .......... 16

*National Leased Hous. Assn. v. United States*, 22 Cl. Ct. 649 (Mar. 1, 1991) .......... 17, 18

*Park Village Apts. v. United States*, 32 Fed. Cl. 441(1994) .......... 4-5, 17, 18

*Park Village Apts v. United States*, 25 Cl. Ct. 729 (1992) .......... 17

*Sheridan Square Partnership v. United States*, 761 F.Supp. 738 (D. Colo. 1991) .......... 18

*Smart v. Gillette Company Long-Term*, 70 F.3d 193 (1995) .......... 15

*Smelser v. United States*, 62 Fed. Cl. 768 (Ct. Cl., 2004) .......... 10

*United States v. Equitable Trust Company*, 611 F.2d 492 (4th Cir. 1979) .......... 16

*United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) .......... 16

*Ventas, Inc. v. United States*, 381 F.3d 1156 (Fed. Cir. 2004) .......... 14

*Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569 (Fed. Cir. 1997)............................20, 21

FEDERAL STATUTES

42 U.S.C. §1437f ..................................................................3, 4, 5, 6, 12, 13, 16, 17, 18, 19

28 U.S.C. §1491 ..........................................................................................................16

28 U.S.C. §2501 ..........................................................................................................23

PUBLIC LAW

Department of Veteran's Affairs and Housing and Urban Development and Independent Agencies Appropriations Act of 1995 (the "1994 Amendments"), Pub. L. No. 103-327, 108 Stat 2298 ..........................................1-2, 5-6, 7, 11, 13, 15, 17, 19, 21

FEDERAL REGISTER

60 FR 12594 *et seq.* ..................................................................................................2-3, 8

60 FR 55934 *et seq.* ..........................................................................................................8

61 FR 66132 *et seq.* ..........................................................................................................8

63 FR 11956 *et seq.* ..........................................................................................................8

63 FR 51224 *et seq.* ..........................................................................................................8

64 FR 51860 *et seq.* ..........................................................................................................8

64 FR 66888 *et seq.* ..........................................................................................................8

66 FR 59055 *et seq.* ..........................................................................................................8

RULES OF THE FEDERAL COURT OF CLAIMS

RCFC 56(c)..................................................................................................................10

HUD NOTICES

HUD Notice 95-12 ..................................................................2, 3, 6, 7, 9, 11-12, 15, 17, 18

HUD Notices 97-14, 98-3, 99-17, 00-14 02-10 ............................................................ passim

# APPENDIX

*Cuyahoga Metropolitan Housing Authority v. United States*,
57 Fed. Cl. 751 (2003) ........................................................................................................1

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **STATESMAN II APARTMENTS, INC.,** | ) | CASE NOS. 04-805C and No. 04-806C |
| | ) | (Consolidated) |
| Plaintiff, | ) | |
| | ) | JUDGE LETTOW |
| v. | ) | |
| | ) | **PLAINTIFFS' COMBINED** |
| **THE UNITED STATES OF AMERICA,** | ) | **MEMORANDUM IN OPPOSITION** |
| | ) | **TO DEFENDANT'S MOTION FOR** |
| Defendant. | ) | **SUMMARY JUDGMENT AND IN** |
| | ) | **SUPPORT OF PLAINTIFFS'** |
| | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| | ) | |

## INTRODUCTION

Plaintiffs, Statesman II Apartments, Inc. ("Statesman Apts.") and Beach House Development Company ("Beach House") (collectively "the Properties"), bring this action for damages against the United States of America. Acting through the Department of Housing and Urban Development ("HUD" or "Government"), the Government failed to provide for automatic annual rent increases in 1998, 1999, and 2000 for Statesman Apts. and in 1998, 1999, 2000, 2001, and 2002 for Beach House, as required under its Housing Assistance Payment Contracts ("HAP Contracts") with the Properties.

Under the express terms of the HAP Contracts, the Properties are entitled to annual rent increases based upon the application of the full Automatic Annual Adjustment Factors published by HUD ("AAAF"). The adjustment is only limited by appropriate application of the Overall Limitation provision of the HAP Contracts.

HUD breached the HAP Contracts by its failure and subsequent refusal to grant the rent increases mandated by the HAP Contracts. The Government relied on 1994 Amendments to the

U.S. Housing Act of 1937 ("1994 Amendments") and HUD Notice 95-12 ("Notice 95-12") to refuse such increases. Notice 95-12 requires Section 8 owners to submit comparability studies within certain deadlines in order to obtain rent increases; requires deduction of 1% from the full Annual Adjustment Factor for non-turnover units;[1] and incorrectly calculates the Overall Limitation provision of the Contracts.

The Properties are entitled to summary judgment in their favor because the HAP Contracts are unambiguous, and there is no dispute regarding the material facts of the case. This Court in *Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751 (2003), dealt with identical contracts and identical issues, and found that the passage of the 1994 Amendments, and the issuance by HUD of Notice 95-12 implementing same, resulted in breaches of the AAAF provisions of the HAP Contracts in issue in this case. This Court further found that the unmistakability defense was not applicable. The Properties request that this Court follow suit in this action.

## STATEMENT OF THE ISSUES

1. Whether the reduction by HUD of the automatic adjustment factor by 1% for non-turnover units in the calculation of annual adjustment of rents, as required by the 1994 Amendments and Notice 95-12, constituted a breach of the HAP Contracts.

