LEXSEE 57 FED. CL. 751

**CUYAHOGA METROPOLITAN HOUSING AUTHORITY, Plaintiff, v. THE UNITED STATES, Defendant.**

**Nos. 01-46C, 01-251C, 01-416C**

**UNITED STATES COURT OF FEDERAL CLAIMS**

**57 Fed. Cl. 751; 2003 U.S. Claims LEXIS 258**

**September 22, 2003, Filed**

**SUBSEQUENT HISTORY:** Motion granted by Cuyahoga Metro. Hous. Auth. v. United States, 2004 U.S. Claims LEXIS 97 (Fed. Cl., Apr. 26, 2004)

**DISPOSITION:** Plaintiff's motion for summary judgment granted in part and motion to amend granted; defendant's cross-motion for summary judgment denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** [**1] Fred Joseph Livingstone, Taft, Stettinus & Hollister, Cleveland, OH, for plaintiff.

Timothy Paul McIlmail, U.S. Department of Justice, Washington, D.C., for defendant, with whom was Assistant Attorney General Robert D. McCallum, Jr.

**JUDGES:** Francis M. Allegra, Judge.

**OPINIONBY:** Francis M. Allegra

**OPINION:** [*752] **ALLEGRA, Judge:**

Janus was the god of gates in Roman mythology, often portrayed having two faces - one looking forward, the other backward. A similar profile often is exhibited by the United States in contracts effectuating [*753] government programs - like Janus, it simultaneously displays the visages both of an ordinary contracting party and the sovereign. The former eagerly looks forward to the societal benefits often only derivable through the cooperation of its contracting partners, while the latter charily views its contract obligations backwards through the prism of uniquely-enjoyed sovereign defenses. Knotty questions arise when, in such transactions, the United States subsequently improves its contracting position by flexing its sovereign muscles, often by enacting legislation. *See, e.g., United States v. Winstar Corp.*, 518 U.S. 839, 135 L. Ed. 2d 964, 116 S. Ct. 2432 (1996).

This case poses such [**2] questions. It is the legacy of a series of events that began in the late 1970s, when the Cuyahoga Metropolitan Housing Authority (CMHA or plaintiff), based in Cleveland, Ohio, entered into a series of contracts with the Department of Housing and Urban Development (HUD) to provide low-income housing under the United States Housing Act of 1937 (the Housing Act of 1937). Plaintiff asserts that its rights under these contracts were repudiated by the Congress in 1994, when it amended the Housing Act to alter how rent subsidies were to be determined. According to plaintiff, that repudiation eventually ripened into a series of contract breaches. Not so, defendant responds, asseverating that the particular rights in question never existed and thus could neither be repudiated nor breached. Within this context, defendant aggressively invokes one of the sovereign defenses mentioned above - the labyrinthine unmistakability doctrine. Nonetheless, for the reasons that follow, the court holds that the United States, indeed, breached the contracts in question and is liable for that breach.

## I. FACTUAL AND STATUTORY BACKGROUND n1

n1 These facts shall be deemed established for purposes of future proceedings in this case. RCFC 56(d).

[**3]

In 1974, Congress amended the Housing Act of 1937 to create what is known as the Section 8 housing program. *See* 42 U.S.C. § 1437f. That program provides federally subsidized housing to millions of low income tenants by authorizing, *inter alia*, the payment of rent subsidies to private owners and developers of low-income housing. Under the program, tenants make rental payments based on their income and ability to pay; HUD then makes "assistance payments" to the private landlords to make up the difference between the tenant's contribution and a "contract rent" agreed upon by the landlord and HUD. 42 U.S.C. § § 1437a(a), 1437f(c)(3)(A); see also Nat'l Leased Hous. Ass'n v. United States, 105 F.3d 1423, 1425 (Fed. Cir. 1997) (describing the program); *Crest A Apts. Ltd. II v. United States*, 52 Fed Cl. 607, 609 (2002) (same).

In 1978 and 1979, CMHA and HUD entered into three Housing Assistance Payments ("HAP") contracts under the Section 8 housing program. n2 The framework for these contracts was governed, in part, by 42 U.S.C. § 1437f(c)(1), under which, an initial [**4] maximum monthly contract rent was established for each dwelling unit. As originally enacted, 42 U.S.C. § 1437f(c)(2) provided for adjustments in this maximum monthly rent thusly -

> (A) The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.
>
> * * * * *
>
> (C) Adjustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary.

