*v. United States*, 225 F.3d 1336, 1343 (Fed. Cir. 2000); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997); Restatement (Second) of Contracts § 235(2) (1981). That *prima facie* breach was then exacerbated when HUD, in its 1995 directive, imposed additional requirements not envisioned in either the HAP contracts or the prior legislation. In this regard, the court rejects defendant's contention that the sixty-day time limit imposed by the directive was a "reasonable exercise of HUD's authority to administer HAP contracts." To the contrary, that requirement appears to represent yet another new and fundamental change in the deal previously executed. [**38]

The court treads carefully in referring to this as only as a *prima facie* breach, because to this point in the analysis, the court has considered only the express provisions of the HAP contracts. For there to be actual liability here, the court also must determine whether the government reserved the right to pass the 1994 amendments under the so-called "unmistakability doctrine." Only if this is not true, can the court then say, with confidence, that defendant actually breached the contracts in question.

[*763] **B. Does the unmistakability doctrine shield defendant from liability?**

We begin with the general rule that "when the United States enters into contract relations, its rights and duties therein are generally governed by the law applicable to contracts between private individuals." *Lynch v. United States*, 292 U.S. 571, 579, 78 L. Ed. 1434, 54 S. Ct. 840 (1934); *see also Franconia Associates v. United* States, 536 U.S. 129, 141, 153 L. Ed. 2d 132, 122 S. Ct. 1993 (2002); *Mobil Oil Exporting & Producing, S.E., Inc. v. United States*, 530 U.S. 604, 607, 147 L. Ed. 2d 528, 120 S. Ct. 2423 (2000); *Perry v. United States*, 294 U.S. 330, 351, 79 L. Ed. 912, 55 S. Ct. 432, 80 Ct. Cl. 861 (1935). This general precept, however, ordinarily is not viewed as limiting [**39] the government's sovereign powers. "Sovereign power," the Supreme Court has stated, "governs all contracts subject to the sovereign jurisdiction, and will remain intact unless surrendered in unmistakable terms." *Winstar*, 518 U.S. at 872 (1996) *(quoting Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148, 71 L. Ed. 2d 21, 102 S. Ct. 894 (1982)); *see also Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1578 (Fed. Cir. 1997), *cert. denied*, 524 U.S. 951, 141 L. Ed. 2d 735, 118 S. Ct. 2365 (1998). The latter sentence encapsulates the so-called "unmistakability doctrine" - as easily summarized as it is poorly delineated, the latter owing to a welter of conflicting opinions, no less than four of which are in *Winstar* itself.

In truth, the most unmistakable thing about the "unmistakability doctrine" is the sheer number of unresolved questions it engenders. For one thing, it is less than clear in what type of actions this doctrine applies - is it a "defense" only when a plaintiff seeks to exempt itself from a statute in an injunctive action or does it also shield the United States from liability when damages are sought due to an alleged breach of contract? Also in need of elucidation [**40] is whether the doctrine hinges on either the nature of the contractual undertaking or the role played by the government therein - is it available in a regular procurement and, if not, does it apply to hybrid contracts of the sort at issue here? A third tenebrous issue is whether the "sovereign powers" protected by the doctrine include all exercises of legislative power, among them laws abrogating specific government obligations under a particular class of contracts, or are implicated only when the Congress passes general legislation that incidentally impacts upon a contract or contractor. In shorter form, this issue sometimes takes the form whether the "unmistakability" doctrine applies only to actions first covered by the so-called "sovereign acts" doctrine, which generally shields from liability the United States' "public and general acts as a sovereign." *Horowitz v. United States*, 267 U.S. 458, 461, 69 L. Ed. 736, 45 S. Ct. 344, 61 Ct. Cl. 1025 (1925). n18 Finally, even if the "unmistakability" doctrine applies, there remain unconcluded issues as to what sort of unmistakable promise will prevent the government from exercising its sovereign powers and, subsidiarily, whether the degree of that unmistakability [**41] varies by the nature of the [*764] contract, with more exactitude required in some settings.

n18 The sovereign acts doctrine dates back to one of the earliest decisions of the Court of Claims, *Deming v. United States*, 1 Ct. Cl. 190 (1865). In that case, brought by an Army supplier whose costs had increased because of a new statute, the court also recognized the Janus-like character of the United States as contracting party and sovereign, observing "the United States as a contractor are not responsible for the United States as a lawgiver." *Id.* at 191. In *Jones v. United States*, 1 Ct. Cl. 383 (1865), the court extended the doctrine to executive branch actions in concluding that the government was not liable when the presence of federal troops hindered a surveyor under contract to the government. It stated: "Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct, or violate the particular contracts into which it enters with

private persons." *Id.* at 384. The "public and general" language in *Jones* was eventually adopted by the Supreme Court in *Horowitz*. More recently, the Federal Circuit indicated that determining whether the government, in passing legislation, is acting as a contractor or a sovereign, requires "a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior governmental contracts." *Yankee Atomic*, 112 F.3d at 1575. For a further discussion of the history of, and policies underlying, the sovereign acts doctrine, *see* Edward A. Fitzgerald, "*Conoco, Inc. v. United States*: Sovereign Authority Undermined by Contractual Obligations on the Outer Continental Shelf," 27 Pub. Cont. L.J. 755, 777-81 (1998) (hereinafter "Fitzgerald").

