> enforcement of the contractual [**77] obligation alleged would block the exercise of a *sovereign power* of the Government.' . . . In defining 'sovereign power' in turn, the Court emphasized that the unmistakability doctrine was not designed to protect efforts to target government contractors if the targeting would otherwise be improper.

*Id.* at 802. After quoting, *haec verba*, Justice Souter's footnote definition of "sovereign power," this court then construed that language stating - "In other words, the *Winstar* plurality supports [the] argument that an inquiry into the alleged 'targeted' nature of the . . . legislation is relevant to determining whether the Government can take advantage of the unmistakability doctrine in the present case." *Id.* Summarizing, this court concluded that "for an act of Congress to qualify as an exercise of sovereign power, it cannot have been designed merely to eliminate an obligation that arose under one of the Government's contractual relationships." *Id.* at 803. n30

> n30 Commenting on Justice Scalia's concurrence in *Winstar*, the court later reemphasized:
>
> > Under this view, the inquiry into possible 'targeting' by Congress is relevant to determining whether the alleged breach is merely an incidental effect of a sovereign act designed to promote the public good, or instead is a deliberate attempt by Congress to alter its previous bargain with the contractor. If the former, the parties are presumed to have intended that no liability attach to Congress's action (absent unmistakable language to the contrary). If the latter, however, the [concurrence's] unmistakability defense is not available, because it is not reasonable to presume that contractors intend for the Government to deliberately target the elimination of rights that would, under normal rules of construction, accrue to the contractor, particularly where the contract imposes an obligation of good faith and fair dealing on both parties.
>
> *Id.* at 804; *see also Pitney Bowes, Inc. v. U.S. Postal Serv.*, 27 F. Supp. 2d 15, 23 (D.D.C. 1998); *see generally*, Steven J. Burton, "Breach of Contract and the Common Law Duty to Perform in Good Faith," 94 Harv. L. Rev. 369 (1980).

[**78]

[*774] Consistent with this view, two subsequent decisions of this court have explicitly linked the sovereign acts and unmistakability doctrines, holding that enactments not covered by the former are, for that reason, outside the latter. Thus, in *General Dynamics Corp. v. United States*, 47 Fed. Cl. 514 (2000), the court, after reviewing both *Winstar* and *Yankee Atomic*, concluded "it seems clear . . . that what the Supreme Court and the Federal Circuit had in mind when they referred to sovereign power was that power exercised by government for 'public and general' purposes, as opposed to releasing government from its contractual obligations." *Id.* at 542. More recently, in *Grass Valley Terrace v. United States*, 51 Fed. Cl. 436 (2002), this court reconsidered a prior opinion, *see* 46 Fed. Cl. 629 (2000), and reversed its holding that the sovereign acts and unmistakability doctrines should be considered separately. Instead, adopting the reasoning in *General Dynamics*, the court concluded that the statute in question was not a "sovereign act," and thus also was not covered by the unmistakability doctrine, because it [**79] specifically targeted particular individuals and was designed to avoid a government contractual obligation. 51 Fed. Cl. at 440-41. n31 Other decisions of this and others courts are to similar effect. n32

> n31 The nexus between the sovereign acts and unmistakability doctrines proceeds from a common objective - to shield exercises of the lawmaking function that involve sovereign powers. This nexus is neither historical nor, strictly speaking, rationale-driven. Thus, while the doctrines incorporate similar requirements, they proceed from independent lines of authority: the sovereign acts doctrine from early Court of Claims decisions (circa 1865) applying concepts of sovereign immunity; the unmistakability doctrine from early Supreme Court decisions (circa 1830) construing the Contracts Clause. This perhaps explains why the court in *Adams v. United States*, 42 Fed. Cl. 463, 485 (1998), concluded that the unmistakability doctrine was

available, even where the sovereign acts doctrine was not. This court, however, disagrees with *Adams* to the extent that it can be read to suggest that the sovereign powers protected by the unmistakability doctrine vary significantly from the actions protected by the sovereign acts doctrine. [**80]

