Nos. 04-805C, 04-806C (consolidated)
(Judge Lettow)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STATESMAN II APARTMENTS, INC.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT UPON LIABILITY ISSUES

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(FAX)(202) 514-8624

Attorneys for Defendant

OF COUNSEL:

C. ALLEN VILLAFUERTE
Trial Attorney
Office of General Counsel
Department of Housing
and Urban Development
Washington, DC

FEBRUARY 4, 2005

# TABLE OF CONTENTS

Page

STATEMENT OF THE ISSUES . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . 3

I. Nature Of The Case . . . . . . . . . . 3

II. The Section 8 Housing Assistance Payments (HAP) Program . . . . . . . . . . 3

A. The Section 8 Statute . . . . . . . . . . 3

B. The Section 8 HAP Programs For New Construction And Substantial Rehabilitation . . . . . . . . . . 5

C. Rent Subsidy Payments Under The Section 8 HAP Program . . . . . . . . . . 5

D. The 1994 Amendments To The Section 8 Statute . . . . . . . . . . 6

E. HUD Notice 95-12 . . . . . . . . . . 7

F. The Statesman II And Beach House HAP Contracts . . . . . . . . . . 9

STATEMENT OF FACTS . . . . . . . . . . 10

I. Statesman II Apartments, Inc. . . . . . . . . . . 10

II. Beach House Development Company . . . . . . . . . . 12

III. Annual Adjustment Factors . . . . . . . . . . 13

IV. Fair Market Rents . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . 14

I. Summary Judgment Standards . . . . . . . . . . 14

II. HUD's Publication Of Different AAFs For "Turnover" And "Non-Turnover" Units Did Not Breach The HAP Contracts. . . . . . . . . . . 16

## TABLE OF CONTENTS (CONT'D)

Page

III. The HAP Contracts Do Not Require That, When Applying The Rent Comparability Limitation To A Proposed Rent Adjustment, A "Material Difference" Exists Only If The Adjusted Rent Exceeds 120% Of The Sum Of The Comparable Unassisted Rent Plus The Initial Difference . . . . 17

IV. The Owners Have Not Demonstrated That The Initial Contract Rents Under The HAP Contracts Were 120% Of Comparable Unassisted Rents . . . . 21

V. The Failure Of HUD, After 1994, To Adjust Contract Rents Under The Owners' HAP Contracts Annually On The Contract Anniversary Dates Did Not Breach, Or Result In A Breach Of, The HAP Contracts . . . . 24

A. The Requirement Of The 1994 Amendments To The Section 8 Statute That Section 8 HAP Project Owners Submit Rent Comparability Studies To HUD For Purposes Of Determining The Annual Rent Adjustment Due (If Any) Is Not An Unlawful Attempt To Amend The HAP Contracts . . . . 24

B. The Unmistakability Doctrine Applies To The Owners' HAP Contracts . . . . 28

VI. The Requirement Of HUD Notice 95-12 That Adjustments Of Contract Rents Are Effective 60 Days After Receipt Of The Rent Comparability And Other Information Required By The Notice Is Not Unlawful . . . . 31

VII. The Owners' Claims Based Upon HUD's Failure To Make AAF-Based Rent Adjustments For Contract Years 1995, 1996, and 1997 Are Barred By The Six-Year Statute Of Limitations Applicable To This Suit, Including The Owners' Claim That, For The Purpose Of Determining Damages Due To HUD's Failure To Adjust The HAP Contract Rents In 1998 And Thereafter, The Calculation Must Begin With What The Contract Rents Would Have Been If HUD Had Adjusted The Contract Rents In 1995, 1996, And 1997 . . . . 32

CONCLUSION . . . . 34

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Acacia Villa v. United States*, 36 Fed. Cl. 277 (1996) .................................................. 19

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................ 14,15

*Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41 (1986) ......................................................................................... 28

*Brown Park Estates-Fairfield Development Co. v. United States*, 127 F.3d 1449 (Fed. Cir. 1997) ........................................................................ 33,34

*Celotex Corp. v. United States*, 477 U.S. 317 (1986) ............................................. 14,15

*Centex Corp. v. United States*, Nos. 03-5087, -5095 (Fed. Cir., Jan. 19, 2005) ............. 31

*Cisneros v. Alpine Ridge Group*, 508 U.S. 10 (1993) .................................... 10,21,26,27

*Commodities Recovery Corp v. United States*, 34 Fed. Cl. 282 (1995) .................... 14,15

*Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751 (2003) ........................................................... 24,25,26,27,29

*Federal Housing Partners IV v. Cisneros*, 55 F.3d 362 (8th Cir. 1995) ....................... 27

*Government Systems Advisors, Inc. v. United States*, 847 F.2d 811 (Fed. Cir. 1988) ....................................................................... 15

*Jones v. United States*, 1 Ct. Cl. 383 (1865) .............................................................. 29

*L. W. Matteson, Inc. v. United States*, 61 Fed. Cl. 296 (2004) ..................................... 15

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ........................................................................................ 14

*Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982) ............................................. 28

*National Leased Housing Association v. United States*, 22 Cl.Ct. 649 (1991) ............... 25

*National Leased Housing Association v. United States*, 32 Cl.Ct. 454 (1994) ..................................................................... 19,21,22,23

*National Leased Housing Association v. United States*, 32 Cl.Ct. 762 (1995) ............... 19

*National Leased Housing Association v. United States*, 105 F.3d 1423 (Fed. Cir. 1997) ........................................................................ 18,27

## TABLE OF AUTHORITIES (CONT'D)

### FEDERAL CASES (CONT'D)

*NKF Engineering, Inc. v. United States*, 805 F.2d 372 (Fed. Cir. 1986) ........................ 32

*Park Village Apartments v. United States*, 25 Cl.Ct. 729 (1992) .................................. 20

*Park Village Apartments v. United States*, 32 Fed. Cl. 441 (1994),
aff'd, 152 F.3d 943 (Fed. Cir.) (Table), cert. denied, 525 U.S. 962 (1998) ................ 8

*Spirit Leveling Contractors v. United States*, 19 Cl.Ct. 84 (1989) ............................ 18,19

*Sweats Fashions, Inc. v. Pennill Knitting Co.*,
833 F.2d 1560 (Fed. Cir. 1987) ................................................................ 14,15

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) ............................................ 28,30

*Yankee Atomic Electric Co. v. United States*,
112 F.3d 1569 (Fed. Cir. 1997), cert. denied, 524 U.S. 951 (1998) .................... 30,31

### FEDERAL STATUTES

**United States Code:**

28 U.S.C. § 2501 ........................................................................................ 33

42 U.S.C. § 1437a(a) (1994) .......................................................................... 6

42 U.S.C. § 1437f(a) (1970 & Supp. 1974) ..................................................... 4

42 U.S.C. § 1437f(a) .................................................................................... 4

42 U.S.C. § 1437f(c)(1) ................................................................................ 21

42 U.S.C. § 1437f(c)(1) (1970 & Supp. IV 1974) ........................................... 4

42 U.S.C. § 1437f(c)(2) (1982) ..................................................................... 4

42 U.S.C. § 1437f(c)(2)(A) ....................................................................... 2,6,7

42 U.S.C. § 1437f(c)(2)(A) (1994) ............................................................. 7,16

42 U.S.C. § 1437f(c)(2)(A) (2000) ................................................................ 7

42 U.S.C. § 1437f(c)(2)(C) .......................................................................... 24

42 U.S.C. § 1437f(c)(3)(A) (1994) ................................................................ 6

## TABLE OF AUTHORITIES (CONT'D)

## FEDERAL STATUTES (CONT'D)

**Public Laws:**

Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298 .......... passim

Housing and Community Development Act of 1974, Pub. L. No. 93-383, 88 Stat. 633 .......... 22

Housing and Urban-Rural Recovery Act of 1983, Pub. L. No. 98-181, 97 Stat. 1155, 1183 (1983) .......... 4

United States Housing Act of 1937, as amended, (codified at 42 U.S.C. § 1437 et seq.) .......... 3

