IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **STATESMAN II APARTMENTS, INC., ET AL.,** | ) | CASE NOS. 04-805C and No. 04-806C (Consolidated) |
| Plaintiffs, | ) | JUDGE LETTOW |
| v. | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | **PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE TO CROSS-MOTION FOR SUMMARY JUDGMENT** |
| Defendant. | ) | |

Plaintiffs respectfully submit the attached Reply Memorandum in support of their Cross-Motion for Summary Judgment.

Respectfully submitted,

/s/ *Fred J. Livingstone*
Fred J. Livingstone (0009528)
Taft, Stettinius & Hollister LLP
3500 BP Tower
200 Public Square
Cleveland, OH 44114-2302
(216) 241-2838
(216) 241-3707 – Fax
flivingstone@taftlaw.com

Attorney for Plaintiff
Statesman II Apartments, Inc.,

Of Counsel:
Mark J. Valponi
Majeed G. Makhlouf
Taft, Stettinius & Hollister LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838
(216) 241-3707 – Fax

Dated: March 4, 2005

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

APPENDIX ........ iv

REPLY MEMORANDUM ........ 1

I. THE HAP CONTRACTS GIVE HUD NO GENERAL AUTHORITY TO REDUCE THE ANNUAL ADJUSTMENT FACTOR ........ 1

II. THE GOVERNMENT'S ASSERTIONS THAT PLAINTIFFS' CLAIMS ARE PREMATURE WOULD LEAVE PLAINTIFFS WITHOUT A REMEDY FOR BREACH OF CONTRACT. ........ 2

III. FAILURE TO INCLUDE A MATERIAL DIFFERENCE FACTOR IN THE 1994 AMENDMENTS OR NOTICE 95-12 CONSTITUTES A REPUDIATION WHICH RIPENED INTO A BREACH OF CONTRACT ON THE ANNIVERSARY DATES OF THE YEARS IN QUESTION ........ 3

IV. LONG-STANDING PRECEDENT RESULTING FROM THE GOVERNMENT'S ARGUMENTS TO THE COURTS IS THAT A MATERIAL DIFFERENCE IS AN AMOUNT IN EXCESS OF 120% OF THE SUM OF COMPARABLE RENT AND INITIAL DIFFERENCE ........ 5

V. PLAINTIFFS HAVE DEMONSTRATED THAT THE INITIAL DIFFERENCE FOR EACH PROJECT WAS IN EXCESS OF 20% ........ 8

VI. THE PHRASE "AS DETERMINED BY THE GOVERNMENT" DOES NOT GIVE HUD THE AUTHORITY TO SHIFT THE BURDEN OF PROVIDING COMPARABILITY STUDIES TO THE HAP CONTRACT OWNERS ........ 9

VII. MOST POST-WINSTAR CASES HAVE DENIED APPLICABILITY OF THE UNMISTAKABILITY DOCTRINE WHERE NO PUBLIC AND GENERAL LEGISLATION IS INVOLVED ........ 10

VIII. HUD'S CLAIMED NEED FOR TIME TO CONSIDER ADJUSTMENT OF RENTS DOES NOT CURTAIL THE 6-YEAR STATUTE OF LIMITATIONS WITHIN WHICH A CONTRACT CLAIM MAY BE ASSERTED ........ 12

IX. PLAINTIFFS ARE ENTITLED TO AAAF ADJUSTMENTS FOR THE YEARS 1995, 1996, AND 1997 ........ 13

# TABLE OF AUTHORITIES

## CASE LAW

*Brown Park Estates-Fairfield Dev. Co. v. U.S.*,
127 F.3d 1449 (Fed. Cir. 1997)....................13

*Cuyahoga Metropolitan Housing Authority v. United States*,
57 Fed. Cl. 751 (2003) .................... 1, 5, 9, 12-13

*First Fed. Sav. & Loan Assn. of Rochester v. United States*,
58 Fed. Cl. 139 (2003)....................3

*Franconia Associates v. United States*,
539 U.S. 129 (2002)....................3

