# DEFENDANT'S APPENDIX

# In the United States Court of Federal Claims

Nos. 01-46C, 01-251C, 01-416C

(Filed: June 2, 2005)

---

| | | |
|---|---|---|
| CUYAHOGA METROPOLITAN HOUSING AUTHORITY, | * | Summary judgment; Breach of contract; HUD section 8 housing program; HAP contracts; 1994 amendments to Housing Act of 1937; HUD Notice 95-12; Damages; One-percent rule of 42 U.S.C. § 1437f(c)(2)(A); Expectancy damages; Legal impact of law effectuating a breach; Causation v. mitigation; Construction of overall limitation in HAP contracts and 42 U.S.C. § 1437f(c)(2)(C); Judicial estoppel; Cost of comparability studies; Prejudgment interest. |
| Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES, | * | |
| Defendant. | * | |

---

**OPINION**

---

*Fred Joseph Livingstone*, Taft, Stettinus & Hollister, Cleveland, OH, for plaintiff.

*Andrew P. Averbach*, U.S. Department of Justice, Washington, D.C., for defendant, with whom was *Assistant Attorney General Peter D. Keisler.*

**ALLEGRA, Judge:**

*"If a contract is broken, the measure of damages generally is the same, whatever the cause of the breach."*[1]

This is the second leg of a jurisprudential voyage having its genesis in a series of contracts entered into between the plaintiff, Cuyahoga Metropolitan Housing Authority (CMHA or plaintiff), and the Department of Housing and Urban Development (HUD) to provide low-income housing under the United States Housing Act of 1937 (the Housing Act). This court previously held that plaintiff's rights under these contracts were repudiated by Congress in 1994, when it amended the Housing Act to alter how rent subsidies were to be determined. *Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751, 762 (2003) (*CMHA I*). That repudiation was exacerbated, this court further opined, when HUD, in a 1995 directive, imposed additional requirements on obtaining rent increases that were not envisioned in either the contracts or the

---

[1] *Globe Ref. Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 544 (1903) (Holmes, J.).

1994 legislation. *Id.* In so concluding, the court rejected defendant's banner defense – that no repudiation or breach arose under the so-called unmistakability doctrine. *Id.* at 777-80. At issue in the pending cross-motions for partial summary judgment are what damages are awardable for the resulting partial breaches of the HAP contracts.

## I. BACKGROUND

A detailed recitation of the factual and statutory background of this case may be found in this court's prior opinion. *Id.* at 752-58. This court will rehearse here only those details necessary to provide context, filling in a few additional facts as necessary.

In 1974, Congress amended the Housing Act of 1937 to create what is known as the Section 8 housing program. *See* 42 U.S.C. § 1437f. Under the program, tenants make rental payments based on their income and ability to pay; HUD then makes "assistance payments" to the private landlords to make up the difference between the tenant's contribution and a "contract rent" agreed upon by the landlord and HUD. 42 U.S.C. §§ 1437a(a), 1437f(c)(3); *see also Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1425 (Fed. Cir. 1997) (describing the program); *CMHA I*, 57 Fed. Cl. at 753-55 (same). In 1978 and 1979, CMHA and HUD entered into three Housing Assistance Payments ("HAP") contracts under this program. Each contract concerned one of three properties: Quarrytown Tower Apartments (Quarrytown), with 180 one-bedroom units; Severance Tower Apartments (Severance), with 190 one-bedroom units; and Ambleside Tower Apartments (Ambleside), with 201 one-bedroom units. The contracts' anniversary dates are January 31, May 1, and August 15, respectively.

The framework for these contracts was governed, in part, by 42 U.S.C. § 1437f(c)(1), under which an initial maximum monthly contract rent was established for each dwelling unit. As originally enacted, 42 U.S.C. §1437f(c)(2) provided for adjustments in this maximum monthly rent thusly –

> (A) The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.
>
> * * * * *
>
> (C) Adjustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary.

42 U.S.C. § 1437f(c)(2)(A) and (C) (1982). The HAP contracts in question implemented these provisions by providing that adjustment of rents will be made annually on the basis of a

reasonable formula, subject to an "overall limitation" preventing adjustments from producing material differences between the rents at comparable assisted and unassisted units.

