Defendant views this case as boiling down to a simple "fast-fish, loose-fish" distinction:[12] without exception, either one submits a timely and complying request for a rent increase or can never receive that increase, either directly or in the form of damages. But, while defendant views this proposition as almost self-evident, it most certainly is not – as was said of Melville's "Moby Dick," there is more here than a simple story about a fish.

There is no real debate that the 1994 Act is the law of the land. But, that says nothing about whether plaintiff may recover expectation damages, for the issue here is not the validity of the 1994 Act, but how that statute impacts, if at all, within the established analytical framework governing the availability of expectation damages. Defendant would go further and ascribe to the statute an overarching impact – one that transcends any of the specific prongs of the expectation damages analysis and overtrumps plaintiff's right to such damages based on its failure to comply with the new rent adjustment regime. But, in so contending, defendant seemingly dons blinders to a critical point, *to wit*, that expectation damages, by design, provide a claimant "the benefits [it] expected to receive ***had the breach not occurred***," *Glendale Federal Bank*, 239 F.3d at 1380 (emphasis added); *see also LaVan v. United States*, 382 F.3d 1340, 1350 (Fed. Cir. 2004); *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1308 (Fed. Cir. 2004) (quoting Restatement § 344 cmt.a) ("[c]ompensation of a party's expectation interest 'attempt[s] to put him in as good a position as he would have been in had the contract been performed, that is, had there been no breach."). Logic suggests that, consistent with the theory of expectation damages, this court cannot afford controlling and preclusive effect to the very statutory provisions that triggered the breach. Defendant cites no case to the contrary – and there is none. Certainly, no case involving a statutorily-triggered breach of contract has treated the offending statute as insulating the government from damages. To the contrary, in determining expectation damages, courts have disregarded the breaching provisions in determining, for example, what profits a plaintiff would have received but for the passage of the statute.[13]

Were the law otherwise, Congress could negate, with impunity, the inflation adjustment provisions in any government contract merely by adopting a moratorium on increases – such a law would breach prior contracts, but assertedly not require the payment of damages. This scenario, if effective, would reduce the notion of having enforceable government contracts to a

---

[12] *See* Herman Melville, *Moby-Dick: or, the Whale* ch. 89 (1851).

[13] *See, e.g., Comm. Fed. Bank v. United States*, 59 Fed. Cl. 338, 350-51 (2004) (calculating expectation damages in *Winstar*-type case by estimating what plaintiff's profits would have been in the "but-for world" of the previously existing capital requirements); *Coast Fed. Bank, FSB v. United States*, 49 Fed. Cl. 53, 55 (2001) ("It is immaterial whether, for purposes of calculating plaintiff's damages by hypothesizing a "no breach" world that differs from the real world only by eliminating the breach, the resulting scenario is unrealistic. Any scenario that assumes that plaintiff's contract was not breached is in some measure unrealistic, since it assumes away all the events that led to that breach of contract.").

whimsy, unleashing the same sort of intense legal discomfort that led this court soundly to reject defendant's unmistakability defense. *See CMHA I*, 57 Fed. Cl. at 777-80; *see also United States v. Winstar*, 518 U.S. 839, 921-22 (1996) (Scalia, J., concurring) (noting that broad application of the unmistakability defense would render government contracts "illusory"). Although the circumstances *sub judice* are less startling, this case is fundamentally no different – as with the moratorium, defendant seeks to invoke here provisions of a statute that the theory of expectation damages treats as nonexistent. The decisional law demonstrates that, for a statute to have the preclusive effect defendant desires, it must either bluntly withdraw the government's waiver of sovereign immunity, or more subtlely impact, in defendant's favor, one or more of the prongs of the legal algorithm governing expectation damages. The former is not the case here. Determining whether the latter is true requires the court to consider, *ab ovo*, whether defendant's invocation of the new adjustment regime presents either an issue of causation or one of mitigation.

In *Franconia*, *supra*, this court confronted a similar question. There, it held that the enactment of two statutes, which permanently restricted the prepayment of certain Farmers' Home Administration loans, constituted a repudiation of prior loan agreements that contained unrestricted prepayment provisions. *Franconia*, 61 Fed. Cl. at 730-33. When this repudiation blossomed into a series of breaches, the obligors on the mortgages sought damages equal to the profits they allegedly lost when they could not prepay their mortgages and convert their housing complexes to private, commercial use. Yet, defendant claimed that these property owners only had themselves to blame – that their failure to elect one or more of the economic incentives offered by Congress to encourage property owners to remain in the rural housing program constituted an intervening cause that precluded the owners from recovering the lost profits. *Id.* at 749-50. Unpersuaded, the court observed:

