> provision to require adjustment of the contract rents in order to eliminate any material difference between the rents charged for assisted and comparable unassisted units would be generally consistent with the reasonable expectations of both HUD and the project owners as to the value of the rented units. HUD and the project owners would both be assured that contract rents would not stray too far from market rents. HUD could expect to pay and the project owners could expect to receive rents not materially different from the rents charged for comparable units on the open market.

*Nat. Leased Hous. II*, 32 Fed. Cl. at 466. As in *National Leased Housing*, market considerations underlie HUD's interpretation of the HAP contracts here, under which CMHA could expect to receive adjusted rents no greater than what it could have received in renting its units on the open market. *See Alpine Ridge*, 508 U.S. at 18-19 (overall limitation "provides that contract rents 'shall not' be adjusted so as to exceed materially the rents charged for 'comparable unassisted units' on the private rental market – even if other provisions of the contracts might seem to require such a result."); *Park Village II*, 32 Fed. Cl. at 446. As such, it would appear that HUD's definition of "material" is reasonable, at least insofar as it applies to the facts of this case.

**b. Judicial Estoppel**

Plaintiff, however, asserts that defendant should be judicially estopped from taking a more restrictive view of the overall limitation in this case than it did in prior litigation in this court. "The doctrine of judicial estoppel," the Federal Circuit has stated, "is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996) (citing *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)); *see also New Hampshire v. Maine*, 532 U.S. 742, 750 (2001); *Franconia*, 61 Fed. Cl. at 755.[22] The decision whether to invoke judicial estoppel "lies within the court's discretion." *Data General Corp.*, 78 F.3d at 1565; *see also New Hampshire*, 532 U.S. at 750 (judicial estoppel "'is an equitable doctrine invoked by a court at its discretion'") (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)). Not surprisingly, each case must be decided upon its own facts and circumstances. *Motley v. New Jersey State Police*, 196 F.3d 160, 163 (3d Cir. 1999).

---

[22] As colorfully described by the Sixth Circuit:

> Courts have used a variety of metaphors to describe the doctrine, characterizing it as a rule against "playing 'fast and loose with the courts,'" "blowing hot and cold as the occasion demands," or "hav[ing] [one's] cake and eat[ing] it too." Emerson's dictum that "a foolish consistency is the hobgoblin of little minds" cuts no ice in this context.

*Reynolds v. Comm'r,* 861 F.2d 469, 472 (6th Cir. 1988) (citations omitted).

While the situations under which the doctrine may be applied are not "reducible to any general formulation of principle," *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982), according to Supreme Court, "several factors typically inform the decision whether to apply the doctrine in a particular case." *New Hampshire*, 532 U.S. at 750. "First, a party's later position must be 'clearly inconsistent' with its earlier position." *Id.* "Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Id.* (internal quotations omitted). Finally, "[a] third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 751; *see also Minn. Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1303 (Fed. Cir. 2002); *Westinghouse Elec. Co. v. United States*, 56 Fed. Cl. 564, 570-01 (2003).

Before considering these factors, the court must address a threshold issue – whether the doctrine of judicial estoppel applies to the United States – a question on which the courts certainly are not unified and on which the Federal Circuit has yet to express an opinion.[23] The Supreme Court has recognized that "ordinarily the doctrine of estoppel or that part of it which precludes inconsistent positions in judicial proceedings is not applied to states." *Illinois ex rel. Gordon v. Campbell*, 329 U.S. 362, 369 (1946); *see also New Hampshire*, 532 U.S. at 755. And, the same level of hesitation ought to apply in deciding whether to invoke the doctrine against the United States. Nonetheless, in its watershed decision in *New Hampshire*, *supra*, the Supreme Court concluded that the doctrine applied to a state, thereby plainly suggesting that the same might be true of the United States. Indeed, there are several reasons why the doctrine ought to apply to the United States, albeit in limited circumstances.