2. Whether HUD's required omission of a material difference factor in calculating the Overall Limitation pursuant to the 1994 Amendments and Notice 95-12 constituted a breach of the HAP Contracts.

3. Whether the material difference factor is 20%.

---

[1] A non-turnover unit is one in which the same tenant continuously occupies the unit during the

4. Whether the automatic annual adjustment requirements of the HAP Contracts require HUD to calculate what the contract rents would have been for contract years 1995, 1996, and 1997 in order to determine damages for breach of contract for 1998 and subsequent years in question.

5. Whether the Initial Difference was 20% of the Initial Contract Rent.

6. Whether the Notice 95-12 requirement that requests for adjustment of rents be submitted 60 days prior to any adjustment of rents being effective is authorized by law and/or is an abuse of discretion.

7. Whether, in the event an owner's Contract Rents exceed HUD's published fair market rents, HUD's requirement of the submission of a rent survey by the owner as a condition to any adjustment of rent constitutes a breach of the HAP Contracts.

## STATEMENT OF FACTS AND STATEMENT OF THE CASE

### A. The Housing Assistance Payment Contracts.

Between November 14, 1980, and October 25, 1982, the Properties each entered into separate HAP Contracts with HUD. (Copies of the Statesman Apts. and Beach House HAP Contracts are reproduced in the Appendix to Defendant's Motion for Summary Judgement ("Def App.") at 61 and 122, respectively; *see also* Defendant's Proposed Findings of Uncontroverted Facts ("DPFUF") ¶2.) Under the terms of the HAP Contracts, HUD is to provide housing assistance payments to the Properties for units leased by lower-income families. Under 42 U.S.C. §1437f(c)(1), the housing assistance payments provided by HUD are designed to

---

year. (60 FR 12594, Defendant's Appendix ("Def. App.") 196.)

reimburse the Properties for the difference between the rent called for under the HAP Contracts for each unit ("Contract Rent") and the amount paid by each leasing family.

The HAP Contracts specify an initial, per unit, Contract Rent for each Property. Pursuant to Section 1.8(b) of the HAP Contracts ("Section 1.8(b)"), HUD is required to increase the Contract Rent annually based upon Automatic Annual Adjustment Factors ("AAAFs") determined and published by the Government. Such provision permits the reduction of the factor only if the utilities are paid directly by the families:

> 1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. **These published Factors will be reduced appropriately by the Government where utilities are paid directly by the families.**
>
> 2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of this Contract.

(Section 1.8(b), Def. App. 64, 125 (emphasis added).)

Under Section 1.8(d) of the HAP Contracts and the former version of 42 U.S.C. §1437f(c)(2)(C), rent adjustments must not have resulted in a material difference between the rents charged for assisted and comparable unassisted units ("Material Difference"). Per its terms, this limitation, however, was not to be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences existed with respect to the initial contract rents ("Initial Difference").

In *Acacia Villa v. United States*, this Court determined that for purposes of calculating the Overall Limitation, a "material difference" is a difference greater than twenty percent (20%). *Acacia Villa v. United States*, 36 Fed. Cl. 277, 279 (1996) (citing *Park Village Apts. v. United*

*States*, 32 Fed. Cl. 441, 448 (1994)). As set forth in Section 1.8(d) of the HAP Contracts, in effect, an "initial difference" between the Contract Rent and the fair market rents is added to comparable unassisted rents in calculating the Overall Limitation. Accordingly, the Contract Rent, as adjusted, cannot exceed the combined sum of (1) the current, fair market rent for comparable units in the area and (2) the Initial Difference by more than twenty percent.

**B. Legislative Amendments and HUD Notice 95-12.**

**1. Amendments to 42 U.S.C. §1437f:**

On September 28, 1994, Congress passed the Department of Veteran's Affairs and Housing and Urban Development and Independent Agencies Appropriations Act of 1995 ("1995 Act"). Among the many components of this Act, 42 U.S.C. §1437f(c)(2)(A) was amended ("1994 Amendments"). Prior to the 1994 Amendments, 42 U.S.C. §1437f(c)(2)(A), read as follows:

> The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units, or, if the Secretary determines, on the basis of a reasonable formula.

42 U.S.C. §1437f(c)(2)(A). Section 1.8(b) reflects this language. (*See* Def. App., 64, 125.)

Under the 1994 Amendments, however, the following language was added to 42 U.S.C. §1437f(c)(2)(A):

> However, where the maximum monthly rent, for a unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary...Except for assistance under the certificate program, for any unit occupied by the same family at the time of the last annual rental adjustment, where the assistance contract provides for the adjustment of the maximum monthly rent by applying an annual adjustment factor and where the

> rent for a unit is otherwise eligible for an adjustment based on the full amount of the factor, 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0.