42 U.S.C. § 1437f(c)(2)(A) and (C) (1982). The HAP contracts in question implemented [*754] these provisions in a two-fold fashion: (i) providing that adjustment of rents will be made annually on the basis of a reasonable formula, but (ii) stipulating as an "overall limitation" that, notwithstanding any other provision of the contract, adjustments shall not produce material differences between [**5] the rents at comparable assisted and unassisted units. *See Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 13, 123 L. Ed. 2d 572, 113 S. Ct. 1898 (1993) (describing a similar contract provision).

n2 Each contract concerned one of three properties: Quarrytown Tower Apartments (Quarrytown), Severance Tower Apartments (Severance) and Ambleside Tower Apartments (Ambleside). The contracts' anniversary dates are January 31, May 1, and August 15, respectively.

The first of these requirements - that of the annual adjustment - was implemented through Section 1.8b ("Automatic Annual Adjustments") of the HAP contracts, which provides, in pertinent part -

> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.
>
> (2) On [**6] each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective Date of the Contract.

The Automatic Annual Adjustment Factors (AAAFs) referenced here are generated by HUD's Office of Economic Affairs, which uses two market studies, the Consumer Price Index and the Bureau of the Census American Housing Surveys, to produce a percentage by which rents will be adjusted. HUD establishes a limited number of AAAFs to cover the entire country. n3

n3 *See, e.g.*, Notice of Final Fiscal Year (FY) 1999 Fair Market Rents, 63 Fed. Reg. 52,858 (Oct. 1, 1998); Notice of Final Fiscal Year (FY) 1998 Fair Market Rents, 62 Fed. Reg. 50,724 (Sept. 26, 1997); Notice of Final Fiscal Year (FY) 1997 Fair Market Rents, 61 Fed. Reg. 49,576 (Sept. 20, 1996); Notice of Final Fiscal

Year (FY) 1996 Fair Market Rents, 61 Fed. Reg. 6,690 (Feb. 21, 1996); *see also Acacia Villa v. United States,* 36 Fed. Cl. 277, 278 (1996); *see also Charlotte Housing for the Elderly v. Cuomo,* 89 F. Supp. 2d 70, 71 (D.C.D.C. 2000).

[**7]

Consistent with 42 U.S.C. § 1437f(c)(2)(C), the HAP contracts in question also contain, in Section 1.8d, an "Overall Limitation" that states:

> Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

HUD regulations in effect at the time the contracts in question were entered mirrored these requirements. *See* 24 C.F.R. § 880.609(c) (1979). To protect the differences which "existed with respect to the initial Contract Rents," HUD developed what is known as the "initial difference," equal to the difference between the initial Section 8 contract rents and the original comparables.

In the early 1980s, HUD became increasingly concerned that application of the AAAFs was yielding rents well above those for comparable [**8] unassisted units. Accordingly, the agency began to undertake, with respect to certain projects, "comparability studies" as a means of determining the rents it believed were being charged in comparable unassisted units. Those studies would select three to five comparable projects in a relevant geographic area; the agency would then conduct appraisals to see whether the rents at those projects were materially different from the Section 8 project rents. If they were, the rents determined through the comparability studies would serve as a "cap" of the rental increase produced by the more general AAAFs. *Alpine Ridge*, 508 U.S. at 14.

[*755] Litigation ensued. Section 8 project owners not only challenged the process by which HUD conducted comparability studies, but also claimed that the mere use of such studies to limit increases under the AAAFs violated their contracts.

In *Rainier View Associates. v. United States Department of Housing & Urban Development*, 848 F.2d 988, 991 (9th Cir. 1988) (per curiam), *cert. denied*, 490 U.S. 1066, 104 L. Ed. 2d 630, 109 S. Ct. 2065 (1989), the Ninth Circuit rejected HUD's interpretation of the law and language of the contracts, and concluded that [**9] HUD could not use comparability studies as an independent cap to formula-based rent increases. The *Rainier View* court stated that section 1437f(c)(2)(A) of Title 42 allows HUD to choose either the market-survey or the reasonable-formula method for adjusting rents, and that "the overall limitation provision [of the statute and the contract] . . . is clearly a limitation on the calculation of the formula used to adjust rents, not an independent basis for making annual rent adjustments." 848 F.2d at 991. The court found that, having elected to use a reasonable formula in the HAP Contracts, HUD could not retract that choice by applying a market-survey cap through the comparability studies. In the court's view, that approach would nullify the formula method that the statute authorizes and that HUD elected. In other words, the court believed that, under HUD's regulations, the "overall limitation" on rents had to be integrated into, not superimposed upon, the adjustment formula. *Id.* (citing 24 C.F.R. § 888.204 (1987)). In short, *Rainier View* acknowledged that adjustments were limited by comparable rents, but held that comparability determinations [**10] had to be considered in creating the AAAFs, not applied as a separate cap.