[**42]

To answer at least some of these questions, the court ultimately must attempt to reconcile the seeming paradoxes posed by *Winstar* - a daunting task that this court believes, in the first instance, is best approached by developing a healthier understanding of the provenance of the unmistakability doctrine itself. To that topic, the court now turns.

**1. The Provenance of the Unmistakability Doctrine**

**a. Early Cases**

The unmistakability doctrine has its roots in several early Supreme Court cases involving the application of the Contracts Clause, U.S. Const., art. I, § 10, cl. 1, which commands that "no State shall . . . pass any . . . Law impairing the Obligation of Contracts . . ." n19 Perhaps the earliest of these cases is *Providence Bank v. Billings*, 29 U.S. (4 Pet.) 514, 7 L. Ed. 939 (1830), where the Court construed the Rhode Island legislature's charter of a bank. The bank claimed that a subsequent tax had diminished the value of that charter and sought an injunction against the imposition of the tax. Writing for a unanimous court, Justice Marshall held that, absent an explicit exclusion from increased taxation, the State's power to tax could not be enjoined, reasoning [**43] that "the power of legislation . . . resides in government as part of itself, and need not be reserved when property of any description, or the right to use it in any manner, is granted to individuals or corporate bodies." *Id.* at 563.

n19 Early applications of the Contracts Clause yielded another defense sometimes wielded by the government in breach of contract actions - the reserved powers doctrine. That doctrine, used to void contracts *ab initio*, simply provides that the sovereign may not contract away "'an essential attribute of its sovereignty.'" *See Winstar*, 518 U.S. at 888 (quoting *United States Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23, 52 L. Ed. 2d 92, 97 S. Ct. 1505 (1977)). Defendant, however, has not asserted this defense herein.

A few years later, in *Charles River Bridge v. Warren Bridge*, 36 U.S. (11 Pet.) 420, 9 L. Ed. 773 (1837), the proprietor of a bridge spanning the Charles River from Boston to Cambridge under a Massachusetts charter, sued for damages and to prevent [**44] the construction and operation of a nearby bridge under a second charter. It argued that its charter impliedly was exclusive. Surveying various English and American precedents, Justice Taney extended the ruling in *Providence Bank* to any situation where the government acts "to promote the happiness and prosperity of the community." *Id.* at 547. Narrowly construing the charter possessed by the proprietor, Justice Taney readily concluded that it did not contain an implicit right against further charters being granted, stating that "in grants by the public nothing passes by implication." *Id.* at 546. Amplifying this point, he further wrote that - "the continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the end of its creation[.]" *Id.* at 548.

*Providence Bank* and *Charles River Bridge* are typical of early cases involving the unmistakability doctrine - they involved state corporate charters and rights that allegedly were appurtenant thereto (often, however, unstated); mostly (though not exclusively) sought injunctive relief; and focused on whether the state government [**45] (or a political subdivision thereof) had retained generally acknowledged sovereign powers, such as the right to tax, control navigation, or foreclose on property via eminent domain. In these cases, and others decided over the next seventy years or so, the Supreme Court held that the Contracts Clause was not violated when the relevant charter was silent as to the reservation of these sovereign powers. n20 While none of these cases appears [*765] actually to have employed the term "unmistakable," let alone the paradigmatic "unmistakability doctrine," the Court came closest to enunciating the doctrine in its modern terms in *St. Louis v. United Railways Co.*, 210 U.S. 266, 280, 52 L. Ed. 1054, 28 S. Ct. 630 (1908), where it indicated that a government's power to tax was unaffected by a contract, unless it "has been specifically surrendered in terms which admit of no other reasonable interpretation."

n20 *See also, e.g., Rogers Park Water Co. v. Ferugs*, 180 U.S. 624, 628-29, 45 L. Ed. 702, 21 S. Ct. 490 (1901) (charter including schedule of rates could be altered by city government to reduce rates, holding that the latter authority "cannot be held to have been stipulated away by doubtful or ambiguous provisions")*; Covington v. Kentucky*, 173 U.S. 231, 233-34, 43 L. Ed. 679, 19 S. Ct. 383 (1899) (upholding state property tax on city's waterworks despite earlier law providing that such waterworks shall remain "forever" exempt from tax); *Vicksburg, Shreveport & Pacific Railroad v. Dennis*, 116 U.S. 665, 670, 29 L. Ed. 770, 6 S. Ct. 625 (1886) (under unmistakability presumption, tax exemption in charter construed to apply only to railroad once it became operational); David B. Toscano, "Forbearance Agreements: Invalid Contracts for the Surrender of Sovereignty," 92 Colum. L. Rev. 426, 452-53 (1992) (describing these cases); Fitzgerald, 27 Pub. Cont. L.J. at 788 (same).