n32 *See, e.g., Kimberly Associates v. United States*, 261 F.3d 864, 869 (9th Cir. 2001) (adopting the construction of "sovereign power in *General Dynamics*, while reemphasizing that "an unmistakability doctrine analysis requires examination of . . . [in] what capacity was the United States acting when it breached its contractual obligations"); *Resolution Trust Corp v. Fed. Savings and Loan Ins. Corp.*, 34 F.3d 982, 984 (10th Cir. 1994); *United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1151 & n.88 (E.D. Cal. 2001); *Conoco, Inc. v. United States*, 35 Fed. Cl. 309, 335 (1996), *rev'd, on other grounds, sub nom., Marathon Oil Exploration & Producing SE, Inc. v. United States*, 177 F.3d 1331 (Fed. Cir. 1999), *rev'd, sub nom., Mobil Oil Co. v. United States*, 530 U.S. 604, 147 L. Ed. 2d 528, 120 S. Ct. 2423 (2000); *see also Tamarind Resort Assocs. v. Virgin Islands*, 138 F.3d 107, 112, 39 V.I. 485 (3d Cir. 1998).

**2. Redux**

The foregoing should make obvious that the basic proposition announced above - that, [**81] at least in the context of legislation, the unmistakability doctrine applies only when the Congress invokes one of the sovereign powers protected by the doctrine - finds support in a wealth of authorities. *Winstar*, as well as its progenitors and progeny, teach that the orbit of this doctrine significantly intersects that of the sovereign acts doctrine - both apply when the Congress acts to protect public safety, morals or the economy; neither applies when the Congress instead targets the government's contractual obligations in an effort to obtain a better deal. Several additional reasons support this conclusion.

First, it should not be overlooked that the unmistakability doctrine is designed to "avoid[] difficult constitutional questions about the extent of state authority to limit the subsequent exercise of legislative power." [*775] *Winstar*, 518 U.S. at 875. In other words, the doctrine is a rule of constitutional avoidance that specifically evolved to avert unnecessary applications of the "reserved powers" doctrine. As such, it is significant that the latter doctrine is itself limited to the uniquely important sovereign powers "necessary to protect the public health, [**82] or the public morals." *New Orleans Gas-Light Co. v. Louisiana Light Producing & Manuf'g Co.*, 115 U.S. 650, 669, 29 L. Ed. 516, 6 S. Ct. 252 (1885). n33 Outside the application of these powers, the Supreme Court has enforced, as against the assertion of the "reserved powers" doctrine, a variety of state and municipal contracts that made promises in return for substantial consideration. n34 In the court's view, this is significant for it makes little sense to afford a prophylactic rule - the unmistakability doctrine - a broader berth than the constitutional dilemma it is designed to avoid. This observation, in turn, buttresses the court's conclusion that the unmistakability doctrine protects only certain forms of legislation, *to wit*, those truly invoking "sovereign powers."

n33 *See also Grand Trunk Western Ry. Co. v. City of South Bend*, 227 U.S. 544, 554, 57 L. Ed. 633, 33 S. Ct. 303 (1913) (application of reserved powers doctrine cannot be based on government's reconsideration of "inconveniences" of contract that were foreseeable from the outset); *New Orleans Gas-Light*, 115 U.S. at 665-69 (citing other cases); *Stone v. Mississippi*, 101 U.S. 814, 820-21, 25 L. Ed. 1079, 1 Ky. L. Rptr. 146 (1879); *see generally*, Janice C. Griffith, "Local Government Contracts: Escaping from the Governmental/ Proprietary Maze," 75 Iowa L. Rev. 277, 290-99 (1990) (summarizing the early development of the reserved powers doctrine); Stewart E. Sterk, "The Continuity of Legislatures: Of Contracts and the Contracts Clause, 88 Colum. L. Rev. 647, 698 (1988). [**83]

n34 *See, e.g., Wood v. Lovett*, 313 U.S. 362, 85 L. Ed. 1404, 61 S. Ct. 983 (1941) (challenges to validity of tax sales); *Indiana ex rel. Anderson v. Brand*, 303 U.S. 95, 82 L. Ed. 685, 58 S. Ct. 443 (1938) (tenure of public education teachers); *Appleby v. City of New York*, 271 U.S. 364, 380, 70 L. Ed. 992, 46 S. Ct. 569 (1926) (state can contract that specific land will be "free from subsequent regulatory control"); *St. Cloud Pub. Serv. Co. v. City of St. Cloud*, 265 U.S. 352, 355, 68 L. Ed. 1050, 44 S. Ct. 492 (1924) (municipal contract can "suspend, during its life, the governmental power of fixing and regulating . . . rates"); *Russell v. Sebastian*, 233 U.S. 195, 210, 58 L. Ed. 912, 34 S. Ct. 517 (1914) (utility regulation); *American Smelting & Refining Co. v.*