## FEDERAL REGULATIONS

**Code of Federal Regulations:**

24 C.F.R. Part 880 (1994) .......... 5

24 C.F.R. Part 880 (1979) .......... 12

24 C.F.R. § 880.201 (1994) .......... 5

24 C.F.R. §§ 880.301-405 (1994) .......... 5

24 C.F.R. § 880.501(d)(1) (1994) .......... 6

24 C.F.R. Part 881 (1994) .......... 5

24 C.F.R. Part 881 (1979) .......... 11

24 C.F.R. § 881.201 (1994) .......... 5

24 C.F.R. §§ 881.301-405 (1994) .......... 5

24 C.F.R. § 881.501(d)(1) (1994) .......... 6

24 C.F.R. § 888.203 (1994) .......... 9

## TABLE OF AUTHORITIES (CONT'D)

## MISCELLANEOUS

**Rules of the Court of Federal Claims:**

Rule 1(a)(2) .... 14

Rule 56(c) .... 14

**HUD Notices:**

HUD Notice 95-12 .... passim

HUD Notice 97-14 .... 7

HUD Notice 98-3 .... 7

HUD Notice 99-17 .... 7

HUD Notice 00-14 .... 7

HUD Notice 2002-10 .... 7

**HUD Handbooks:**

HUD Handbook 7420.1 CHG (May 1978) .... 23

HUD Handbook 7420.1 REV-1 (Feb. 1981) .... 23

# INDEX TO DEFENDANT'S SUPPLEMENTAL APPENDIX


| **Document** | **Page** |
|---|---|
| Memorandum dated January 14, 1986, from Silvio J. DeBartolomeis, Deputy Assistant Secretary for Multifamily Housing Programs, HUD, for Regional Directors of Housing, et al., re: "Questions and Answers on Section 8 Annual Rent Adjustments" .................................. | 1 |
| Declaration of Dennis Morton, Director, Multifamily Program Center, Cleveland HUD Office ........................................................................ | 13 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STATESMAN II APARTMENTS, INC., Plaintiffs, | ) | Nos. 04-805C, 04-806C (consolidated) |
| v. | ) | (Judge Lettow) |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT UPON LIABILITY ISSUES

Pursuant to the Court's Order filed on August 31, 2004,[1] defendant, the United States, submits the following combined reply to plaintiffs' opposition to defendant's motion for summary judgment and opposition to plaintiffs' cross-motion for summary judgment upon liability issues.[2]

STATEMENT OF THE ISSUES

1. Whether the Government breached the plaintiffs' Section 8 Housing Assistance Payments (HAP) contracts by publishing different "annual adjustment factors" (AAFs) for purposes of adjusting the rents of "turnover" and "non-turnover" units subsidized by the HAP contracts.

---

[1] The Order provides that the Government's reply to plaintiffs' opposition to the Government's motion for summary judgment and response to plaintiffs' cross-motion for summary judgment upon liability issues must be filed by February 4, 2005.

[2] In this brief, "Pl. Mem. ____" refers to the referenced page(s) of "Plaintiffs' Combined Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment" dated January 7, 2005;"Statesman II Compl. ¶ ____" refers to the referenced paragraph(s) of the "First Amended Complaint of Plaintiff Statesman Apartments, Inc." filed by leave of the Court on September 9, 2004; "Beach House Compl. ¶ ____" refers to the referenced paragraph(s) of the "First Amended Complaint of Plaintiff Beach House Development Company" " filed by leave of the Court on September 9, 2004;"DPFUF ¶ ____" refers to the referenced paragraph(s) of "Defendant's Proposed Findings of Uncontroverted Fact" dated November 5, 2004; "Def. App. ____" refers to the referenced page(s) of the appendix to "Defendant's Motion for Summary Judgment" dated November 5, 2004; "Def. Supp. App. ____" refers to the referenced page(s) of the appendix to this brief.

2. Whether HUD Notice 95-12 breached plaintiffs' HAP contracts insofar as it provides, with respect to annual rent adjustments, that a "material difference" between the rents of assisted and comparable unassisted units exists where a contract rent resulting from a AAF-based rent adjustment would exceed the sum of the comparable unassisted rent and the amount of any difference between the rents of assisted and comparable unassisted units that existed with respect to the initial contract rents.

3. Whether the issue raised by plaintiffs as to the amount of the "initial difference" to be preserved in rent adjustments under plaintiffs' HAP contracts is 20% of the initial monthly contract rents is ripe for consideration.

4. Whether, assuming for the sake of argument that the issue raised by plaintiffs as to the amount of the "initial difference" to be preserved in rent adjustments under plaintiffs' HAP contracts is ripe for consideration, the initial difference is the dollar amount represented by 20% of the initial monthly contract rents.

5. Whether the 1994 amendments to 42 U.S.C. § 1437f(c)(2)(A) breached, or resulted in a breach, of plaintiffs' HAP contracts insofar as it requires that, where a AAF-based rent adjustment would result in a contract rent that exceeds the "fair market rental" published by HUD for an existing dwelling unit in the market area, HUD may adjust the rent only to the extent that the project owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by HUD.

6. Whether the provisions of HUD Notice 95-12 concerning the timing of rent adjustments where a project owner is required to demonstrate that an AAF-based rent adjustment does

not result in a contract rent that materially exceeds the comparable unassisted rent is consistent with and permitted by the plaintiffs' HAP contracts.

7. Whether the six-year statute of limitations applicable to suits under the Tucker Act bars, for the purpose of determining damages to which plaintiffs' allegedly are due by reason of the failure to of HUD to adjust the HAP contract rents in 1998 and thereafter, use of the contract rents that would have been in effect immediately prior to the 1998 HAP contract anniversaries if plaintiffs had received AAF-based rent adjustments in 1995, 1996, and 1997.

## STATEMENT OF THE CASE

### I. Nature Of The Case

In this consolidated proceeding, plaintiffs, Statesman II Apartments, Inc. (Statesman II) and Beach House Development Company (Beach House) (collectively "the Owners"), own low-income rental housing projects in the Cleveland, Ohio area. The rents of the low-income tenants in these housing projects are subsidized by the Government pursuant to long-term rent subsidy agreements known as "Housing Assistance Payments Contracts." The Owners seek damages for alleged breaches of contract based upon the failure of HUD to adjust the contract rents annually on the contract anniversary dates – for the years 1995-2000, in the case of Statesman II, and for the years 1995-2002, in the case of Beach House.

### II. The Section 8 Housing Assistance Payments (HAP) Program

### A. The Section 8 Statute

Section 8 of the United States Housing Act of 1937, as amended (42 U.S.C. § 1437f) (the Section 8 statute), creates a statutory scheme pursuant to which the United States, through the Department of Housing and Urban Development (HUD), directly or indirectly subsidizes the

rents of low-income individuals and families living in privately owned buildings. This litigation concerns claims by owners of "newly constructed" or "substantially rehabilitated" housing with respect to which, at all relevant times, the Section 8 statute provided that "assistance payments" "may be made . . . in accordance with the provisions" of that statute for "the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a) (1970 & Supp. 1974).[3]

As originally enacted and at the time the Statesman II and Beach House HAP contracts were executed, the Section 8 statute specified that "[a]n assistance contract entered into pursuant to this section shall establish the maximum monthly rent (including utilities and all maintenance and management charges) which the owner is entitled to receive for each dwelling unit to which such assistance payments are to be made." 42 U.S.C. § 1437f(c)(1) (1970 & Supp. IV 1974). In addition, section 8(c)(2) provided, in part, with respect to the adjustment of contract rents:

> (A) The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.
>
> * * * * *
>
> (C) Adjustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary.

---

[3] In 1983, Congress amended 42 U.S.C. § 1437f(a) by repealing the Section 8 "newly constructed, and substantially rehabilitated" programs, but grand-fathering existing Section 8 New Construction and Substantial Rehabilitation HAP projects, such as the owners' projects in this case, as being subject to the Section 8 laws. See section 209(a)(1) of the Housing and Urban-Rural Recovery Act of 1983, Pub. L. No. 98-181, 97 Stat. 1155, 1183 (1983).