*General Dynamics Corp. v. United States*,
47 Fed. Cl. 514 (2000).................... 10-12

*Kimberly Assocs. v. United States*,
261 F.3d 864 (9th Cir. 2001) ....................12

*Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*,
497 U.S. 116 (1990).................... 7-8

*National Leased Hous.g v. United States*,
32 Fed. Cl. 762 (1995), *aff'd* 105 F.3d 1423 (Fed. Cir. 1997) ....................6

*National Leased Hous. Assn. v. United States*,
22 Cl. Ct. 649 (1991) ....................6

*Norfolk Southern Railway Co. v. Shankin*,
529 U.S. 344 (2000)....................7

*Park Village Apts. v. United States*,
32 Fed. Cl. 441(1994), *aff'd* 152 F.3d 943 (Fed. C.Vir. 1998).................... 5-7

*Park Village Apts v. United States*,
25 Cl. Ct. 729 (1992) ....................5

*Sheridan Square Partnership v. United States*,
761 F.Supp. 738 (D. Colo. 1991)....................6

*United States v. Winstar Corp.*,
518 U.S. 839 (1996)....................3, 10, 12

*Yankee Atomic Elec. Co. v. United States*,
112 F.3d 1569 (Fed. Cir. 1997), *cert. denied*, 524 U.S. 951 (1998)....................10

## FEDERAL STATUTES

42 U.S.C. §1437f ........................................ 4-5, 8

28 U.S.C. §2501 ........................................ 12

## PUBLIC LAW

Department of Veteran's Affairs and Housing and Urban Development and Independent Agencies Appropriations Act of 1995 (the "1994 Amendments"), Pub. L. No. 103-327, 108 Stat 2298 ........................................ 2, 3, 8, 9, 12

## HUD NOTICES

HUD Notice 95-12 ........................................ 2, 3-5, 8, 9

1986 Memorandum ........................................ 4, 6-8

## LEGISLATIVE HISTORY

S. Rep. 103-311 ........................................ 1

## OTHER

*Merriam-Webster's Collegiate Dictionary*, 11th Ed. (2003) ........................................ 5

Restatement (Second) of Contracts, § 346 ........................................ 3

## APPENDIX

Affidavit of Fred J. Livingstone....1

*Park Village II* Post Trial Brief....2

Affidavit of Richard Racek, Jr. ....7

Letter of Richard Racek dated March 18, 2004
regarding Statesman Apartment Rent Survey....8

Letter of Richard Racek dated March 18, 2004
regarding Lakeshore Village (Beach House) Rent Survey....9

## REPLY MEMORANDUM

### I. THE HAP CONTRACTS GIVE HUD NO GENERAL AUTHORITY TO REDUCE THE ANNUAL ADJUSTMENT FACTOR.

The Government argues that HUD had the discretion under Section 1.8(b) of the HAP Contracts to establish factors for different types of dwelling units and therefore implies it had discretion to reduce a factor when tenant turnover had not occurred in a dwelling unit. This does not logically or legally follow from the language of the HAP Contracts.[1] In fact, the opposite is true. The HAP Contracts at issue contemplate factors being published in the Federal Register and that, where appropriate, such factors are reduced "where utilities are paid directly by the Families." That is the sole reason permitted by the HAP Contracts to reduce the factor in any way. The HAP Contracts do not permit a reduction for any other reason.

If HUD indeed had the power to publish a variety of factors, including ones reducing the factor for tenant turnover, there would have been no reason for Congress to grant such authority.[2] As Judge Allegra emphasized in *Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed. Cl. 751 (2003), with respect to the statutory requirement that Section 8 owners obtain comparability studies:

---

[1] 1.8(b) Automatic Annual Adjustments

> 1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the families.
>
> 2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of this Contract.

(HAP Contract Section 1.8(b), Def. App. 64, 125).

[2] S. Rep. 103-311 at 70.

> One might wonder why Congress bothered to pass such limits if, as defendant contends, HUD always had the power, under the original Section 8 program, to require the project owners to present a comparability study as a precondition to receiving an adjustment. The simple fact is – it did not have that power.