The annual adjustment was implemented through Section 1.8b ("Automatic Annual Adjustments") of the HAP contracts, which provides, in pertinent part –

> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. . . .
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

Consistent with 42 U.S.C. § 1437f(c)(2)(C), the HAP contracts also contain, in Section 1.8d, an "Overall Limitation," that states:

> Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

HUD regulations in effect at the time the contracts in question were executed mirrored these requirements. *See* 24 C.F.R. § 880.609(c) (1979). To protect the differences which "may have existed with respect to the initial Contract Rents," HUD developed what is known as the "initial difference," equal to the difference between the initial Section 8 contract rents and the original comparables.[2]

---

[2] On January 14, 1986, HUD's Deputy Assistant Secretary for Multifamily Housing Programs issued a memorandum setting forth two alternate ways for determining whether a material difference exists. This memorandum explained that a material difference would exist "whenever the adjusted Section 8 rent would exceed 120 percent times the sum of the comparable rent and the initial difference" or where –

> (1) The adjusted Section 8 rent would exceed the correlated unassisted rent for comparable units by more than the initial difference for that unit type.

In the early 1980s, HUD began using "comparability studies" – surveys of rents at comparable unassisted buildings – to enforce the "overall limitation" in its various HAP contracts. This practice was challenged in court as violating the contracts. Attempting to resolve this litigation, Congress, in 1987, added the following sentence to section 1437f(c)(2)(C): "If the Secretary . . . does not complete and submit to the project owner a comparability study not later than 60 days before the anniversary date of the assistance contract under this section, the automatic annual adjustment factor shall be applied." Housing and Community Development Act of 1987, Pub. L. No. 100-242, § 142(c)(2)(B), 101 Stat. 1850 (1988), *codified at* 42 U.S.C. 1437f(c)(2)(C). But, litigation over the rent adjustment method continued, prompting Congress, in 1989, to enact Section 801 of the Reform Act (the Reform Act), Pub. L. No. 101-235, 103 Stat. 2057-2059 (codified at 42 U.S.C. 1437f(c)(2)(C) (Supp. II 1990) and 42 U.S.C. 1437f note (Supp. II 1990)). The Reform Act prescribed new procedures for calculating rent adjustments. Retrospectively, it required HUD to pay landlords an increased amount, above what the studies required HUD to pay under its interpretation of the contracts; prospectively, it established a limited role, under defined criteria, for HUD's future use of comparability studies.

The Reform Act required HUD to promulgate "regulations for conducting comparability studies for projects where the Secretary has reason to believe that the application of the formula adjustments . . . would result in such material differences" between assisted and unassisted units, and to use those studies to establish a "modified annual adjustment factor" for a geographically smaller area. § 801(c), 103 Stat. 2058 (1989). The statute described, in detail, the methodology the Secretary was to use in conducting these studies. It also stated that if a modified adjustment factor could not be established or failed to eliminate material differences between rents at comparable assisted and unassisted units, the Secretary could employ another methodology "for conducting comparability studies in order to establish rents that are not materially different from rents charged for comparable unassisted units." *Id.* In keeping with those provisions, HUD promulgated regulations to govern the conduct and use of comparability studies to generate modified adjustment factors, and, in cases in which such factors were ineffective, to provide for a system of adjusting rents through comparability studies. *See* 24 C.F.R. § 888.301 *et seq.*. In 1993, the Supreme Court, in *Cisneros v. Alpine Ridge Group*, 508 U.S. 10 (1993), upheld the amendments to section 801 made by the Reform Act.

Following *Alpine Ridge*, Congress remained concerned that subsidized rents were still higher than warranted. In response, it amended section 1437f(c)(2)(A) of Title 42 by adding the following language:

---

> (2) The adjusted Section 8 rents would exceed the amount needed to 'operate' comparable projects.

An attachment to the memorandum set forth guidelines for determining the amount needed to operate comparable projects.

> However, where the maximum monthly rent, for a unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary. The immediately foregoing sentence shall be effective only during fiscal year 1995.

Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994) ("the 1994 Act" or "1994 amendments"). The 1994 Act provided that the amendment "shall apply to all contracts for new construction, substantial rehabilitation, and moderate rehabilitation projects under which rents are adjusted under section 8(c)(2)(A) of [the United States Housing Act of 1937] by applying an annual adjustment factor." *Id.* Subsequent amendments cumulatively made the provision applicable to "fiscal year 1996 prior to April 26, 1996, and fiscal years 1997 and 1998, during fiscal year 1999 and thereafter."[3]

The 1994 Act made at least one other potentially significant change – reducing the annual adjustment factor in situations where a given unit was occupied by the same tenant during a prior year. In this regard, the amended statute provided:

> Except for assistance under the certificate program, for any unit occupied by the same family at the time of the last annual rental adjustment, where the assistance contract provides for the adjustment of the maximum monthly rent by applying an annual adjustment factor and where the rent for a unit is otherwise eligible for an adjustment based on the full amount of the factor, 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0. In the case of assistance under the certificate program, 0.01 shall be subtracted from the amount of the annual adjustment factor (except that the factor shall not be reduced to less than 1.0), and the adjusted rent shall not exceed the rent for a comparable unassisted unit of similar quality, type, and age in the market area.

Pub. L. No. 103-327, 108 Stat. 2298 at 2315 (1994) (codified at 42 U.S.C. § 1437f(c)(2)(A)). As with the modification above, this "1-percent deduction" was originally applicable only during

---

[3] *See* Pub.L. No. 105-33, § 2004, 111 Stat. 257 (1997); Pub. L. No. 105-65, § 201(C)(1), 111 Stat. 1364 (1997); Pub. L. No. 104-204, § 201(g), 110 Stat. 2893 (1996).

fiscal year 1995, but subsequently was extended to cover "fiscal year 1996 prior to April 26, 1996, and fiscal years 1997 and 1998, and during fiscal year 1999 and thereafter."[4]

On March 7, 1995, HUD issued Notice 95-12, by its terms designed "[t]o effect all applicable contracts with HAP anniversary dates from [March 7, 1995] to the end of Federal [fiscal year] 1995 (through September 30, 1995)." This directive prescribed, with exceptions not herein relevant –

> If current project rents on a . . . contract (before the application of the AAF) are above the published [fair market rent] for the area then in order to receive a rent increase, the owner must submit, at least 60 days prior to the HAP contract anniversary date, form HUD 92273, Estimates of Market Rent by Comparison, . . . completed by a non-identity of interest, state certified, general appraiser, FOR EACH UNIT TYPE (e.g. 1BR, 2BR, etc.). This form must contain at least three examples of unassisted housing in the same market area of similar age, type and quality.

Regarding the consequences of not filing a comparability study, the notice indicated –

> If the owner fails to submit the information required by this Notice at least 60 days before the contract anniversary date, then the rent levels will not be adjusted on the contract anniversary date, rather the new rent levels will go into effect 60 days after receipt of the required information. However, if the owner fails to submit this information by the date of the FY 1996 HAP contract anniversary, then no increase will be granted for the FY 1995 contract year.

At several other points, the notice reiterated the consequences of not filing a timely request for increase.[5] According to the directive, if the owner demonstrated that comparable, unassisted rents were more than five percent over contract rents, HUD would increase contract rents to the lesser of: (i) contract rents adjusted according to the AAAF; or (ii) the comparable, unassisted rent plus the so-called "initial difference."[6] Although Notice 95-12 expired, by its terms, on

---

[4] *See* Pub.L. No. 105-33, § 2004, 111 Stat. 257 (1997); Pub. L. No. 105-65, § 201(C)(1), 111 Stat. 1364 (1997); Pub. L. No. 104-204, § 201(g), 110 Stat. 2893 (1996).

[5] For example, at another point, it stated that – "[i]f an owner does not request an increase or fails to submit a request based on the guidelines in this chapter, then the rents will remain the same as the current contract rents, unmodified by HUD or the Contract Administrator."

[6] The directive gave several examples of how these rules should be implemented, including one in which the project was eligible to receive the AAAF based on the comparable and another in which the project was eligible only for the comparable rents.