> While "in the workaday world, the conceptual distinctions between damage, 'duty' to minimize, mitigation, and proximate cause are frequently blurred," . . . the fact is these concepts have distinct purposes and definitions. In order to prove that losses were "proximately caused" by defendant's breach, plaintiffs need not show that they might have avoided or minimized such losses or that defendant's conduct was the "sole" cause of their damages. *See Long Island Sav. Bank, FSB v. United States*, 60 Fed. Cl. 80, 90 (2004); *Westfed Holdings*, 55 Fed. Cl. [544, 553 (2003)]. . . . Rather, they must only show that the breach was a "substantial factor" and that the damages flowed "inevitably and naturally" therefrom. *Bluebonnet*, 266 F.3d at 1356; *Long Island*, 60 Fed. Cl. at 90; *Ramsey*, 101 F. Supp. [353, 357 (Ct. Cl. 1951)]. Thus, plaintiffs need not show that each dollar claimed was entirely unaffected by outside events. *Citizens*, 59 Fed. Cl. [507, 514-15 (2004)]. By comparison, where instead the question presented involves an injured party's failure to act to lessen damages, the issue does not involve proximate causation, but rather mitigation. *See Deere & Co. v. Reinhold*, 2000 WL 486607 at *8 (E .D. Pa. Apr.24, 2000). As one leading commentator has summarized, "[a]lthough the injured party's own failure to avoid a loss may bar recovery for that loss, this is

> not thought of as a consequence of a requirement of causation, but of a limitation under a 'mitigation' rule." III. E Allen Farnsworth, Farnsworth on Contracts (Farnsworth) § 12.1 at p. 149 (2d ed.1998); see also id. at § 12.12 at p. 228.

*Franconia*, 61 Fed. Cl. at 750 (additional case citations omitted). It continued:

> Were these distinctions untrue, "the doctrine of mitigation of damages would lose much of its significance," *Willems Indus. Inc. v. United States*, 295 F.2d 822, 831 (Ct. Cl. 1961). Indeed, in every case, a breaching party could simply recast its mitigation defense in causation terms and thereby avoid the hurdles imposed by the established case law. Under this scenario, such a party would never be called upon affirmatively to plead, let alone prove, mitigation, and instead would benefit from a pervasive causation defense not subject, like mitigation, to the bounds of reasoned decisionmaking.

*Id.* Cementing its views, the court concluded that "[t]he decisional law [thus] demonstrates that, as between the concepts of causation and mitigation, [defendant's] contentions sound only under the latter doctrine, the contours of which have been carefully charted by the courts to avoid placing exactly the sort of burdens on injured parties that defendant would assign here." *Id.*

So it is here. For the same reasons as in *Franconia,* defendant's arguments sound in mitigation, not causation, and must be tested as such.[14] Notably, apart from asserting that plaintiff timely should have availed itself of the new adjustment process, defendant neither contests that the breach was a "substantial factor" in plaintiff not receiving what otherwise would have been automatic rent adjustments, nor that the damages corresponding to the failure to receive those adjustments flowed "inevitably and naturally" from the breach. *Bluebonnet*, 266 F.3d at 1356; *Long Island*, 60 Fed. Cl. at 90; *Ramsey v. United States*, 101 F. Supp. 353, 357 (Ct. Cl. 1951). Stated in the affirmative, it appears that the causal connection between the breach and the loss of the additional rent has been "definitely established" as the increases would not have been lost "but for the breach." *California Fed. Bank v. United States*, 395 F.3d 1263, 1268 (Fed. Cir. 2005).[15] The question that remains is whether plaintiff should have mitigated its damages by

---

[14] *See Globe Savings Bank, F.S.B. v. United States*, 2005 WL 1023484 at * 18 (Fed. Cl. Apr. 29, 2005) (rejecting, following *Franconia*, the government's effort "to avoid the consequences of . . . [the] shift in the burden of proof" by "fram[ing] its arguments regarding mitigation in terms of causation and foreseeability"); *see also Long Island*, 60 Fed. Cl. at 93 (distinguishing between causation and mitigation).

[15] In *California Federal*, the Federal Circuit rejected the notion that a breach need only be a "substantial factor" contributing to a loss. 395 F.3d at 1267. But, a fuller reading of that opinion suggests that prior cases employing some forms of the "substantial factor" test are not necessarily erroneous. In fact, the Federal Circuit and the Court of Claims both have held that satisfaction of that test, in combination with other factors, can demonstrate causation. This was

seeking rent increases during the years in question using the new mechanism established by the 1994 Act and HUD Notice 95-12.