---

[23] There are pronounced differences among the courts regarding application of judicial estoppel against the government. The Sixth Circuit, for example, has held that the doctrine is applicable to government actors, but should be "construed narrowly," *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995), while the Seventh Circuit has apparently concluded that "government entities are not necessarily treated differently [than private litigants] when applying judicial estoppel," *United States v. Sherwin-Williams Co.*, 165 F. Supp.2d 797, 810 (C.D. Ill. 2001) (construing Seventh Circuit cases); *see also United States v. Christian*, 342 F.3d 744, 747-50 (7th Cir. 2003). Several circuits have noted that they have never applied judicial estoppel to the government in a criminal case, *see United States v. Kattar*, 840 F.2d 118, 129 n.7 (1st Cir. 1988) and *Nichols v. Scott*, 69 F.3d 1255, 1272 (5th Cir. 1995), while others have applied the doctrine in such cases, *see Owens*, 54 F.3d at 275, *United States v. Christian*, 342 F.3d at 747-50. The Tenth Circuit did not recognize the doctrine of judicial estoppel for *any* litigant until 2005, *see Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1068-69 (10th Cir. 2005), and has yet to address its applicability to state actors.

More so than other preclusion doctrines, the purpose of judicial estoppel is "'to protect the integrity of the judicial process,'"[24] rather than individual litigants. *See In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999) ("the doctrine is intended to project the judicial system, rather than the litigants"). As such, this form of estoppel is less akin to equitable or nonmutual collateral estoppel, and more like concepts of waiver by litigation conduct (*e.g.*, failing to raise an argument at the appropriate time) or sanctions for spoliation of evidence, discovery abuse, or perpetrating fraud upon the court.[25] Though the latter principles are not often invoked against the United States, they undoubtedly apply, at least to the extent that direct monetary sanctions are not imposed.[26] And if these principles apply to the United States, as they do, based upon the need to protect the integrity of the judicial system, so too should the doctrine of judicial estoppel, which is predicated upon the same vital need. Various cases so hold.[27]

---

[24] *New Hampshire*, 532 U.S. at 743; *see also In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) ("Judicial estoppel is a doctrine intended to prevent the perversion of the judicial process."); *Allen*, 667 F.2d at 1166 (judicial estoppel "protect [s] the essential integrity of the judicial process"); *Konstantinidis v. Chen*, 626 F.2d 933, 938 (D.C. Cir. 1980) (rule is intended to prevent "improper use of judicial machinery"); *Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953) (judicial estoppel prevents parties from "playing 'fast and loose with the courts'" (quoting *Stretch v. Watson*, 6 N.J.Super. 456, 469, 69 A.2d 596, 603 (1949)).

[25] *See New Hampshire v. Ramsey*, 366 F.3d 1, 16 (1st Cir. 2004) ("The concept of waiver by litigation conduct is related to the doctrine of judicial estoppel."); *Lowey v Stovall*, 92 F.3d 219, 223 n.3 (4th Cir. 1996) ("Unlike equitable estoppel . . . judicial estoppel is designed to protect the integrity of the courts rather than any interests of the litigants."); *Owens*, 54 F.3d at 275 ("Judicial estoppel serves a different function from other forms of estoppel, such as equitable estoppel or collateral estoppel. . . . Consequently, judicial estoppel may apply in contexts when other forms of estoppel do not."); *Nat. Medical Enterprise v. United States*, 28 Fed. Cl. 540, 546 n.2 (1993) ("Moreover, in contrast to equitable estoppel which generally fails against the Government, . . . judicial estoppel implicates dissimilar purposes"); *see also* 18B Wright, Miller & Cooper, § 4477 ("judicial estoppel has little to do with preclusion by judgment;" "the preclusion of inconsistent positions rests on concerns independent of the concerns that support preclusion by judgment;" "distinctive policies . . . shape 'preclusion of inconsistent positions'").

[26] *See, e.g., Pentax Corp v. Robison*, 135 F.3d 760, 762 (Fed. Cir. 1998) (waiver of argument not previously raised applies to government); *Mundy v. United States*, 983 F.2d 950, 953 (9th Cir. 1993); *United States v. Horn*, 29 F.3d 754, 766-67 (1st Cir. 1994) (government misconduct); *Chilcutt v. United States*, 4 F.3d 1313, 1326 (5th Cir. 1993) (Rule 37 sanctions applicable to government); *see also United States v. Stauffer Chemical Co.*, 464 U.S. 169-73 (1984) (doctrine of collateral estoppel applies to the United States).