42 U.S.C. §1437f(c)(2)(A).

### 2. HUD Notice 95-12 (Def. App. 1-24):

In HUD Notice 95-12 and its successors, HUD has construed the 1994 Amendments to require the submission of a comparability study if the unadjusted Contract Rent is more than HUD's published fair market rent for the area. (Def. App. 3. *See also* HUD Notice 97-14 (3/17/97), Def. App. 25-41; HUD Notice 98-3 (1/23/98), Def. App. 42-43; HUD Notice 99-17 (7/8/99), Def. App. 44; HUD Notice 00-14 (8/9/00), Def. App. 45; and HUD Notice 2002-10 (5/17/02), Def. App. 46-60.) Notice 95-12 limited any such adjustment to the lesser of (a) the comparable rent determined by the study plus the Initial Difference or (b) the AAAF adjusted rent.[2] (Def. App. 4.) This limitation violates the HAP Contracts because it does not allow for any nonmaterial (up to 20%) differences within the Overall Limitation.

---

[2] Notice 95-12 requires the owner to submit a rent comparability study, conducted by a state certified, general appraiser, setting forth at least three examples of unassisted housing of similar age, type and quality in the same market area. (Def. App. 3.) It also requires the owner to submit evidence of the Initial Difference which existed in the initial contract rents. (Def. App. 4.) Once a comparable rent is determined, the Initial Difference (the dollar amount by which the initial contract rent exceeded the original comparable rent), is added to the comparable rent. (Def. App. 3-4.) This determines the maximum permissible rent level allowed for each unit, otherwise known as the "adjusted comparable rent." (Def. App. 4.)

If the adjusted comparable rent is less than the contract rent as adjusted by applying the AAAF, the adjusted comparable rent will be the new contract rent. (Def. App. 3.) If the adjusted comparable rent is greater than the contract rent as adjusted by applying the AAAF, then HUD will take into account turnover and non-turnover differences by subtracting .01 from the full AAAF in the case of non-turnover units. (Def. App. 4-5.) The aggregate rents for turnover and non-turnover units as adjusted are summed and divided by the total number of units to produce an average, which becomes the new contract rent. (*Id.*) However, in the event that the adjusted

HUD Notice 95-12 requires HAP Contract owners to submit such comparability study and additional information at least 60 days before the requested increase becomes effective ("60-Day Requirement"). (Def. App. 3.) It also precludes any increase in Contract Rent if the project owner fails to submit the required information within the contract year. (*Id.*) Neither the 1994 Amendments nor any other statutory enactments include any of these requirements. The 1994 Amendments and Notice 95-12 further violate the HAP Contracts by requiring a 1% deduction in non-turnover units.

**C. HUD's Failure To Provide Automatic Annual Rent Increases to the Properties.**

When each HAP Contract was executed, an initial difference existed with respect to each property. (*See* Racek, Supplements to Rent Surveys, Def. App. 85, 159.) Each year between the time the Properties and HUD entered into the HAP Contracts through 1994, the Contract Rents for each of the Properties were increased pursuant to application of the AAAFs as set forth below:

| Property | Initial Contract Rent | | Initial Difference[3] | | 1994 Contract Rent | |
|---|---|---|---|---|---|---|
| | 1 BR | 2 BR | 1 BR | 2 BR | 1 BR | 2 BR |
| Statesman | $370 | $424 | $70 | $82 | $586 | $671 |
| | 2 BR | 3 BR | 2 BR | 3 BR | 2 BR | 3 BR |
| Beach House | $474 | $537 | $79 | $89 | $662 | $779 |

comparable rent is lower than the current rent without adjustment, the current rent remains the appropriate rent for that year. (*Id.*)

[3] Although the Racek Supplements indicate initial differences of $95 and $104 for one and two bedroom units at Statesman Apts. and $277 and $290 for two and three bedroom units at Beach House, only $70 and $82 is being claimed for Statesman Apts. and $79 and $89 for Beach House. The claimed figures for each Property are the 20% of Initial Contract Rent maximum allowed by 42 U.S.C. §1437f(c)(1).

(DPFUF, ¶¶ 4, 6; Def. App. 85, 159 for initial difference.)

Since the 1994 Contract Rent adjustments, the Government published AAAFs each year for the years 1995 through 2002:

| | Non-Turnover Units (AAAF less 1%) | Turnover Units (Full AAAF) |
|---|---|---|
| 1995 | 1.018 | 1.028 |
| 1996 | 1.008 | 1.018 |
| 1997 | 1.013 | 1.023 |
| 1998 | 1.020 | 1.030 |
| 1999 | 1.024 | 1.034 |
| 2000 | 1.033 | 1.043 |
| 2001 | 1.003 | 1.013 |
| 2002 | 1.047 | 1.057 |

(*See* Federal Register, 60 FR 12594, 60 FR 55934, 61 FR 66132, 63 FR 11956, 63 FR 51224, 64 FR 51860, 64 FR 66888 and 66 FR 59055, Def. App. 196-241.)

Under Section 1.8(b), Statesman Apts. was entitled to receive Contract Rent adjustment for the year 1998 using a 1997 Contract Rent calculated as if adjustments had been made for the years 1995 through 1997. Thereafter, it was entitled to receive adjustments for 1998 and through November 2000 based on the prior year's Contract Rent. Beach House was entitled to receive such adjustments for the year 1998 using a 1997 Contract Rent calculated as if adjustments had been made for the years 1995 through 1997. Thereafter, it was entitled to receive Contract Rent adjustments for 1999, 2000, 2001 and through September 2002 based on the prior year's Contract Rent.