Shortly before the panel ruled in *Rainier View*, Congress amended Section 8 to validate HUD's use of comparability studies to cap AAAF increases. Specifically, it added the following sentence to section 1437f(c)(2)(C): "If the Secretary . . . does not complete and submit to the project owner a comparability study not later than 60 days before the anniversary date of the assistance contract under this section, the automatic annual adjustment factor shall be applied." Housing and Community Development Act of 1987, Pub. L. No. 100-242, § 142(c)(2)(B), 101 Stat. 1850 (1988), *codified at* 42 U.S.C. 1437f(c)(2)(C). n4 Although the court of appeals was advised of that amendment, it denied rehearing. And the Supreme Court, in turn, denied the government's petition for a writ of certiorari. 490 U.S. 1066 (1989).

n4 Regarding this amendment, the accompanying Conference Committee Report explained:

> The House amendment contained a provision that was not contained in the Senate bill to require that rent adjustments not result in

> material differences between rents for assisted and unassisted units of similar quality and age in the same market area and that [an] automatic annual adjustment factor be used if the Secretary or appropriate State agency fails to submit a comparability study to the project owner 60 days before the anniversary date of the assistance contract. The conference report contains the House provision . . . .

H. R. Conf. Rep. No. 100-426 at 177 (1987); *see also* H. Rep. 100-122(I) at 33 (1987).

[**11]

Passage of the 1987 Act, however, did not end the imbroglio between HUD and Section 8 project owners over the use of comparability studies. Far from it. HUD continued to believe that *Rainier View* was wrongly decided and declined to apply that decision outside the Ninth Circuit. For their part, section 8 project owners continued to assert they were entitled to automatic formula-based rent adjustments without application of a separate comparability cap. These differences again erupted into litigation, which, in turn, caused the Congress, in December of 1989, to enact Section 801 of the Reform Act (the Reform Act), Pub. L. No. 101-235, 103 Stat. 2057-2059 (codified at 42 U.S.C. 1437f(c)(2)(C) (Supp. II 1990) and 42 U.S.C. 1437f note (Supp. II 1990). This legislation was intended to "ensure a reasonable rate of return to the owners while effectuating the original congressional objective . . . of avoiding excessive rents and rates of return for section 8 projects." n5 The Reform [*756] Act prescribed new procedures for calculating rent adjustments, both retrospectively and prospectively. The retrospective provisions required HUD to pay landlords [**12] an increased amount, above what the comparability studies required HUD to pay under its interpretation of the contracts, while the prospective provisions established a limited role, under defined criteria, for HUD's future use of comparability studies.

n5 135 Cong. Rec. S16,602 (daily ed. Nov. 21, 1989) (remarks of Sen. D'Amato). The Senate Banking, Housing, and Urban Affairs Committee explained that "the Committee did not . . . share the Ninth Circuit's interpretation of HUD's authority to perform individualized comparability studies. Clearly, a market reality test must be an integral component of the Section 8 program to ensure that HUD pays reasonable rents." *Id.* at S16,600.

To deal with HUD's prior use of comparability studies, the Reform Act provided for increased rental payments to certain Section 8 project owners. § 801(a), 103 Stat. 2057-2058. This provision applied to owners whose rental adjustments were limited because of HUD's use of a comparability study as an independent cap, as well as to [**13] owners who did not request rental readjustments because they anticipated that HUD would reduce their project rents. For the period from fiscal year 1980 until the date when HUD promulgated new regulations to govern future rental adjustments, the provision required HUD to calculate rental adjustments in an amount equal to the AAAF times the portion of the contract rent that was not used for debt service. At the request of an owner, HUD was then to pay the amount by which that rental adjustment figure exceeded the rental adjustments actually approved by HUD for the relevant years. In no event, however, was such a retroactive payment to be less than thirty percent of the AAAF times the full contract rent, less rental subsidies actually approved. Thus, this provision required HUD retroactively to increase, to at least thirty percent of the AAAF level, payments made to owners whose adjustments were limited by comparability studies. n6 HUD issued detailed regulations to govern the process of making such retroactive payments. 56 Fed. Reg. 20,078 (1991).

n6 Furthermore, the Reform Act provided that, at a project owner's request, HUD would make a one-time redetermination of the contract rent as a basis for future rent adjustments. § 801(d), 103 Stat. 2058-2059. Under that provision, the contract rent would be the greater of: (i) the currently approved contract rent, or (ii) the contract rent as calculated under the retroactive provisions in Section 801(a).