[**46]

Another line of authority, however, was crystallizing during this same general period. In these cases, often involving utilities, the Supreme Court held that the government must observe the same contracting rules as private parties - what one leading commentator refers to as the "rule of congruence." n21 A prime example is *Cleveland v. Cleveland City Railway*, 194 U.S. 517, 48 L. Ed. 1102, 24 S. Ct. 756 (1904), where the Court struck down a local ordinance that required a train company to reduce its cross-town rates to four cents. The Court noted that an earlier charter to the same company had expressly reserved to the city the power to decrease fares, but that the current charter was silent on this point. *Id.* at 536. On that basis, it concluded that it was "free from doubt" that the ordinance "was an impairment of the contracts embodied in the prior ordinances." *Id.* at 537; *see also Detroit v. Detroit Citizens' Street Ry. Co.*, 184 U.S. 368, 382, 46 L. Ed. 592, 22 S. Ct. 410 (1902) (noting as to city's contract with street railway, "the contract once having been made, the power of the city over the subject, so far as altering the rates of fare or other matters properly involved [**47] in and being a part of the contract, is suspended for the period of the running of the contract").

n21 *See* Joshua I. Schwartz, "Liability for Sovereign Acts: Congruence and Exceptionalism in Government Contracts Law," 64 Geo. Wash. L. Rev. 633 (1996); *see also* Alan R. Burch, "Purchasing the Right to Govern: Winstar and the Need to Reconceptualize the Law of Regulatory Agreements," 88 Ky. L.J. 245, 273 (2000) (hereinafter "Burch").

At times, these utility cases referred to - and made short shrift of - principles resembling the unmistakability doctrine. For example, in *Los Angeles v. Los Angeles Gas & Electric Co.*, 251 U.S. 32, 64 L. Ed. 121, 40 S. Ct. 76 (1919), where an utility argued that it had an exclusive franchise, preventing the city from using its power of eminent domain, the Supreme Court noted that under California law, "'every intendment is to be indulged in favor of [a law's] validity; and doubts resolved in a way to uphold the law-making power.'" *Id.* at 37 [**48] (quoting *Ex Parte Haskell*, 112 Cal. 412, 44 P. 725 (Cal. 1896)). Yet, in this and other cases, the Court appeared to distinguish between the exercise of archetypal sovereign powers, such as the power of eminent domain, or the taxing and police powers, and other actions taken by the government in more of a corporate, proprietary or business role. n22 Actions in the latter roles were deemed more susceptible to the traditional rules of contracts: "If [the government] comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same rules that govern individuals there." *Cooke v. United States*, 91 U.S. 389, 398, 23 L. Ed. 237 (1895); *see also* Burch, *supra*, at 274 n.113 (listing numerous other such "congruence" cases).

n22 *See, e.g., Los Angeles Gas & Elec.*, 251 U.S. at 40 ("It will be observed that we are not concerned with the duty of the corporation operating a public utility to yield uncompensated obedience to a police measure adopted for the protection of the public, but with a proposed uncompensated taking or disturbance of what belongs to one lighting system in order to make way for another."); *Vicksburg v. Vicksburg Waterworks, Co.*, 206 U.S. 496, 508, 51 L. Ed. 1155, 27 S. Ct. 762 (1907) ("That a state may, in matters of proprietary rights, exclude itself from the right to make regulations of this kind, . . . has been too frequently declared to admit of doubt.").

[**49]

The tracks of these two parallel lines of authority - those of the unmistakability doctrine and the congruence principle - can be spoored into the middle of the last century. As to the unmistakability doctrine, there [*766] were several additional cases during this period involving the Contracts Clause, highlighted by *Home*

*Building & Loan Association v. Blaisdell*, 290 U.S. 398, 78 L. Ed. 413, 54 S. Ct. 231 (1934) and *Veix v. Sixth Ward Building & Loan Association of Newark*, 310 U.S. 32, 84 L. Ed. 1061, 60 S. Ct. 792 (1940). In the first of these, the Supreme Court indicated that, absent express terms, "the reservation of essential attributes of sovereign power is . . . read into [the] contract[] as a postulate of the legal order." *Home Building*, 290 U.S. at 435. It elucidated -

> But into all contracts, whether made between States and individuals, or between individuals only, there enter conditions which arise not out of the literal terms of the contract itself; they are superinduced by the preexisting and higher authority of the laws of nature, of nations, or of the community to which the parties belong; they are always presumed, and must be presumed, to be known and recognized by all, [**50] are binding upon all, and need never, therefore, be carried into express stipulation, for this could add nothing to their force. Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, wherever a necessity for their execution shall occur.

*Id.* at 435-36 (quoting *Long Island Water Supply Co. v. Brooklyn*, 166 U.S. 685, 692, 41 L. Ed. 1165, 17 S. Ct. 718 (1897)). Later burnishing this rule in *Veix*, the Court indicated that such sovereign authority involved not only legislation to promote "health, morals and safety," but also "extends to economic needs as well." *Veix*, 310 U.S. 32, 38-39, 84 L. Ed. 1061, 60 S. Ct. 792 (1940). n23

n23 Other cases to similar effect during this period include: *New York Rapid Transit Corp. v. City of New York*, 303 U.S. 573, 590-93, 82 L. Ed. 1024, 58 S. Ct. 721 (1938); *Puget Sound Power & Light Co. v. Seattle*, 291 U.S. 619, 627, 78 L. Ed. 1025, 54 S. Ct. 542 (1934); *see also United States Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 25, 52 L. Ed. 2d 92, 97 S. Ct. 1505 (1977).