> *Colorado ex rel. Lindsley,* 204 U.S. 103, 115, 51 L. Ed. 393, 27 S. Ct. 198 (1907) (conditions for foreign corporations to transact business); *United States ex rel. Von Hoffman v. City of Quincy*, 71 U.S. (4 Wall.) 535, 554-55, 18 L. Ed. 403 (1866) (taxation); *see also United States v. Bekins*, 304 U.S. 27, 51-52, 82 L. Ed. 1137, 58 S. Ct. 811 (1938).

Second, the court's construction of the unmistakability doctrine finds support in [**84] several relatively recent decisions of the Supreme Court analyzing that doctrine in its original context, *i.e.*, a State's potential violation of the Contracts Clause. For example, in *Allied Structural Steel v. Spannaus*, 438 U.S. 234, 57 L. Ed. 2d 727, 98 S. Ct. 2716 (1977), the Court refused to apply the unmistakability line of cases in holding that a Minnesota pension statute severely impaired established contractual relations between employers and employees. Although the case did not involve contracts to which the State itself was a party, the Court's rationale, nonetheless, provides indication as to the type of sovereign powers that are safeguarded by the unmistakability doctrine:

> This Minnesota law simply does not possess the attributes of those state laws that in the past have survived challenge under the Contract Clause of the Constitution. The law was not even purportedly enacted to deal with a broad, generalized economic or social problem. It did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken, but invaded an area never before subject to regulation by the State. It did not effect simply a temporary [**85] alteration of the contractual relationships of those within its coverage, but worked a severe, permanent, and immediate change in those relationships - irrevocably and retroactively. And its narrow aim was leveled, not at every Minnesota employer, not even at every Minnesota employer who left the State, but only at those who had in the past been sufficiently enlightened as voluntarily to agree to establish pension plans for their employees.

Id. at 250 (citations omitted). Other recent decisions have likewise emphasized that the enactments protected by the [*776] unmistakability doctrine (and the reserved powers doctrine) must serve broad societal purposes and not be directed at the abrogation of particular contracts. *See Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412-413 n.14, 74 L. Ed. 2d 569, 103 S. Ct. 697 (1983) (government excused from breach of Contracts Clause where legislation designed to remedy "a broad or general social or economic problem"); *U.S. Trust Co.*, 431 U.S. at 25, 26 n. 25 (doctrine applies where exercise of sovereign power is "reasonable and necessary to serve an important public purpose"); *City of El Paso v. Simmons*, 379 U.S. 497, 508, 13 L. Ed. 2d 446, 85 S. Ct. 577 (1965) [**86] (doctrine applies to "essential attributes of sovereign power" designed to protect the "general welfare"); *see also In re Seltzer*, 104 F.3d 234, 235 (9th Cir. 1996).

Third, although not determinative in its own right, the view of the doctrine adopted herein is also more in accord with its roots as rule of contract construction. *See Jefferson Branch Bank v. Skelly*, 66 U.S. (1 Black) 436, 446, 17 L. Ed. 173 (1861); *see also Winstar*, 518 U.S. at 873-74 (citing *Minot v. Philadelphia & Baltimore R.R.*, 85 U.S. (18 Wall.) 206, 225, 21 L. Ed. 888 (1873)). As described by Justice Scalia in *Winstar*:

> [The unmistakability doctrine] is simply a rule of presumed (or implied-in-fact) intent. . . . Generally, contract law imposes upon a party to a contract liability for any impossibility of performance that is attributable to that party's own actions . . . . When the contracting party is the government, however, it is simply *not* reasonable to presume an intent of the sort.

518 U.S. at 920-21. Even under this "reverse-presumption," the government is not presumed to have retained the power to target undesirable provisions [**87] of particular contracts for subsequent modification. *See Coast-to-Coast*, 45 Fed. Cl. at 804; Joshua I. Schwartz, "The Status of the Sovereign Acts and Unmistakability Doctrines in the Wake of Winstar: An Interim Report," 51 Ala. L. Rev. 1177, 1197 (2000) ("The government is not entitled to any exceptional sovereignty-based defense when it singles out a particular contracting partner for impairment of its contract rights."). When the latter occurs, the general rule regarding impossibility of performance applies and, to

the extent the government renders its own performance impossible, it is liable.