42 U.S.C. § 1437f(c)(2) (1982).

B. The Section 8 HAP Programs For New Construction And Substantial Rehabilitation

HUD has established by regulations a variety of programs implementing the Section 8 statute, including programs addressing "newly constructed" and "substantially rehabilitated" rental housing projects. See 24 C.F.R. Part 880 (1994) ("Section 8 Housing Assistance Payments Program for New Construction"); 24 C.F.R. Part 881 (1994) ("Section 8 Housing Assistance Payments Program for Substantial Rehabilitation"). In each of these programs, proposals were solicited for the construction or rehabilitation of housing the rents for which would be subsidized under agreements entered into pursuant to the Section 8 statute. Upon selection and approval of a proposal, HUD or a PHA, as the case may be, executed an "Agreement to Enter into a Housing Assistance Payments Contract" pursuant to which they agreed to execute a Housing Assistance payments (HAP) contract upon the owner's satisfactory completion of the project. See 24 C.F.R. §§ 880.301-405 & 881.301-405 (1994).

C. Rent Subsidy Payments Under The Section 8 HAP Program

The rent subsidy is provided in one of two ways. HUD enters into a Housing Assistance Payments contract directly with the owner of a housing project, or it enters into an "annual contributions contract" with a "public housing agency," which, in turn, enters into a HAP contract with a project owner. In either case, the HAP contract is the vehicle for payment of the Section 8 rent subsidy ("housing assistance payment") to the project owner.

The HAP contract specifies a monthly rent for dwelling units covered by the agreement, termed the "contract rent." 24 C.F.R. §§ 880.201 & 881.201 (1994) ("Contract Rent" defined).

Under the HAP contract, the tenant pays the owner a portion of the contract rent, which is based upon the tenant's income. 42 U.S.C. § 1437a(a) (1994); 24 C.F.R. §§ 880.201 & 881.201 (1994) ("tenant rent" defined). The governmental entity with which the owner contracts (either HUD or a PHA) pays a rent subsidy to the owner equal to the difference between the tenant rent and the contract rent. 42 U.S.C. § 1437f(c)(3)(A) (1994); 24 C.F.R. §§ 880.501(d)(1) & 881.501(d)(1) (1994).

D. <u>The 1994 Amendments To The Section 8 Statute</u>

The Section 8 statute has been amended several times since the Statesman II and Beach House HAP contracts were executed. The present litigation concerns amendments to the Section 8 statute contained in the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298 (the 1994 Act), enacted on September 28, 1994. Among other things, the 1994 Act amended the Section 8 statute by adding two sentences to 42 U.S.C. § 1437f(c)(2)(A) so that, as amended, it provided:

> The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines on the basis of a reasonable formula. *However, where the maximum monthly rent, for a unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area , the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality , type, and age in the same market area, as determined by the Secretary. . . . For any unit occupied by the same family at the time of the last annual rental adjustment, where the assistance contract provides for the adjustment of the maximum*

> *monthly rent by applying an annual adjustment factor and where the rent for the unit is otherwise eligible for an adjustment based on the full amount of the factor, 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0.*

42 U.S.C. § 1437f(c)(2)(A) (1994) (emphasis added).

The 1994 Act provided that these amendments to the Section 8 statute "shall apply to all contracts for new construction, substantial rehabilitation, and moderate rehabilitation projects under which rents are adjusted under [section 1437f(c)(2)(A)] by applying an annual adjustment factor," 108 Stat. at 2315, such as plaintiffs' HAP contracts. The amendments are effective prospectively "during fiscal year 1995, during fiscal year 1996 prior to April 26, 1996, and fiscal years 1997 and 1998, and during fiscal year 1999 and thereafter." 42 U.S.C. § 1437f(c)(2)(A) (2000).

E. HUD Notice 95-12

On March 7, 1995, HUD issued Notice H 95-12 (HUD), concerning "Annual Adjustment Factor Rent Increase Requirements Pursuant to the Housing Appropriations Act of 1995" (HUD Notice 95-12), which implemented the 1994 Act's amendments to the Section 8 statute. See Def. App. 1-24.[4] HUD Notice 95-12 recited that, "[a]mong the many measures developed by the [1994 Act], emphasis was placed on utilizing the mechanism in the Section 8 contract language which permits an analysis on the reasonableness of the [annual adjustment factor (AAF)] formula as it is applied to each project unit type." Def. App. 1. HUD Notice 95-12 announced that "review of AAF under the Overall Limitation clause of the HAP Contract would apply to Section

---

[4] Although HUD Notice 95-12 expired on September 30, 1995, subsequent notices reinstated and extended its provisions. See HUD Notice 97-14 (3/17/97), Def. App. 25-41; HUD Notice 98-3 (1/23/98), Def. App. 42-43; HUD Notice 99-17 (7/8/99), Def. App. 44; HUD Notice 00-14 (8/9/00), Def. App. 45; and HUD Notice 2002-10 (5/17/02), Def. App. 46-60.

8 New Construction and Substantial Rehabilitation Properties where Section 8 rent levels for a unit type presently exceed the published Existing Housing Fair Market Rents (FMR) . . . ." Id.

HUD Notice 95-12 provided that, where existing HAP contract rents *exceeded* the applicable published, current fair market rents for the area, the Section 8 project owner would be required to submit to HUD a study of the rents charged for comparable, unassisted units. See Def. App. 3. If the owner's study indicated that comparable, unassisted rents exceeded the contract rent by more than five percent, HUD would increase contract rents to the lesser of (1) contract rents adjusted according to the applicable published annual adjustment factor or (2) the comparable, unassisted rent plus any "initial difference" to be preserved in rent adjustments. See Def. App. 4. Where the owner provided this information at least 60 days before the HAP contract anniversary date, HUD would increase the contracts rents effective on the anniversary. If, however, the owner provided this information less than 60 days before the HAP contract anniversary date, HUD would increase the contract rents effective on the date 60 days after the owner submitted the information. See Def. App. 3. Where, however, the owner did not provide the rent comparability information by the *next* contract anniversary date, HUD would not increase contract rents for the preceding year. Id.

HUD Notice 95-12 further provided that, where existing HAP contract rents *did not exceed* the applicable current, published fair market rents, the contract rents would be adjusted using the "appropriate AAF." Def. App. 9. In order to receive a rent adjustment, however, the owner was required to submit to HUD "the number of units in which turnover occurred since the last HAP contract anniversary date." Id. If the owner failed to submit the tenant turnover data at least 60 days before the contract anniversary date, the contract rents would not be adjusted on the

contract anniversary date, but would "go into effect 60 days after" HUD's receipt of the required turnover data. Id. If, however, the owner failed to submit the turnover information by the *next* HAP contract anniversary, HUD would not increase contract rents for the preceding year. Id.

F. The Statesman II And Beach House HAP Contracts

The terms of the Statesman II and Beach House HAP Contracts are similar and the rent adjustment provisions are virtually identical. With respect to rent adjustments, the Owners' HAP contracts provided:

> b. Automatic Annual Adjustments
>
> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government [[5]]. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

Statesman II and Beach House HAP Contracts, Part I, § 1.8b, Def. App. 64, 125.

[5] When contract rents are adjusted by applying published "annual adjustment factors" (AAFs), the existing rent is multiplied by the relevant AAF to arrive at the new contract rent. For example, if the monthly rent in effect during the previous HAP contract year is $100 per unit and the applicable AAF is 1.05, the monthly contract rent for the current year adjusted in accordance with the AAF would be $105 (1.05 x $100). See 24 C.F.R. § 888.203 (1994).

The Owners' HAP contracts also contained an "Overall Limitation" provision that trumps the other rent adjustment provisions. See Cisneros v. Alpine Ridge Group, 508 U.S. 10, 17-19 (1993). It provided:

> d. Overall Limitation. Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

Statesman II and Beach House HAP Contracts, Part I, § 1.8d, Def. App. 64, 125.

In addition, the HAP contracts provided that "[t]he Owner shall furnish such information and reports pertinent to the Contract as reasonably may be required from time to time by the Government." Statesman II and Beach House HAP Contracts, Part II, § 2.6a, Def. App. 68, 103.