*Id.* at 762. But even if HUD had the power to establish a variety of factors, it did not have the right under the terms of the HAP Contracts to reduce them for non-turnover units. Congress' mandate to do so, implemented by Notice 95-12, constituted a breach of Plaintiffs' HAP Contracts.

## II. THE GOVERNMENT'S ASSERTIONS THAT PLAINTIFFS' CLAIMS ARE PREMATURE WOULD LEAVE PLAINTIFFS WITHOUT A REMEDY FOR BREACH OF CONTRACT.

The Government asserts that Plaintiffs' claims are premature. It contends that Plaintiffs must wait to raise their claims regarding the one percent non-turnover reduction requirement and the omission of a material difference factor in both the 1994 Amendments and Notice 95-12. Until when? The Government suggests that these claims could be asserted only when increases (we assume with the non-turnover reductions and without a material difference) are received.

Plaintiffs, however, have already applied for such increases and same have been denied. (Appendix to Defendant's Motion for Summary Judgment ("Def. App.") 76, 121; 150.) The denials were based upon the 1994 Amendments and Notice 95-12, which make clear that the one percent non-turnover reduction will be applied to whatever increases Plaintiffs are entitled to receive and no material difference factor will be included in calculating the overall limitation provided by Section 1.8(d) of the HAP Contracts.

This is a repudiation, at least, of HUD's obligations under the HAP Contracts to apply the full adjustment factor without the non-turnover reduction and to allow for a material difference in calculating the overall limitation under Section 1.8(d) of the HAP Contracts. These denials

ripened into contract breaches as of the due dates of the increases claimed by Plaintiffs. *See Franconia Associates v. United States*, 539 U.S. 129 (2002).

Additionally, if Plaintiffs had to wait some further unspecified time, their claims would be precluded or reduced by the running of the statute of limitations, and Plaintiffs would be left without a remedy for the breaches. Parties damaged by a breach are entitled to a remedy. *See United States v. Winstar Corp.*, 518 U.S. 839, 843 (1996) ("[a]lthough Congress subsequently changed the relevant law, and thereby barred the Government from specifically honoring its agreements, we hold that the terms assigning the risk of regulatory change to the Government are enforceable, and that the Government is therefore liable in damages for breach"); *First Fed. Sav. & Loan Assn. of Rochester v. United States*, 58 Fed.Cl. 139, 160 (2003) ("[t]he award of damages is the common form of relief for breach of contract. Virtually any breach gives the injured party a claim for damages") (*citing* Restatement (Second) of Contracts, § 346). The breaches of contract caused by the one percent reduction for non-turnover units and the omission of the material difference factor are the heart of Plaintiffs' claims. If they are truly breaches of contract, as Plaintiffs have demonstrated, it is not apparent from the Government's argument how such breaches would ever be remedied.

## III. FAILURE TO INCLUDE A MATERIAL DIFFERENCE FACTOR IN THE 1994 AMENDMENTS OR NOTICE 95-12 CONSTITUTES A REPUDIATION WHICH RIPENED INTO A BREACH OF CONTRACT ON THE ANNIVERSARY DATES OF THE YEARS IN QUESTION.

The Government has argued that HUD has the right under the HAP Contracts to interpret the phrase "material difference" which is a part of the contract for which Plaintiffs bargained, so long as its interpretation is reasonable and not arbitrary. There is no dispute over that proposition. The Government, however, claims that HUD has interpreted the phrase material difference in Notice 95-12 to mean any amount in excess of the sum of comparable unassisted rent and the initial difference and that such an interpretation is not unreasonable nor arbitrary.

That contention flies in the face of the statutory language in 42 U.S.C. §1473f(c)(2)(C), Section 1.8(d) of the HAP Contracts, long-standing legal precedent, and HUD's own interpretive arguments to the courts.

42 U.S.C. §1437f (c)(2)(C) has always provided (both before and after the 1994 Act) that adjustments in contract rent shall not result in ***material*** differences between rents for assisted and unassisted comparable units.[3] Section 1.8 (d) of the HAP Contracts also provides:

> Overall Limitation. Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in **material differences** between the rents charged for assisted and comparable unassisted units, as determined by the Government: provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents. (Emphasis added).