September 30, 1995, later notices reinstated and made permanent its provisions. *See, e.g.*, HUD Notice 97-14 (March 17, 1997); HUD Notice 00-14 (Aug. 9, 2000).[7]

Except as noted below, CMHA last received rent adjustments based upon published AAAFs in 1994.[8] CMHA took no action with regard to contract rent adjustments until 1999, when it requested payment of the past due annual rent increases that HUD failed to make after the 1994 contract year. CMHA first provided information regarding comparable unassisted units for Quarrytown on November 17, 2000, indicating that the sum of comparable rents plus the initial difference exceeded the 1994, $560 contract rent in every year from 1995 through 2000. On January 23, 2001, it filed complaint No. 01-46C in this court, seeking contract rent increases for Quarrytown for 1995 through 2000. On January 26, 2001, HUD retroactively increased Quarrytown's 1995 rents to $576, after determining that Notice 95-12 did not apply to 1995 for Quarrytown because of its effective date.

---

[7] These notices all contain provisions that do not require HUD field offices to revisit rent increases based on AAAFs approved during periods that notices were not in effect. For example, Notice 95-12 stated:

> If the Field Office has already issued the rent increase approval letter and/or a new Rent Schedule implementing the [AAAF](s) for FY 1995, these rents will remain the approved rents regardless of whether or not they have been made effective at the property by the issuance date of the Notice. If a Field Office has approved the application of the AAF to contract rents, for FY 1995, the approved rents will not be reconsidered under the procedures of this Notice.

Notably, while Notice 95-12 did not provide a procedure for waiving any of its requirements, subsequent notices appear to contain such a provision. For example, HUD Notice 97-14 indicated that "the provisions for comparability where gross project rents exceeded FMR and lower [AAAF]s for units with no-turnover" could be waived via "explicit approval of the Assistant Secretary of Housing – FHA Commissioner."

[8] The following chart reflects the 1994 rents and compares them to the initial rents and "initial difference" for each property

| **Name** | **Initial Contract Rent** | **Initial Difference** | **1994 Contract Rent** |
|---|---|---|---|
| Quarrytown | $310 | $62 | $560 |
| Severance | $299 | $61 | $572 |
| Ambleside | $298 | $60 | $575 |

As for Severance, CMHA first provided comparability information for that property on March 2, 2001, indicating that the sum of comparable rents plus the initial difference exceeded the 1994, $572 contract rent in every year from 1995 to 1997. On March 27, 2001, HUD retroactively increased the 1996 Severance rents to $582 after determining that Notice 95-12 did not apply to the property for 1996. On April 26, 2001, CMHA filed complaint No. 01-251C in this court, seeking contract rent increases for Severance for 1995 through 2000. On May 16, 2002, HUD increased Severance contract rents to $601 for 2000, and to $603 for 2001.

Lastly, CMHA provided its first comparability study for the Ambleside property on May 15, 2001, indicating that the sum of comparable rents plus the initial difference did not exceed the 1994, $575 contract rent until 1997. On July 17, 2001, CMHA filed complaint No. 01-416C in this court, seeking contract rent increases for Ambleside for 1995 through 2001. On March 19, 2002, HUD retroactively increased 1996 Ambleside rents to $585, and on May 16, 2002, increased contract rents for Ambleside for 2000 to $604, and for 2001 to $606. On September 26, 2003, Cuyahoga filed an amended complaint with respect to the Ambleside property, seeking damages for 2001.

Thus, in approximately the first half of 2001, CMHA filed three independent actions in this court – one per project. On July 24, 2001, this court ordered the cases consolidated. Thereafter, the parties filed cross-motions for summary judgment. On September 22, 2003, this court concluded that plaintiff's rights under these contracts were repudiated when Congress, in 1994, amended the Housing Act to alter how rent subsidies were to be determined, which repudiation was exacerbated when HUD issued and then followed Notice 95-12. *CMHA I*, 57 Fed. Cl. at 762. The court, however, ruled that, based upon the pending motions, it was unable to resolve the damages to which plaintiff was entitled, stating:

> Finally, both parties would have this court press ahead and consider specifically what damages are owed CMHA. On brief, plaintiff proceeds from the notion that this court's rejection of defendant's unmistakability doctrine argument means that the 1994 amendments do not apply to it and that, instead, it is entitled to the adjustments owed under the original HAP contracts. For its part, defendant contends that the court should enter judgment in its favor to the extent that CMHA failed to timely demonstrate entitlement to contract rent increases under the 1994 amendments. At this point, both contentions seem wrong--this court does not hold that either the 1994 amendments or the 1995 HUD directive are inapplicable to CMHA, as would be the case, for example, were such amendments unconstitutional or the directive invalid; rather; it holds that the amendments and the directive ultimately effectuated a breach of plaintiff's HAP contracts. In the court's view, this means that plaintiff is entitled to whatever damages are appropriate, under the circumstances, on account of that breach. In theory, such damages may hinge on the extent of the breach here and likely will fall within the traditional categories of expectancy, reliance or restitution damages. As such, they may or may not track those damages that have been awarded in *Winstar* savings

> and loan cases, such as *LaSalle Talman Bank v. United States*, 317 F.3d 1363 (Fed. Cir. 2003) and *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348 (Fed. Cir. 2001). To determine this, however, the court believes that additional briefing and, potentially, fact-finding is required. Accordingly, the court declines to award any damages at this time.

*CMHA I*, 57 Fed. Cl. at 781. Subsequently, the parties filed cross-motions for partial summary judgment zeroing in on damages issues. Oral argument on those motions was held on June 18, 2004. Thereafter, the court ordered two rounds of supplemental briefing that addressed various issues.[9] That briefing has now been completed.

## II. DISCUSSION

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

CMHA essentially seeks two types of damages. First, it claims expectancy damages based upon HUD's failure to adjust its rents by application of the AAAFs subject to the overall limitation. Significantly, plaintiff contends these adjustments should be made: (i) without regard to the 1-percent deduction for units with no turnover, as required by 42 U.S.C. § 1437f(c)(2)(A), as amended by the 1994 Act; and (ii) employing an overall limitation equal to 120 percent of the sum of the comparable rents and the so-called "initial difference." Second, CMHA seeks restitution damages to cover the cost of the comparability studies it has submitted to HUD in connection with the requested annual adjustments. While defendant has little quarrel with the latter category of damages, it strenuously objects to the first. On the latter count, it remonstrates, *inter alia*, that expectancy damages are not recoverable here because plaintiff failed to comply with the new rent adjustment procedures set forth in the 1994 amendments and Notice 95-12. Defendant also asserts that, in calculating damages here, there is neither basis upon which to disregard the 1-percent deduction required by section 1437f(c)(2)(A), nor grounds to support plaintiff's limning of the overall limitation.

---

[9] Specifically, the court ordered the parties to provide their views on four issues: (i) whether the repudiation of a contract by legislation results in a series of breaches or in a single breach marked, at the latest, by the time of filing suit; (ii) whether the specific provisions of legislation that repudiate a prior contract are enforceable in determining damages for a breach and, if so, under what circumstances; (iii) how damages are calculated where the breaching party, by virtue of his breach, puts himself in a position where he can no longer regulate the contract price under the terms of the original agreement; and (iv) whether the "material difference" threshold – allegedly, 120 percent of the comparable rent plus initial difference – is not only a ceiling that cannot be exceeded, but also a floor on the rent to which plaintiff is entitled.

### A. Did the One-Percent Rule in the 1994 Act Effectuate a Breach?

The first ruling herein dealt exclusively with liability issues; this second was to deal with damages. Yet, in its pending motion, CMHA elliptically argues – for the first time in this case – that the 1994 Act effectuated a breach by reducing the AAAFs by 1 percent "for any unit occupied by the same family at the time of the last annual rental adjustment." 42 U.S.C. § 1437f(c)(2)(A). It claims that this court's prior opinion "recognized that the [1994] Amendments were proposed to Congress by HUD and adopted by Congress as a way to save money on its HAP contracts" and asseverates that because the 1-percent deduction was part of this "money-savings package," it also gave rise to a breach. But, the second proposition does not flow from the first – that the 1-percent modification of the AAAF formula for occupied properties reduced program costs does not, *ipso facto*, mean that it was inconsistent with any of the provisions of the HAP contracts. In relevant terms, those contracts merely provide that "Automatic Adjustment Factors will be determined by the Government at least annually," and that "[s]uch Factors and the basis for their determination will be published in the Federal Register." Nothing in this language suggests that there will be a single, monolithic factor for all units at a given property or that Congress could not authorize HUD, in determining the AAAF for a given unit, to make a different adjustments for those in which no turnover had occurred. Accordingly, there is no indication that the statutory 1-percent deduction constituted the abrogation of any right or obligation established under the HAP contracts. *Cf. Franconia*, 61 Fed. Cl. at 732-33; *CMHA I*, 57 Fed. Cl. at 762. On this issue, this court need go no further.[10]