On the latter issue, we espy familiar *terra firma* – "a non-breaching party generally may not recover damages attributable to that party's failure to take reasonable, non-burdensome steps to avoid its loss." *Koby v. United States*, 53 Fed. Cl. 493, 496-97 (2002). Damages that the plaintiffs might have "avoided without undue risk, burden or humiliation" are hence not recoverable. Restatement § 350; *see also Middleton v. United States*, 175 Ct. Cl. 786, 792 (1966); *Old Stone Corp. v. United States*, 63 Fed. Cl. 65, 79 (2004); *Franconia*, 61 Fed. Cl. at 740. "Application of this principle," this court has stated, "requires the court to consider whether a reasonable person, acting in light of the known facts and circumstances, would have taken steps to avoid certain damages." *Koby*, 53 Fed. Cl. at 497. As this court explained in *Franconia* –

> Whether or not the buyer's obligation to mitigate damages has been discharged depends on the reasonableness of its conduct. In this connection, reasonable

---

certainly true in *Bluebonnet, supra,* where the Federal Circuit affirmed a causation finding that this court had rendered in reliance upon a "substantial factor" test, stating –

> The Court of Federal Claims properly determined that the breach of the forbearances was a substantial factor in Bluebonnet's increased financing costs because it forced Bluebonnet to raise capital at a time when FIRREA had made investments in thrifts riskier and considerably less attractive. The government's various arguments regarding alternative causes for the damages lack merit.

266 F.3d at 1356, *rev'g, on other grounds*, 47 Fed. Cl. 156, 173 (2000); *see also Energy Capital Corp. v. United States*, 302 F.3d 1314, 1328-29 (Fed. Cir. 2002) (affirming award of expectation damages in which this court had relied, in part, on the substantial factor test); Arthur L. Corbin, 5 Corbin on Contracts § 999 at 25 (1964) (discussing the substantial factor test). Indeed, in *Franconia*, this court did not find causation based solely upon the "substantial factor" test, but also concluded that the damages flowed "inevitably and naturally" from the breach. 61 Fed. Cl. at 750. Moreover, in *California Federal*, the Federal Circuit made clear that its holding should not be read "to say that the breach must be the sole factor or sole cause in the loss of profits," stating further that "[t]he existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." 395 F.3d at 1268; *see also Westfed Holdings, Inc. v. United States*, 2005 WL 1119654 at *6 (Fed. Cir. May 12, 2005). At least two subsequent decisions of this court have recognized that some of the differences in the decisional law on this count may be attributable to different formulations of the "substantial factor" test, noting that the standard mapped by *California Federal* is essentially the same as the multi-faceted approach traditionally employed by this court in considering causation issues. *See, e.g., Precision Pine & Timber, Inc. v. United States*, 64 Fed. Cl. 165, 166 (2005); *Scott Timber Co. v. United States*, 64 Fed. Cl. 130, 138 n.2 (2005); *see also Alaska Pulp Co. v. United States*, 59 Fed. Cl. 400, 414 (2004).

> conduct is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented. Where a choice has been required between two reasonable courses, the person whose wrong forced the choice cannot complain that one rather than the other was chosen.

61 Fed. Cl. at 741 (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3rd Cir.1950)); *see also Beckman Cotton Co. v. First Nat'l Bank of Atlanta*, 666 F.2d 181, 184 (5th Cir.1982); *First Nationwide Bank v. United States*, 56 Fed. Cl. 438, 444 (2003); *Tampa Elec. Co. v. Nashville Coal Co.*, 214 F.Supp. 647, 652 (M. D. Tenn.1963). "The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter." *In re Kellett Aircraft*, 186 F.2d at 198-99; *see also Apex Min. Co. v. Chicago Copper & Chem. Co.*, 306 F.2d 725, 731 (8th Cir.1962); *Franconia*, 61 Fed. Cl. at 741. Rather, the burden is on the breaching party to show that reasonable possibilities for mitigation existed and were ignored. *See T.C. Bateson Construction Co. v. United States*, 319 F.2d 135, 160 (Ct. Cl. 1963); *Franconia*, 61 Fed. Cl. at 741; *Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 561-62 (2003); *Robinson v. United States*, 50 Fed. Cl. 368, 370 (2001).