[27] *See Valentine-Johnson v. Roche*, 386 F.3d 800, 811-12 (6th Cir. 2004); *Owens*, 54 F.3d at 275-76; *North Alaska Environmental Ctr. v. Lujan*, 961 F.2d 886, 891 (9th Cir. 1992); *Reynolds*, 861 F.2d at 474; *Kraft, Inc. v. United States*, 30 Fed. Cl. 739, 763-64 (1994); *Manning*

The rationales commonly employed in shielding the United States from other forms of estoppel simply do not resonate in this very different context. For example, while courts have expressed concern that application of estoppel principles could convert inadvertent statements by government employees into legally binding precedents, the concept of judicial estoppel applies only to "a knowing assault upon the integrity of the judicial system." *Reynolds*, 861 F.2d at 474; *see also Scarano*, 203 F.2d at 513 (judicial estoppel involves "intentional self-contradiction"). Moreover, application of the doctrine to actions undertaken in litigation neither requires the government to "secure perfect performance from its hundred of thousands of employees," *Richmond*, 496 U.S. at 433, nor "invite[s] endless litigation over both real and imagined claims of misinformation by disgruntled citizens," *id.*. Rather, it merely enforces the responsibilities of ordinary diligence and candor that the cadre of attorneys representing the United States already owe and is applicable only when a clearly inconsistent position is documented, usually by reference to briefs or transcripts. Nor does subjecting the United States to this doctrine violate the doctrine of separation powers, any more than other rules designed to protect the integrity of the judicial system are viewed as a threat to that separation. *See, e.g., Chilcutt*, 4 F.3d at 1327 (imposition of discovery sanctions does not violate separation of powers). To the contrary, if anything, the reverse is true – application of the doctrine to the United States reinforces that delicate separation, by ensuring that agencies of the executive and legislative branches, no less than any other litigant, do not lead the third branch astray.[28]

---

*v. Buchan*, 357 F. Supp.2d 1036, 1054 (N.D. Ill. 2004); *Seward v. U.S. Dept. of Agriculture*, 229 F. Supp. 2d 557, 569 (S.D. Miss. 2002); *Sherwin-Williams Co.*, 165 F. Supp.2d at 810, *FDIC v. Duffy*, 835 F. Supp. 307, 322 (E. D. La. 1993); *Donovan v. U.S. Postal Service*, 530 F. Supp. 894, 902 (D.C.D.C. 1981); *see also Yniguez v. Arizona*, 939 F.2d 727, 738-39 (9th Cir. 1991) (holding the State of Arizona was judicially estopped); *Russell v. Rolf*, 893 F.2d 1033, 1038-39 (9th Cir. 1990) (same as to the State of Washington); *Czajkowski v. City of Chicago*, 810 F. Supp. 1428, 1444-47 (N. D. Ill.1992) (same as to the City of Chicago); *see generally*, 18B Wright, Miller & Cooper § 4477 ("It has been suggested that the United States – and presumably any other government – may enjoy special respect for changes of position based on changed approaches to public policy, but even a government may be precluded from blatant inconsistency, particularly when the matter does not involve broad formulation and reformulation of public policy."). There are numerous other cases in which this court and others have analyzed whether the multi-factored test for judicial estoppel was met, without addressing significantly the threshold issue whether the doctrine could ever apply to the United States. *See, e g., Data General Corp.*, 78 F.3d at 1565; *Navajo Refining Co., LP v. United States*, 58 Fed. Cl. 200, 215 (2003); *Westinghouse Elec. Co. v. United States*, 56 Fed. Cl. 564, 571-72 (2003); *Plaintiffs in Winstar-Related Cases v. United States*, 37 Fed Cl. 174, 190 (1997); *Nat. Medical Enterprise*, 28 Fed. Cl. at 546 n.2. Notably, defendant has not hesitated to invoke the doctrine against plaintiffs in this court. *See, e.g., San Carlos Irr. and Drainage Dist. v. United States*, 111 F.3d 1557, 1568 (Fed. Cir. 1997).