Despite the Properties' compliance with the express provisions of the HAP Contracts, HUD continues to refuse to make rent adjustments for the years 1998 through November 2000 for Statesman Apts. and 1998 through September 2002 for Beach House.

D. **The Properties' Correspondence With HUD Regarding Requests For 1998-2002 Rent Increases.**

The Properties last received rent adjustments based upon the published AAAFs in 1994. In letters dated April 2, 2004, the Properties requested payment of the past due annual rent increases for the year 1998 through November, 2000 in the case of Statesman Apts. and through September, 2002 in the case of Beach House. (Def. App. 76, 150.) The request included rent comparability studies and other documents required by Notice 95-12. The Properties requested that the increases reflect each of the AAAF's applicable since the rents were last adjusted in 1994. However, in this lawsuit, the Properties are only claiming the appropriate Contract Rents for Statesman Apartments from 1998 through November, 2000 and through September, 2002 for Beach House.

By letter dated April 23, 2004, HUD denied the requests of the Properties, citing Notice 95-12, the lack of a materiality component in its instructions, and a pending lawsuit as the reasons for the denial.[4] (Def. App. 121.)

E. **The Lawsuits.**

On May 11, 2004, the Properties filed suit in this Court alleging HUD's breach of the HAP Contracts. On August 30, 2004, the cases were consolidated before this Court. The Properties claim that HUD's denial of their requests for rent increases violates the express terms of the HAP Contracts and that HUD's failure to automatically adjust the Contract Rents has

---

[4] The pending lawsuit referred to by HUD is *Cuyahoga* in which a motion and cross-motion for summary judgment on the issue of damages have been filed. As of the date of the filing of this Cross Motion, the damage issue has not been ruled upon by Judge Allegra.

resulted in substantially lower housing assistance payments for the Properties. For the reasons set forth below, this Court should grant summary judgment in favor of the Properties.

**LAW AND ARGUMENT**

Contract interpretation is a question of law, appropriately resolved through summary judgment. *Government Sys. Advisors, Inc. v. United States*, 847 F.2d 811 (Fed. Cir. 1988). Rule 56(c) of the CFC provides that summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."

If the moving party bears the burden of persuasion at trial, that party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Thereafter, the nonmoving party demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable jury to find for him at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). In order to meet this burden, the opposing party must point to specific, affirmative evidence in the record and not simply rely on mere allegations, conclusory or vague statements, or general denials in the pleadings. *Celotex*, 477 U.S. at 324. In reviewing the record, "this Court must view the evidence in the light most favorable to the nonmoving party, and may not weigh the evidence or assess its credibility." *Smelser v. United States*, 62 Fed. Cl. 768 (Ct. Cl., 2004), *citing Anderson* 477 U.S. at 248-49. A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson*, 477 U.S. at 248. Disputes over facts that will not change the outcome of the litigation will not preclude the entry of judgment. *Id.*

To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249-50. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.*

**I. THE PROPERTIES ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE HUD HAS BREACHED THE EXPRESS TERMS OF THE HAP CONTRACTS.**

This Court has found that the Government committed a breach of virtually identical HAP Contracts when it failed to automatically adjust a HAP Contract owner's rent (subject to invocation of the Overall Limitation provision). *Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751 (2003) at 762. In *Cuyahoga*, after a thorough exposition of the legislative and case history of these contract provisions, Judge Allegra held:

> Accordingly, this court holds that the HAP contracts expressly require HUD to provide CMHA with annual adjustments barring the agency's invocation of the overall limitation. As such, the passage of the 1994 amendments was a repudiation of this contract provision that seemingly caused a failure to perform a contractual duty when it was due, at that point ripening into an apparent breach of contract. *See Franconia*, 536 U.S. 129 at 142-43; *see also Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1343 (Fed. Cir. 2000); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997); Restatement (Second) of Contracts §235(2) (1981).

*Cuyahoga* at 762. Further, by requiring that the owner submit a comparability study as a condition to such adjustment, Judge Allegra stated:

> Thus, from the passage of Section 8 in 1974 until it was modified in 1995, the statutory mechanism clearly envisioned that annual adjustments were to be automatic unless HUD promptly performed a comparability study. Certainly, this was the intent underlying the 1987 Act and the Reform Act, in which Congress ratified HUD's

> interpretation of the statute as authorizing it to limit increases...One might wonder why Congress bothered to pass such limits if, as defendant contends, HUD always had the power, under the original Section 8 program, to require the project owners to present a comparability study as a precondition to receiving an adjustment.

*Id.* at 761-2.

For the reasons set forth herein, this Court should grant summary judgment in favor of the Properties.

**A. Construing The Express Terms Of A Lawful Contract.**

In construing obligations arising under contract, a court begins with the plain language of the agreement. *General Dynamics Corp. v. United States*, 47 Fed. Cl. 514, 545 (2000). "If the contract language is clear and unambiguous, the court must give the words their ordinary meaning and may not resort to extrinsic evidence." *Id.* (*citing McAbee Construction, Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)).

Under the HAP Contracts as authorized and directed by 42 U.S.C. §1437f(a) and (c)(2)(A), HUD is required to make automatic annual rent adjustments to the Contract Rents based on the AAAF's determined and published by the Government. (*See* Section 1.8(b), Def. App., 64, 125.) These rent adjustments are only limited by the requirement that the rents not result in a Material Difference with rents charged for comparable unassisted units plus the Initial Difference. (*See* 42 U.S.C. §1437f(c)(2)(C); Section 1.8(d), Def. App., 64, 125.)