[**14]

Looking prospectively, the Reform Act required HUD to promulgate "regulations for conducting comparability studies for projects where the Secretary has reason to believe that the application of the formula adjustments . . . would result in such material differences" between assisted and unassisted units, and to use those studies to establish a "modified annual adjustment factor" for a geographically smaller area. § 801(c), 103 Stat. 2058. The statute described, in detail, the methodology to be used by the Secretary in conducting such comparability studies. It also stipulated

that if a modified adjustment factor could not be established or failed to eliminate material differences between rents at comparable assisted and unassisted units, the Secretary could apply another methodology "for conducting comparability studies in order to establish rents that are not materially different from rents charged for comparable unassisted units." *Id.* In keeping with those provisions, HUD promulgated regulations to govern the conduct and use of comparability studies to generate modified adjustment factors, and, in cases in which such factors were ineffective, to provide for a system of adjusting [**15] rents through comparability studies. *See* 24 C.F.R. § 888.301 *et seq.*; *see also Charlotte Housing*, 89 F. Supp. 2d at 73.

In 1993, the Supreme Court, in *Alpine Ridge*, upheld the amendments to section 801 made by the Reform Act. Various property holders had argued that the provision authorizing HUD to limit automatic rent adjustments through the use of comparability studies violated the Due Process Clause of the Fifth Amendment. The Court, however, held that the contracts at issue in that case, which were virtually identically to those at issue here, did not prohibit HUD from using comparability studies to cap formula-based rate adjustments. Finding that the property owners "have no contract right to unobstructed formula-based rent adjustments," the Court concluded that it had "no occasion to consider whether § 801 of the Reform Act unconstitutionally abrogated such a right." 508 U.S. at 21.

[*757] Following this decision, Congress, still concerned that HUD was paying too much in subsidies, amended section 1437f(c)(2)(A) of Title 42 by adding the following language:

> However, where the maximum monthly rent, for a [**16] unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary. The immediately foregoing sentence shall be effective only during fiscal year 1995.

Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994) ("the 1994 Act" or "1994 amendments"). n7 The 1994 Act further provided that the amendment "shall apply to all contracts for new construction, substantial rehabilitation, and moderate rehabilitation projects under which rents are adjusted under section 8(c)(2)(A) of [the United States Housing Act of 1937] by applying an annual adjustment factor." *Id.* Subsequent amendments cumulatively made the provision applicable to "fiscal year 1996 prior to April 26, 1996, and [**17] fiscal years 1997 and 1998, during fiscal year 1999 and thereafter." n8

n7 In introducing S. 2049, which later became this law, Senator Riegle placed in the record an explanation of the bill prepared by HUD. Regarding the provision quoted above, that explanation stated:

> In general, while assisted projects continue to have a place in national low-income housing policy, HUD can no longer afford to over-subsidize projects. "Material differences" do exist between assisted and unassisted properties. The money the Department spends on rental assistance helps fewer households when it is tied to unreasonably high-rent projects. Public confidence in HUD programs is also undermined whenever HUD is seen to be paying rents well above the going rate or continuing to prop up undeserving projects.

140 Cong. Rec. S4388, S4869 (April 26, 1994).

n8 *See* Pub.L. No. 105-33, § 2004, 111 Stat. 257 (1997); Pub. L. No. 105-65, § 201(C)(1), 111 Stat. 1364 (1997); Pub. L. No. 104-204, § 201(g), 110 Stat. 2893 (1996).

[**18]

On March 7, 1995, HUD issued Notice 95-12, designed, by its terms, "to effect all applicable contracts with HAP anniversary dates from [March 7, 1995] to the end of Federal [fiscal year] 1995 (through September 30, 1995)." In critical terms, this directive prescribed, with exceptions not herein relevant -

> If current project rents on a . . . contract (before the application of the AAF) are above the published [fair market rent] for the area then in order to receive a rent increase, the owner must submit, at least

> 60 days prior to the HAP contract anniversary date, form HUD 92273, Estimates of Market Rent by Comparison, . . . completed by a non-identity of interest, state certified, general appraiser, FOR EACH UNIT TYPE (e.g. 1BR, 2BR, etc.). This form must contain at least three examples of unassisted housing in the same market area of similar age, type and quality.

Regarding the consequences of not filing the cited comparability study, the notice indicated -

> If the owner fails to submit the information required by this Notice at least 60 days before the contract anniversary date, then the rent levels will not be adjusted on the contract anniversary date, [**19] rather the new rent levels will go into effect 60 days after receipt of the required information. However, if the owner fails to submit this information by the date of the FY 1996 HAP contract anniversary, then no increase will be granted for the FY 1995 contract year.