[**51]

This same period, however, also yielded two decisions commonly viewed as twin paeans to the congruence rule - *Lynch v. United States*, 292 U.S. 571, 78 L. Ed. 1434, 54 S. Ct. 840 (1934) and *Perry v. United States*, 294 U.S. 330, 79 L. Ed. 912, 55 S. Ct. 432, 80 Ct. Cl. 861 (1935). *Lynch* involved life insurance policies issued to veterans by the government during World War I under the War Risk Insurance Act of 1917, § § 400-405, 40 Stat. 409. When it discovered that these policies would eventually cost the government a billion dollars, Congress terminated them in the Economy Act of 1933, § 17, 48 Stat.11, which provided that "all laws granting or pertaining to yearly renewable term insurance are hereby repealed." Rejecting the government's assertion that the contracts had been annulled, Justice Brandeis, writing for a unanimous Court, first held that the insurance policies were contracts of the United States, rather than mere gratuities that could be "redistributed or withdrawn at any time in the discretion of the Congress," and thus "create vested rights." 292 U.S. at 577. n24 Then, in one of the most definitive statements of the congruence rule, Justice Brandeis declared that "when the United States enters [**52] into contract relations, its rights and duties therein are governed by the law applicable to contracts between private individuals." *Id.* at 579. The Court noted that while federal contracts may be abrogated when "the action taken falls within the federal police power or some other paramount power," *id.*, there was no suggestion that Congress had "abrogated these contracts in the exercise of [such] power." *Id.* at 580. Rather, it appeared that the legislation had been motivated by a simple intent to maintain the government's credit by reducing its obligations, triggering the following, somewhat scolding response from the Court -

> Congress was free to reduce gratuities deemed excessive. But Congress was without power to reduce expenditures by abrogating contractual obligations of the [*767] United States. To abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation.

*Id.* Because the government had not reserved the "power to curtail the amount of the benefits which Congress contracted to pay," *id.* at 578, the Court opined, Congress could not modify [**53] the prior contracts for "'the United States are as much bound by their contracts as are individuals.'" *Id.* at 580 (quoting *Union Pac. R.R. v. United States*, 99 U.S. 700, 719, 25 L. Ed. 496, 25 L. Ed. 504, 14 Ct. Cl. 594 (1878)).

n24 In this regard, the Court stated further -

> True, these contracts, unlike others, were not entered into by the United States for a business purpose . . . But the policies, although not entered into for gain, are legal obligations of the same dignity as other contracts of the United States and possess the same legal incidents.

292 U.S. at 576-77.

The following term, in *Perry,* plaintiffs who possessed U.S. bonds promising payment of principal in "United States gold coin of the present standard of value" challenged another Depression-era law that declared clauses in contracts requiring payment in gold, including those involving the United States, were "against public policy." The same law required such payment to be in any "coin or currency which at the time of payment [**54] is legal tender." Joint Resolution of June 5, 1933, ch. 48, 48 Stat. 112. In a companion case to *Perry*, the Court held that under the Commerce Clause, Congress could retroactively invalidate gold clauses in private contracts. *See Norman v. Baltimore & Ohio R.R.*, 294 U.S. 240, 79 L. Ed. 885, 55 S. Ct. 407 (1935). But, in *Perry*, the Court held that abrogation of the same gold clauses in the U.S. bonds was impermissible, citing *Lynch* in observing:

> There is a clear distinction between the power of the Congress to control or interdict the contracts of private parties when they interfere with the exercise of its constitutional authority, and the power of Congress to alter or repudiate the substance of its own engagements . . . . To say that the Congress may withdraw or ignore that pledge is to assume that the Constitution contemplates a vain promise, a pledge having no other sanction than the pleasure and convenience of the pledgor. This Court has given no sanction to such a conception of the obligations of our Government.

294 U.S. at 350-51. Rejecting, as inapplicable, the argument that "the Government cannot by contract restrict the exercise of a sovereign power, [**55] " the Court found instead that "the right to make binding obligations is a competence attaching to sovereignty." 294 U.S. at 353. The Court thereby viewed its holding as not restricting, but reaffirming, Congress' power to borrow money under Article I, § 8, cl.2 of the Constitution, reasoning, in this regard, that "the binding quality of the promise of the United States is of the essence of the credit which is so pledged." 294 U.S. at 353. Despite this ground-breaking analysis, the Court ultimately concluded that plaintiff was entitled only to the face value of the bonds, "recovering no more than the loss he had suffered and of which he may rightly complain." *Id.* at 354. n25

n25 Four dissenting Justices, led by Justice McReynolds, characterized the latter holding as "amounting to a declaration that the Government may give with one hand and take away with the other." *Id.* at 377. *See also* Leo P. Martinez, "Of Fairness and Might: The Limits of Sovereign Power to Tax After Winstar," 28 Ariz. St. L.J. 1193, 1211 (1997).