Finally, it bears noting, as others have before, that there is no logical limit to the government's plenary characterization of the unmistakability doctrine. While defendant does not - and in good faith could not - deny the existence of the congruence line of cases, it generally seeks to limit those cases to their facts, never offering an acceptable theoretical basis upon which to conclude when the unmistakability doctrine ceases to apply and ordinary contract principles control. Carried to its logical extreme, the government's position would transform the unmistakability [**88] doctrine from a shield into a meat axe that would allow the Congress to reserve the choicest portions of the government's contracts and discard the rest - if the price offered for goods or services under preexisting contracts or statutory mechanism were too high, Congress could lower them; if those willing to offer goods or services under a given program were in short supply or eligible to leave a program, Congress could simply extend the agreements already in force; and, if instead the need for a program had diminished, Congress could then discard preexisting contracts, despite the reasonable expectations of their private partners. *See Winstar*, 518 U.S. at 922 (Scalia, J.). n35 While such actions might be [*777] deemed a compensable taking of the private party's contract rights or other property interests under the Fifth Amendment, *see Chancellor Manor v. United States*, 331 F.3d 891, 903 (Fed. Cir. 2003)*; Cienega Gardens v. United States*, 331 F.3d 1319, 1353 (Fed. Cir. 2003), the fact remains that, unless based upon the invocation of a sovereign power, they also constitute a breach of contract. n36 In short, although the contours of the [**89] unmistakability doctrine remain somewhat imprecise, there is a clear basis for concluding when that doctrine does ***not*** apply - as Locke said, "though no man can draw a stroke between the confines of night and day, still light and darkness are on the whole tolerably distinguishable."

n35 As Justice Souter observed in *Winstar*, "the Government's position would not only thus represent a conceptual expansion of the unmistakability doctrine beyond its historical and practical warrant, but would place the doctrine at odds with the Government's own long-run interest as a reliable contracting partner in the myriad workaday transaction of its agencies." 518 U.S. at 883; *see also Perry*, 294 U.S. at 351 ("To say that the Congress may withdraw or ignore that pledge, is to assume . . . a vain promise, a pledge having no other sanction than the pleasure and convenience of the pledgor."). One might argue that an everyday response to these concerns would be for private parties to negotiate contracts that contain "unmistakable promises" regarding the government's use of its sovereign powers. But, setting aside the question whether the government would agree to such a provision, private parties should not have to guard against the possibility that the government would target essential provisions of their contract for later unilateral revision, thereby obtaining a second promise from the government not to do what it should not do in the first instance. Indeed, absent specific judicial imprimatur, any such language might well be ultimately viewed as not being "unmistakable." One can only speculate what would happen in the marketplace if prominently displayed in every contract were a provision explicitly indicating that the government reserved the right to change unilaterally any provision subsequently deemed by the Congress or executive agency to be unduly expensive or otherwise ill-advised. [**90]

n36 Indeed, in *Cienega*, *supra*, the Federal Circuit rejected the notion that the mortgage contracts there did not give rise to vested rights, but instead were subject to subsequent regulation and modification, stating:

> This case is instead comparable to Winstar, 518 U.S. 839, 116 S. Ct. 2432, 135 L. Ed. 2d 964. Though Winstar was a breach of contract case and not a takings case, it showed that the abrogation by legislation of clear, unqualified contract rights requires a remedy, even in a highly regulated industry, there banking, because the contracts embodied the commitments of the contracting parties. *Id.* at 896-97, 116 S. Ct. 2432. The Owners' contractual prepayment rights are such clear, unqualified rights. The purpose of contracts is precisely to fix obligations and entitlements so that they will not be affected by subsequent background changes. Nor were the Owners' rights subject to divestiture simply because of their voluntary participation in a housing program

> under government control. To hold otherwise would mean that Congress could have changed the mortgage contracts in any way to affect any of the rights established by the contracts - including changing the contracts to extend their term from forty to, for example, eighty years - and the Owners would be without a remedy. Again, this is not and cannot be the law.