## STATEMENT OF FACTS

### I. Statesman II Apartments, Inc.

Statesman II owns Statesman Apartments, a low-income rental housing project located at 16705-16825 Van Aken Boulevard, Shaker Heights, Ohio, having acquired that property on or about November 18, 1993, from Statesman Apartments Development Company II, an Ohio limited partnership (the Partnership). DPFUF ¶ 1. Statesman Apartments consists of 20 one-bedroom apartments and 27 two-bedroom apartments. Id.

In 1980, the Partnership, Statesman II's predecessor-in-interest, and the United States, acting through HUD, entered a HAP contract with respect to Statesman Apartments (the Statesman II HAP Contract). DPFUF ¶ 2. The Statesman II HAP Contract, which was executed in

stages beginning with Stage 1 effective on November 14, 1980, applied to all 47 apartments of which Statesman Apartment consists. Id. Statesman Apartments was developed by the Partnership under the Section 8 Housing Assistance Payments Program for Substantial Rehabilitation, the regulations for which originally were codified at 24 C.F.R. Part 881 (1979). Id.

The Statesman II HAP Contract was for an initial term of five years, renewable for three additional terms of five years each at the owner's option, for a maximum of 20 years. See Statesman II HAP Contract, Part I, §§ 1.1c, 1.4a (Alternative 2), Def. App. 61, 62. The anniversary date of the Statesman II HAP Contract was November 14. The Statesman II HAP Contract was terminated on November 30, 2000. DPFUF ¶ 3.

The initial monthly contract rents under the Statesman II HAP Contract were $370 for each of the one-bedroom apartments and $424 for each of the two-bedroom apartments. DPFUF ¶ 4. The last rent adjustment received by Statesman II for Statesman Apartments under the Statesman II HAP Contract was effective on November 14, 1992. DPFUF ¶ 6. As of that date and during the period from November 14, 1992, to November 30, 2000, when the Statesman II HAP Contract was terminated, the monthly contract rents were $586 for one-bedroom apartments and $671 for two-bedroom apartments. Id.

After 1992, Statesman II did not submit any rent comparability information or tenant turnover data to HUD or request annual rent adjustments under the Statesman II HAP Contract until April 2, 2004, when, through its attorney, Statesman II submitted to HUD a request for "automatic adjustment contract rent increases" for Statesman Apartments for the years 1998 through November 30, 2002. See DPFUF ¶ 9. That request was accompanied by information

concerning comparable, unassisted rents and tenant turnover data. Id. On April 23, 2004, HUD denied the requested rent adjustments. Id.

II. Beach House Development Company

Beach House owns Lakeshore Village, a low-income rental housing project located at 16151 Lake Shore Boulevard, Cleveland, Ohio. DPFUF ¶ 10. Lakeshore Village consists of 102 two-bedroom apartments and six three-bedroom apartments. Id.

In October 1982, Beach House and the United States, acting through HUD, entered a HAP Contract with respect to Lakeshore Village (Beach House HAP Contract). DPFUF ¶ 11. The Beach House HAP Contract, which was executed in stages, covered all 108 apartments of which Lakeshore Village consists. Id. Lakeshore Village was developed by Beach House under the Section 8 Housing Assistance Payments Program for New Construction, the regulations for which were codified initially at 24 C.F.R. Part 880 (1979). Id.

The initial monthly contract rents under the Beach House HAP Contract were $474 for each of the two-bedroom apartments and $537 for each of the three-bedroom apartments. DPFUF ¶ 12. The last rent adjustment for Lakeshore Village under the Beach House HAP Contract was effective on October 4, 1994. DPFUF ¶ 14. From that time through September 2002, the monthly contract rents for Lakeshore Village were $662 for two-bedroom apartments and $779 for three-bedroom apartments. Id.

After 1994, Beach House did not submit any rent comparability information or tenant turnover data to HUD or request annual rent adjustments under the Beach House HAP Contract until April 2, 2004, when, through its attorney, Beach House submitted to HUD a request for "automatic adjustment contract rent increases" for Lakeshore Village for the years 1998 through

September 30, 2002 . . . ." DPFUF ¶ 15. That request was accompanied by information concerning comparable, unassisted rents and tenant turnover data. Id. On April 23, 2004, HUD denied the requested rent adjustments. Id.

III. Annual Adjustment Factors

The published annual adjustment factors (AAFs) (highest cost utility included) for contract rents for fiscal years 1995-2002 for projects located in the PMSA Cleveland-Lorain-Elyria, Ohio area, such as Statesman Apartments and Lakeshore Village, were as follows:

| | Turnover Units[6] | Non-Turnover Units[7] |
|---|---|---|
| FY 1995 | 1.028 | 1.018 |
| FY 1996 | 1.018 | 1.008 |
| FY 1997 | 1.023 | 1.013 |
| FY 1998 | 1.030 | 1.020 |
| FY 1999 | 1.034 | 1.024 |
| FY 2000 | 1.043 | 1.033 |
| FY 2001 | 1.013 | 1.003 |
| FY 2002 | 1.057 | 1.047 |

See DPFUF ¶¶ 17-24.

IV. Fair Market Rents

Fair market rents published by HUD in the Federal Register during 1995-2001 for the PMSA Cleveland-Lorain-Elyria, Ohio area for one-bedroom, two-bedroom, and three-bedroom units were as follows:

---

[6] A "turnover" unit is a unit occupied by a new family since the last contract anniversary date. See DPFUF ¶ 17.

[7] A "non-turnover" unit is a unit occupied by the same family as at the time of the last contract anniversary date. See DPFUF ¶ 17.

| | 1-BR | 2-BR | 3-BR |
|---|---|---|---|
| August 1995 | $405 | $501 | $637 |
| September 1995 | $412 | $510 | $648 |
| February 1996 | $412 | $510 | $648 |
| September 1996 | $422 | $522 | $663 |
| September 1997 | $434 | $537 | $683 |
| October 1998 | $480 | $594 | $755 |
| October 1999 | $500 | $619 | $787 |
| September 2000 | $521 | $645 | $820 |
| October 2001 | $587 | $726 | $924 |

See DPFUF ¶ 25.

## ARGUMENT

### I. Summary Judgment Standards

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Commodities Recovery Corp. v. United States, 34 Fed. Cl. 282, 287-88 (1995). Summary judgment is not a disfavored procedural shortcut; it is an integral part of the Court's rules as a whole, which are to be construed to secure the just, speedy, and inexpensive determination of every action. Celotex Corp. v. United States, 477 U.S. 317, 327 (1986); Sweats Fashions, Inc. v. Pennill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987); Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 89 (1989); see also RCFC 1(a)(2).

A dispute is "genuine" if, on the entirety of the record, the evidence is such that a reasonable jury could resolve a factual matter in favor of the nonmoving party. Anderson, 477 U.S. at 248; Sweats Fashions, 833 F.2d at 1562. Thus, when the record as a whole would not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Matsushi-

ta Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Commodities Recovery, 34 Fed. Cl. at 288. A fact is "material" if it could affect the outcome of the suit and its materiality is determined by the substantive law applicable to the case. Anderson, 477 U.S. at 248; Spirit Leveling, 19 Cl. Ct. at 89. "Contract interpretation is a matter of law and thus amenable to decision on summary judgment." Government Systems Advisors, Inc. v. United States, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988); accord L. W. Matteson, Inc. v. United States, 61 Fed. Cl. 296, 307 (2004) (Contract interpretation is "an appropriate predicate for summary judgment.").

The party moving for summary judgment bears the initial burden of demonstrating either the absence of a genuine issue of material fact or the absence of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325; Sweats Fashions, 833 F.2d at 1563; Commodities Recovery, 34 Fed. Cl. at 288. If the moving party makes that showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute exists with respect to a material fact by pointing to evidence of record or proffering evidence establishing an essential element of its case upon which it bears the burden of proof. Celotex, 477 U.S. at 322; Commodities Recovery, 34 Fed. Cl. at 288.