HUD argues that "Notice 95-12 … reflects HUD's current view of what constitutes a 'material difference'…."[4] If that be the case, it is strange that nowhere in Notice 95-12 is the phrase "material difference" used. Contrast that with HUD's 1986 Memorandum to which the Government Reply cites.[5] Its focus is on defining that term at great length.

Further, the plain language of Section 1.8(d) of the HAP Contracts contradicts HUD's contention that Notice 95-12's definition is a reasonable redefinition of "material difference." The language of Section 1.8(d) requires that HUD add the comparable, unassisted rent to any initial difference which may have existed, to reach a total ("Total"). Then, the plain language of

[3] "Adjustments in the maximum rents under subparagraphs (A) and (B) shall not result in material differences between the rents charged for assisted units and unassisted units of similar quality, type, and age in the same market area…." 42 USC 1437f(c)(2)(C).

[4] Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Defendant's Opposition to Plaintiffs' Cross-Motion for Summary Judgment Upon Liability Issues, ("Opposition Brief") p. 19.

[5] *See* January 14, 1986 Memorandum from Silvio J. DeBartolomeis ("1986 Memorandum") (Defendant's Supplemental Appendix, p. 1).

Section 1.8(d) requires that application of the automatic annual adjustment factor ("AAAF") to the old contract rent not result in any **material difference** from that Total.

HUD's claim that just the Total (comparable, unassisted rent plus the initial difference) results in the material difference from the Total itself renders the words "material" and "difference" meaningless. *Merriam-Webster's Collegiate Dictionary*, 11th Ed. (2003), defines "material" as "having real importance or great consequences" and "difference" as "the degree or amount by which things differ in quantity or measure." Under HUD's theory, there is not only **no material difference**, but **no difference at all** contemplated in Notice 95-12's so called clarification of the statutory and contract term "material difference." This interpretation repudiates Plaintiffs' rights under the HAP Contracts to receive more than the sum of comparable unassisted and the initial difference if application of the AAAF results in a greater number.

HUD's determination of what is a "material difference" must be reasonable, not arbitrary. *See* 42 U.S.C. 1437f (c)(A)(2); *Cuyahoga*, 75 Fed. Cl. at 779. Clearly, HUD's claim that Notice 95-12's determination that **no** difference is a material difference is unreasonable and arbitrary. HUD is required by the plain language of the HAP Contracts to determine that a material difference is that figure which exceeds the sum of comparable, unassisted rent and initial difference by an amount of real importance or an amount of consequence. That contract term, which is part of Plaintiffs' bargain, cannot be unilaterally erased by HUD. HUD's action constitutes a breach of contract for which it is liable.

## IV. LONG-STANDING PRECEDENT RESULTING FROM THE GOVERNMENT'S ARGUMENTS TO THE COURTS IS THAT A MATERIAL DIFFERENCE IS AN AMOUNT IN EXCESS OF 120% OF THE SUM OF COMPARABLE RENT AND INITIAL DIFFERENCE.

The Government admits that *National Leased Hous. Assn. v. United States*, 22 Cl. Ct. 649, 661 (1991); *Park Village Apts. v. United States*; 25 Cl. Ct. 729 (1992); *Park Village Apts. v.*

*United States*, 32 Fed. Cl. 441 (1994) ("Park Village II"), *aff'd* 152 F.3d 943 (Fed. Cir. 1998); *National Leased Hous. Assn. v. United States*, 32 Fed. Cl. 762 (1995), *aff'd* 105 F.3d 1423 (Fed. Cir. 1997), all hold that a material difference is more than 120% of the sum of comparable, unassisted rent and the initial difference ("120% Standard"). Additionally, the District Court in *Sheridan Square Partnership v. United States*, 761 F. Supp. 738, 743 n. 2 (D. Colo.1991) reached that conclusion.