### B. Expectancy Damages Based Upon the Failure to Make Adjustments

Plaintiff's primary claim is that it is entitled to expectancy damages corresponding to the rent adjustments it would have received but for the partial breach of its HAP contracts. "The general rule in common law breach of contract cases," the Federal Circuit has oft-stated, "is to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed," *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997), in short, to give the injured party "the benefits [it] expected to receive had the breach not occurred." *Glendale Federal Bank FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (citing Restatement (Second) of Contracts, §

---

[10] CMHA arguably waived this argument by failing to raise it in its motion for summary judgment on liability issues. *See Belgrave v. Pena*, 254 F.3d 384, 386 (2d Cir. 2001). Indeed, even in its current briefs, plaintiff deals with this issue in a cursory fashion. But, plaintiff is not alone in belatedly raising new arguments regarding liability. While claiming that it is not seeking reconsideration of this court's prior liability ruling, defendant, nonetheless, argues that HUD could require plaintiff to provide comparability studies under a provision in the HAP contract that requires owners to "furnish such information and reports pertinent to the Contract as reasonably may be required from time to time by the Government." In the court's view, taken in the context of the entire contract, and particularly given the detailed adjustment provisions therein, there is no way that this clause could reasonably be construed to require owners to provide comparability studies as part of a revised adjustment regime.

344(1)(a)) (hereinafter "Restatement"); *see also Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 746 (2004). Conversely, it is also axiomatic that "the non-breaching party should not be placed in a better position through the award of [expectancy] damages than if there had been no breach." *Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d 1341, 1345 (Fed. Cir. 2003). As such, "[e]xpectation damages are recoverable provided they are 'actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty.'" *National Australia Bank v. United States*, 63 Fed. Cl. 352, 355 (2004) (quoting *Bluebonnet*, 266 F.3d at 1355).

**(1) Availability of Expectancy Damages**

The above principles are undisputed. To facilitate resolution of the cross-motions, the parties also agree that: (i) any expectation damages recoverable here should be calculated by treating each contract year as giving rise to a separate breach; and (ii) to the extent expectation damages are allowable, the overall limitation should apply even though HUD did not prepare comparability studies during any of the relevant years and plaintiff supplied such studies later. The latter point represents a significant concession by CMHA, which, while seeking the equivalent of the rent adjustments, cedes that those adjustments remain subject to the overall limitation in the HAP contracts. Finally, defendant apparently neither contests that the damages plaintiff seeks in the form of increased rents were "reasonably foreseeable" nor that these damages can be proven with reasonable certainty, at least, once certain parameters (*e.g.*, the overall limitation) are established. At this juncture, the parties part company, adopting widely divergent courses.

In particular, they strenuously disagree as to whether expectation damages in the form of increased rents may be recovered for any of the years in which plaintiff did not provide a comparability study within the time periods set by Notice 95-12. Recall, that notice requires, at a minimum, that the request and study be provided within the relevant contract year.[11] But, the required documents were not so provided for the years remaining at issue, leading defendant to rejoin that by virtue of its failure to comply timely with Notice 95-12, CMHA may not receive the damage equivalent of the rent increases it seeks *via* this litigation. In defendant's view, the rents in question were lost neither because of the passage of the 1994 amendments nor the adoption of Notice 95-12, but because plaintiff did not timely comply with the post-1994 regime for obtaining rent increases. This nonfeasance, defendant maintains, constitutes both an intervening cause, severing the chain of causation between the breaches and the lost increases, as well as a failure to mitigate damages. On both counts, it repeatedly stresses that the 1994 Act and Notice 95-12 (and the time limitations in the latter) are valid and fully apply to CMHA, despite the fact, of course, that these same authorities effectuated the breaches here.

[11] To apply to an entire contract year, a request for adjustment and supporting study must, under Notice 95-12, be supplied at least 60 days prior to the beginning of the contract year; no increase would forthcoming under the notice if the request was not received during the relevant contact year.