Burnishing this "undue risk and expense" standard, Williston on Contracts provides that "almost any risk of considerable loss to the injured person if he attempts to mitigate damages should be considered undue." 11 Samuel Williston, A Treatise on the Law of Contracts § 1353 (3d ed.1968); *see also Brazos Electric Power Coop., Inc. v. United States*, 52 Fed. Cl. 121, 129 (2002). While reasonable cost-avoiding steps include affirmative efforts to make substitute arrangements compensating for the lack of contract performance, such arrangements need not be entered into if they would expose the party to undue risk or significantly compromise its interests. *See* Restatement, § 350 cmts. c & g; *see also Westamerica Mortgage Co. v. First Nationwide Bank*, 1988 WL 76377 at *5 (D.Colo. Jul.15, 1988). Thus, an injured party is not expected to "'exalt the interests of the defaulter to his own probable detriment.'" *Koby*, 53 Fed. Cl. at 497 (quoting *In re Kellett Aircraft*, 186 F.2d at 199); *see also Contempo Design, Inc. v. Chicago and N.E. Ill. Dist. Council of Carpenters*, 226 F.3d 535, 554-55 (7th Cir. 2000), *cert. denied*, 531 U.S. 1078 (2001); *Franconia*, 61 Fed. Cl. at 741; John D. Calamari & Joseph M. Perillo, The Law of Contracts § 14-15 (3d ed.1987). Accordingly, courts have been reluctant to require parties, under the duty to mitigate, to deal further with the breaching party, especially if the breacher's alternative terms differ substantially from those of the original contract. *Stanspec Corp. v. Jelco, Inc.*, 464 F.2d 1184, 1187 (10th Cir. 1972); *Campfield v. Sauer*, 189 F. 576, 579 (6th Cir. 1911); *Franconia*, 61 Fed. Cl. at 741; *Koby*, 53 Fed.Cl. at 497.[16] In particular, a

---

[16] *See also Cain v. Grosshans & Petersen, Inc.*, 196 Kan. 497, 413 P.2d 98, 102 (1966) ("[A]n innocent party is not [automatically] required to execute a less advantageous contract with one who has already welshed on his agreement."); *Coppola v. Marden, Orth & Hastings Co.*, 282 Ill. 281, 118 N.E. 499, 500 (1917) (purchaser has no duty to pay in cash when credit terms are

plaintiff is not required to mitigate losses by "accepting an arrangement with the breaching party made conditional on the plaintiff's surrender of its rights under the repudiated contract." *Brazos*, 52 Fed. Cl. at 129; *see also Teradyne, Inc. v. Teledyne Indus., Inc.*, 676 F.2d 865, 870 (1st Cir. 1982); Restatement, § 350, cmt. e.

Would a reasonable person, acting in like circumstances, have sought increases under the revised mechanism adopted by Congress and implemented by HUD? And, how quickly would they have done so? Certainly, even a casual observer might readily draw parallels between this case and *Franconia* and *Koby* – in the latter cases, defendant's mitigation arguments failed. Like CMHA, the plaintiffs in *Franconia and Koby* cases were offered less desirable, alternative transactions by the same party that had breached their original contracts – the Federal government – and they declined. *See Franconia,* 61 Fed. Cl. at 742-45 ; *Koby*, 53 Fed. Cl. at 498. Ironically, in *Franconia*, the plaintiffs' hesitancy to deal further with the government was deemed reasonable based not only upon Congress' twice repudiating their contracts, but also its repudiation of a variety of contracts under other Federal housing programs – including those at issue here. *Franconia*, 61 Fed. Cl. at 742 ("During this same general period, Congress also saw fit to alter other low-income housing contracts, limiting the prepayment provisions in some HUD agreements and modifying the rent increase provisions in others."). In the case *sub judice*, the situation is the reverse and CMHA seemingly also was entitled to measure its response to the new rent adjustment regime by taking into account how HUD had performed – or not – under its other housing contracts. Finally, in *Franconia*, as may be the case here, there were issues as to how well balanced the alternative transactions offered by Congress were – whether they could fairly compensate the property owners, yet still effectuate Congress' strong desire to reduce program outlays.

But, *Koby* and *Franconia* were decided only after a full exploration and explication of the evidence surrounding the mitigation issue. In this case, discovery has not yet occurred. An armada of factual questions lurk over the horizon. Among them is whether – given the cost and burdens of conducting the comparability studies, and without assurances that cost of those studies would be reimbursed or that significant increases would flow therefrom – plaintiff reasonably delayed performing and submitting such studies while apparently contemplating whether to sue. Also relevant is whether plaintiff reasonably hesitated to make requests under the new regime, concerned that its compliance with that regime would be viewed by HUD, defendant and potentially this court as waiving its breach claims. While defendant complains that CMHA should not have hesitated to embrace the new adjustment regime, it has aggressively pursued waiver arguments in other cases, when a party aggrieved by a government breach has elected to proceed with performance. *See, e.g., Westfed Holdings, Inc. v. United States*, 2005

---

material part of the contract); Charles J. Goetz & Robert E. Scott, *The Mitigation Principle: Toward A General Theory of Contractual Obligation*, 69 Va. L.Rev. 967, 993 n. 57 (1983).

WL 1119654 (Fed. Cir. May 12, 2005) (rejecting government's assertion of waiver doctrine).[17] Seemingly, defendant cannot have it both ways – to urge conduct in this case that it would seek to penalize elsewhere. And, of course, these and other issues must be judged not from damning hindsight, but rather "'in the light of one viewing the situation at the time the problem was presented.'" *Franconia*, 61 Fed. Cl. at 741 (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir. 1950)). Ultimately, however, while both *Franconia* and *Koby* suggest that defendant will face rough waters in proving that plaintiff should have readily accepted the alternate adjustment mechanism, that issue must be resolved based only upon a full evidentiary record.