[28] The court sees no other constitutional impediments to invoking judicial estoppel against the United states. To be sure, in *OPM v. Richmond*, *supra*, the Supreme Court held that equitable estoppel would not lie against the United States for certain monetary claims because

This is, of course, not to suggest that the doctrine should be applied as readily to the United States as it is to private parties. "[B]road interests of public policy may make it important to allow a change of positions that might seem inappropriate as a matter of merely private interests." 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4477, p. 784. Thus, as stressed by the Supreme Court, judicial estoppel seemingly should not apply to the United States where its invocation "would compromise a governmental interest in enforcing the law." *New Hampshire*, 532 U.S. at 755; *see also United States v. Simmons*, 247 F.3d 118, 124 (4th Cir. 2001). As noted by the Court in a somewhat different context: "[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant." *Heckler v. Community Health Services of Crawford Cty., Inc.*, 467 U.S. 51, 60 (1984). Nor ordinarily should the doctrine apply where the shift in the government's position is "'the result of a change in public policy,'" *New Hampshire*, 532 U.S. at 755 (quoting *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995)), or a "change in facts essential to the prior

---

application of the doctrine would violate the Appropriations Clause of the Constitution. *Id.* at 424-28. The Federal Circuit, however, has made clear that this rule should not be interpreted to bar application of equitable estoppel in all cases involving monetary claims. In *Burnside-Ott Aviation Training Ctr. v. United States*, 985 F.2d 1574 (Fed. Cir. 1993), that court reversed a ruling of this court that had improperly relied upon *Richmond* as barring an equitable estoppel claim, explaining:

> [T]he Claims Court erred in concluding that *Richmond* stands for the proposition that equitable estoppel will not lie against the government for any monetary claim. The *Richmond* holding is not so broad. *Richmond* is limited to "claim[s] for the payment of money from the Public Treasury ***contrary to a statutory appropriation***." 496 U.S. at 424, 110 S.Ct. at 2471 (emphasis added). Indeed, because the Supreme Court's analysis in *Richmond* is based entirely on the Appropriations Clause of the Constitution, Article 1, Section 9, Clause 7, which provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," its holding must be limited to claims of entitlement contrary to statutory appropriations.

*Id.* at 1581. By way of further contradistinction to *Richmond*, the Federal Circuit stated: "Burnside-Ott's assertion of a right to payment of money from the Public Treasury, however, is not based upon a statutory entitlement. Burnside-Ott's assertion is instead based upon its contract with the Navy. Nor does Burnside-Ott claim entitlement contrary to statutory eligibility criteria, as did *Richmond*." *Id.*; *see also Westinghouse Elec. Corp. v. United States*, 41 Fed. Cl. 229, 240 (1998). For similar reasons, the Appropriations Clause provides no obstacle to the application of the judicial estoppel doctrine in a case such as this.

judgment," *New Hampshire*, 532 U.S. at 755.[29] As the Supreme Court concluded in *New Hampshire*, while the foregoing considerations do not shield governmental entities from the judicial estoppel doctrine, they undoubtedly delimit further the doctrine's application.

Judged by these standards, this case is a multilayered story. Defendant contends that it has never "conceded that the 120 percent threshold represented the exclusive means of calculating the rent following a comparability study, or of defining a material difference." But, a review of several of its prior briefs reveals that defendant has come perilously close to arguing that the 120 percent rule was the exclusive HUD standard for materiality – so close, perhaps, as to lead a reasonable jurist into believing this proposition, even though it is not true.

In *National Leased Housing*, the primary issue was whether the contracts authorized HUD to use comparability studies to decrease contract rents. Defendant's briefs did not describe the 1986 memorandum as establishing a singular 120 percent rule. Rather, in briefing cross-motions for partial summary judgment, defendant first mapped the contours of the overall limitation by stating that the annual adjustments "may not materially differ from comparable unassisted rents that may have existed with respect to the initial contract rents." Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment and Defendant's Cross-Motion for Partial Summary Judgment 64 (Nov. 10, 1988). But, this brief did not mention the 1986 memorandum's definition of a "material difference." Indeed, defendant did not discuss that definition until it responded to another set of cross-motions in 1994. Then, in one of its briefs, defendant summarily recounted, in a footnote, the substance of the 1986 memorandum, stating:

> At any rate, under the rent adjustment guidelines contained in the January 14, 1986 . . . memorandum, if the sum of the comparable unassisted rent and the initial difference (expressed as a fixed dollar amount) is less than (a) the rent that would result from application of the relevant AAAF to the existing contract rent and (b) the rent level needed to cover reasonable and necessary operating expenses plus an allowance for owner distributions or operating contingencies, the owner will receive a rent adjustment of no less than the lowest of the AAAF rent, 120 percent of the sum of the comparable unassisted rent and the initial dollar difference, or 'the rent needed to cover the Section 8 project's debt service, operating costs of comparable projects and any allowance [for owner distributions or operating contingencies permitted by Attachment #1 to the [1986] memorandum.'