Pursuant to their express terms, the HAP Contracts were intended to comprise the entire agreement between the parties and could only be altered by written agreement of the parties:

> This Contract, including such exhibits, comprises the entire agreement between the parties hereto with respect to the matters contained herein, and neither party is bound by any representations or agreements of any kind except as contained herein or except

> agreements entered into in writing which are not inconsistent with this Contract.

(HAP Contract, Section 1.1, Def. App. 61, 122.)

No subsequent agreements were entered into between the Properties and HUD. The Properties have not agreed that HUD could avoid its contractual obligations to automatically adjust the Contract Rents on an annual basis so long as the adjusted rent did not result in a Material Difference between rents for assisted and unassisted comparable units plus the Initial Difference. No language in the HAP Contracts allows the Government to unilaterally alter the terms of such Contracts. Here, just as in *Cuyahoga*, the Government failed to automatically adjust the Contract Rent on an annual basis. In *Cuyahoga*, such failure was held to be a breach of the HAP Contracts at issue. Thus, summary judgment for the Properties is appropriate based upon the Government's clear breach of the HAP Contracts as this Court has previously found. *See Cuyahoga*, 57 Fed. Cl. at 763, 781.

### B. The Government Cannot Avoid Its Congressionally Mandated Obligations To The Properties Embodied In The Express Terms Of The HAP Contracts.

Purportedly to implement the 1994 Amendments, HUD issued Notice 95-12, which among other things:

a. made reference to "fair market rents" which HUD had published in the Federal Register which were applicable to the area, type of unit and year;

b. provided that, if the unadjusted Contract Rents of the owner were in excess of that fair market rent, the owner had to submit a study of comparable unassisted units which, when added to any Initial Difference existing for the unit ("Adjusted Comparable Rent"), exceeded the unadjusted Contract Rent;

c. provided that the existing Contract Rent could be adjusted by the published AAAF only if such Adjusted Comparable Rent exceeded the existing Contract Rent;

d. provided that such Contract Rent adjustments must take into consideration a 1% reduction in the adjustment factor for non-turnover units, and that the new

Contract Rent would be the lesser of either the Adjusted Comparable Rent or the Adjusted Contract Rent;

e. provided that any increase in Contact Rent would be effective on the later of the anniversary date of the HAP Contract or 60 days following submission of the required documents (60-Day Requirement).

f. omitted a Material Difference Factor in the definition of Adjusted Comparable Rent.

These requirements and this omission are breaches of the HAP Contracts.

### 1. The Deduction Of 1% From The AAAF Factor For Non-Turnover Units Is A Breach Of The HAP Contracts.

Section 1.8(b) requires the Government to annually adjust the Contract Rent by the most recently published AAAF's. Such factors are to be determined by the Government annually and will be reduced where utilities are paid directly by the tenants. Section 1.8(b)(1). Other than reduction for utilities, the HAP Contracts make no provision for reduction of the factors for any other reason.

The Government's argument that Section 1.8(b)(1) permits HUD to impose reductions in the factor upon the basis of a reasonable formula as authorized by statute does not explain why there is specific mention in the HAP Contracts of reductions in the case of utilities paid by the tenants. If the right to determine various factors based upon a variety of reasons existed, why was it necessary to specifically provide for the utility reduction? Courts have recognized that the inclusion of specific exceptions to a statute indicates an intent to exclude other exceptions:

> Where Congress includes certain exceptions in a statute, the maxim *expressio unius est exclusio alterius* presumes that those are the only exceptions Congress intended. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 188, 98, S.Ct. 2279, 57 L.Ed.2d 117 (1978). Accordingly, we agree with the Court of Federal Claims' conclusion that "[b]ecause Congress set forth those adjustments with specificity, the court must conclude, absent persuasive evidence to the contrary, that Congress intended no other adjustments to apply." *Ventas*, 57 Fed.Cl. [411] at 414-15.

*Ventas, Inc. v. United States*, 381 F.3d 1156, 1161 (Fed. Cir. 2004).

The logic of that concept applies also to contract language. The First Circuit in its commentary on the maxim stated:

> We think that this case is a classic example of a situation in which the hoary maxim *expressio unius est exclusio alterius* is helpful. The maxim instructs that, when parties list specific items in a document, any item not so listed is typically thought to be excluded. *See, e.g., FDIC v. Singh*, 977 F.2d 18, 22-23 (1st Cir. 1992) (applying *expressio unius* rule).

*Smart v. Gillette Company Long-Term*, 70 F.3d 173, 179 (1995).

The *Singh* case cited in *Smart* involved a note and guaranty signed by certain partners unconditionally. Subsequently, the note was rewritten specifying certain alterations in the original note including a non-recourse provision. No change was made in the guaranty which was specifically referred to, among other documents, as remaining in full force and effect. The Court held that the non-recourse provisions in the rewritten note did not alter the guaranty because of, among other reasons, the maxim of *expressio unius*:

> That maxim applies as forcibly to exceptions to an obligation as to enumerations of the objects embraced by a contract. Here, the Amendment lists a number of particular alterations in the security instruments without once mentioning a nullification or diminution of the liabilities assumed under the Guaranty. In these circumstances, the parties' failure to provide expressly for modification of the Guaranty leaves us no choice but to give effect to the Guaranty's provisions.