According to the directive, if the owner demonstrated that comparable, unassisted rents were more than five percent over contract rents, then HUD would increase contract rents to the lesser of: (i) contract rents adjusted according to the AAAF; or (ii) the comparable, unassisted rent plus the so-called "initial difference." n9

> n9 The directive gave several examples of how these rules should be implemented, including one in which the project was eligible to receive the AAAF based on the comparable and another in which the project was eligible only for the comparable rents.

[*758] Except as noted below, CMHA last received rent adjustments based upon published AAAFs in 1994. n10 CMHA took no action with regard to contract rent adjustments until [**20] 1999, when it requested payment of the past due annual rent increases that HUD failed to make after the 1994 contract year. CMHA first provided information regarding comparable unassisted units for Quarrytown on November 17, 2000, indicating that the sum of comparable rents plus the initial difference exceeded the 1994, $ 560 contract rent in every year from 1995 through 2000. On January 23, 2001, it filed complaint No. 01-46C in this court, seeking contract rent increases for Quarrytown for 1995 through 2000. On January 26, 2001, HUD retroactively increased Quarrytown's 1995 rents to $ 576, after determining that Notice 95-12 did not apply to 1995 for Quarrytown because of its effective date.

> n10 Since the 1994 contract rent adjustments, the government published AAAFs each year for 1995 through 2001, as follows:

| Year | Non-Turnover Units | Turnover Units |
|---|---|---|
| 1995 | 1.018 | 1.028 |
| 1996 | 1.008 | 1.018 |
| 1997 | 1.013 | 1.023 |
| 1998 | 1.020 | 1.030 |
| 1999 | 1.024 | 1.034 |
| 2000 | 1.033 | 1.043 |
| 2001 | 1.003 | 1.013 |

[**21]

As for Severance, CMHA first provided comparability information for that property on March 2, 2001, indicating that the sum of comparable rents plus the initial difference exceeded the 1994, $ 572 contract rent in every year from 1995 to 1997. On March 27, 2001, HUD retroactively increased the 1996 Severance rents to $ 582 after determining that Notice 95-12 did not apply to the property for 1996. On April 26, 2001, CMHA filed complaint No. 01-251C in this court, seeking contract rent increases for Severance for 1995 through 2000. On May 16, 2002, HUD increased Severance contract rents to $ 601 for 2000, and to $ 603 for 2001.

Lastly, CMHA provided its first comparability study for the Ambleside property on May 15, 2001, indicating that the sum of comparable rents plus the initial difference did not exceed the 1994, $ 575 contract rent until 1997. On July 17, 2001, CMHA filed complaint No. 01-416C in this court, seeking contract rent increases for Ambleside for 1995 through 2001. On March 19, 2002, HUD retroactively increased 1996 Ambleside rents to $ 585, and on May 16, 2002, increased contract rents for Ambleside for 2000 to $ 604, and for 2001 to $ 606.

Thus, in approximately [**22] the first half of 2001, CMHA filed three independent actions in this court - one for each project. On July 24, 2001, this court ordered the cases consolidated. On April 1, 2002, plaintiff filed a motion for summary judgment. Defendant filed its opposition to plaintiff's motion for summary judgment and cross-motion for summary judgment on May 31, 2002. After oral argument, supplemental briefing was completed on March 13, 2003.

**II. DISCUSSION**

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Hunt v. Cromartie*, 526 U.S. 541, 549, 143 L. Ed. 2d 731, 119 S. Ct. 1545 (1999); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

CMHA brings this action for breach of contract, seeking damages resulting from the HUD's failure to provide it automatic rent increases for various years for Quarrytown, Severance and Ambleside. n11 The gravamen of its complaint is that, under the express terms of the HAP contracts, it is entitled to those increases based upon the application of the AAAFs published by HUD. It asserts that the United States repudiated its HAP contracts when Congress [**23] passed the 1994 amendments - leading to a breach allegedly compounded when HUD issued, and subsequently relied, upon, HUD Directive 95-12. The latter directive, plaintiff maintains, established requirements beyond those even in [*759] the 1994 amendments, further abridging its right to the automatic increases. Defendant mounts a multi-faceted counterattack on these contentions, beginning with the simple proposition that the 1994 amendments and HUD Directive 95-12 did not alter any contract rights that CMHA actually possessed. In this regard, while defendant does not invoke the so-called "sovereign acts" doctrine, it does argue that, under the so-called "unmistakability doctrine," HUD, acting on behalf of the United States, *sub silentio* reserved the right to pass legislation of the sort at issue as part of the HAP contracts. Finally, defendant raises other more narrow objections to plaintiff's entitlement to damages for particular years.

n11 For Quarrytown, plaintiff seeks damages for the years 1996 through 2001. For Severance and Ambleside, the relevant years are 1995 and 1997 through 2001.