[**56]

Immediately after *Lynch* and *Perry,* one schooled in the law might have reconciled those cases with decisions applying the unmistakability doctrine by blithely surmising that the States simply fared better under the Contracts Clause than the United States did under the Fifth Amendment. While subsequent cases would show this reasoning to be faulty, n26 there was little precedent in the 1950s to indicate as much, because although the unmistakability doctrine by then was over 120 years old, the Supreme Court had yet to apply it to the United States. n27 The [*768] state of the law in this regard, indeed, would remain unchanged for approximately another thirty years.

n26 See, e.g., *Nat'l* R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry., 470 U.S. 451, 472-73, 84 L. Ed. 2d 432, 105 S. Ct. 1441 (1985); *Pension Benefit Guarantee Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733, 81 L. Ed. 2d 601, 104 S. Ct. 2709 (1984).

n27 In 1879, the Supreme Court hinted that the unmistakability doctrine might apply to the federal government in deciding two companion cases that became known as the Sinking Fund Cases. *See Union Pacific R.R. Co. v. United States*, 99 U.S. 700 (1879) and *Central Pacific Ry. v. Gallatin*, 99 U.S. 700 at 727 (1879). These cases did not involve contracts *per se*, but rather Civil War legislation that authorized the building of the intercontinental railroad. To fund that railroad, Congress authorized the issuance of various bonds payable by railroads in thirty years.

In 1878, concerned with the railroad's long-term solvency, Congress added a requirement that the railroads deposit half of their earnings into a sinking fund within the Treasury. The Court upheld this requirement as against a Due Process challenge, and intimated that the United States, though not subject to the Contract Clause, might benefit from a rule similar to the unmistakability doctrine, stating that - "The United States cannot, any more than a State, interfere with private rights, except for legitimate governmental purposes." *Union Pacific*, 99 U.S, at 718. It noted further that if a state were to pass the same law, "it would not be seriously contended that such legislation was unconstitutional, either because it impaired the obligations of the charter contract, or deprived the corporation of its property without due process of law." 99 U.S. at 721-22; *see also* Burch, *supra*, at 284.

[**57]

Finally, in 1982, the Court invoked that doctrine on behalf of another sovereign - not the United States, but a Native American Tribe. In *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 71 L. Ed. 2d 21, 102 S. Ct. 894 (1982), the Tribe granted private parties rights to oil and natural gas underlying tribal land; the lease prevented the Tribe from raising the rent or royalty payments provided therein, but did not say anything about taxes. *Id.* at 135. When the Tribe imposed a severance tax on oil and natural gas production, the developer sued, claiming a breach of contract. The Supreme Court, however, upheld the tax, reasoning that: "without regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." *Id.* at 148. By noting that the unmistakability doctrine applied to sovereign power "without regard to its source," the Court thus paved the way for that doctrine to apply to the United States.

It did not take long for that potential to become a reality - the year was 1986, the case was *Bowen v. Public Agencies Opposed to Social Security Entrapment* (POSSE), 477 U.S. 41, 91 L. Ed. 2d 35, 106 S. Ct. 2390 (1986) [**58] and the statute involved was the Social Security Act of 1935. Every State had taken advantage of the 1950 amendments to that Act to enter into long-term contracts with the Federal government to obtain Social Security coverage for their employees and those of their local governments. Mirroring a provision in section 418(g) of the 1950 amendments, these contracts permitted the States to terminate the contracts on behalf of certain groups of state or local employees by giving two years advance notice. In 1983, after various States, including California, had begun increasingly to exercise these rights, Congress repealed the termination provision retroactively, *see* Social Security Amendments Act of 1983, Pub. L. No. 98-21, 97 Stat. 65, thereby preventing the local government's from withdrawing their employees from the Social Security system, even where notices had previously been given. 477 U.S. at 46-48.

The States claimed that this legislation had effectuated a taking of their contract rights. Rejecting this argument, Justice Powell, writing on behalf of a unanimous Court, reasoned -

> While the Federal Government, as sovereign, has the power to enter contracts [**59] that confer vested rights, and the concomitant duty to honor those rights, *see Perry v. United States*, . . .; *Lynch v. United States*, . . ., we have declined in the context of commercial contracts to find that a 'sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in' the contract. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148, 71 L. Ed. 2d 21, 102 S. Ct. 894, . . . . Rather, we have emphasized that 'without regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.' *Ibid.* Therefore, contractual arrangements, including those to which a sovereign itself is party, "remain subject to subsequent legislation" by the sovereign. *Id.*, at 147.

[*769] 477 U.S. at 52. In so holding, the Court distinguished between the Section 418 agreements and other contracts, noting, *inter alia*, that Congress had explicitly reserved the right in the original Social Security Act to modify its provisions. *Id.* at 53-54. [**60] Then, in a critical passage, Justice Powell distinguished *Lynch* and *Perry*, noting:

> the provision constituted neither a debt of the United States, *see Perry* . . ., nor an obligation of the United States to provide benefits under a contract for which the obligee paid a monetary premium, *see*

> *Lynch* . . . . The termination clause was not unique to this Agreement; nor was it a term over which the State had any bargaining power or for which the State provided independent consideration. Rather, the provision simply was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare.