331 F.3d at 1334.

[**91]

**3. Does the unmistakability doctrine apply to this case?**

It remains to determine whether the unmistakability doctrine is triggered on the facts of this case. The court holds that it is not.

In passing the 1994 amendments, the Congress did not act to protect public safety, morals or the economy, through the exercise, for example, of its police powers. Rather, in an appropriations measure, it deliberately targeted, at HUD's behest, that agency's contractual obligations under preexisting HAP contracts in an effort to reduce outlays under the Section 8 program. As a prelude to taking this action, the House Appropriation Committee noted the "lack of sufficient outlays necessary to support a number of critical programs," H. Rep. 104-555 at 1, while its counterpart in the Senate complained that it and the subcommittee dealing with HUD "have faced extraordinary difficulties due to limited amounts available for domestic discretionary spending," S. Rep. 103-311 at 6. The Senate report then proposed that Congress adopt a number of HUD-sponsored changes to the Section 8 program to save money, among them the amendment *sub judice*, stating:

> The 1995 budget also contains a number [**92] of legislative proposals that are designed to produce outlay savings. These legislative proposals include: a proposal to reduce preservation cost limits from 120 percent to 100 percent of the fair market rent; a proposal to round down the annual adjustment factor to the next lowest whole dollar; a proposal to monitor income reporting and match it with IRS reported income; a proposal to limit the annual adjustment factor rent increases to cases where rents are less than the local market average; a proposal to refinance high cost section 8 debt; a proposal to limit section 8 new construction/substantial rehabilitation rents to the fair market rent for renewals; a proposal to eliminate the subsidy [*778] for loan management units when they are vacated; a proposal to reduce the annual adjustment factor rent increases for tenants who stay in section 8 and section 202/811 projects; and a proposal to reduce the fair market rent from the 45th to the 40th percentile of local market rent.

*Id.* at 40. This same report further indicated that the limitations on automatic adjustments will "generate[] $ 110,000,000 in outlay savings in 1995," and that the Committee "believes that the projects [**93] can absorb this freeze on the AAAF." *Id.* at 70. Further revealing the nature of this legislation, written statements submitted by HUD officials in response to questions posed by members of the House Appropriations Committee indicate that the agency had sponsored the provision in question because the Administration had unsuccessfully attempted to freeze outright the AAAFs for Section 8 projects. *See Department of Veterans Affairs and Housing and Urban Development and Independent Agencies Appropriations for FY 1995: Hearings before the Subcomm. on VA, HUD and Independent Agencies of the House Comm. on Appropriations*, 103rd Cong., 2d Sess. 374 (1994).

Notwithstanding this history, defendant contends that the 1994 amendments represented the exercise of an important sovereign power - namely, preserving the integrity of, and public confidence in, the Section 8 program by ensuring that HUD was not over-subsidizing these housing projects. Consistent with the Supreme Court's "Contracts Clause" jurisprudence, the court must scrutinize this assertion of Congress' purpose with an extra measure of vigilance "because the [government's] self-interest is at stake." *U.S. Trust Co.*, 431 U.S. at 26; [**94] *see also McGrath v. Rhode Island Retirement Bd.*, 88 F.3d 12, 16 (1st Cir. 1996) ("it is clear that a state must do more than mouth the vocabulary of the public weal in order to reach safe harbor"). Indeed, defendant's assertion has a decidedly hollow ring in several respects.

First, any notion that the primary purpose of the amendments was to preserve the integrity of the program is belied by the fact that the legislation did not make permanent changes to the program, but rather, initially, was in effect only for fiscal year 1995. Subsequent appropriation bills then extended the new provisions, but only to certain defined periods, including specific days in fiscal year 1996; it was not until the latter part of 1997

that Congress made the provision permanent for fiscal year 1999 and thereafter. n37 The halting, pock-marked structure of these effective date provisions belies any broad programmatic goal to bring Section 8 rents closer to what was perceived as market rents, for if that were the goal, the provisions would have made that change without temporal exception or interruption. Instead, the structure of the provisions, as well as parts of the accompanying legislative [**95] history, n38 suggest that Congress was more concerned about reducing outlays and used the temporal limitations to sweep in enough adjustments to produce the desired fiscal result. Indeed, it should not be overlooked that prior to the [*779] 1994 amendments, the statute already contained provisions calibrating rents to the market, including the overall limitation provision. What the 1995 legislation instead accomplished was to shift the responsibility and risk of demonstrating that a particular annual adjustment is warranted from HUD to the project owners, notwithstanding prior agreements to the contrary. In the court's view, this is precisely the type of targeted abrogation of contractual rights that the various opinions in *Winstar* made clear is neither covered nor protected by the unmistakability doctrine.