## II. HUD's Publication Of Different AAFs For "Turnover" And "Non-Turnover" Units Did Not Breach The HAP Contracts.

Regarding rent adjustments under HAP contracts for the Section 8 New Construction and Substantial Rehabilitation Programs, such as the HAP contracts in this case, the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298 (the 1994 Act), which amended the Section 8 Statute, provided, in relevant part:

> For any unit occupied by the same family at the time of the last annual rental adjustment, where the assistance contract provides for the adjustment of the maximum monthly rent by applying an annual adjustment factor and where the rent for the unit is otherwise eligible for an adjustment based on the full amount of the factor, 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0."

42 U.S.C. § 1437f(c)(2)(A) (1994).

The Owners allege that "[t]he requirement of such reduction by the 1994 Amendments and Notice 95-12 constituted a repudiation and/or breach of the HAP Contracts when applied to any of the automatic annual increases which the Properties are entitled to receive." Pl. Mem. 16. We disagree.

To begin with, insofar as the Owners contend that the 1994 Act's requirement of different AAFs for "turnover" and "non-turnover" units repudiates or breaches the Owners' HAP contracts "when applied to" the rent adjustments to which the Owners allegedly are entitled, but have not yet received, the claim is premature. The Government did not make any AAF-based rent adjustments at all for the HAP contract years at issue in this litigation. The occasion to apply different AAFs for "turnover" and "non-turnover" units has not arisen. HUD disputes the Owners' right to any AAF-based rent adjustments whatsoever for the HAP contract years at issue.

At any rate, HUD's issuance of different AAFs for "turnover" and "non-turnover" units, which the 1994 Act required, did not breach the Owners' HAP contracts. The rent adjustment provision contained in the Owners' HAP contracts provided, in relevant part:

> Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These

> published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

Statesman II and Beach House HAP Contracts, Part I, § 1.8b(1), Def. App. 64, 125.

The Owners seize upon the last sentence of section 1.8b(1), arguing that "the specific inclusion of the utility reduction exception indicates an intention to exclude other reductions, such as the 1% reduction for non-turnover units." Pl. Mem. 15. This argument is flawed.

Section 1.8b(1) of the HAP contracts gives the Government the discretion to establish different AAFs for a given type of dwelling unit such as, for example, a one-bedroom apartment, depending upon the circumstances. The "1% reduction for non-turnover units" to which the Owners refer is a two-tiered calculation of the AAFs published in the Federal Register, depending upon whether the units at issue are "turnover" or "non-turnover" units. The last sentence of section 1.8b(1) does not restrict the exercise of contractual discretion to use such a two-tiered method of arriving at AAFs for "non-turnover" units. It simply provides that the AAFs, however computed by HUD, will be reduced where utilities are paid directly by the Section 8 tenant.

HUD's publication of separate AAFs for "turnover" and "non-turnover" units, therefore, did not breach, and could not have resulted in a breach of, the Owners' HAP contracts. The second count contained in the Owners' complaints, accordingly, is without merit and it should be dismissed.

## III. <u>The HAP Contracts Do Not Require That, When Applying The Rent Comparability Limitation To A Proposed Rent Adjustment, A "Material Difference" Exists Only If The Adjusted Rent Exceeds 120% Of The Sum Of The Comparable Unassisted Rent Plus The Initial Difference.</u>

The "Overall Limitation" upon rent adjustments contained in the Owners' HAP contracts provides, in pertinent part, that, "[n]otwithstanding any other provisions" of the HAP contracts,

rent adjustments "shall not result in material differences between the rents charged for assisted and unassisted units, as determined by the Government . . . ." Statesman II and Beach House HAP Contracts, Part I, § 1.8d, Def. App. 64, 125.

The Owners allege that HUD breached their HAP contracts when it issued HUD Notice 95-12 because Notice 95-12 provides that a "material difference" between the rents of assisted and comparable unassisted units exists whenever a AAF-based rent adjustment would exceed the sum of the comparable unassisted rent and the amount of any difference in the rents of assisted and comparable unassisted units that existed with respect to initial contract rents under the HAP contracts (hereinafter referred to as the "initial difference"[8]). Pl. Mem. 17-18. We disagree.

Again, as in the case of the Owners' claim regarding HUD's publication of different AAFs for "turnover" and "non-turnover" units, this claim is premature. The Owners have not demonstrated that the alleged improper failure by the Government to make any AAF-based rent adjustments for the HAP contract years at issue in this litigation was based upon a misapplication by HUD of the "material differences" component of the Overall Limitation provision contained in the Owners' HAP contracts. The occasion to apply the "material differences" term has not arisen.

In any event, the Owners' interpretation of the "material differences" component of the Overall Limitation provision is flawed. The HAP contracts provide for adjustments to contract rents subject to the "overall limitation" that such adjustments not create "material differences" between the resulting contract rents and comparable unassisted rents. The only proviso is that

---

[8] The "initial difference" to be preserved in rent adjustments is the mathematical difference, expressed in dollars, between the original HAP contract rent and the initial rental value of a comparable, unassisted unit. National Leased Housing Ass'n v. United States, 105 F.3d 1423, 1435 (Fed. Cir. 1997); accord Park Village Associates v. United States, 32 Fed. Cl. 441, 446-47 (1994), aff'd, 152 F.3d 943 (Fed. Cir.) (Table), cert. denied, 525 U.S. 962 (1998).

the Overall Limitation does not prohibit "differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents." Statesman II and Beach House HAP Contracts, Part I, § 1.8d, Def. App. 64, 125.

The HAP contracts do not define what constitutes a "material difference." They leave that to the Government to determine. Park Village, 32 Fed. Cl. at 446-47. Where a contract confers upon one party discretion to make material determinations, a court ordinarily will not disturb that party's determination unless it is arbitrary and capricious. National Leased Housing Ass'n v. United States, 32 Fed. Cl. 762, 763 (1995).

The Owners contend that a difference between the rents of unassisted and comparable unassisted units is not "material" except where it exceeds 120% of the sum of the comparable unassisted rent and any initial difference. In support of that contention, the Owners cite National Leased Housing Ass'n v. United States, 32 Fed. Cl. 454, 466 (1994); Park Village, 32 Fed. Cl. at 452; National Leased Housing, 22 Cl. Ct. 649, 661 (1991); see also Acacia Villa v. United States, 36 Fed. Cl. 277, 279 n.3 (1996). These precedents hold that a "material difference" is 120% or more of the sum of the comparable unassisted rent and any initial difference. That interpretation, however, is based upon an incorrect reading of a 1986 HUD memorandum that was superseded by HUD Notice 95-12, which reflects HUD's current view of what constitutes a "material difference" between the rents of assisted and comparable unassisted rents.

The document upon which National Leased Housing and Park Village rely for their interpretation of "material difference" as 120% or more of the sum of the comparable unassisted rent and any initial difference is a January 14, 1986 memorandum from Silvio J. DeBartolomeis, then

Deputy Assistant Secretary for Multifamily Housing Programs, concerning "Questions and Answers on Section 8 Annual Rent Adjustments." See Def. Supp. App. 1-12. This memorandum, however, does not provide that a material difference exists only where the adjusted contract rent would exceed 120 percent of the sum of the comparable unassisted rent and the initial difference. Rather, it provides that, even where the adjusted contract rent does not exceed 120% of the sum of the comparable unassisted rent and the amount of any initial difference, the difference nevertheless is "material" if one of two other conditions is present: (1) the adjusted contract rent would exceed the comparable unassisted rent by more than the amount of the initial difference or (2) the adjusted contract rents would exceed the amount needed to operate comparable projects. Id., at 4.

HUD Notice 95-12, in effect, clarified "material difference." The notice provided that, where existing HAP contract rents exceeded fair market rents, a project owner would be required to submit to HUD a study of the rents charged for comparable, unassisted units. If the owner's study indicated that comparable, unassisted rents exceeded the contract rent by more than five percent, HUD would increase contract rents to the lesser of (1) contract rents adjusted according to the applicable published annual adjustment factor or (2) the comparable, unassisted rent plus the initial difference to be preserved in rent adjustments. Def. App. 3. Therefore, an adjustment would not exceed the sum of the comparable unassisted rent and the initial difference. Id. Thus, Notice 95-12 represents HUD's determination that a material difference exists where an adjusted contract rent would exceed the comparable unassisted rent plus the initial difference.