The Government, however, now asserts that "that interpretation … is based upon an incorrect reading of a 1986 memorandum...."[6] (Opposition Brief, p. 19.) It now asserts that there were other standards set forth in the 1986 Memorandum which define material difference. The courts in the five cited cases did not arrive at the 120% Standard definition of material difference on their own. Rather, the Government urged at least one of these courts to apply the 120% Standard. In *Park Village II*, the Government argued to this Court in its Post Trial Brief that the 120% Standard was HUD's sole standard for determining material difference:

> A HUD memorandum dated January 14, 1986, advised all of HUD's regional directors of housing that "a material difference exists whenever the adjusted Section 8 rent would exceed 120 percent times the sum of the comparable rent and the initial difference." This definition of material difference refers to those situations in which the AAF ("factored") rent would exceed the comparable rent.

Defendant's Post-Trial Brief dated June 17, 1994, *Park Village II*, ("Post Trial Brief") (Pl. Sup. Appendix ("Pl. Sup. App.") p. 3.)

In *Park Village II*, the plaintiff argued that the AAAF rents were <u>lower</u> than comparable rent and, therefore, it should be entitled to the comparable rent figure. The Government in its Post Trial Brief argued contra:

[6] The reference is to the January 14, 1986 Memorandum from Silvio J. DeBartolomeis (Defendant's Supplemental Appendix, p. 1).

> HUD did not anticipate that the overall limitation provision would be applicable to those situations in which the comparable rent would exceed the factored rent. PX8 at page 3. Accordingly, HUD did not develop a policy statement for determining when a material difference existed in this reverse situation. Common sense suggests, however, that a mirror image approach would be appropriate for those situations where comparable rent exceeds the factored rent. To develop a mirror image approach, we need to examine how HUD's policy was implemented.
>
> The 1986 memorandum demonstrates that HUD's goal was to eliminate material differences, not all differences. PX8 at attachment 2. If the comparable rent plus initial difference equaled \$360, the 120 percent material difference limitation would cap the annual adjustment at \$432. Id. At example 1B. A factored rent that exceeded \$432 would be materially different from the comparable rent plus initial difference. Id. Accordingly, HUD would eliminate the material difference by approving an adjusted contract rent of \$432. The Section 8 program participant would receive an adjusted contract rent that was 120 percent greater than the comparable rent plus initial difference. Id. Nonetheless, this would not constitute a material difference. Id.

(Pl. Sup. App. pp. 3-4.)[7]

HUD now argues directly contrary to the position it urged in *Park Village II* that the general overall limitation only consists of the sum of comparable unassisted rent and the initial difference. It further argues that the 1986 Memorandum also provides for an average operating cost exception which allows the general limit to be exceeded but in no case by more than by 20%. Normally, an agency's construction of its own regulations is entitled to substantial deference by the courts. *Norfolk Southern Railway Co. v. Shankin*, 529 U.S. 344, 356 (2000). This deference, however, does not apply when a later interpretation is inconsistent with what the court has previously adopted as the correct interpretation at the urging of the agency. *Shankin*, 529 U.S. at 356; *accord Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 131 (1990) ("[o]nce we have determined a statute's clear meaning, we adhere to that determination

[7] Director David M. Cohen, who is one of the signers of the Government's Motion herein, also signed the *Park Village II* Post Trial Brief.

under the doctrine of *stare decisis*, and we judge an agency's later interpretation of the statute against our prior interpretation of the statute's meaning").

If HUD disagreed with this Court's previous interpretation of the 1986 Memorandum, HUD had the power to amend it. It did not. The 1994 Amendments and Notice 95-12 did not mention "material difference." To suggest that Notice 95-12 clarifies HUD's 1986 interpretation of material difference is beyond belief. The 1986 Memorandum, which specifically dealt with the concept of material difference, cannot be recast at this late date by ignoring the judiciary's prior interpretation of it. Accordingly, this Court should affirm its previous interpretations of the 1986 Memorandum, the last pronouncement on material difference, and hold that the 120% Standard is the correct overall limitation for the automatic adjustment of rents called for by Plaintiffs' HAP Contracts.