Left unresolved by this approach is whether the timing limitations of HUD Notice 95-12 are valid. Under the mitigation approach, the court need not reach the issue – the question, rather, is whether plaintiff acted reasonably in not filing its requests and studies within the time periods prescribed by the notice and its successors. Contrary to defendant's importunings, to approach the issue in this fashion is not effectively to grant plaintiff a perpetual license to ignore the notice requirements. Assuming *arguendo* those requirements are valid, plaintiff must comply with them if it wishes to receive rent increases in the ordinary course; if it chooses instead to litigate, it will face a mitigation defense which stature will only grow over time. This will be so because even if CMHA's failure to comply with the new regime is deemed reasonable in this case, there is no assurance that, with the passage of time and the clarification of its rights, its further refusal to comply will be deemed reasonable *in futuro*. Plaintiff's actions in filing requests for increases under the new regime prior to filing these lawsuits – albeit in defendant's view, belatedly – suggest that it understands this. At all events, this court perceives no reason why the breaching procedural rules adopted by HUD should fare any better than breaching statutes enacted by Congress – in accordance with the decisional law, neither should be given effect in calculating expectation damages, except, of course, in evaluating mitigation.

**(2) The Overall Limitation**

The parties next vigorously disagree as to the meaning of the overall limitation contained in the HAP contracts, an issue that significantly impacts the amount of rents recoverable. Recall, section 1.8d of those contracts defines what is denoted as an "overall limitation," stating that "[n]otwithstanding any other provisions of this contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government." As noted previously, this limitation closely

---

[17] Arguing that CMHA did not act reasonably, defendant harps that "Cuyahoga's failure to submit comparability studies in a timely manner has resulted in complex and time-consuming litigation that might not have been necessary had it submitted its studies in time." One might note that this litigation also would have been unnecessary had defendant not repudiated the HAP contracts and forced plaintiff to litigate not only that question, but its entitlement to the costs of the relevant comparability studies. Notably, defendant did not concede that the latter costs were recoverable (and then, only in part) until it briefed the pending motions.

tracks the 1937 Housing Act, which provides that "[a]djustments in the maximum rents," whether based on market surveys or on a reasonable formula, "shall not result in material differences" between Section 8 rents and the rents for comparable housing on the private market. 42 U.S.C. § 1437f(c)(2)(C). Similar language has long been incorporated in HUD's regulations. *See* 24 C.F.R. § 880.609(c); *see also* 40 Fed. Reg. 18,687 (1975) (promulgating the original version of this regulation, 24 C.F.R. § 880.110(d)). Unfortunately, these sources provide little guidance as to what is meant by a "material difference," leaving the parties room to dispute, for damage calculation purposes, whether a material difference exists between any of the adjusted rents at issue here and those charged for comparable unassisted units.

**a. "Material Difference"**

While judicial constructions of the "overall limitation" language abound, no case has addressed the precise question at hand. As defendant notes, the Supreme Court has made clear that the contract language – particularly, the phrase "as determined by the Government" – as well as the underlying statute, affords HUD discretion both in comparing the rents of assisted and unassisted units and in determining "whether there exist material differences between the rents charged for assisted and comparable unassisted units." *Alpine Ridge*, 508 U.S. at 21; *see also Fed. Housing Partners IV v. Cisneros*, 55 F.3d 362, 368 (8th Cir. 1995) (discussing this discretion); *Park Village* (*Park Village II*), 32 Fed. Cl. 441, 447 (1994) ("Hence, the overall limitation grants HUD discretion in determining which units are comparable, what rents are charged for those comparable units, and whether AAAF-based adjustments would result in differences between assisted and comparable unassisted rents that are 'material.'"). Owing to this grant of discretion, HUD was authorized to adopt, and apply within the context of the HAP contracts, a reasonable interpretation of the "material difference" requirement that is consistent with the Housing Act. *See Chevron U.S.A. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984); *Morton v. Ruiz*, 415 U.S. 199, 231 (1974) ("The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.").

One of HUD's earliest constructions of the overall limitation occurred in a 1986 memorandum from the Office of the Assistant Secretary for Housing to HUD field offices. This memorandum sets forth two ways for determining whether a difference between an adjusted Section 8 rent and comparable rents is "material." First, it indicates that "[a] material difference exists whenever the adjusted Section 8 rent would exceed 120 percent times the sum of the comparable rent and the initial difference." Second, it states –

> So long as the adjusted Section 8 rent would NOT exceed 120 percent times the sum of the comparable rent and the initial difference, the difference between a Section 8 rent and a correlated unassisted rent is "material" only if BOTH of the following conditions are met.