---

[29] A like consideration underlies the Supreme Court's hesitancy to apply too broadly the doctrine of collateral estoppel to the government. *See Montana v. United States*, 440 U.S. 147, 159 (1979) ("changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues"); *Commissioner v. Sunnen*, 333 U.S. 591, 600-01 (1948) (collateral estoppel does not apply to Commissioner of Internal Revenue where pertinent statutory provisions or Treasury regulations have changed between the first and second proceeding).

Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment Upon Counts II, III and VI of the Complaint and Upon Other Matters and Defendant's Cross-Motion to Dismiss in Part and for Summary Judgment Upon Counts II, III and VI of the Complaint 81 n. 36 (March 25, 1994). Though phrased differently than the 1986 memorandum, this footnote appears accurately to capture the substance of the memorandum.

Nonetheless, different – and potentially misleading – statements about the 1986 memorandum crept into defendant's briefs in *Park Village.* That case involved whether the "overall limitation" in the HAP contracts constituted not only a ceiling, but a floor on adjusted rents. Park Village argued that that the floor should be the comparable rents, without significant diminution. In its post-trial brief, defendant countered that any floor created by the overall limitation should mirror the ceiling created by the limitation – since the latter was 20 percent above the comparables, it said, the floor should be 20 percent below. In this regard, defendant adumbrated that –

> The 1986 memorandum demonstrates that HUD's goal was to eliminate material differences, not all differences. If the comparable rent plus initial difference equaled $360, the 120 percent material difference limitation would cap the annual adjustment at $432. A factored rent that exceeded $432 would be materially different from the comparable rent plus initial difference. Accordingly, HUD would eliminate the material difference by approving an adjusted contract rent of $432. The Section 8 program participant would receive an adjusted contract rent that was 120 percent greater than the comparable rent plus initial difference. Nonetheless, this would not constitute a material difference.

Park Village, Defendant's Post-Trial Brief 18 (June 17, 1994) (citations omitted). Taking this example to its logical conclusion, defendant asserted that, for the floor created by the overall limitation, "[t]he material difference threshold should be calculated by subtracting 20 percent from the comparable rent." *Id.* This court eventually embraced defendant's exegesis, stating that "[a]ssuming the same 20 percent threshold is employed where AAAF-based adjustments result in below-market rents, the overall limitation would be triggered only when the rents charged for comparable unassisted units are at least 20 percent higher than the AAAF-based contract rent." *Park Village II*, 32 Fed. Cl. at 448.

Park Village sought reconsideration, arguing that this court had misconstrued the concept of "material difference." In response, defendant reiterated:

> Park Village appears to argue that once a comparability study is performed by HUD, there should be no difference, material or immaterial, between the adjusted contract rent and the sum of the comparable rent and initial difference. Such an interpretation of the 'overall limitation' clause would effectively remove the adjective 'material' from the statute, regulation and contract . . . The plain

> language of the overall limitation contemplates and tolerates some difference between the adjusted HAP contract rent and comparable rent. HUD properly exercised its regulatory authority to establish the 120 percent level as the point where such differences become material.

Park Village, Defendant's Response to Plaintiff's Motion for Reconsideration 3-4 (Feb. 8, 1995). This court denied the motion on March 2, 1995. *See* Order Denying Motion for Reconsideration of Judgment Order (Ct. Cl. March 2, 1995). Finally, on appeal, Park Village argued that it was improper for this court to conclude that a difference between adjusted rents and comparable rents was not "material" unless the magnitude of difference was 20 percent or more. To the contrary, defendant asserted before the Federal Circuit –

> Park Village offered no evidence at trial in support of its apparent belief that all differences are 'material' for the purposes of the overall limitation clause. The only evidence before the trial court was contained in the January 1986 HUD memo stating that a difference is material if the adjusted contract rent exceeded comparable rent by more than 120 percent. The trial court properly deferred to the Government's determination that, based upon this evidence, the 20 percent magnitude for determining the materiality of the difference was applicable in those situations, such as this, where the adjusted rent was lower than comparable rent.