*FDIC v. Singh*, 977 F.2d 18, 23 (1st Cir. 1992) (Internal citation omitted.)

Accordingly, in the instant case, the specific inclusion of the utility reduction exception indicates an intention to exclude other reductions, such as the 1% reduction for non-turnover units. The requirement of such reduction by the 1994 Amendments and Notice 95-12 constituted

a repudiation and/or breach of the HAP Contracts when applied to any of the automatic annual increases which the Properties are entitled to receive.

**2. The 60-Day Requirement In HUD Notice 95-12 Is Unlawful.**

This Court has previously rejected HUD's contention in its Motion that the requirement to submit requests for increases 60 days in advance of the date of their effectiveness was a "reasonable exercise of HUD's authority to administer HAP Contracts":

> That *prima facie* breach was then exacerbated when HUD, in its 1995 directive, imposed additional requirements not envisioned in either the HAP contracts or the prior legislation. In this regard, the court rejects defendant's contention that the sixty-day time limit imposed by the directive was a "reasonable exercise of HUD's authority to administer HAP contracts." To the contrary, that requirement appears to represent yet another new and fundamental change in the deal previously executed.

*Cuyahoga*, 57 Fed. Cl. at 762. There is no Congressional authority for the imposition of the 60-Day Requirement in 42 U.S.C. §1437f, any amendments thereto, or any other Congressional legislation.

As a department of Government established by Congress, HUD only has such authority as is granted by Congress. *United States v. Equitable Trust Co.*, 611 F.2d 492, 499 fn 18 (4th Cir. 1979). HUD entered into the HAP Contracts with the Properties pursuant to 42 U.S.C. §1437f. Such contracts are generally subject to the ordinary rules of construction applicable to private contracts. *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996). Indeed, the HAP Contracts do not permit any unilateral additions to contract terms without the consent of the other party. (Section 1.1 of the HAP Contracts, *quoted supra*, 13; Def. App. 61, 122). The Properties have not consented to any additional contract terms.

The 60-Day Requirement is effectively a HUD-initiated amendment to the six year Congressional statute of limitations under the Tucker Act, within which time a party can bring an

action to enforce a contractual right against the Government. *See* 28 U.S.C. §1491. The Government's citation of *National Leased Housing*, 105 F.3d 1423 (Fed. Cir. 1997), and *Cisneros v. Alpine Ridge*, 508 U.S. 10 (1993), is inapposite. The Properties are not arguing for an unlimited right of adjustment of rents. They acknowledge the Overall Limitation provision in the HAP Contracts and point out that it is the Government which is ignoring its terms by not providing for a "material difference" factor in calculating the limitation.

For the Government to suggest that the Plaintiffs are arguing against comparability studies is simply not correct. The Plaintiffs are insisting that the Government abide by the HAP Contracts and correctly apply their provisions. In the case of the Overall Limitation, it means adding the comparable rent and initial difference and multiplying the sum by the material difference of 120% which is the uniform result of the Courts which have addressed that provision.

Since the 60-Day Requirement has been imposed without Congressional authority and without the consent of the Properties, this Court should adopt the *Cuyahoga* Court's finding that the 60-Day Requirement is unlawful and unenforceable against the Properties.

**3. The Omission By Notice 95-12 Of A 20% Material Difference Factor In Defining The Overall Limitation Results In A Breach Of The HAP Contracts.**

42 U.S.C. §1437f (c)(2)(C) has always provided (both before and after the 1995 Act) that adjustments in Contract Rent shall not result in ***material*** differences between rents for assisted and unassisted comparable units. Section 1.8 (d) of the HAP Contract provides:

> Overall Limitation. Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government: provided, that this limitation shall not be construed to prohibit

> differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

Prior to the 1994 Amendments this Court and all other Courts uniformly and without exception interpreted this requirement to mean that only a difference in excess of 20% was material. *See National Leased Hous. Assn. v. United States*, 22 Cl.Ct. 649 (1991); *Park Village Apts v. United States*, 25 Cl. Ct. 729 (1992); *Park Village Apts. v. United States*, 32 Fed. Cl. 441 (1994), *aff'd* 105 F.3d 1612 (Fed. Cir. 1997); *National Leased Hous. Assn. v. United States*, 32 Fed. Cl. 454 (1994), *aff'd* 152 F.3d 943 (Fed. Cir. 1998). *See also Sheridan Square Partnership v. United States*, 761 F.Supp. 738, 743, n. 2 (D. Colo. 1991).

Notice 95-12 does not provide for any 20% upward adjustment of the sum of Comparable Rent and Initial Difference to reflect this statutory and contractual requirement. HUD cannot ignore the plain language of the HAP Contracts and subsection (c)(2)(C) and omit the Material Difference factor. In so doing, it has deprived the Properties of their full right to annual adjustments for the years in question in violation of both the Congressional mandate and the HAP Contracts.