[**24]

The court will take up the issues posed by the parties' arguments *seriatim.*

**A. Was there a *prima facie* breach here?**

To determine whether plaintiff's contractual rights were breached, the court first must determine what those rights are. *See San Carlos Irrigation and Drainage District v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). Several interpretational guides mark this decisional path. First, as an over-arching matter, the court, in interpreting a contract, seeks to "effectuate its spirit and purpose." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir.1991) (quoting *Arizona v. United States*, 575 F.2d 855, 863, 216 Ct. Cl. 221 (Ct. Cl. 1978)). Toward that end, contract interpretation "begins with the plain meaning of the agreement." *Id.* at 1274; *see also Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479, 1483 (Fed. Cir. 1998); *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1479 (Fed. Cir. 1997). "An interpretation which gives a reasonable meaning to all parts," the law provides, "will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, [**25] insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona*, 575 F.2d at 863; *see also Fortec Constr. v. United States*, 760 F.2d 1288, 1292 (Fed. Cir. 1985); *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 458-59 (2001).

The HAP contracts at issue indicate that "Automatic Annual Adjustment Factors will be determined by the Government at least annually" and that "on each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government." The "automatic" references in these provisions, as well as the annual periodicity established therein, plainly reveal an intent that the adjustments would occur without CMHA having to take any significant action. *See American Heritage Dictionary of the English Language* 122 (4th ed. 2000) ("automatic" means "acting or operating in a manner essentially independent of external influence or control"). n12 Of course, the automatic nature of these adjustments is qualified by the "overall limitation," which indicates that "notwithstanding any other provisions [**26] of this

Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government . . ." The latter provision requires HUD to determine whether there is a material difference, but does not identify whether it or the project owners must bear the burden of showing, respectively, that there is or is not a material difference. Logic, however, suggests that for the adjustments in the first part of the contract to be truly "automatic," the burden of demonstrating a material difference must lie on HUD.

n12 In *Brighton Village Associates v. United States*, 52 F.3d 1056 (Fed. Cir. 1995), the Federal Circuit construed the pre-1987 version of the statute and focusing on its use of the word "shall," concluded: "the statute unambiguously requires the HAP contract to provide for at least annual rent adjustments." *Id.* at 1061; *see also Brown Park Estates - Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1451 (Fed. Cir. 1997) ("In addition to setting initial contract rents, HUD is responsible for adjusting the contract rents on at least an annual basis."); *Acacia Villa*, 36 Fed. Cl. at 280 ("The title of Section 1.8(b), 'Automatic Annual Adjustments,' anticipates that rent adjustments will occur automatically and annually.").

[**27]

Among the constellation of opinions construing HAP contracts, none has pinpointed this issue. Yet, the exegeses of the overall [*760] limitation provision in these opinions consistently indicate that a project owner would receive an automatic adjustment unless HUD came forward with evidence triggering the limitation. Take, for example, *Alpine Ridge*, which involved whether HUD could use comparability studies as a check on automatic adjustments. There, the Supreme Court explained the "overall limitation" provision thusly:

> The rent adjustments indicated by the automatic adjustment factors remain the presumptive adjustment called for under the contract. It is only those presumably exceptional cases where the Secretary has reason to suspect that the adjustment factors are resulting in materially inflated rents that a comparability study would ensue. Because the automatic adjustment factors are themselves geared to reflect trends in the local or regional housing market, theoretically it should not be often that the comparability would suggest material differences between Section 8 and private-market rents.

508 U.S. at 19-20. Both the Court's reference to comparability [**28] studies being invoked only in "exceptional cases" and to automatic adjustments being "presumptive" clash with the notion, advanced by the government here, that the same contract provision can be construed to require property owners to provide comparability studies as a precondition to receiving an "automatic" adjustment. n13 Further indication that the Court believed that HUD was required to conduct the relevant studies may be found in its admonition that "if respondents have been denied formulabased rent increases based on shoddy comparisons, their remedy is to challenge the particular study, not to deny HUD's authority to make comparisons." *Id.* at 20-21; see also *Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1431 (Fed. Cir. 1997). Other cases proceed similarly from the notion that the critical statutory language here places on HUD, and only on HUD, the burden of coming forward to show that a particular adjustment would violate the limitation. *See, e.g., Acacia Villa*, 36 Fed. Cl. at 280-81; *Park Village Apts. v. United States*, 32 Fed. Cl. 441, 453 (1994), *aff'd (per curiam)*, 152 F.3d 943 (Fed. Cir. 1998), [**29] *cert. denied*, 525 U.S. 962, 142 L. Ed. 2d 329, 119 S. Ct. 405 (1998); Nat'l Leased Hous. Ass'n v. United States, 22 Cl. Ct. 649, 656-60 (1991), *aff'd*, 105 F.3d 1423 (Fed. Cir. 1997).