*Id.* at 55. n28

> n28 In the most recent Supreme Court case to apply the unmistakability doctrine to absolve the United States from liability, *United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 94 L. Ed. 2d 704, 107 S. Ct. 1487 (1987), the Court held that a treaty granting an Indian Tribe ownership of a river bed did not abrogate the right of the United States to regulate the navigability of the river. Specifically, it held the assertion of the navigational servitude did not effect a taking. In so holding, the court held that the Tribe did not "gain[] an exemption from the servitude simply because it received title to the riverbed" under its treaty. *Id.* at 707. "Such a waiver of sovereign authority will not be implied," the Court continued, "but instead must be 'surrendered in unmistakable terms.'" *Id.* (quoting *POSSE*, 477 U.S. at 52).

[**61]

Read in isolation, Justice Powell's statement in POSSE that "sovereign power . . . will remain intact unless surrendered in unmistakable terms," *id.* at 52, appears broad and unqualified - defendant, in fact, would have this court so hold Yet, by distinguishing, rather than overruling, *Lynch* and *Perry*, the Court clearly signaled that the unmistakability doctrine has limits. What are they? If history is any guide, they are not so dependent on the nature of the underlying agreement as they are on that of the allegedly breaching legislation. A key then is whether that legislation invokes or embodies the types of sovereign power encompassed by the doctrine - those that "promote the happiness and prosperity of the community," *Charles River Bridge*, 36 U.S. at 547, or involve the health, morals, safety or economic needs of the citizenry, *Veix*, 310 U.S. at 38-39. If such is the case - where, for example, the challenged legislation represents a general exercise of the taxing or police powers - the unmistakability doctrine readily applies. If it is not - where, for example, the challenged legislation represents a bald "repudiation" of [**62] a contractual obligation prompted by Congress' desire to correct what it perceives to be an overly generous deal - the unmistakability doctrine will avail the government naught. It follows, *a fortiori*, that the unmistakability doctrine is not triggered by the passage of just any legislation - contrary to defendant's importunings, the power of Congress to pass legislation under Article I of the Constitution is neither coextensive nor coterminous with the doctrine. Rather, the doctrine is more limited - owing those limitations to its historical roots in the Contracts Clause cases and its peaceful coexistence with the congruence line of cases for more than a century. It remains to test these propositions in the harrowing crucible that is *Winstar*.

**b. The *Winstar* decision.**

*Winstar*, of course, was one (actually a trio) of many cases spawned when the Congress enacted a statute that precluded regulatory agencies from accepting a particular regulatory treatment that had allegedly been promised by contract to various entities acquiring insolvent thrift institutions. There, as here, the United States made the unmistakability doctrine the centerpiece of its defense, wielding, [**63] as both a buckler and shield, the broad statement of that rule in *POSSE* quoted above. The Supreme Court rejected that argument in a judgment supported by three opinions: a plurality opinion authored by Justice Souter, a separate concurring opinion by Justice Breyer, and an opinion concurrent in the judgment written by Justice Scalia.

[*770] The plurality opinion in *Winstar* decided that the unmistakability doctrine was inapplicable. Summarizing some of the same history discussed above, Justice Souter stated that the "application of the [unmistakability] doctrine . . . turns on whether enforcement of the contractual obligation would block the exercise of a sovereign power of the Government." 518 U.S. at 879. He found that the latter was not the case, as the thrifts were not seeking to preclude the United States from exercising its sovereign powers, but rather to collect damages arising from the regulatory change. Five justices, however, disagreed with this conclusion, with the three concurring justices opining that the plurality's approach clashed with precedent, which had "not made the availability of these sovereign defenses (as opposed to their validity on the merits) [**64] depend upon the nature of the contract at issue." *Id.* at 919 (Scalia, J., concurring); *see also id.* at 926 (Rehnquist, C.J., dissenting). Three of these justices - those who concurred in the judgment - believed that the doctrine applied, but that the contracts in question contained an unmistakable promise to continue the favorable regulatory treatment. *Id.* at 920-21 (Scalia, J.). The two dissenting justices also believed that the doctrine applied, but found that the contract failed to

contain an unmistakable promise against further regulatory action. *Id.* at 935-36 (Rehnquist, C.J., dissenting).

Each of these opinions, however, intimates that the application of the unmistakability doctrine turns on the nature of the legislation or other action alleged to have breached the contract. Invoking *Lynch* and *Perry*, Justice Souter, for example, noted that "the National Government has some capacity to make agreements binding future Congresses by creating vested rights," albeit acknowledging that "the extent of that capacity . . . remains somewhat obscure." *Id.* at 876. Attempting to reconcile the unmistakability and congruence lines of cases, Justice Souter explained [**65] further -

> *Merrion*, *Bowen*, and *Cherokee Nation* thus announce no new rule distinct from the canon of construction adopted in *Providence Bank* and *Charles River Bridge*; their collective holding is that a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an Act of Congress), nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power. The cases extending back into the 19th century thus stand for a rule that applies when the Government is subject either to a claim that its contract has surrendered a sovereign power (*e.g.*, to tax or control navigation), or to a claim that cannot be recognized without creating an exemption from the exercise of such a power (*e.g.*, the equivalent of exemption from Social Security obligations). The application of the doctrine thus turns on whether enforcement of the contractual obligation alleged would block the exercise of a sovereign power of the Government.