n37 For reasons unrevealed, two of these subsequent amendments created and preserved a window from April 26, 1996, through September 30, 1996, during which the amendment did not apply. *See* The Balanced Budget Act of 1997, Pub.L. No. 105-33, § 2003, 111 Stat. 251 (1997) (applying the provision to FY 1995, FY 1996 prior to April 26, 1996, FY 1997, FY 1999, and thereafter); Pub. L. No. 105-65, § 201(c)(1), 111 Stat. 1344 (1997) (applying provision to FY 1995, FY 1996 prior to April 26, 1996, FY 1997 and FY 1998); Pub. L. No. 104-204, § 201(g), 110 Stat. 2874 (1996) (applying provision to FY 1995 and FY 1997). [**96]

n38 For example, the House report accompanying the passage of Pub. L. No. 105-65, indicates that the limitation on automatic adjustments was one of a "number of administrative provisions designed to reduce costs at HUD." H. Rep. 105-175 at 45; see *also* S.Rep. 104-318 at 29 (noting, in regards to P.L. 104-19, that "central to the Committee's program is the critical task of reversing the ever-increasing cost of Federal housing subsidy commitments, which cannot be sustained if the Federal budget is to be brought into balance"); *id.* at 47 (noting that reviewing new subsidy proposals for "overall economic and budgetary effect . . . provides some external discipline to what has been little more than a popularity contest."); H. Rep. 104-628 at 1 (describing the rationale for HUD's FY 1997 budget as "reflecting a fundamental recognition that significant changes are required if the goal of a balanced budget is to be realized"); H.Rep. 105-175 at 4 (same as to FY 1998 budget).

Second, to the extent that Congress' concern was that the subsidized rents in Section 8 housing frequently [**97] exceeded HUD's "fair market rents," *see, e.g.*, H. Rep. 105-149 at 518, it bears stressing that the latter term is not synonymous with the more familiar concept of "fair market value." Congress has repeatedly observed as much, with a 1996 report examining the Section 8 program, which accompanied one of the extensions of the 1994 amendments, finding:

> Despite its best efforts, HUD's [fair market rents] FMRs do not always accurately reflect true market rents for certain areas and submarkets within broadly defined areas. In fact, the description most often made of FMRs is that they are neither fair nor market. . . . When FMRs are inaccurate - a significant problem in the past - subsidies may be too high for prevailing rents in some submarkets and too low in others.

H. Rep. 104-461 at 100-01; *see also* H. Rep. 105-76 at 130 (same); S. Rep. 102-28(I) at 303 (citing studies criticizing the FMRs as "arbitrary"); S. Rep. 101-249(I) at 291 (same). Accordingly, in seeking to limit AAAFs so as to bring the subsidized rents closer to the HUD-established fair market rents, Congress again appeared more concerned with lowering HUD's expenditures than with calibrating the rents [**98] to some objective barometer of reasonableness. Indeed, even if Congress' sole intent was to make HUD's expenditures under the HAP contracts more in accord with the market, it remains that such a retroactive adjustment of the price to be paid under contracts fails to invoke any of the sovereign powers implicated by the unmistakability doctrine and thus remains actionable. *See Winstar*, 518 U.S. at 917; Burch, *supra* at 396. Understandable as Congress' desire to save money may be, the rule for it, like private parties, sometimes is *pacta sunt servanda* - colloquially, "a deal is a deal."