The determination of material difference reflected in HUD Notice 95-12 constitutes a reasonable exercise of HUD's HAP contractual discretion. It provides for an adjustment to the extent of the initial difference, consistent with the Overall Limitation provision in HAP contracts.

It is consistent with the overarching goal of the Section 8 HAP Program that participating project owners not receive contract rents that exceed comparable unassisted rents. See Alpine Ridge, 508 U.S. at 21; National Leased Housing, 32 Fed. Cl. at 466. It is consistent not only with the intent of the 1994 Act that contract rents not exceed comparable unassisted rents, see 42 U.S.C. § 1437f(c)(2)(A) (1994), but also with Congress's concern that Section 8 contract rents had out-paced fair market rents. See S. Rep. No. 103-311, at 40 (1995).[9]

HUD Notice 95-12's clarification of the "material difference" component, therefore, did not breach, or result in a breach, of the Owners HAP contracts.

IV. The Owners Have Not Demonstrated That The Initial Contract Rents Under The HAP Contracts Were 120% Of Comparable Unassisted Rents.

The Overall Limitation upon rent adjustments contained in the HAP contracts provides that the rent comparability restriction "shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents." See Statesman II and Beach House HAP Contracts, Part I, § 1.8d, Def. App. 64, 125. The Owners contend that the initial difference to be preserved in rent adjustments under their HAP contracts is the dollar amount represented by 20% of the initial contract rents, citing 42 U.S.C. § 1437f(c)(1). Pl. Mem. 7 & n.3.[10]

---

[9] As the Senate Committee on Appropriations reporting upon the 1994 amendments to the Section 8 statute noted: "According to administration figures, about 75 percent of section 8 new construction, substantial rehabilitation, and moderate rehabilitation projects currently have section 8 contract rents above the existing housing FMR's. By contrast, two-thirds of all units rent for less than the FMR in the metropolitan area." S. Rep. No. 103-311, at 40.

[10] In the case of the Statesman II HAP Contract, the Owners contend that the initial differences are $70 for the one-bedroom units and $82 for the two-bedroom units. Pl. Mem. 7. In the case of the Beach House HAP Contract, the Owners contend that the initial differences are

(continued...)

It is not necessary to decide the question of the amount of the initial difference to be preserved in rent adjustments under the Owners' HAP contracts in order to resolve any liability issue in this case. Any question with respect to initial differences potentially could arise only in the context of damages issues. However, the scope of the current briefing – as provided by the Court's August 31, 2004 pretrial order – is restricted to liability issues.

Assuming for the sake of argument that the question of the amount of the initial difference to be preserved in rent adjustments under the Owners' HAP contracts is ripe for consideration, the Owners have not demonstrated that the initial difference to be preserved in rent adjustments is the dollar amount represented by 20% of the initial contract rents. Section 1437f(c)(1) of title 42, United States Code, does not provide for an initial difference that is 20% of the initial contract rent. It merely establishes a *ceiling* upon initial contract rents: they may not exceed fair market rents by more than 10 or 20 percent, depending upon the type of project. See National Leased Housing, 32 Cl. Ct. at 468-69.[11]

As this Court observed in National Leased Leasing, "HUD has periodically published handbooks describing Section 8 program procedures, including the calculation of initial contract

[10](...continued)
$79 for the two-bedroom units and $89 for the three-bedroom units. Id.

[11] Section 1437f(c)(1) provides, in pertinent part: "The maximum monthly rent shall not exceed by more than 10 per centum the fair market rental established by the Secretary periodically but not less than annually for existing or newly constructed rental dwelling units of various sizes and types in the market area suitable for occupancy by persons assisted under this section, except that the maximum monthly rent may exceed the fair market rental (A) by more than 10 but not more than 20 per centum where the Secretary determines that special circumstances warrant such higher maximum rent . . . ." 42 U.S.C. § 1437f(c)(1) (2000). This 10 or 20 percent limit has been in effect since the Section 8 statute was first enacted. See Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 201, 88 Stat. 633, 663 (1974).

rents," and that, "[a]lthough the handbooks have changed over time, for at least a substantial period, HUD calculated the initial contract rents for many Section 8 units by making percentage adjustments to the rents charged for comparable unassisted units" 32 Fed. Cl. at 469.

The HUD Handbook effective in 1980, when the Statesman II HAP contract was entered, provided for a 10% adjustment in the case of a Section 8 HAP project without a HUD-insured mortgage and in the case of a Section 8 HAP project with a HUD-insured project in which 100% of the revenue-producing units were assisted, "to compensate for the increased security services and higher costs of owning and maintaining assisted *family* housing . . . ." HUD Handbook 7420.1 CHG, ch. 9, at 9-13 (May 1978) (quoted in National Leased Housing, 32 Fed. Cl. at 469 n.9). Consistent with that policy, the initial contract rents for Statesman Apartments included a 10% special adjustment to the comparable unassisted rents, $34 in the case of the one-bedroom units (10 % of the $336 comparable unassisted rent, rounded up to the nearest dollar) and $39 in the case of the two-bedroom units (10 % of the $385 comparable unassisted rent, rounded up to the nearest dollar). See Declaration of Dennis Morton, ¶¶ 2, 3, Def. Supp. App. 13, 14.

The HUD Handbook in effect in 1982, when the Beach House HAP contract was entered, "was revised to allow a 10 percent adjustment for all Section 8 projects, subject to a 'rent reasonableness' test." National Leased Housing, 32 Fed. Cl. at 470 n.9; see also HUD Handbook 7420.1 REV-1, ch. 9, at 9-4 to 9-5 (Feb. 1981) (quoted in National Leased Housing, 32 Fed. Cl. at 470 n.9).

The Owners, therefore, have not demonstrated that the initial difference to be preserved in rent adjustments is the dollar amount represented by 20% of the initial contract rents under the HAP contracts.

## V. The Failure Of HUD, After 1994, To Adjust Contract Rents Under The Owners' HAP Contracts Annually On The Contract Anniversary Dates Did Not Breach, Or Result In A Breach Of, The HAP Contracts.

### A. The Requirement Of The 1994 Amendments To The Section 8 Statute That Section 8 HAP Project Owners Submit Rent Comparability Studies To HUD For Purposes Of Determining The Annual Rent Adjustment Due (If Any) Is Not An Unlawful Attempt To Amend The HAP Contracts.

The Owners contend that, under the version of 42 U.S.C. § 1437f(c)(2)(C) in effect prior to the enactment of the 1994 Act, the Government was obliged to conduct rent comparability studies in conjunction with annual rent adjustments, not the Section 8 HAP project owner. Pl. Mem. 18. The Owners assert that "HUD did not have the authority to require owners to demonstrate that a proposes adjustment would not exceed comparable rent," citing Cuyahoga Metropolitan Housing Authority v. United States, 57 Fed. Cl. 751, 762 (2003). Pl. Mem. 19. They further contend that "the requirement that an owner provide the comparability analysis" "is a unilateral addition to the HAP Contracts which places an unagreed-upon extra burden on project owners which cannot be enforced against [the Owners]." Id. We disagree.

In Cuyahoga, the court held that HAP contracts which contained rent adjustment provisions substantially identical to the rent adjustment provisions contained in the Owners' contracts in this case "expressly require HUD to provide [the project owner] with annual adjustments barring the agency's invocation of the overall limitation" and that "the passage of the 1994 amendments [to 42 U.S.C. § 1437f(c)(2)(A)] was a repudiation of this contractual provision that seemingly caused a failure to perform a contractual duty when it was due, at that point ripening into a breach of contract." 57 Fed. Cl. at 762. In that connection, the Cuyahoga court opined that, in applying the HAP contract's overall limitation with respect to factor-based, annual rent adjust-

ments, HUD has the burden of demonstrating a material difference, including the responsibility for performing rent comparability studies. Id. at 759-62.