## V. PLAINTIFFS HAVE DEMONSTRATED THAT THE INITIAL DIFFERENCE FOR EACH PROJECT WAS IN EXCESS OF 20%.

The Government argues that Plaintiffs were limited by the HUD Handbook to an initial difference of 10%. Plaintiffs claim that the governing limitation is the statutory limit of 20% found at 42 U.S.C. 1437f(c)(1) and have demonstrated that the <u>actual</u> <u>initial</u> <u>differences</u> were greater than 20%. (*See* Affidavit of Richard Racek, Jr., dated February 22, 2005, and Letters of Richard Racek, dated March 18, 2004 ("Racek Letters"), Pl. Sup. App. pp. 7-10). Although the Racek Letters show initial differences greater than 20%, Plaintiffs acknowledge that they are bound by the 20% statutory maximum.

The proviso in Section 1.8(d) of the HAP Contracts reads, "…that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents." The differences which "may have existed" are not subject to reduction due to an exercise of HUD's

discretion or a HUD determination reflected in Handbooks or other issuances.[8] The HAP Contract language speaks in terms of what the actual difference was at the time of the initial contract rents. Accordingly, the 20% initial difference claimed by Plaintiffs is applicable.

## VI. THE PHRASE "AS DETERMINED BY THE GOVERNMENT" DOES NOT GIVE HUD THE AUTHORITY TO SHIFT THE BURDEN OF PROVIDING COMPARABILITY STUDIES TO THE HAP CONTRACT OWNERS.

In *Cuyahoga Metropolitan Housing Authority v. United States*, Judge Allegra found that HUD's attempts to shift the production of comparability studies from HUD to the property owners "stretches the language of the contracts and the underlying statute well beyond its breaking point." *Id.*, 57 Fed. Cl. at 760. The Government now argues that it is the phrase "as determined by the Government" in the overall limitation section of the HAP Contracts, Section 1.8(d), which permits the Government to shift the burden of obtaining such studies to the owners. That phrase is appended to the language "adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units.…" A straightforward interpretation of that language limits HUD's discretion to: 1) what material differences are and 2) what comparable rents are. Nothing in that section suggests the authority to shift the burden of initially demonstrating either to the owners.

Further, as Judge Allegra pointed out in *Cuyahoga*, the legislative and judicial history clearly demonstrates that HUD had the right to utilize comparability studies, but also had the burden of providing them. *Id.* at 761. Nothing in Section 1.8(d) "trumps" that. Accordingly, this Court should find that both the 1994 Amendments and Notice 95-12 constituted repudiations of the provisions of the HAP Contracts that require HUD to demonstrate what comparable unassisted contract rents were prior to invoking the overall limitation of the HAP Contract Rents.

---

[8] In fact, the Government did not even introduce the cited handbooks into the record here. It simply cites to a footnote in a case referencing the handbooks.

## VII. MOST POST-WINSTAR CASES HAVE DENIED APPLICABILITY OF THE UNMISTAKABILITY DOCTRINE WHERE NO PUBLIC AND GENERAL LEGISLATION IS INVOLVED.

The Government appears to argue that it has the right to amend its contracts by legislation, except where it has unmistakably agreed not to. The Government's argument embraces even legislation which targets specific contracts for the purpose of saving the Government money. The Government also minimizes the holding in *Yankee Atomic Electric Co. v. United States*, 112 F.3d 1569 (Fed. Cir. 1997), *cert. denied*, 524 U.S. 951 (1998), by suggesting that the two step approach that the Court used in arriving at its decision, did not mean that the Court was linking the Unmistakability Doctrine to the Sovereign Acts Doctrine.

Even the Government admits that the *Yankee* Court first determined that the Congressional act in question was a sovereign act. The *Yankee* Court then determined that there was no unmistakable promise by the Government not to act in a way which would block performance of the contract. If the Unmistakability Doctrine was applicable in all events, as the Government is now arguing, then the *Yankee* Court engaged in a meaningless exercise in first determining whether the legislation constituted a sovereign act.