> 1. The adjusted Section 8 rent would exceed the correlated unassisted rent for comparable units by more than the initial difference for that unit type. . . . [and]
>
> 2. The adjusted Section 8 rents would exceed the amount needed to "operate" comparable projects.

(Emphasis in original). Under the latter formulation, a material difference could exist even if the adjusted rent did not exceed 120 percent times the sum of the comparable rent and the initial difference. Indeed, if the adjusted rent exceeded the amount necessary to operate a comparable project, a difference could be "material" simply because the adjusted rent exceeded the comparable rent plus the initial difference.

In 1992, HUD proposed a regulation that took a somewhat different tack. That regulation stated that "[a] material difference between the assisted and comparable unassisted rent is defined as a dollar amount equal to five percent of the comparable rent plus one dollar, or the initial difference plus one dollar, whichever is greater." 57 Fed. Reg. 49,120, 49,125 (proposed Oct. 29, 1992) (to have been codified at 24 C.F.R. § 888.205(c)(1)). But, this regulation was never adopted, perhaps overtaken by the passage of the 1994 amendments. To effectuate the latter amendments, HUD instead issued Notice 95-12, in which it employed yet another formulation of the "material difference," albeit without specifically mentioning the phrase. There, it stated:

> Once the initial difference is determined for each unit type, . . . , it should be added on to the comparable rent for each unit type to determine what is the maximum permissible rent level allowed for each unit. This will be referred to as the Adjusted Comparable Rent. This rent level will then be compared to the rent level adjusted by the Table One [AAAF], for each unit type. The lower of the two rent levels will become the new effective rents (unless this would require a rent reduction, then the current contract rent level will be maintained).

This last formulation echoes the 1986 memorandum in concluding that a "material" difference exists provided there is any difference between the adjusted rent and the sum of the comparable rent plus the initial difference; it differs, however, significantly from the 1992 proposed regulation which, at a minimum, treated a difference of five percent of the comparable rent as being material.

Invoking this 1995 notice, defendant argues that a material difference exists under the HAP contracts if the adjusted rent would exceed the comparable rent plus the initial difference. Under this formulation, the material difference corresponds to the initial difference – the addition of the initial difference to the comparable rent is presumed to result in a figure materially different than the comparable rents. By comparison, plaintiff asseverates that there must be a material difference beyond that attributable to the initial difference – that the contract and the statute anticipate that a material difference would arise only if the adjusted rent exceeded the

product of the sum of the comparable rent plus the initial difference times some other factor creating a material distinction. Citing various authorities, plaintiff asserts that the latter factor is 1.2, that is, that a material difference exists only if the adjusted rent exceeds the sum of the comparable rent plus the initial difference by 20 percent or more.[18]

Where the initial difference is significant, defendant's construction of the contract and the underlying statute seems, at least at first blush, reasonable. After all, neither the contract nor the statute requires that there be a material difference between the adjusted rent and the sum of the comparable rent plus the initial difference; rather, by their terms, both require merely that the adjustment "not result in material differences between the rents charged for assisted and comparable unassisted units." Defendant's construction of the overall limitation works as long as the "initial difference" is sufficiently large so that its addition to the comparable rents results in a sum materially greater than the comparable rents themselves. But, what if the facts are otherwise, that is, if the initial difference is *de minimis* or nonexistent? Then, defendant's formulation of the "overall limitation" collapses, yielding a limitation that is not materially greater than the comparable rents, thereby seemingly violating both the contracts and the statute. Indeed, where there is no initial difference, HUD's notion of materiality evaporates in a puff – even under the most strained definition of the term, one simply cannot talk about a "material" difference of zero. HUD apparently recognized this in crafting the 1992 proposed regulation, which stated that the material difference would be the "greater" of the "initial difference plus one dollar" or "five percent of the comparable rent plus one dollar." Under this formulation, the material difference could never fall below "five percent of the comparable rent plus one dollar," thereby effectuating the language of the HAP contracts and the statute even where no initial difference existed.