Park Village, Brief for the Appellee, 1997 WL 33512955 (Nov. 12, 1997).

Based, in particular, on the latter two excerpts, the court finds that defendant hitherto has argued constructions of the 1986 memorandum, and derivatively the concept of "material difference" contained therein, that differ from what it asserts here. At the least, it appears defendant never alerted the court in *Park Village*, as it did in *National Leased Housing*, that the 1986 memorandum contained not one, but **two** distinct definitions of "materiality." Defendant's reliance on the more lenient 120-percent rule plainly redounded to its advantage in *Park Village*, where this court concluded that the overall limitation "creates both a ceiling and a floor on periodic rent adjustments." *Park Village I*, 25 Cl. Ct. at 731. Relying on defendant's interpretation, this court concluded that the floor of the overall limitation would not be triggered unless the adjusted rent was more than twenty percent below the comparable rents.[30] Moreover, since both *Park Village II*, *supra*, and *National Leased Housing II, supra,* were decided by the same judge and around the same time, it is conceivable that defendant's briefs in *Park Village*

---

[30] That defendant made this argument in a losing cause is of no moment. Judicial estoppel "may apply because a court accepted the party's position, even though the party lost the judgment." 18B Wright, Miller & Cooper, § 4477; *see also U.S. Phillips Corp. v. Sears Roebuck & Co.*, 55 F.3d 592, 595-97 (Fed. Cir. 1995); *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1992).

caused this court in *National Leased Housing* to describe the overall limitation in the following less than complete terms:

> The overall limitation proscribes only material differences, and since 1986, HUD has interpreted material differences according to a 1986 HUD memorandum which provides that 'a material difference exists whenever the adjusted Section 8 rent would exceed 120 percent times the sum of the comparable rent and the initial difference.' This approach appears to be a reasonable application of the overall limitation, *see Park Village Apartments v. United States*, 32 Fed. Cl. 441, 451-53 (1994), and therefore, given, the 120 percent threshold, the overall limitation should apply only in exceptional circumstances.

*Nat'l Leased Housing Ass'n II*, 32 Fed. Cl. at 466. Note, that like defendant's briefs in *Park Village* the above passage suggests that the 1986 memorandum only had a single test for determining whether a material difference exists – the 120 percent rule. Whatever the origin of this quote, this court plainly was influenced by this characterization of the material difference in concluding that HUD's use of comparability studies was permissible. *See Nat'l Leased Housing Ass'n I*, 32 Cl. Ct. at 466-67.

But is defendant's position in the case *sub judice* "clearly inconsistent" with its earlier positions? In fact, defendant's position here is consistent with its rendition of the 1986 memorandum in *National Leased Housing*. Moreover, all defendant's statements in *Park Village* regarding the 120 percent rule related to the 1974 version of the 1937 Housing Act – not the 1994 version. Throughout the instant litigation, defendant has stressed repeatedly that its current view of what is a material difference derives neither from the 1986 memorandum nor from HUD's 1992 proposed regulation, but from Notice 95-12, which was issued to effectuate the 1994 amendments. Accordingly, even if defendant were locked into its prior interpretation of the 1986 memorandum, that does not preclude it from construing the 1994 amendments by reference to Notice 95-12. Without a doubt, in the latter notice, HUD recalibrated somewhat its interpretation of what is a "material difference." While defendant's use of that newly-minted interpretation in administering HAP contracts executed years earlier raises issues regarding the reasonableness of HUD's exercise of discretion under the contract, it is not precluded by the doctrine of judicial estoppel. *See Folio v. City of Clarksburg*, 134 F.3d 1211, 1217-18 (4th Cir. 1998) (judicial estoppel not invoked where second position was based upon a change in the law); *Tuveson v. Florida Governor's Council on Indian Affairs, Inc.*, 734 F.2d 730, 735 (11th Cir. 1984) (same). A contrary view would be tantamount to precluding HUD from reexamining its view of what is a material difference based upon the 1994 amendments, a position seemingly at odds with the Supreme Court's admonition that judicial estoppel not be applied to a state actor if it "would compromise a governmental interest in enforcing the law." *New Hampshire*, 532 U.S. at 755; *see also United States v. Simmons*, 247 F.3d 118, 124 (4th Cir. 2001).[31]