**4. The Requirement That Owners Submit A Comparability Study Is An Unlawful Attempt to Amend the HAP Contracts.**

Under the express terms of the HAP Contracts, rents were to be adjusted on an annual basis pursuant to AAAF's published by HUD. In amending 42 U.S.C. §1437f(c)(2)(A), Congress imposed a new requirement on owners, namely, the requirement that they obtain and submit comparability studies. Under pre-amendment 42 U.S.C. §1437f(c)(2)(C) (which is still in effect), the Government or a state agency was and is obligated to conduct the comparability studies, not the owner. *See* discussion in *Cuyahoga*, 57 Fed. Cl. at 762 cited on pp. 20-21 of this Memorandum.

This Court made it plain in *Cuyahoga*, contrary to the Government's assertions in its Motion, that HUD did not have the authority to require owners to demonstrate that a proposed adjustment would not exceed comparable rent. In fact, that lack of authority was the reason Congress passed the 1994 Amendments. *See Cuyahoga*, 57 Fed. Cl. at 762 and citation infra, p. 12.

All the cases cited in HUD's Motion are cases supporting the right of HUD to conduct comparability studies. The Properties have no quarrel with that right. However, the requirement that an owner provide the comparability analysis mandated by 42 U.S.C. §1437f(c)(2)(A) contradicts the requirements for automatic Contract Rent increases pursuant to the terms of the pre-existing HAP Contracts. It is a unilateral addition to the HAP Contracts which places an unagreed-upon extra burden on project owners which cannot be enforced against the Properties.

## II. THE UNMISTAKABILITY DEFENSE IS NOT AVAILABLE WHERE GOVERNMENT LEGISLATION TARGETS CERTAIN OF ITS CONTRACTS IN ORDER TO SAVE MONEY.

HUD's Motion raises the unmistakability defense in a half-hearted fashion. This is understandable because the application of the unmistakability doctrine has been proscribed by rulings of the United States Supreme Court and this Court. In *Cuyahoga*, Judge Allegra extensively discussed the history and scope of the doctrine and found that it was not applicable in breach of contract cases where, as here, the legislation had targeted a specific set of contracts in order to save money. *Cuyahoga*, 57 Fed. Cl. at 778. He found that the 1994 Amendment was not public and general in character and that no sovereign power of the Government was implicated so as to preclude a finding that the amendment constituted a breach of the HAP Contracts.

It remains to determine whether the unmistakability doctrine is triggered on the facts of this case. The court holds that it is not.

In passing the 1994 amendments, the Congress did not act to protect public safety, morals or the economy, through the exercise, for example, of its police powers. Rather, in an appropriations measure, it deliberately targeted, at HUD's behest, that agency's contractual obligations under preexisting HAP contracts in an effort to reduce outlays under the Section 8 program. As a prelude to taking this action the House Appropriation Committee noted the "lack of sufficient outlays necessary to support a number of critical programs," H. Rep. 104-55 at 1, while its counterpart in the Senate complained that it and the subcommittee dealing with HUD "have faced extraordinary difficulties due to limited amounts available for domestic discretionary spending," S. Rep. 1033-311 at 6. The Senate report then proposed that Congress adopt a number of HUD-sponsored changes to the Section 8 program to save money, among them the amendment *sub judice*, stating:

> The 1995 budget also contains a number of legislative proposals that are designed to produce outlay savings. These legislative proposals include: ...a proposal to round down the annual adjustment factor to the next lowest whole dollar; ...a proposal to limit the annual adjustment factor rent increases to cases where rents are less than the local market average; ...a proposal to limit section 8 new construction/substantial rehabilitation rents to the fair market rent for renewals; ...a proposal to reduce the annual adjustment factor rent increases for tenants who stay in section 8 and section 202/811 projects; and a proposal to reduce the fair market rent from the 45th to the 40th percentile of local market rent.

*Id.* at 40. This same report further indicated that the limitations on automatic adjustments will "generate[] $110,000,000 in outlay savings in 1995," and that the Committee "believes that the projects can absorb this freeze on the [A]AAF." Id. at 70. Further revealing the nature of this legislation, written statements submitted by HUD officials in response to questions posed by members of the House Appropriations Committee indicate that the agency had sponsored the provision in question because the Administration had unsuccessfully attempted to freeze outright the AAAFs for Section 8 projects. See Department of Veterans Affairs and Housing and Urban Development and Independent Agencies Appropriations for FY 1995: Hearings before the Subcomm. On VA, HUD and Independent Agencies of the House Comm. On Appropriations, 103rd Cong., 2d Sess. 374 (1994).

*Id.* at 92-93.

Other recent decisions have also spelled out the limits of the unmistakability defense. This Court in *General Dynamics Corp v. United States.*, 47 Fed. Cl. 514 (2000), adopted the two step analysis set forth in *Yankee Atomic Electric Corp v. United States*, 112 F.3d 1569 (Fed. Cir. 1997), in order to apply the unmistakability defense. First, there must be a public and general act, i.e., a sovereign act, and second, there must be an unmistakable promise by the Government to refrain from blocking performance. In commenting on *Yankee Atomic*'s analysis, this Court stated:

> That was a two-step analysis which first explored the question of whether the governmental action preventing performance of a contract was a "public and general" act within the meaning of the sovereign acts doctrine. After an affirmative conclusion on that issue, the second question to explore was whether the contract contained an unmistakable promise that the Government would refrain from exercising its sovereign power in a way that could block performance of the contract. If the answer to that question was also yes, then the governmental action at issue would constitute a breach of contract.