n13 Indeed, the Court's interpretation of this provision appears to have sprung directly from the government's opening brief, which asserted -

> The language of that provision clearly expresses the requirement that adjustments that result in material differences between assisted and unassisted projects will not be made, and ***it necessarily envisions that HUD will conduct a survey of some kind in order to determine the prevailing rent levels in the unassisted market.***

Brief for Petitioner (No. 92-551) at 19 (emphasis added).

It is, of course, true that unlike in *Alpine Village*, the issue here is not whether HUD may use comparability

studies to limit automatic adjustments; nor, as in *Park Village*, whether HUD might use such studies to reduce preexisting rents; nor, as in [**30] *Acacia Village*, whether HUD must employ such studies within the year the automatic adjustment is owed. Yet, the construction of the overall limitation reflected in these cases represents, in this court's view, its most natural reading. Indeed, that this language gave rise to so many *bona fide* disputes concerning HUD's role in setting rents illustrates just how far the government seeks to elasticize those same words in arguing not that HUD ***may*** use such comparability studies to limit the automatic adjustments, but that the property owners ***must*** use such studies to qualify for them. In the court's view, this conceptualization stretches the language of the contracts and the underlying statute well past its breaking point. n14

n14 In fact, even if the contracts were ambiguous on this count - which they are not - the doctrine of *contra preferentum* would dictate that any ambiguity in that language be interpreted against the drafter, here, HUD, ultimately leading the court to the same interpretation. *See, e.g., United States v. Seckinger*, 397 U.S. 203, 210, 25 L. Ed. 2d 224, 90 S. Ct. 880 (1970) ("[A] contract should be construed most strongly against the drafter, which in this case was the United States."); *S.W. Aircraft Inc. v. United States*, 551 F.2d 1208, 1212, 213 Ct. Cl. 206 (Ct. Cl. 1977); *Park Village*, 32 Fed. Cl. at 446 n.3. *See, however, Adrienne Village v. United States*, 25 Cl.Ct. 457, 459 (1992) (doctrine of *contra preferentum* does not apply to construction of the "overall limitation" in the HAP contracts as the limitation is "straight-forward" and "very precise").

[**31]

[*761] Of course, unlike normal contractual undertakings, the contracts here had their source in legislation passed by the Congress, requiring the court to consider that legislation in construing the contracts. *See, e.g., Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669, 84 L. Ed. 2d 590, 105 S. Ct. 1544 (1985); *Barseback Kraft AB*, 121 F.3d at 1480-81 (construing an agreement in light of the underlying legislation). Far from supporting defendant, however, the history of the legislation, in fact, only confirms the interpretation that proceeds naturally from the contracts' plain language.

When the HAP contracts were signed, the Housing Act stated that contracts in the Section 8 program "shall provide for adjustment annually or more frequently," subject to the proviso that such adjustment "shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary." 42 U.S.C. § 1437f(c)(2)(A), (C) (Supp. V. 1975). n15 Subsequently, HUD interpreted the latter clause as authorizing it to use comparability studies to preclude adjustments that would otherwise result in rents materially in excess of [**32] rents at comparable unassisted projects. Congress explicitly ratified that action in the 1987 Act, n16 but qualified this authority by providing that if HUD did not submit a comparability study to a Section 8 owner within 60 days of the anniversary date of the contract, the full AAAF would apply. 42 U.S.C. § 1437f(c)(2)(C) (1988). In the Reform Act, Congress again confirmed HUD's authority to conduct comparability studies, but required HUD to publish regulations for conducting such studies and provided a procedure for HUD to use such studies to develop a "modified annual adjustment factor." At the same time, Congress retained the sixty-day limitation adopted in the 1987 Act, thus adhering to the view that HUD's failure to perform a comparability study would lead to an automatic adjustment. 42 U.S.C. § 1437f(c)(2)(C) (Supp. II 1990). These provisions were left undisturbed when, in the 1994 amendments, Congress finally indicated that where the maximum monthly rent to be adjusted using an AAAF "exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the [**33] owner demonstrates that adjusted rents would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary." 42 U.S.C. § 1437f(c)(2)(A), (C) (Supp. II 1996).

n15 The comparability limitation originated in the House bill. *See* H.R. 15361, 93rd Cong., § 201 (1974). The House committee report explained -

> Assistance contracts would have to provide for periodic adjustments, at annual or more frequent intervals, in maximum monthly rents to reflect changes in the fair market rentals established for the housing are for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable . . . However, authorized adjustments in maximum rents could not result in material differences between

the rents charged for assisted and comparable unassisted units.