*Id.* at 878-79. Justice Souter then supplied an important definition as to [**66] which sovereign powers were protected by the doctrine, *to wit*:

> 'Sovereign power' as used here must be understood as a power that could otherwise affect the Government's obligation under the contract. The Government could not, for example, abrogate one of its contracts by a statute abrogating the legal enforceability of that contract, Government contracts of a class including that one, or simply all Government contracts. No such legislation would provide the Government with a defense under the sovereign acts doctrine, . . .

*Id.* at 878 n. 22 (citation omitted).

The latter definition would have been unremarkable had it been in the plurality's discussion of the sovereign acts doctrine; its conspicuous placement within the plurality's response to the government's unmistakability argument, however, is significant, as it suggests a nexus between the two doctrines that hinges on whether a given enactment truly represents the exercise of a "sovereign power." This linkage is all the more significant given the plurality's statement that under the [*771] sovereign acts doctrine, the legislature can enact laws that are "relatively free of Government self-interest," but not "statutes [**67] tainted by a governmental object of self-relief ." *Id.* at 896. The plurality viewed such self-interest as "instances in which the Government seeks to shift the costs of meeting its legitimate public responsibilities to private parties." *Id.* Thus, in terms reminiscent of *Lynch* and *Perry*, the plurality thereby demarcated, more clearly perhaps than before, the point at which the influence of both the sovereign acts and unmistakability doctrines wanes and the congruence principles take hold.

That the unmistakability doctrine hinges on the nature of the government's breaching act is a leitmotif found in both concurring opinions. Thus, Justice Breyer began his opinion by observing: "Both common sense and precedent make clear that an 'unmistakable' promise to bear the risk of a change in the law is not required in every circumstance in which a private party seeks contract damages." *Id.* at 911. By way of example, he noted that in neither *Lynch* nor *Perry* "did the Court suggest that an 'unmmistakable' promise, beyond that discernible using ordinary principles of contract interpretation, was necessary before liability could be imposed on the Government." *Id.* at [**68] 912. "This approach is unsurprising," he added, "for in practical terms it ensures that the government is able to obtain needed goods and services from parties who might otherwise, quite rightly, be unwilling to undertake the risk of government contracting." *Id.* at 913. Surveying decisions such as *POSSE* in light of such congruence principles, Justice Breyer observed that -

> it is difficult to believe that the Court intended its 'umistakability' language in these unusual cases to disable future courts from inferring, from language and circumstances under ordinary contract principles, a more narrow promise in more typical cases - say, a promise not to abrogate, or to restrict severely through legislation and without compensation, the very right that a sovereign explicitly granted by contract (*e.g.*, the right to drill for oil, or to use the riverbed).

*Id.* at 916-17. Summarizing, Justice Breyer indicated that the foregoing considerations, "along with the general principle that the government is ordinarily treated like a private party when it enters into contracts," meant that the "unmistakability" language in cases like POSSE "might have grown out of unique [**69] features of sovereignty, believed present in those cases, which, for reasons of policy, might have made appropriate a special caution in implying the claimed promise." *Id.* at 918. Finding that "there is no special policy reason related to sovereignty which would justify applying an 'unmistakability' principle here," Justice Breyer thus agreed that the doctrine was inapplicable. *Id.*

For his part, Justice Scalia disagreed with the contention that the unmistakability doctrine did not apply because the suits in question sought damages. *Id.* at 919-20. Yet, still concluding that the doctrine did not shield the government from liability under the contracts at issue, he too focused on the nature of the action taken by the government. In this regard, Justice Scalia wrote:

> it is reasonable to presume *(unless the opposite clearly appears)* that the sovereign does *not* promise that none of its multifarious sovereign acts, needful for the public good, will incidentally disable it or the other party from performing one of the promised action.

*Id.* at 921. Were the government "free to make its own performance impossible through its manner of regulation," Justice [**70] Scalia concluded, the result would be to place performance within one party's unilateral control - "an absolutely classic description of an illusory promise," *id.* at 921, tantamount to "no promise regarding the future at all - not even so much as a peppercorn's worth." *Id.* at 922. Finally, commenting on the relationship between the unmistakability doctrine and the sovereign acts doctrine, Justice Scalia stated that "in my view the 'sovereign acts' doctrine adds little, if anything at all, to the 'unmistakability' doctrine and is avoided whenever that one would be - *i.e.*, [*772] whenever it is clear from the contract in question that the Government was committing itself not to rely upon its sovereign acts in asserting . . . the doctrine of impossibility." *Id.* at 923. As further support for the latter contention, Justice Scalia returned to *Lynch* and *Perry*, noting that "in both of them, as here, Congress specifically set out to abrogate the *essential bargain* of the contracts at issue - and in both we declared such abrogation to amount to impermissible repudiation." *Id.* at 924.

Even in dissent, Chief Justice Rehnquist seemed to distinguish between the true exercise [**71] of a "sovereign power" in support of the public good and the passage of legislation that merely targets a specific government obligation under a contract. For example, in commenting on the plurality's opinion, he stated:

> The second reason the principal opinion advances for its limitation on the unmistakability doctrine is that if it were applied to all actions for damages, it would impair the Government's ability to enter into contracts. But the law is well established that Congress may not simply abrogate a statutory provision obligation performance without breaching the contract and rendering itself liable for damages . . . Equally well established, however, is that the sovereign does not shed its sovereign powers just because it contracts.