Finally, the court rejects categorically any claim that the 1994 amendments come under the unmistakability doctrine because they saved money that, in turn, could be

employed for the general welfare. Such a bootstrapping argument would reduce to a nullity any limitations on the scope of the doctrine, for it would be the rare case, indeed, in which Congress could not resort to this safe harbor while targeting undesirable contract provisions. *Per contra.* In the court's view, the sovereign powers implicated by the unmistakability doctrine must be directly invoked in the legislation [**99] under study - the doctrine does not apply where instead Congress uses the funds saved from reneging on the government's contractual obligations for other public purposes. As noted by the Supreme Court in *Lynch*, 292 U.S. at 580, "to abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation." *Cf. U.S. Trust Co.*, 431 U.S. at 26 ("A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all."). In this regard, the legislation in question thus poses exactly the concerns that Justice Souter had in mind when he indicated that ordinary breach of contract principles ought to apply to "instances in which the Government seeks to shift the costs of meeting its legitimate public responsibilities to private parties." *Winstar*, 518 U.S. at 896; *see also Centex Corp. v. United States*, 49 Fed. Cl. 691, 710-11 (2001). [**100]

A final observation on this point: in many ways, the government's case here is less compelling than in *Winstar*. There, the legislation [*780] in question, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. 101-73, 103 Stat. 183, obligated the newly-created Office of Thrift Supervision to "prescribe and maintain uniformly applicable capital standards" for all savings associations, and not just those that had previously contracted with the government. 12 U.S.C. § 1464(t)(1)(A). Moreover, while these provisions were enacted as part of a comprehensive response to the savings and loan crisis, there was no indication that the legislation was specifically targeted at the prior contracts in an effort to reduce government outlays. Yet, the Supreme Court, nonetheless, assumed that such legislation effectuated a breach of contract, stating: "Legislation can almost always be written in a formally general way, and the want of an identified target is not much security when a measure's impact nonetheless falls substantially upon the Government's contracting partners." 518 U.S. at 902-03. Here, of course, the impact of the 1994 amendments [**101] fell not substantially, but exclusively upon the government's contracting partners, with an avowed intent to reduce outlays during times of budget constraints. As such, defendant's suggestion that this action was protected by the unmistakability doctrine is wholly unconvincing.

Defendant has plainly rendered its performance under the HAP contracts impossible. Accordingly, the court holds that the United States is liable to CMHA for breach of contract.

**C. The Parties' Remaining Contentions.**

Having decided that the 1994 amendments, and the subsequent HUD directive, effectuated a general breach of contract, it remains to resolve several other issues raised by defendant that impact upon whether CMHA is entitled to damages with respect to particular properties or particular years.

First, defendant argues - and plaintiff apparently agrees - that the contract rents granted by HUD for Quarrytown in 1995 and for Severance and Ambleside for 1996 represent the rents owed under the HAP contracts. As such, CMHA's claims to increases for those particular projects for the year(s) specified are moot. CMHA, however, hastens to add that it has not agreed that the increases reflected [**102] in these rents satisfied its claims for later years. The court agrees.

Second, defendant contends that there was no obligation to adjust the contract rent for Ambleside for 2001 at the time the Ambleside complaint was filed herein. To be sure, CMHA filed the referenced complaint on July 17, 2001, approximately one month prior to the August 15, 2001, anniversary date for the Ambleside contract. CMHA, however, argues that raising the claim for 2001 in its initial complaint was both necessary and appropriate under the circumstances, as it was attempting to avoid having to file two separate suits as to Ambleside, while minimizing concerns regarding the running of the statute of limitations as to its 1995 claim. n39 The court, however, notes that defendant never filed a "responsive pleading" to the complaint (No. 01-416C) that raised this matter. n40 Accordingly, under RCFC 15(a), the court deems plaintiff's statements on brief as the equivalent of motion to amend the subject complaint to raise this claim and, so deemed, allows that motion. n41 *See Spehr v. United* [*781] *States*, 51 Fed. Cl. 69, 83 (2001). Therefore, on or before October 1, 2003, plaintiff shall formally file [**103] an amended complaint in case No. 04-416C, raising its entitlement to damages for 2001 on account of Ambleside.

n39 These concerns were well-founded, given that defendant initially pressed statute of limitations arguments in this case. Those assertions were apparently jettisoned in light of the government's loss in *Franconia Associates v. United States,* 536 U.S. 129, 153 L. Ed. 2d 132,