Even the Cuyahoga court, however, acknowledged that while the overall limitation upon rent adjustments contained in HAP contracts requires HUD to determine whether there is a material difference between an adjusted contract rent and the comparable unassisted rent, that provision does not specify which party has the burden of demonstrating that there is or is not a material difference, as the case may be. See 57 Fed. Cl. at 759. The phrase "as determined by the Government" contained in the overall limitation provision requires that the ultimate determination of whether a rent adjustment would result in a contract rent that is materially different from the comparable unassisted rent be made by the Government, but it does not impose upon the Government the burden of demonstrating that a formula-based rent adjustment would result in a contract rent that is materially different from the comparable unassisted rent or the responsibility for performing a rent comparability study.

Nothing in the 1994 amendments to the Section 8 statute or, for that matter, HUD Notice 95-12, abdicates the responsibility imposed by the overall limitation clause upon the Government to determine whether a rent adjustment would result in a contract rent materially different from the comparable unassisted rent. The issue here is whether, as an exercise of the discretion given the Government by the HAP contract's overall limitation provision, the Government may require that the project owner provide the Government with a rent comparability study in order that the Government may discharge its duty to make the material difference determination.

The overall limitation upon rent adjustments contained in the HAP contracts affords HUD the "discretion to design and implement comparability studies as a reasonable means of

effectuating [the overall limitation provision's] mandate." Alpine Ridge, 508 U.S. at 21. The HAP contracts "do not contain any provision limiting HUD to any particular methodology for making its comparability determination." National Leased Housing, 22 Cl. Ct. at 659. HUD's discretion under the overall limitation provision to design and implement rent comparability studies includes the discretion to place the onus of conducting such studies upon the project owner.

The Cuyahoga court's conclusion that the Government has the burden of demonstrating that an annual rent adjustment would run afoul of the rent comparability limitation rests upon an inference drawn from section 1.8b(1) of the HAP contract, which provides that "Automatic Annual Adjustment Factors will be determined by the Government annually," and section 1.8b(2) of the HAP contract, which provides that, "[o]n each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government." See Statesman II and Beach House HAP Contracts, Part I, § 1.8b(2), Def. App. 64, 125. The Cuyahoga court opined that "[t]he 'automatic' references in these provisions, as well as the annual periodicity established therein, plainly reveal an intent that the adjustments would occur without [the project owner] having to take any significant action" and that "[l]ogic . . . suggests that for the adjustments in the first part of the contract to be truly 'automatic,' the burden of demonstrating a material difference must lie on HUD." 57 Fed. Cl. at 759.

The overall limitation clause, however, trumps the "automatic" annual rent adjustment provisions, limiting both rent adjustments and rent payments under the HAP contracts. National Leased Housing, 105 F.3d at 1434. Thus, a project owner "cannot claim entitlement to formula-

based rent adjustments that materially exceed market rents for comparable units." Alpine Ridge, 508 U.S. at 19; accord Federal Housing Partners IV v. Cisneros, 55 F.3d 362, 367-68 (8th Cir. 1995) ("The contention that [AAFs] are the presumptive method of adjusting rents is incorrect by the terms of the contracts. While [AAFs] might be the *norm for practical reasons*, the overriding principle set forth in the contracts is that [AAFs] shall not result in material differences . . . . (emphasis added)).

The HAP contracts, moreover, imposed upon the Owners the duty to "furnish such information and reports pertinent to the Contract as reasonably may be required from time to time by the Government," which is consistent with and buttresses the discretion afforded the Government by the overall limitation provision to require that the Owners provide HUD with rent comparability studies in order to receive an annual rent adjustment. Statesman II and Beach House HAP Contracts, Part II, § 2.6a, Def. App. 68, 130.[12/] The Cuyahoga court did not address that contractual duty of the project owner in analyzing whether a project owner may be required to perform a comparability study as a condition of receiving an annual rent adjustment.

Therefore, the requirement in the 1994 Act's amendments that owners demonstrate that AAF-adjusted rents would not materially differ from the rents for comparable unassisted units is not inconsistent with the Owners' HAP contracts. Pursuant to the 1994 amendments and HUD Notice 95-12, HUD continues to determine the validity of rent comparability studies and to eval-

---

[12] The requirement that the Owners provide rent comparability data to HUD is reasonable because that information is necessary for the Government to make the ultimate determination of whether an AAF-based rent adjustment would differ materially from rents charged for comparable unassisted housing. It also avoids what had been a claim by Section 8 HAP project owners in the past that HUD performed rent comparability studies in an arbitrary and capricious manner. See Alpine Ridge, 508 U.S. at 20.

uate whether, upon the basis of such studies, assisted rents materially differ from comparable, unassisted rents.

B. The Unmistakability Doctrine Applies To The Owners' HAP Contracts.

The plurality opinion in United States v. Winstar Corp., 518 U.S. 839, 878 (1996), synthesizing the "collective holding" of Supreme Court precedent discussing the doctrine, restated the unmistakability doctrine as follows: "[A] contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a sub-sequent sovereign act (including an Act of Congress), nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power."[13]

In the brief in support of the Government's motion for summary judgment in this case, we demonstrated that, by virtue of the unmistakability doctrine, even assuming for the sake of argument that the 1994 amendment to the Section 8 statute was inconsistent with the terms of the Owner's HAP contracts, the 1994 amendment relieved HUD of any obligation to increase contract rents on contract anniversary dates in cases where owners whose contract rents exceeded fair market rents did not timely demonstrate that adjusted rents would not exceed comparable unassisted rents. The HAP contracts do not expressly exempt the Owners from the application of the 1994 amendment or otherwise purport to shift the risk of any future legislative acts to the Government.

---

[13] "Without regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148 (1982). Thus, "contractual arrangements, including those to which the sovereign itself is party, 'remain subject to subsequent legislation' by the sovereign." Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 52 (1986) (quoting Merrion).

The Owners respond by characterizing the Government's alternate defense based upon the unmistakability doctrine as "half-hearted," remarking that "[t]his is understandable because the application of the unmistakability doctrine has been proscribed by rulings of the United States Supreme Court and this Court." Pl. Mem. 19. The Owners rely heavily upon Cuyahoga, where the court held that the unmistakability doctrine could not be invoked by the Government as a defense to breach-of-contract claims with respect to the 1994 Act amendments to the Section 8 statute because they are not a "public and general" act.

The linchpin of the Cuyahoga court's analysis of the unmistakability doctrine is its linkage of the requirement that the legislation in question be of a public and general character, a feature of the separate and distinct "sovereign acts" doctrine,[14] with the unmistakability doctrine. There is, however, no basis either in Supreme Court precedent or, for that matter, in Yankee Atomic Electric Co. v. United States, 112 F.3d 1569 (Fed. Cir. 1997), cert. denied, 524 U.S. 951 (1998), cited by the Owners, for this conflation of those doctrines.

The plurality opinion in Winstar treats the sovereign acts and unmistakability doctrines as alternative defenses and it takes up the sovereign acts doctrine only *after* having addressed

---

[14] The "sovereign acts" doctrine was first enunciated in Jones v. United States, 1 Ct. Cl. 383, 384 (1865): "Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons." This doctrine strikes a balance between, on the one hand, the government's need for freedom to legislate, and, on the other hand, the obligation to honor its contracts by limiting the circumstances in which a government act may be attributed to the government in its capacity as contractor: a governmental act (including legislation) that is "public and general" may not be attributed to the government as contractor, leaving the government – like a private party – free to invoke impossibility or any other applicable contract defense grounded upon the supervening governmental act.

the unmistakability doctrine. Compare 518 U.S. at 871-87 (unmistakability), with id. at 891-909 (sovereign acts). If the sovereign acts doctrine were a prerequisite for application of the unmistakability doctrine, the Winstar plurality presumably would have addressed the sovereign acts doctrine first, and having held (as it did) that the requirements of the sovereign acts doctrine were not met, the plurality's nearly 20-page analysis of the unmistakability doctrine could have been dispensed with entirely. As for the concurring opinion in Winstar, while it concluded that the sovereign acts doctrine "adds little, if anything at all, to the 'unmistakability' doctrine" (id. at 923-24), it did not suggest in any way that the unmistakability doctrine is limited by the scope of the sovereign acts doctrine.