In *General Dynamics Corp. v. United States*, 47 Fed. Cl. 514 (2000), an instructive case which the Government never addresses in its Opposition Brief, this Court specifically held that the *Yankee* decision had created a two step process. First, this Court looked to whether the government action preventing performance of the contract was a "public and general" act under the Sovereign Acts Doctrine. *Id.* at 541. Second, if, and only if, the Court had first determined that the governmental action was, in fact, a "sovereign act," then the Court would look to whether the contract contained an unmistakable promise that the Government would refrain from exercising its sovereign power in a way that would influence the rights of the parties to the contract. *Id.*

In *General Dynamics*, the plaintiff corporation entered into a contract with the Government for the design of a nuclear submarine. *Id.* at 518-19. A Federal Acquisition Regulation ("FAR") regarding contractor compensation was incorporated into the contract. *Id.* at 519. Specifically, the contract stated:

> The Government shall make payments to the Contractor when requested as work progresses . . . in amounts determined to be allowable by the Contracting Officer in accordance with subpart 31.2 of the Federal Acquisition Regulation (FAR) in effect on the date of this contract and the terms of this contract.

*Id.*

Under the FAR, there was no fixed or numerical limitation on the allowability of executive compensation costs, aside from the requirement that such costs be reasonable. *Id.* at 520. However, after the parties entered into the contract, Congress enacted the National Defense Authorization Act for Fiscal Year 1998 ("NDAA"), which imposed a cap on defense contractors' allowable costs for executive compensation. When the Government disallowed executive costs sought by *General Dynamics*, the company filed a complaint alleging breach of contract based on the fact that there was no language in the contract indicating that subsequent legislation inconsistent with the contract terms would be binding on the parties. *Id.* at 520-21.

This Court held that the contract language incorporated a version of the applicable federal regulation in effect at the time the contract was executed, not the subsequently enacted version. *Id.* at 547. The Government's attempt at retroactively abrogating the terms of the contract and imposing a cap on senior executive compensation through subsequent legislation was held to be a breach of the contract. This Court found that the later Congressional action limiting executive compensation was not a sovereign act, as the major purpose of the executive compensation cap was to reduce federal expenses under existing defense contracts. *Id.* at 541. While the Government had the sovereign right to enact prospective legislation limiting such costs, it did not

have the right to pass retroactive legislation with the purpose of abrogating its own obligations under the earlier contract. *Id.* at 542. This Court then decided that an unmistakability analysis was not necessary because the provisions of the NDAA at issue were not a sovereign act. *Id.* at 543; *see also Kimberly Assocs. v. United States*, 261 F.3d 864 (9th Cir. 2001).[9]

Here, at the suggestion of HUD, Congress enacted legislation which targeted a set of specific contracts for the purpose of saving money. As Judge Allegra held in *Cuyahoga*, because the 1994 Amendments targeted the HAP Contracts of Section 8 owners, it was not a sovereign act. Under the holding of *General Dynamics*,[10] the analysis ends there, and there is no application of the Unmistakability Doctrine.

## VIII. HUD'S CLAIMED NEED FOR TIME TO CONSIDER ADJUSTMENT OF RENTS DOES NOT CURTAIL THE 6-YEAR STATUTE OF LIMITATIONS WITHIN WHICH A CONTRACT CLAIM MAY BE ASSERTED.

In its Opposition Brief, the Government justifies the Notice 95-12 requirement that applications for adjustment of rents must be made at least 60 days before the adjustments can

---

[9] In *Kimberly Associates*, 261 F.3d 864, Kimberly entered into a loan agreement with the Government, promising to build a multi-family, low-income housing project. *Id.* at 866. To discourage prepayment of the loans, Congress subsequently passed the Emergency Low Income Housing Preservation Act of 1987 (the "ELIHPA"). *Id.* By the time the ELIHPA was passed, Kimberly had already prepaid close to the entire loan amount and the Government sought to retroactively subject Kimberly to ELIHPA's prepayment procedures. *Id.* at 867. Kimberly sued. *Id.*

The Court held that it was "unquestionable that when it altered the terms of the contract with Kimberly, the government was not acting in a 'public and general' capacity." *Id.* at 870. Specifically, ELIHPA's prepayment restrictions effectively repudiated the Government's contractual obligations by repudiating Kimberly ability to prepay the mortgage. *Id.* The Court stated that the Government had, "through targeted legislation" sought to delay performance of the contract which constituted "a substantial breach of the contract terms." *Id.*

Because the Court first determined that the application of ELIHPA to Kimberly's contract was not a sovereign act, it then held that the Unmistakability Doctrine had no application. *Id*.