Overlooking these difficulties (or perhaps because of them), defendant would have this court heavily defer to HUD's current view of what is "material." But, beyond determining whether HUD's view is reasonable, any claim to deference here is severely diminished not only

---

[18] To illustrate the parties's differences on this point, assume a comparable rent of $400, an initial difference of $50, and an AAAF-adjusted rent of $525. Defendant, applying Notice 95-12, asserts that a material difference exists if the AAAF-adjusted rent exceeds the sum of the initial difference and the comparable rent – here, $450. Under this interpretation, the AAAF-adjusted rent of $525 would substantially exceed the maximum permissible rent, the overall limitation would be triggered and the adjusted rent would be limited to $450. By comparison, plaintiff argues that a material difference exists only if the AAAF-adjusted rent exceeds 120 percent of the sum of the initial difference and the comparable rent. Under this theory, a material difference exists only if the AAAF-adjusted rent exceeds ($450) times (1.2), or $540. Under this formulation, the hypothetical AAAF-adjusted rent of $525 would not create a material difference and plaintiff thus would be entitled to the higher figure.

because the agency has never formally promulgated its views,[19] but also because it has periodically shifted its position, employing at least three different formulations within the last twenty years. *See, e.g., Good Samaritan Hospital v. Shalala*, 508 U.S. 402, 417 (1993) ("[T]he consistency of an agency's position is a factor in assessing the weight that position is due"); *INS v. Cardoza- Fonseca*, 480 U.S. 421, 446, n. 30 (1987) (quoting *Watt v. Alaska*, 451 U.S. 259, 273 (1981)) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view."). Indeed, as will be discussed in greater detail below, HUD's current interpretation of what is a "material" starkly contrasts with the more accommodating view defendant offered in defending HUD's use of comparability studies in cases that predated the passage of the 1994 Act. In those cases, defendant suggested that a material difference occurred when the adjusted rent exceeded 120 percent of the sum of the comparable rent and the initial difference, thus allowing it to argue that overall limitation would be rarely triggered. *See, e.g. Park Village Apartments v. United States* (*Park Village I*), 25 Cl. Ct. 729, 732 n.2 (1992); *Sheridan Square P'ship v. United States*, 761 F. Supp. 738, 743 n.2 (D.Colo. 1991). In light of this history, HUD's claim that it has consistently applied a long-standing interpretation of the "overall limitation" does not hold water. *See Good Samaritan Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 212-13 (1988).

So, where does this leave us? The question here is not whether, in every circumstance imaginable, HUD's definition of materiality is arbitrary, capricious, or otherwise contrary to law, as might be true in a facial challenge under the Administrative Procedures Act. Rather, this court must synchronically view HUD's definition in terms of whether it yields a proper measure of expectancy damages in this case – that which CMHA would have received had no breach occurred. The latter inquiry, in turn, requires this court to determine whether HUD's definition of materiality is reasonable, as applied to the facts *sub judice*. *See Nat'l Leased Housing II*, 32 Fed. Cl. at 764; *Park Village II*, 32 Fed. Cl. at 447. Here, the initial differences are not *de minimis* and range from $60 to $62. Nonetheless, the theoretical cracks lurking in HUD's current interpretation of materiality are question-begging and oblige this court to consider further whether that interpretation is reasonable as applied to these HAP contracts. This court answers that question in the affirmative – HUD's interpretation is reasonable, at least in the context of a case that involves significant initial differences. Several reasons lead to this conclusion.

---

[19] In *Christensen v. Harris County*, 529 U.S. 576, 587 (2000), the Supreme Court held that "[i]nterpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference." The Court held that such agency interpretations of the law are entitled to respect, but only "to the extent that those interpretations have the 'power to persuade.'" *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). More recently, in *United States v. Mead Corp.*, 533 U.S. 218 (2001), the Court emphasized that interpretations that do not have the force of law – particularly, those that are not subjected to notice and comment – are "beyond the *Chevron* pale." *Id.* at 234; *see also Vons Cos., Inc. v. United States*, 51 Fed. Cl. 1, 8 n.5 (2001).

First, as its text makes plain, the contract language envisions that the material difference may correspond to the initial difference, provided the latter itself is material. To be sure, by closely linking the notion of what is material to the size of the initial difference, HUD risks deeming a *de minimis* difference "material." Such a finding would run counter to the ordinary understanding of the term "material," which Black's defines as "significant" or "essential," in the sense that the object described is "of such a nature that knowledge of the item would affect a person's decisionmaking." *Black's Law Dictionary* 998 (8th ed. 2004).[20] It would also conflict with how this court has construed the "material difference" language in the context of the HAP contracts, albeit in resolving other issues.[21] But, that is not ***this*** case. The initial differences here are such that, viewed in the way envisioned by Notice 95-12, they equal approximately 10

---

[20] Employing this common meaning, various courts have defined "material" as meaning "significant," "having real importance," or "something substantially greater than *de minimis*." *See Kungys v. United States*, 485 U.S. 759, 786 (1988) (Stevens, J., concurring) ("'material' means 'having real importance' or 'great consequences.'") (quoting *Webster's Ninth New College Dictionary* 733 (1983)); *Doebereiner v. Sohio Oil Co.*, 880 F.2d 329, 334 (11th Cir. 1989) (same); *see also Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004) (defining "materially adverse acts" to exclude those that are "*de minimis*"); *Elkind v. Liggett & Myers Inc.*, 635 F.2d 156, 166 (2d Cir. 1980) (defining "materiality," in securities fraud context, as meaning "reasonably certain to have a substantial effect on the market price of the security"); *Williams v. Port Authority of New York and New Jersey*, 813 A.2d 531 (N.J. 2003) ("substantially greater than *de minimis*"); *Magaw v. Middletown Board of Education*, 731 A.2d 1196, 1202 (N. J. Super. 1999) (same); *Lohstreter v. Lohstreter*, 623 N.W.2d 350, 355 (N.D. 2001) (defining "material change" as a change in circumstances that "substantially affects" a party's financial standing).