---

[31] Since this court has exclusive, nationwide jurisdiction over the issues presented, it must consider whether defendant's conduct is egregious enough to warrant potentially estopping

At all events, it is far from clear that any such inconsistency here was either knowing or purposeful. For one thing, defendant made no attempt whatsoever to hide the actual contents of the 1986 memorandum – this relatively short document was repeatedly included in various appendices filed in both of the relevant cases. And, defendant accurately described that memorandum in *National Housing*. Indeed, although it came close, defendant never actually argued that HUD had determined that a material difference exists "only" when the 120-percent rule was met. This leaves one to wonder why this court in *Park Village II*, 32 Fed. Cl. at 448 (emphasis added), stated that "[a]pplying that discretion in situations where AAAF-based adjustments produce above-market rents, HUD has determined that a material difference exists ***only*** where the contract rent would exceed comparable rents by 20 percent or more." Indeed, several of the briefs filed after *Park Village II* was decided, including two filed by the Solicitor General in the Supreme Court, did not set forth separate interpretations of the 1986 memorandum, but merely parroted the latter sentence from *Park Village II.* This leads to the distinct possibility that the description of the 1986 memorandum in those briefs was based upon inadvertence or mistake.[32] Moreover, the plaintiffs in *National Housing* and *Park Village* clearly alerted this court and the Federal Circuit that HUD's position on what constituted a "material" difference had metamorphosed over time. This court recognized as much in *National Leased Housing I*, *supra*, noting, *inter alia*, that "[p]rior to 1981, there was generally no attempt to invoke the 'Overall Limitation' provision of the HAP contracts," 22 Cl. Ct. at 651, and that "HUD's definition of 'material' has allegedly varied over the years," *id.* at 661. Accordingly, although the circumstances here remain somewhat foggy, there is no clear indication that this court was misled by defendant's briefs, and at least some possibility that this court, for reasons unexplained, was aware of, but discounted, the alternative method for determining a "material difference" stated in the 1986 memorandum.

Based on the foregoing, the court must conclude that the doctrine of judicial estoppel does not apply here. Again, this case does not turn on what HUD believed in 1986 or 1995, but rather on whether its construction of what is "material" as applied here and now is reasonable within the meaning of contracts that were executed in 1978 and 1979, before the 1986 memorandum was even issued. In adjudging similar circumstances, this court's predecessor asked whether an agency imbued with discretion by a contract, exercised that discretion reasonably in administering a contract provision. *See Pacific Far East Line v. United States*, 394 F.2d 990, 998 (Ct. Cl. 1968) (where contract and underlying statute authorized agency to determine method for calculating subsidies, change in methodology was analyzed to determine

---

the government in every case involving the issue presented. While this point, standing alone, does not preclude the invocation of estoppel here, it seemingly must be considered.

[32] *See New Hampshire*, 532 U.S. at 753 (noting that it "may be appropriate to resist application of judicial estoppel 'when a party's prior position was based on inadvertence or mistake.'") (quoting *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 29 (4th Cir. 1995); *see also Lampi Corp. v. American Power Products, Inc.*, 228 F.3d 1365, 1377 (Fed. Cir. 2000).

whether it was reasonable); *see also Everett Plywood Corp. v. United States*, 512 F.2d 1082, 1090 (Ct. Cl. 1975) (where discretion afforded United States under a contract, "exercise of that discretion must be fair and reasonable, not arbitrary and capricious"). That is the question here, as well. And the answer is – that HUD's actions in administering the contract are reasonable, given the language of the HAP contracts, as amplified by the statute as it existed at the time those contract were executed. It follows, *a fortiori*, that its construction of the "material difference" applies in determining the expectation damages owed plaintiff.