*General Dynamics*, 47 Fed. Cl. at 54. This Court adhered to its *General Dynamics* analysis in its 2002 decision in *Grass Valley Terrace v. United States*, 51 Fed Cl. 436 (2002), *rev'd on other grounds*, 536 U.S. 129 (2002) and refused to honor the unmistakability defense.

Earlier recent decisions of this Court have held, as has *Cuyahoga*, that no "public and general" act is involved when an act of Congress has targeted a set of Government contracts to relieve the Government of its obligations thereunder or is designed to save the Government money. *See Grass Valley*, 51 Fed. Cl. 436, and *General Dynamics*, 46 Fed. Cl. 514. The *General Dynamics* decision became final on November 15, 2001. The Government appealed to the Federal Circuit on January 11, 2002 and then voluntarily dropped the appeal on January 30, 2002.

In *Cuyahoga*, Judge Allegra found that saving money in the payment of Contract Rents owed under these types of HAP Contracts was the purpose of the 1994 Amendments. *See id.* Such purpose negates any claim that the 1994 Amendments were public and general acts, therefore excluding the HAP Contracts in question from application of the sovereign acts doctrine. Accordingly, because the first prong of the *Yankee Atomic* analysis cannot be met, the Government's assertion that the claims raised in the Properties' Complaints are subject to the unmistakability defense is without merit.

## III. THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT SHOULD ALSO BE DENIED BECAUSE THE PROPERTIES ARE ONLY CLAIMING DAMAGES FOR 1998 THROUGH THE END OF EACH RESPECTIVE HAP CONTRACT

The Government misconstrues the Properties' claims by wrongly arguing that this Court does not have jurisdiction over such claims. The Properties do not claim any damages for breach of contract for the years 1995 through 1997. What is being claimed, however, is that HUD must calculate what it was required to do automatically in the years 1995 up to 1998. After the calculation of the appropriate 1997 Contract Rent by that process, the damages for the years in question, 1998 through November, 2000 for Statesman Apts., and 1998 through September, 2002 for Beach House, can be calculated.

This result is dictated by the language of the HAP Contracts themselves, which in relevant part provide: "Automatic Annual Adjustment Factors will be determined by the Government at least annually..." §1.8(b)(1). This Court has found that the intent of that language, and particularly the word "automatic," is that the adjustments would occur without the property owner having to take any significant action:

> The HAP contracts at issue indicate that "Automatic Annual Adjustment Factors will be determined by the Government at least annually" and that "on each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government." The "automatic" references in these provisions, as well as the annual periodicity established therein, plainly reveal an intent that the adjustments would occur without CMHA having to take any significant action. *See American Heritage Dictionary of the English Language* 122 (4th ed. 2000) ("automatic" means "acting or operating in a manner essentially independent of external influence or control") n12.

*Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751, 759 (2003).

Automatic adjustments should occur annually whether or not the Properties made any claim for same or not. The result of those automatic adjustments is that the Contract Rents should now be at a level consistent with appropriate adjustments having been made every year. In other words, even though the Properties are barred by the statute of limitations (28 U.S.C. §2501) from making a claim for damages for years 1995 through 1997, the rent levels for these years should have been automatically calculated with appropriate increases pursuant to the contracts and the 1998 rent level calculated from the levels so arrived for 1997.

To illustrate: In 1994 Statesman Apts. received its last rent adjustment to a Contract Rent of $586 for a one bedroom unit. If automatic annual adjustments had been made in 1995, 1996 and 1997, and the appropriate Overall Limitation applied, the following Contract Rents would have resulted:

| | |
|---|---|
| 1995 | $602 |
| 1996 | $613 |
| 1997 | $627 |

Because the adjustment of each year's rent starts with the previous year's rent, Statesman Apts. is entitled to the adjustment of 1998 rents starting with $627 as the then existing rent. The

1998 annual adjustment factor would then be applied to $627 in contrast to $586 which was the Contract Rent which resulted from the last adjustment granted by HUD in 1994.

## CONCLUSION

Under the express terms of the HAP Contracts, the Properties are entitled to annual rent increases based upon the application of AAAF's published by HUD. HUD and its agents breached the HAP Contracts by their failure and subsequent refusal to grant the rent increases mandated by the HAP Contracts.

There is no genuine issue of material fact and summary judgment in favor of the Properties must be entered as a matter of law. In addition, the Government's request for summary judgment must be denied.

Respectfully submitted,

*/s/ Fred J. Livingstone*

Fred J. Livingstone (0009528)
Taft, Stettinius & Hollister LLP
3500 BP Tower
200 Public Square
Cleveland, OH 44114-2302
(216) 241-2838
(216) 241-3707 – Fax

Attorney for Plaintiff
Statesman II Apartments, Inc.,

Of Counsel:
Mark J. Valponi
Majeed G. Makhlouf
Taft, Stettinius & Hollister LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838
(216) 241-3707 – Fax

Dated: January 7, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that on January 7, 2005 I electronically filed a copy of the foregoing *Plaintiff's Cross-Motion For Summary Judgment* with the Clerk of the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

*/s/ Fred J. Livingstone*
Fred J. Livingstone (0009528)