H. Rep. No. 93-1114 at 59 (1974); *see also id.* at 21. Interestingly, the report also indicates that the committee was aware of possible efforts by the Administration to modify the Section 8 Program via "executive fiat," in response to which the committee indicated that "future modifications in or terminations of housing subsidy programs are to be effected through the legislative process only." *Id.* at 18. The Conference Report indicated that this House provision was being adopted and indicated that under it, "rents would be adjusted at least annually to reflect changes in fair market rentals in the area, and permitted HUD to adjust rents on the basis of a reasonable formula." H. Conf. Rep. No. 94-1279 at 140. [**34]

n16 HUD took this view of the legislation when it adopted regulations specifying how it would conduct comparability studies. *See* 57 Fed. Reg. 49120 (1992). These regulations indicated that "section 801(c) of the Reform Act amended section 8(c)(2)(C) of the 1937 Act to ***clarify and affirm*** HUD's ability to use comparability studies as a basis for adjusting contract rents where the Secretary has reason to believe that the application of the AAAFs would result in a material difference between rents for assisted and similar unassisted units in the same market area." *Id.* at 49121 (emphasis added).

Thus, from the passage of Section 8 in 1974 until it was modified in 1995, the statutory mechanism clearly envisioned that annual adjustments were to be automatic unless [*762] HUD promptly performed a comparability study. Certainly, this was the intent underlying the 1987 Act and the Reform Act, in which Congress ratified HUD's interpretation of the statute as authorizing it to limit increases that would create material differences, thereby confirming that HUD's view of [**35] the statute was Congress' from the start.See *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846, 92 L. Ed. 2d 675, 106 S. Ct. 3245 (1986) (quoting *Red Lion Broadcasting Co., Inc. v. FCC*, 395 U.S. 367, 380-81, 23 L. Ed. 2d 371, 89 S. Ct. 1794 (1969)). Both acts, of course, limited how and when HUD could exercise this authority. One might wonder why Congress bothered to pass such limits if, as defendant contends, HUD always had the power, under the original Section 8 program, to require the project owners to present a comparability study as a precondition to receiving an adjustment. The simple fact is - it did not have that power. That Congress instead amended the statute to impose the latter burden suggests that the imposition thereof was, contrary to defendant's claims, latent neither in the earlier legislation nor in any contracts based thereupon. Indeed, unlike with the 1987 Act, there is not the slightest hint in the legislative history that Congress believed that the 1994 amendments confirmed a preexisting right. *Per contra.* Every indication is that Congress knew it was fundamentally altering the process for determining adjustments in preexisting contracts and was doing so to reduce outlays. Hence, [**36] Congress' view of the Housing Act, prior to the 1994 amendments, comports with this court's interpretation of the contract provisions at issue, which mirror that statute. n17

n17 In asserting that the subsequent modification of the legislation did not effectuate a breach, defendant notes that the contracts recite that they are entered into "pursuant to 42 U.S.C. § 1437." It claims the latter reference suggested that the agreements were subject to that law, as amended, citing *Bowen v. Public Agencies Opposed to Social Security Entrapment (POSSE)*, 477 U.S. 41, 91 L. Ed. 2d 35, 106 S. Ct. 2390 (1986). To be sure, in *POSSE*, the Court reached a similar conclusion, but there Congress, in the statute authorizing the agreements that were allegedly breached, expressly reserved to itself "the right to alter, amend, or repeal any provision of" the Act." 42 U.S.C. § 1304. The Supreme Court stressed this - "the State accepted the Agreement under an Act that contained the language of reservation. That language expressly notified the State that Congress retained the power to amend the law under which the Agreement was executed and by amending that law to alter the Agreement itself." 477 U.S. at 54. Here, there was no such reservation and CMHA thus was not placed on notice that it was to assume the risk of subsequent legislation. *See also Winstar*, 518 U.S. at 910 (Souter, J.).

[**37]

Accordingly, this court holds that the HAP contracts expressly require HUD to provide CMHA with annual adjustments barring the agency's invocation of the overall limitation. As such, the passage of the 1994 amendments was a repudiation of this contract provision that seemingly caused a failure to perform a contractual duty when it was due, at that point ripening into an apparent breach of contract. *See Franconia*, 536 U.S. 129 at 142-43; *see also Maine Yankee Atomic Power Co.*