*Id.* at 929. Though he agreed with little else in the majority opinions, the Chief Justice, in fact, acquiesced in two critical propositions: (i) that "*Lynch* stands for the proposition that the congressional repeal of a statute authorizing the payment of money pursuant to a contractual agreement is a breach of that contract," *id.* at 933, and (ii) that "[a] moment's reflection suggests that the unmistakability doctrine [**72] and the sovereign acts doctrine are not entirely separate principles." *Id.* at 937.

While one might struggle mightily to weave a controlling rule of law from the opinions in *Winstar*, n29 the Justices all appear to share several foundational juridical principles that are relevant here: First, they agree that the application of the unmistakability doctrine hinges on whether the challenged legislation subsidiarily

involves the exercise of a "sovereign power" protected by that doctrine. *See, e.g.*, 518 U.S. at 878-79 (Souter, J.). Second, they are conjoined in the view that those "sovereign powers" are not encompassed or invoked in all forms of legislation - citing the congruence cases and viewing the unmistakability doctrine as a canon of construction, they concur that certain reservations of power by the sovereign are implicit in contracts, while others are not. Third, each opinion, in its own way, suggests that the "sovereign powers" that are protected by the doctrine share features with the acts covered by the "sovereign acts" doctrine. These powers are, in the words of Justice Souter, those "that could otherwise affect the Government's obligation under the [**73] contract," *id.* at 878 n.22, exhibiting, as Justice Breyer wrote, "unique features of sovereignty" warranting "special caution," *id.* at 918; they are those that Justice Scalia described as "needful for the public good," *id.* at 921, and, according to sampling of the opinions, include the police and taxing powers, the power of eminent domain and of navigational servitude. Fourth, each opinion plainly excludes from the doctrine's protection legislation modifying what Congress simply perceives as a bad deal - the "sovereign powers" doctrine thus [*773] is not invoked by an enactment that targets for elimination the "essential bargain of the contract at issue," *id.* at 924 (Scalia, J.), "the very right that [the] sovereign explicitly granted by contract," *id.* at 917 (Breyer, J.), or a "statute authorizing the payment of money pursuant to a contractual agreement," *id.* at 933 (Rehnquist, C.J.). In the end, then, *Winstar* confirms that, in deciding whether the unmistakability doctrine applies in a given case, the nature of the legislation alleged to have breached the contract in question is truly [**74] pivotal.

n29 Regarding the precedential impact of such split decisions, the Supreme Court has instructed that "when a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . .'" *Marks v. United States*, 430 U.S. 188, 193, 51 L. Ed. 2d 260, 97 S. Ct. 990 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976)); *see also Texas v. Brown*, 460 U.S. 730, 737, 75 L. Ed. 2d 502, 103 S. Ct. 1535 (1983) (stating that a plurality view that does not command a majority is not binding precedent); *Hertz v. Woodman*, 218 U.S. 205, 213-14, 54 L. Ed. 1001, 30 S. Ct. 621 (1910) ("The principles of law involved not having been agreed upon by a majority of the court sitting prevents the case from becoming an authority for the determination of other cases, either in [the Supreme Court] or in inferior courts").

**c. More Recent Cases**

This court is not the [**75] first to draw these conclusions. In *Yankee Atomic Electric Co. v. United States*, 112 F.3d 1569 (Fed. Cir. 1997), the first significant case to construe *Winstar*, the Federal Circuit was faced with an electric utility, which claimed that a federal assessment imposed by the Energy Policy Act of 1992 to help decommission uranium enrichment facilities, breached the government's prior contract with the utility to supply enriched uranium at a fixed price. Distinguishing *Lynch* and *Perry*, the court began by noting that the Energy Policy Act "constitutes a general exercise of Congress' taxing power for the purpose of addressing a societal problem rather than an act that retroactively increases the price charged to contracting parties for uranium enrichment services." 112 F.3d at 1577. Having concluded, on that basis, that this assessment was a public and general act protected by the "sovereign acts" doctrine, the court next determined whether the unmistakability doctrine applied. *Id.* While noting that, under *Winstar*, the "application of the doctrine is unrelated to the nature of the underlying contracts," the court observed that "importantly, [**76] however, the plurality also expressly stated that application of the unmistakability doctrine turns on whether enforcement of the contractual obligation would effectively block the exercise of a sovereign power of the Government." *Id.* at 1579. Applying this analysis, the court observed that "the assessment at issue in the present case is a general, sovereign act," that involved "the exercise of [the] sovereign power to tax." *Id.* As such, in the court's view, the unmistakability doctrine applied.

Several subsequent cases in this court have construed *Yankee Atomic* as defining when an act of Congress qualifies for protection under the unmistakability doctrine. For example, in *Coast-to-Coast Financial Corp. v. United States*, 45 Fed. Cl. 796 (2000), this court construed the unmistakability doctrine in the course of resolving a discovery dispute. Focusing, in particular, on what constitutes a "sovereign power" under the doctrine, this court explained -

> In describing when the unmistakability doctrine should be applied, the Supreme Court has stated that 'The application of the doctrine thus turns on whether