122 S. Ct. 1993 (2003), *rev'g*, 240 F.3d 1358 (Fed. Cir. 2001).

n40 It is well-accepted that neither a motion to dismiss nor one for summary judgment is a "responsive pleading" within the meaning of Federal Rule of Civil Procedure 15(a). *See, e.g. Centifanti v. Nix*, 865 F.2d 1422, 1431 n.9 (3d Cir. 1989); *Allen v. Veterans Admin.*, 749 F.2d 1386, 1388 (9th Cir. 1984); *LaBatt v. Twomey*, 513 F.2d 641, 651 (7th Cir. 1975). The court sees no reason why these precedents ought not apply to RCFC 15(a). *See Devon Energy Corp. v. United States*, 45 Fed. Cl. 519, 525 (1999) (defining a "responsive pleading" as not including a motion to dismiss).

n41 Even were defendant deemed to have responded to the complaint, the court would, nonetheless, exercise its discretion to allow CMHA to amend its pleadings - under RCFC 15(a), such leave "shall be freely given when justice so requires."

[**104]

Third, defendant urges that CMHA's claim for rent increases for Severance for 1996 is barred by the doctrine of accord and satisfaction. Accord and satisfaction discharges a claim when "some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim." *O'Connor v. United States*, 308 F.3d 1233, 1240 (Fed. Cir. 2002). CMHA requested a $ 27 increase for Severance for 1996. HUD, however, approved only a $ 10 increase, to $ 582. Defendant contends that, on April 16, 2001, CMHA responded to this increase indicating that it would charge the $ 582 and expressed "no reservations" regarding HUD's approval of only a $ 10 increase, thereby agreeing to accept this increase in satisfaction of its claim. But, by this time, CMHA had not only filed suit on the basis that the 1994 amendments effectuated a breach of its HAP contracts, but also had, on February 15, 2001, provided HUD with a position paper, drafted by its counsel, detailing its objections to HUD's general approach. In the court's view, without more, the latter facts preclude this court from concluding, as a matter of [**105] law, that there was the requisite meeting of minds of the parties to extinguish the claim in question. *See O'Connor*, 308 F.3d at 1240 (accord and satisfaction requires a "meeting of the minds of the parties"); *Safeco Credit v. United States*, 44 Fed. Cl. 406, 419 (1999) (same); Restatement (Second) Contracts § 281. Hence, the court must reject defendant's cross-motion on this point, as well.

Finally, both parties would have this court press ahead and consider specifically what damages are owed CMHA. On brief, plaintiff proceeds from the notion that this court's rejection of defendant's unmistakability doctrine argument means that the 1994 amendments do not apply to it and that, instead, it is entitled to the adjustments owed under the original HAP contracts. For its part, defendant contends that the court should enter judgment in its favor to the extent that CMHA failed to timely demonstrate entitlement to contract rent increases under the 1994 amendments. At this point, both contentions seem wrong - this court does not hold that either the 1994 amendments or the 1995 HUD directive are inapplicable to CMHA, as would be the case, for example, were [**106] such amendments unconstitutional or the directive invalid; rather; it holds that the amendments and the directive ultimately effectuated a breach of plaintiff's HAP contracts. In the court's view, this means that plaintiff is entitled to whatever damages are appropriate, under the circumstances, on account of that breach. In theory, such damages may hinge on the extent of the breach here and likely will fall within the traditional categories of expectancy, reliance or restitution damages. As such, they may or may not track those damages that have been awarded in *Winstar* savings and loan cases, such as *LaSalle Talman Bank v. United States*, 317 F.3d 1363 (Fed. Cir. 2003) and *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348 (Fed. Cir. 2001). To determine this, however, the court believes that additional briefing and, potentially, fact-finding is required. Accordingly, the court declines to award any damages at this time.

## III. CONCLUSION

This court need go no further. The story goes that the gates of the *Ianus Geminus*, the temple of Janus, served an important symbolic function - when they were opened, Rome was at war; when they [**107] were closed, it was at peace. In the case *sub judice*, those figurative gates remain open, but with hopes that their closure draws nearer.

Based on the foregoing, plaintiff's motion for summary judgment is **GRANTED, IN PART**, and defendant's cross-motion for summary judgment is **DENIED**. The court concludes that both the 1994 amendments and HUD Directive 95-12 effectuated a breach of the HAP contracts in question and that defendant is liable for the breach. On or before October 10, 2003, the parties shall file a joint status report indicating whether they believe that additional motions on damages should be filed or, instead, that this case [*782] should proceed immediately to trial. In anticipation of the receipt of that report, the court will schedule a status conference in this matter.

**IT IS SO ORDERED.**

Francis M. Allegra

Judge