Nothing in Yankee Atomic purports to marry the unmistakability doctrine to the sovereign acts doctrine either. While the Yankee Atomic court applied the sovereign acts doctrine before addressing the unmistakability doctrine, it did not state that nothing in Yankee Atomic suggests that it applied the unmistakability doctrine only because it determined the statute in that case was a "public and general" act within the meaning of the sovereign acts doctrine.[15] But see

[15] Yankee Atomic involved a statutory assessment against utility companies for the purpose of cleaning up uranium enrichment plants, which the plaintiff utility company contended was a breach of its fixed-price contract with the government for the supply of enriched uranium. The court initially applied the sovereign acts doctrine, concluding that the legislation was not attributable to the government in its capacity as contractor because it "constitutes a general exercise of Congress's taxing power for the purpose of addressing a societal problem rather than an act that retroactively increases the price charged to contracting parties for uranium enrichment services." 112 F.3d at 1577. Having determined that the statute was a "public and general" act, the court then considered whether the plaintiff's enriched uranium supply contract with the government "unmistakably precluded the Government from subsequently exercising its sovereign power to assess a tax," id. at 1579, applying the unmistakability doctrine, and it found that the contract "did not include an unmistakable promise that precluded the Government from later imposing an assessment upon all domestic utilities that employed the [Department of Energy's] uranium enrichment services." Id. at 1580.

Centex Corp. v. United States, Nos. 03-5087, -5095 (Fed. Cir., Jan. 19, 2005), slip op. at 43 ("In Yankee Atomic, this court agreed with the proposition that the unmistakability doctrine is implicated only when the government acts in a sovereign capacity.").

From a logical standpoint, the requirements of the sovereign acts doctrine have no place in the operation of the unmistakability doctrine. The unmistakability doctrine is a rule of contract interpretation that looks to the nature and subject matter of the contract, whereas the sovereign acts doctrine is a liability rule that looks, not to the meaning of the contract itself, but rather to the nature of the subsequent governmental action that prevents performance of the contract.

## VI. The Requirement Of HUD Notice 95-12 That Adjustments Of Contract Rents Are Effective 60 Days After Receipt Of The Rent Comparability And Other Information Required By The Notice Is Not Unlawful.

As discussed above, HUD Notice 95-12 provides that, where existing HAP contract rents exceed fair market rents, the Section 8 HAP project owner is required to submit to HUD a study of the rents charged for comparable, unassisted units. See Def. App. 3. If the owner provides this information at least 60 days before the anniversary of the HAP contract, the contracts rents will be adjusted effective on the anniversary date. If, however, the owner provides this information less than 60 days before the HAP contract anniversary date, the contract rents will be effective on the date 60 days after the owner submits the data. Id.

The Owners object to this "60-day requirement" of HUD Notice 95-12. Pl. Mem. 16-17. They argue that this requirement "is effectively a HUD-initiated amendment to the six year Congressional statute of limitations under the Tucker Act, within which time a party can bring an action to enforce a contractual right against the Government." Id. We disagree.

The Owners' HAP contracts provide for rent adjustments, where appropriate, on the contract anniversary date. Because HUD would require time to consider the information submitted by a project owner, it is a reasonable exercise of HUD's discretion under the HAP contract's overall limitation provision to require that the owner submit rent comparability data, for example, at least 60 days prior to a contract anniversary date. See NKF Engineering, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986) (noting latitude shown to contracting officer's authority to administer contracts).

VII. The Owners' Claims Based Upon HUD's Failure To Make AAF-Based Rent Adjustments For Contract Years 1995, 1996, and 1997 Are Barred By The Six-Year Statute Of Limitations Applicable To This Suit, Including The Owners' Claim That, For The Purpose Of Determining Damages Due To HUD's Failure To Adjust The HAP Contract Rents In 1998 And Thereafter, The Calculation Must Begin With What The Contract Rents Would Have Been If HUD Had Adjusted The Contract Rents In 1995, 1996, And 1997.

In the brief in support of the Government's motion for summary judgment, we showed that the Owners' breach-of-contract claims based upon HUD's failure to grant annual rent adjustments in 1995, 1996, and 1997 are barred by 28 U.S.C. § 2501, the six-year statute of limitations applicable to suits governed by the Tucker Act. The Owners respond that they "do not claim any damages for breach of contract for the years 1995 through 1997." Pl. Mem. 22. According to the Owners, "even though [they] are barred by the statute of limitations (28 U.S.C. § 2501) from making a claim for damages for years 1995 through 1997, the rent levels for these years should have been automatically calculated with appropriate increases pursuant to the contracts and the 1998 rent level calculated from the levels so arrived for 1997." Pl. Mem. 23. We do not agree.

The Federal Circuit rejected a substantially identical argument by the plaintiffs in Brown-Park Estates-Fairfield Development Co. v. United States, 127 F.3d 1449, 1454 (Fed. Cir. 1997), a case that involved rent adjustment claims under HAP contracts that contained rent adjustment provisions virtually identical to the rent adjustment provisions in the Owners' HAP contracts here. In Brown-Park, the owners commenced suit in October 1994, alleging that HUD's failure to make the proper annual rent adjustments at specified times between June 1986 and February 1988 constituted a breach of their HAP contracts. 127 F.3d at 1455. The owners argued that, as a result of the alleged breach, they sustained damages not only during the years in which the alleged breach originally occurred, but also in subsequent years, including during the six years prior to suit (i.e., October 1988 to October 1994). Id.

The Federal Circuit squarely rejected the plaintiffs' claims in Brown-Park, holding that the "continuing claim" doctrine did not apply to those claims and that the claims were barred by the statute of limitations because they "all accrued before the six years preceding filing of suit[.]" 127 F.3d at 1455. The court of appeals stated:

> [A]ppellants are not complaining about any alleged breaches of the HAP contracts by HUD during the six-year period immediately prior to the filing of suit. Appellants' claims are based on HUD's alleged failure to make the proper rent adjustments at the specified times between June of 1986 and February of 1988. That failure, and the consequential damages resulting from it, constitute the actionable wrong that appellants seek to vindicate. As far as the six years prior to filing suit are concerned, appellants do not contend that HUD failed to make rent adjustments during those years. Rather, they argue that on account of HUD's breaches outside the period of the statute of limitations, HUD started from the wrong base when making rent adjustments during the six years prior to the filing of suit. Thus, the alleged improper base for these latter years relates directly to, and is completely dependent on, whether HUD failed to make rent adjustments in earlier years in violation of the HAP contracts.

Id. at 1457-58.

The Owners in the present case, similar to the Brown-Park plaintiffs, argue that, for purposes of determining the HAP contract rents to which the Owners allegedly are entitled for 1998 (and subsequent years), the calculation must begin with what the contract rents would have been on the 1998 contract anniversary if HUD had adjusted the rents in 1995, 1996, and 1997. HUD's alleged improper failure to make those pre-1998 rent adjustments in breach of the HAP contracts, the argument goes, results in the wrong contract-rent base from which to calculate the rent adjustments for 1998 (and later years) to which the Owners allege they are due. The alleged improper rent base for 1998 and thereafter is directly related to and completely dependent upon whether HUD failed to adjust contract rents in 1995, 1996, and 1997 in violation of the Owners' HAP contracts.

The consequential damages sought by the Owners stemming from the alleged wrong rent base, therefore, are barred by the statute of limitations. Any calculation of damages attributable to the failure to adjust HAP contract rents in 1998 or later years must start with the contract rents in effect as of the 1998 contract anniversary, not with what the rents would have been if they had been adjusted in 1995, 1996, or 1997.

## CONCLUSION

For the foregoing reasons and the reasons set forth in the brief in support of defendant's motion for summary judgment, plaintiff's cross-motion for summary judgment should be denied, defendant’s motion for summary judgment should be granted, and plaintiffs' first amended com-plaints should be dismissed.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(FAX)(202) 514-8624

Attorneys for Defendant

OF COUNSEL:

C. ALLEN VILLAFUERTE
Trial Attorney
Office of General Counsel
Department of Housing
and Urban Development
Washington, DC

FEBRUARY 4, 2005