[10] It is critical to note that the Government had the opportunity to appeal the *General Dynamics* decision to the Federal Circuit Court of Appeals and argue its current position on the meaning of *United States v Winstar Corp.*, 518 U.S. 839 (1996). The Government did appeal the *General Dynamics* decision on January 11, 2002, but it withdrew that appeal on January 30, 2002. It now urges this Court to decide the instant case without consideration of the clear dictates of *General Dynamics*.

become effective ("60 Day Requirement"). The Government claims that HUD needs time to consider the information submitted by the owner. Plaintiffs agree that HUD needs time to consider the applications. There is no need, however, to shorten the six year period of the statute of limitations found at 28 U.S.C. § 2501 in order to gain that time.

HUD could take an appropriate period of time after the submission of an application by an owner to make its decision and make such decision retroactive to the anniversary dates in question if the contract anniversary dates had passed. It is one thing for HUD to require certain documentation and to have the time necessary to make its decision. It is another thing for the Government to try to abbreviate the time within which contract rights may be asserted in court. The only time limitation on the period within which an owner can make a claim under Plaintiffs' HAP Contracts is the one imposed by Congress, namely six years. *See* 28 U.S.C. § 2501. It is not the 60 Day Requirement devised *a priori* by HUD. *Cuyahoga*, 75 Fed. Cl. at 762.

## IX. PLAINTIFFS ARE ENTITLED TO AAAF ADJUSTMENTS FOR THE YEARS 1995, 1996, AND 1997.

Plaintiffs recognize that this Court is bound by the Federal Circuit's decision in *Brown Park Estates-Fairfield Dev. Co. v. U.S.*, 127 F.3d 1449 (Fed.Cir. 1997). Plaintiffs emphasize, however, that they are not seeking damages for the years precluded by the statute of limitations. Their claim is that damage calculations for the years 1998-forward cannot exist in a vacuum. A proper measure of such damages must take into account rent adjustments which should have taken place in past years, irrespective of whether those years are precluded by the statute of limitations. To the extent that *Brown Park Estates* precludes such adjustment for the purposes of calculating damages for the years 1998-forward, Plaintiffs maintain that the case is wrongly decided and reserve the right to assert this argument before the Federal Circuit on appeal. This presents a question of damages more properly decided at a later stage of this case.

Respectfully submitted,

/s/ *Fred J. Livingstone*
Fred J. Livingstone (0009528)
Taft, Stettinius & Hollister LLP
3500 BP Tower
200 Public Square
Cleveland, OH 44114-2302
(216) 241-2838
(216) 241-3707 – Fax
flivingstone@taftlaw.com

Attorney for Plaintiff
Statesman II Apartments, Inc.,

Of Counsel:
Mark J. Valponi
Majeed G. Makhlouf
Taft, Stettinius & Hollister LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838
(216) 241-3707 – Fax

Dated: March 4, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that on March 4, 2005, a copy of the foregoing *Plaintiffs' Reply to Defendant's Response to Cross-Motion for Summary Judgment* was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully submitted,

/s/ *Fred J. Livingstone*

Fred J. Livingstone (0009528)
Taft, Stettinius & Hollister LLP
3500 BP Tower
200 Public Square
Cleveland, OH 44114-2302
(216) 241-2838
(216) 241-3707 – Fax
flivingstone@taftlaw.com

Attorney for Plaintiff
Statesman II Apartments, Inc.,

Of Counsel:
Mark J. Valponi
Majeed G. Makhlouf
Taft, Stettinius & Hollister LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838
(216) 241-3707 – Fax