[21] In construing the HAP contracts, this court has rejected the notion that the "overall limitation" could be triggered where there was a *de minimis*, rather than material, difference between the adjusted and comparable rents. For example, in concluding that HUD's use of comparability studies was a reasonable application of the overall limitation, this court, in *Nat'l Leased Housing Ass'n v. United States* (*Nat'l Leased Housing I*), 22 Cl. Ct. 649, 661 (1991), stated:

> Plaintiffs would be entitled to the full AAAF-based rent adjustments when a difference exists but that difference is not 'material.' While HUD's definition of 'material' has allegedly varied over the years, the definition apparently has never been so broad as to encompass all economically significant differences. Indeed, since 1986, pursuant to a HUD memorandum, HUD has maintained that '[a] material difference exists whenever the adjusted Section 8 rent would exceed 120 percent times the sum of the comparable rent and the initial difference.'

*Id.* at 661. In a subsequent opinion, this court reiterated its view that "the overall limitation does not prohibit every difference between rents charged for assisted and comparable unassisted units," but rather "proscribes only material differences." *Nat'l Leased Housing Ass'n v. United States* (*Nat'l Leased Housing II*), 32 Fed. Cl. 454, 466 (1994).

percent of the comparable rents – a figure that certainly appears, even in raw dollars (let alone plain language), to be "material." Indeed, in percentage terms, the initial differences here exceed the 5-percent minimum rule that would have been adopted had HUD finally promulgated the 1992 regulation. *See Park Village II*, 32 Fed. Cl. at 453.

Since the contracts here originated in legislation passed by Congress, it is also appropriate to view the reasonableness of HUD's interpretation through the prism of that legislation. *See, e.g., Bennett v. Kentucky Dept. of Educ.*, 470 U.S. 656, 669-70 (1985); *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1480-81 (Fed. Cir. 1997) (construing an agreement in light of the underlying legislation); *CMHA I*, 57 Fed. Cl. at 761 (same). Significantly, HUD's current definition of "material" comports not only with the 1994 version of the 1937 Housing Act, but, more importantly, with the 1974 version, *i.e.*, the one in effect at the time the HAP contracts were executed. Had Congress wanted the material difference to be an amount above and beyond the sum of the comparable rent and the initial difference, it could have said so in section 1437f(c)(2)(C). It did not do so – either in 1974 or in any of the subsequent versions of the statute. Instead, throughout these versions, Congress consistently defined the material difference solely based upon a comparison of the rents charged for assisted and comparable unassisted units. Moreover, the reports accompanying reports the 1974 Act heralded that the limitation was designed to ensure that increases corresponded to "fair market rentals"and that "inefficient management practices" were not "compensated [for] by increases in either the subsidy or in the amount of rent paid by a tenant." H. Rep. 93-1114, 2d Sess. 21, 59 (1974); *see also* H. Conf. Rep. No. 94-1279 at 140 (1974) (adjustments are "to reflect changes in fair market rentals in the area"). This legislative purpose certainly is not violated by equating the material difference with the initial difference, provided the latter itself is material.

Accordingly, there is no indication that HUD's current formulation is inconsistent with plaintiff's reasonable expectations when it entered into the HAP contracts – expectations that then could be based only upon the plain meaning of the language employed in the contracts, as amplified by the underlying statute and its legislative history. *See Nat. Leased Hous. II*, 32 Fed. Cl. at 466; *Park Village II*, 32 Fed. Cl. at 447. Shedding further light on this issue, this court, in *National Leased Housing II*, noted that, in entering into similar HAP contracts, both HUD and the project owners could reasonably expect only that the adjustment process would yield rents comparable to those that would be obtained in the marketplace –

> Interpreting the overall limitation and Section 8(c)(2)(C) as expressing an overarching concern that Section 8 rents not be materially different from rents charged for comparable unassisted units would seem consistent with the parties' reasonable economic expectations when they entered the HAP contracts. If the project owners did not enter HAP contracts with HUD, they could expect to rent their units to tenants on the open market at rents approximating those charged for comparable unassisted units. Similarly, if HUD, without the benefit of the HAP contracts, tried to find apartments for low-income families, HUD could expect to pay approximately market rents. Therefore, interpreting the overall limitation