**C. Cost of Comparability Studies**

Plaintiff also seeks, as restitution damages, the cost of the comparability studies that it completed in requesting rent increases shortly before it filed suit. Defendant does not contest that if a breach occurred here, plaintiff should be reimbursed for the cost of any study it prepared to obtain an increase. However, defendant asserts that its obligation to reimburse these costs should be limited to those for studies that were timely submitted under Notice 95-12.

The Federal Circuit has made clear that restitution damages are "'available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach.'" *Hansen Bancorp*, 367 F.3d at 1309 (quoting Restatement § 373); *see also Caroline Hunt Trust Estate v. United States*, 2005 WL 1023483 at *30 (Fed. Cl. Apr. 29, 2005). Accordingly, restitution damages are not available here. However, the cost of performing comparability studies seemingly is recoverable as another form of expectation damages, that is, to put plaintiff in as good a position as it would have been had the contract been performed. *See Glendale*, 239 F.3d at 1380; *see also* Restatement §§ 344(1)(a), 347. Various cases, indeed, have indicated that an injured party may recover, as expectancy damages, the increased costs associated with performance of a contract, where the breach has imposed a new performance requirement upon the injured party. *See Home Savings of America v. United States*, 399 F.3d 1341,1353-54 (Fed. Cir. 2005); *see also Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 184-85 (2005). This rule supports the parties' view that the cost of studies potentially leading to increases is recoverable.

Defendant, however, asserts that, as to other study costs, there is a lack of causation – that the breach here did not cause plaintiff to incur the costs for the studies that defendant alleges were filed untimely under Notice 95-12. This contention, of course, assumes that the timing provisions of Notice 95-12 are valid – that HUD could, without specific statutory authority, refuse to grant increases retroactively. But, even if that assumption proves correct, the cost of the studies that HUD viewed as not supporting increases, nonetheless, is recoverable as an incidental cost plainly relating to a reasonable attempt to mitigate. *See Old Stone Corp.*, 63 Fed. Cl. 65, 79 (2004); *Globe Savings*, 2005 WL 1023484 at * 32-35; Restatement § 347 cmt. c. ("[i]ncidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss"). While the recovery of such costs ordinarily would present questions of fact, defendant has not suggested either that the costs for the studies would not have been incurred but for the breach or that plaintiff acted unreasonably in attempting to obtain increases before filing suit. Indeed, part

Case 1:01-cv-00046-FMA Document 79 Filed 06/02/2005 Page 36 of 36

and parcel of any such argument would be the notion that plaintiff acted unreasonably in believing that the timing requirements of Notice 95-12 were invalid – a highly dubious proposition. Therefore, the court concludes that, as to the years in question, plaintiff may recover the reasonable costs associated with any of the studies it conducted with respect to the subject properties prior to filing suit.

### D. Prejudgment Interest

Finally, plaintiff originally sought prejudgment interest on the amount of rents it should have obtained for the years in question. On brief, however, defendant notes the well-accepted rule that interest is not recoverable against the United States, absent an express waiver of sovereign immunity. *See, e.g., Library of Congress v. Shaw*, 478 U.S. 310, 314 (1986) ("In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award."); *Smyth v. United States*, 302 U.S. 329, 353 (1937) ("[I]n the absence of contract or statute evincing a contrary intention, interest does not run upon claims against the Government."); *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 798 (Fed. Cir. 1993) ("[I]nterest may not be recovered against the government in the absence of an explicit waiver of sovereign immunity for that purpose."). Surrounded by an impressive fleet of adverse precedent, plaintiff, at oral argument, surrendered its claim to prejudgment interest.

## III. CONCLUSION

The second leg of this case is at an end. Based on the foregoing, the court **GRANTS, IN PART**, and **DENIES, IN PART**, plaintiff's motion for partial summary judgment and **GRANTS, IN PART**, and **DENIES, IN PART**, defendant's cross-motion for partial summary judgment. On or before, June 24, 2005, the parties shall file a joint status report, indicating how this case should proceed. If appropriate, the status report shall include a schedule for further proceedings, due allowance within which shall be made for the parties to conduct settlement discussions.

**IT IS SO ORDERED.**

s/Francis M. Allegra
Francis M. Allegra
Judge