# In the United States Court of Federal Claims

No. 04-805C and No. 04-806C (Consolidated)

(Filed: July 20, 2005)

| | |
|---|---|
| ************************************ | |
| STATESMAN II APARTMENTS, INC., Plaintiff, v. UNITED STATES, Defendant. | Summary judgment; RCFC 56; breach of contract; contract interpretation; Housing Assistance Payments contracts; HUD Section 8 housing program; 42 U.S.C. § 1437f; 1994 amendments to Housing Act of 1937; statute of limitations; *stare decisis*; judicial estoppel; unmistakability doctrine |
| ************************************ | |

Fred J. Livingstone, Taft, Stettinius & Hollister LLP, Cleveland, OH, for plaintiffs. With him on the briefs were Mark J. Valponi and Majeed G. Makhlouf, Taft, Stettinius & Hollister LLP, Cleveland, OH.

John E. Kosloske, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, and C. Allen Villafuerte, Trial Attorney, Office of General Counsel, Department of Housing and Urban Development, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

These consolidated contract cases are before the court on defendant's motion for summary judgment pursuant to Rule 56(b) of the Rules of the United States Court of Federal Claims ("RCFC") and on plaintiffs' cross-motion for summary judgment. Statesman II Apartments, Inc. ("Statesman II"), plaintiff in No. 04-805C, and Beach House Development

Company ("Beach House"), plaintiff in No. 04-806C (collectively "Statesman II"), each entered into a contract with the Department of Housing and Urban Development ("HUD") to provide low-income housing under the United States Housing Act of 1937, ch. 896, 50 Stat. 888 (1937) (codified as amended at 42 U.S.C. Chapter 8, §§ 1404a - 1440) (also known as the Wagner-Steagall Housing Act). Plaintiffs allege that the government repudiated the contracts in 1994, when Congress amended the Housing Act to, among other things, reverse a presumption governing how certain adjustments to owners' properties' rents were to be determined. Plaintiffs further aver that the repudiation ripened into a breach of the contracts on each date on which HUD failed to make an adjustment to rents as required by the contract. The government opposes plaintiffs' interpretation of the contracts, and it separately seeks to invoke the unmistakability doctrine to preclude a finding of liability for breach of contract even if plaintiffs' interpretation were to be accepted.

For the reasons that follow, the government's motion for summary judgment is denied, and plaintiffs' cross-motion is granted in part and denied in part.

## BACKGROUND[1]

### A. *The Section 8 Housing Program*

In 1974, the federal statutory program for subsidizing low-income housing, known as the Section 8 housing program, was established by way of an amendment to the Housing Act of 1937. *See* Housing and Community Development Act of 1974, Pub. L. No. 93-383, 88 Stat. 633, 662-66 (1974) (adding Section 8 to the Housing Act of 1937, codified as amended at 42 U.S.C. § 1437f). Pursuant to that program, HUD agreed upon a "maximum monthly rent" with a private landlord, and HUD supplemented the tenant's payments by making "assistance payments" to the landlord. 42 U.S.C. §§ 1437a(a), 1437f(c)(3). The "maximum monthly rent" was to be based upon "the fair market rental" value of the dwelling unit, allowing for some increase over the market rate to compensate for the expenses attendant to the Section 8 program. *See* 42 U.S.C. § 1437f(c)(1). As originally enacted in 1974, the statute required HUD to adjust the maximum monthly rents on at least an annual basis as follows:

> (A) The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.

42 U.S.C. § 1437f(c)(2)(A) (1976).

---

[1]The recitations that follow do not constitute findings of fact. Instead, the recited factual elements are taken from the parties' pleadings and filings and are undisputed except where a contrary indication is noted.

In the instant case, Statesman II and Beach House each entered into contracts with HUD under the Section 8 program, known as Housing Assistance Payments ("HAP") contracts. Section 1.8b of each contract implemented the requirements set out in 42 U.S.C. § 1437f(c)(2)(A) as follows:

> b. Automatic Annual Adjustments.
>
> (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

Defendant's Motion for Summary Judgment ("Def.'s Mot."), Defendant's Appendix ("Def.'s App.") 64 (Statesman II's HAP contract), 125 (Beach House's HAP contract).[2]

Adjustments to contract rents were subject to an "overall limitation," such that "[a]djustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary." 42 U.S.C. § 1437f(c)(2)(C) (1982) (which text appears in similar form in the initial sentence of Section 1437f(c)(2)(C) as amended to date). Section 1.8d of each contract implemented that statutory provision as follows:

> Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted

---

[2]HUD develops the Automatic Annual Adjustment Factors ("AAAFs") for various geographic areas based on a formula using rent and utility data from the Consumer Price Index and Census American Housing Surveys. 52 Fed. Reg. 9478 (1987).

> units to the extent that such differences may have existed with respect to the initial Contract Rents.

Def.'s App. 64, 125.[3]

Beginning in the early 1980s, HUD would conduct "comparability studies" in those markets in which it believed automatic adjustments to assisted units had resulted in materially higher rents than those for comparable unassisted units. *See Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 14 (1993). HUD would select three to five unassisted units it considered comparable to a given assisted unit and use the rents of the former to cap adjustments to the latter. *Id.* Landlords contested this action by HUD, and in *Rainier View Associates v. United States*, 848 F.2d 988 (9th Cir. 1988), a court of appeals held that the standard assistance contract prohibited the use of comparability studies as an independent cap on rents. However, in an amendment enacted in 1988, Congress authorized HUD to conduct comparability studies by adding the following language to 42 U.S.C. § 1437f(c)(2)(C): "If the Secretary [of HUD] . . . does not complete and submit to the project owner a comparability study not later than 60 days before the anniversary date of the assistance contract under this section, the automatic annual adjustment factor shall be applied." Housing and Community Development Act of 1987, Pub. L. No. 100-242, § 142(c)(2)(B), 101 Stat. 1815, 1850 (1988). In further amendments in 1989, Congress explicitly authorized HUD to use such comparability studies prospectively to limit AAAF increases. *Cisneros*, 508 U.S. at 15. This amendment revised 42 U.S.C. § 1437f(c)(2)(C) to provide, in pertinent part:

> In implementing the limitation established under the preceding sentence [prohibiting material differences], the Secretary shall establish regulations for conducting comparability studies for projects where the Secretary has reason to believe that the application of the formula adjustments under subparagraph (A) would result in such material differences. The Secretary shall conduct such studies upon the request of any owner of any project, or as the Secretary determines to be appropriate by establishing, to the extent practicable, a modified annual adjustment factor for such market area, as the Secretary shall designate, that is geographically smaller than the applicable housing area used for the establishment of the annual adjustment factor under subparagraph (A). The Secretary shall establish such modified annual adjustment factor on the basis of the results of a study conducted by the Secretary of the rents charged, and any change in such rents over the previous year, for assisted units and unassisted units of similar quality, type, and age in the smaller market area.

[3] The quoted text is from Statesman II's HAP Contract. Section 1.8d of Beach House's HAP Contract is the same, except that it treats "notwithstanding" as consisting of two words rather than one.

Department of Housing and Urban Development Reform Act of 1989, Pub. L. No. 101-235, § 801(c), 103 Stat. 1987, 2058 (1989).

In *Cisneros*, the Supreme Court held that the 1989 amendment did not constitute a breach of the owners' HAP contracts because, among other things, those contracts plainly authorized HUD to conduct comparability studies and to use those studies to limit increases in rent adjustments. 508 U.S. at 21. In that case, private owners subject to HAP contracts with HUD argued that in authorizing HUD to limit automatic adjustments by way of comparability studies, the 1989 amendment violated the Due Process Clause of the Fifth Amendment. They contended that the amendment abrogated the owners' vested rights under the HAP contracts to automatic annual rent increases based solely on the adjustment factors. *Id.* at 16-17. In rejecting that interpretation of the HAP contracts, the Court looked to "the plain language of the assistance contracts," *id.* at 17, and considered "it [to be] clear that § 1.9d – which by its own terms clearly envisions some comparison 'between the rents charged for assisted and comparable unassisted units' – affords the Secretary sufficient discretion to design and implement comparability studies as a reasonable means of effectuating its mandate." *Id.* at 21.[4] The Court further "observe[d] that § 1.9d expressly assigns to 'the Government' the determination of whether there exist material differences between the rents charged for assisted and comparable unassisted units." *Id.*

In 1994, Congress further amended the statute to place on the owner the burden of disproving that the adjusted rent for its unit would exceed the rent for a comparable unassisted unit. That amendment provided, in pertinent part:

> However, where the maximum monthly rent, for a unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary.

Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994) (amending 42 U.S.C. § 1437f(c)(2)(A)). In addition, the 1994 amendments reduced by one percent the annual adjustment factor for units occupied by the same tenant during the previous year. In the words of the statute, as amended:

> [F]or any unit occupied by the same family at the time of the last annual rental adjustment, where the assistance contract provides for the

---

[4]Section 1.9d of the HAP contracts at issue in *Cisneros* is substantially identical to Section 1.8d of the HAP contracts at issue in the instant case.

> adjustment of the maximum monthly rent by applying an annual adjustment factor and where the rent for a unit is otherwise eligible for an adjustment based on the full amount of the factor, 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0.

42 U.S.C. § 1437f(c)(2)(A).[5]

As part of its effort to implement the 1994 amendments, HUD issued Notice 95-12 on March 7, 1995. Def.'s App. 1-24 (HUD Notice 95-12). "Under this Notice, review of AAF[s] under the Overall Limitation clause of the HAP Contract would apply to Section 8 . . . Properties where Section 8 rent levels for a unit type presently exceed the published Existing Housing Fair Market Rents (FMR)." *Id.* at 1. Where the review was thus triggered,

> in order to receive a rent increase, the owner must submit, at least 60 days prior to the HAP contract anniversary date, form HUD 92273, Estimates of Market Rent by Comparison . . . completed by a non-identity of interest, state-certified, general appraiser, FOR EACH UNIT TYPE . . . . This form must contain at least three examples of unassisted housing in the same market area of similar age, type and quality.

*Id.* at 3. The notice emphasized that owners would be penalized for failure to file a timely comparability study:

> If the owner fails to submit the information required by this Notice at least 60 days before the contract anniversary date, then the rent levels will not be adjusted on the contract anniversary date[;] rather the new rent levels will go into effect 60 days after receipt of the required information. However, if the owner fails to submit this information by the date of the FY 1996 HAP contract anniversary, then no increase will be granted for the FY 1995 contract year.

*Id.*; *see also id.* at 5 ("If an owner does not request an increase or fails to submit a request based

---

[5]Both of these 1994 amendments to Section 8(c)(2)(A) stated that "[t]he immediately foregoing sentence shall be effective only during fiscal year 1995." They were subsequently extended through "fiscal year 1996 prior to April 26, 1996, and fiscal years 1997 and 1998, and during fiscal year 1999 and thereafter." Balanced Budget Act of 1997, Pub. L. No. 105-33, §§ 2003-2004, 111 Stat. 251, 257 (1997); Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1998, Pub. L. No. 105-65, § 201(c), 111 Stat. 1344, 1364 (1997); Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1997, Pub. L. No. 104-204, § 201(g), 110 Stat. 2874, 2893 (1996).

on the guidelines in this chapter, then the rents will remain the same as the current contract rents, unmodified by HUD or the Contract Administrator.").[6] Any adjustment to the contract rent would be limited to the *lesser* of (1) the "adjusted comparable rent," determined by adding to the comparable rent the initial difference (the amount by which the original contract rent exceeded the original comparable rent), or (2) the rent level adjusted by the appropriate annual adjustment factor. *Id.* at 4.[7]

B. *The Statesman II and Beach House Contracts*

In 1980, Statesman II's predecessor-in-interest entered into a HAP contract with HUD for the provision of low-income housing at Statesman Apartments in Shaker Heights, Ohio. *See* Def.'s App. 61-73 (Statesman II contract). In 1982, Beach House also entered into such a contract with respect to Lakeshore Village in Cleveland, Ohio. *See id.* at 122-145 (Beach House contract). Each contract was for an initial term of five years, with three optional additional terms of five years each. *Id.* at 61, 122.

The Statesman II contract became effective on November 14, 1980, which became its anniversary date, at which time the amounts of the monthly rent were $370 for one-bedroom apartments and $424 for two-bedroom apartments. *Id.* at 66, 70; Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Facts ("PRDPFUF") ¶¶ 3-4. The last rent adjustment Statesman II received from HUD pursuant to their contract was effective on November 14, 1992. PRDPFUF ¶ 6. From that date through November 30, 2000, the date on which the contract was terminated, the monthly rents amounted to $586 for one-bedroom apartments and $671 for two-bedroom apartments. Def.'s App. 74; PRDPFUF ¶¶ 3, 6.

The Beach House contract took effect on October 4, 1982, the contract's anniversary, on which date two-bedroom apartments were $474, and three-bedroom apartments were $537 per month. Def.'s App. 127, 133; PRDPFUF ¶¶ 12-13. Beach House received its final rent adjustment for its Lakeshore Village property effective October 4, 1994. PRDPFUF ¶ 15. From that date through September 2002, two-bedroom apartments rented at $662 and three-bedrooms at $779. Def.'s App. 146-49; PRDPFUF ¶ 15.

The initial contract rents of each property were higher than those for comparable properties near the dates of origin of each contract, but the parties dispute the amounts of these "initial differences." In particular, divergent amounts have been proffered by, or are

---

[6]HUD reinstated and extended the terms of Notice 95-12 through subsequent notices. *See* Def.'s App. 25-41 (HUD Notice 97-14 (Mar. 17, 1997)); *id.* at 42-43 (HUD Notice 98-3 (Jan. 23, 1998)); *id.* at 44 (HUD Notice 99-17 (July 8, 1999)); *id.* at 45 (HUD Notice 00-14 (Aug. 9, 2000)); *id.* at 46-60 (HUD Notice 02-10 (May 17, 2002)).

[7]If implementing the new effective rent would require a rent reduction, the current contractual rent level would remain in place. Def.'s App. 4.

ascertainable from, the following three sources: plaintiffs, defendant, and a real estate firm, Calabrese, Racek and Markos, Inc. ("Racek"), retained by plaintiffs to prepare comparability studies required by the 1994 amendments and relied on by plaintiffs as the purported source of plaintiffs' figures. The amounts of the initial differences for each property proffered by these sources are as follows:

INITIAL DIFFERENCES

| Property | Plaintiffs' amounts[8] | | | Defendant's amounts[9] | | | Racek's amounts[10] | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1 BR | 2 BR | 3BR | 1 BR | 2 BR | 3BR | 1 BR | 2 BR | 3BR |
| Statesman II | $70 | $82 | — | $34 | $39 | — | $45 | $39 | — |
| Beach House | — | $79 | $89 | — | — | — | — | $184 | $187 |

Subsequent to receiving their last rent adjustments in 1992 and 1994, respectively, Statesman II and Beach House did not submit comparability studies to HUD until April 2,

---

[8]Plaintiffs assert that their figures represent 20% of the respective initial contract rent for each property, as allowed by their interpretation of 42 U.S.C. § 1437f(c)(1). Plaintiffs' Cross-Motion for Summary Judgment ("Pls.' Cross-Mot.") at 7 n.3. Mathematically, $79, the amount plaintiffs claim as the initial difference for a two bedroom apartment at Beach House's property, represents 20% of $395, the amount derived by considering $474, the initial contract rent for that property, less $79.

[9]The government relies for its figures for the Statesman II contract on a declaration of Dennis Morton, the director of the Multifamily Program Center at the Cleveland HUD Office, and on two attachments to that declaration. Mr. Morton testifies that he has produced from his office's files two documents showing that HUD calculated the initial differences for Statesman Apartments by applying a 10% special adjustment to the comparable unassisted rents. Defendant's Supplemental Appendix ("Def.'s Supp. App.") 13-14, 17, 19. According to Mr. Morton's explanation, the forms demonstrate that the initial difference for a one-bedroom apartment was $34 and that for a two-bedroom was $39. *Id.*

The government has not provided any such information or documentation for the Beach House contract, and thus has not proffered any amounts representing the initial difference for a two- or three-bedroom apartment at that property.

[10]Plaintiffs' comparability studies were prepared by Richard G. Racek, Jr., of Calabrese, Racek and Markos, Inc. The court derived his values for the initial differences for the properties by subtracting the adjusted rental rates Mr. Racek computed from his sample of comparable properties from the respective initial contract rents. *See* Def.'s App. 85, 159.

2004.[11] On that date, their attorney submitted requests for automatic adjustments and supporting documentation for Statesman II and Beach House for the period from 1998 through November 30, 2002 and September 30, 2002, respectively. Def.'s App. 76-77, 150-51 (Letters from Fred J. Livingstone to Dennis G. Morton, Dir., Multifamily Program Ctr., Cleveland Area Office of HUD (Apr. 2, 2004)); Def.'s App. 85-120, 159-194 (comparability information). HUD denied those requests on April 23, 2004. *Id.* at 121 (Letter from Dennis G. Morton to Fred Livingstone).

On May 11, 2004, Statesman II and Beach House filed separate complaints with the court. The government answered the complaints on July 9, 2004. The court consolidated the cases on

---

[11]From 1995 through 2002, HUD published automatic annual adjustment factors for each year. *See* Section 8 Housing Assistance Payments Program–Contract Rent Annual Adjustment Factors, 60 Fed. Reg. 12,594 (Mar. 7, 1995); Section 8 Housing Assistance Payments Program–Contract Rent Annual Adjustment Factors, 60 Fed. Reg. 55,934 (Nov. 3, 1995); Section 8 Housing Assistance Payments Program; Contract Rent Annual Adjustment Factors Fiscal Year 1997, 61 Fed. Reg. 66,132 (Dec. 16, 1996); Section 8 Housing Assistance Payments Program–Contract Rent Annual Adjustment Factors/Fiscal Year 1998, 63 Fed. Reg. 11,956 (Mar. 11, 1998); Section 8 Housing Assistance Payments Program–Contract Rent Annual Adjustment Factors, Fiscal Year 1999, 63 Fed. Reg. 51,224 (Sept. 24, 1998); Section 8 Housing Assistance Payments Program–Contract Rent Annual Adjustment Factors, Fiscal Year 2000, 64 Fed. Reg. 72,730 (Dec. 28, 1999); Section 8 Housing Assistance Payments Program; Contract Rent Annual Adjustment Factors, Fiscal Year 2001, 65 Fed. Reg. 66,888 (Nov. 7, 2000); Section 8 Housing Assistance Payments Program–Contract Rent Annual Adjustment Factors, Fiscal Year 2002, 66 Fed. Reg. 59,052 (Nov. 26, 2001).

In addition, HUD published fair market rent schedules for each year during the same time period. *See* Section 8 Housing Assistance Payments Program; Fair Market Rent Schedules for Use in the Rental Certificate Program, Loan Management and Property Disposition Programs, Moderate Rehabilitation Single Room Occupancy Program and Rental Voucher Program, 60 Fed. Reg. 42,230 (Aug. 15, 1995); Fair Market Rents for Section 8 Housing Assistance Payments Program–Fiscal Year 1996, 60 Fed. Reg. 48,278 (Sept. 18, 1995) (first notice of fair market rents); Fair Market Rents for the Section 8 Housing Assistance Payments Program–Fiscal Year 1996, 61 Fed. Reg. 6690 (Feb. 21, 1996) (final notice of fair market rents); Fair Market Rents for the Section 8 Housing Assistance Payments Program–Fiscal Year 1997, 61 Fed. Reg. 49,576 (Sept. 20, 1996); Fair Market Rents for the Section 8 Housing Assistance Payments Program–Fiscal Year 1998, 62 Fed. Reg. 50,724 (Sept. 26, 1997); Fair Market Rents for the Section 8 Housing Assistance Payments Program–Fiscal Year 1999, 63 Fed. Reg. 52,858 (Oct. 1, 1998); Fair Market Rents for Section 8 Housing Assistance Payments Program–Fiscal Year 2000, 64 Fed. Reg. 53,450 (Oct. 1, 1999); Fair Market Rents for Fiscal Year 2001, 65 Fed. Reg. 57,658 (Sept. 25, 2000); Fair Market Rents for the Housing Choice Voucher Program and Moderate Rehabilitation Single Room Occupancy Program–Fiscal Year 2002, 66 Fed. Reg. 50,024 (Oct. 1, 2001).

August 31, 2004 and granted leave for each plaintiff to file an amended complaint on September 9, 2004. Answers to the amended complaints were filed on September 14, 2004. The cross-motions for summary judgment were then filed and briefed, and a hearing on those motions was held on May 4, 2005. On June 3, 2005, the government filed a notice of additional authority, citing the decision in *Cuyahoga Metropolitan Housing Authority v. United States*, 65 Fed. Cl. 534 (2005) ("*Cuyahoga II*"). On June 13, 2005, the court granted leave for the parties to file supplemental briefs respecting that authority. Those briefs having been filed, the motions are now ready for disposition.

## STANDARD FOR DECISION

Summary judgment is appropriate if the record demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). An issue is "genuine" if it "may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250. A fact is "material" if it might affect the outcome of the case. *Id.* at 248. When deciding these issues, courts view all inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

In disposing of cross-motions for summary judgment, courts evaluate each motion on its own merits and resolve any reasonable inferences against the movant. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). Denial of both motions is warranted if genuine issues exist over material facts. *Id.*

## ANALYSIS

### A. *Liability for Breach of Contracts*

"Contract interpretation is a matter of law, and thus issues of contract interpretation can be readily susceptible of resolution via summary judgment." *Record Steel and Constr., Inc. v. United States*, 62 Fed. Cl. 508, 518 (2004) (internal quotation marks and citations omitted). In considering a motion for summary judgment, a court "must be guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. Interpretation of a contract begins–and often ends–with the text of the written agreement. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citation omitted). If that language is explicit and unambiguous, the court must effectuate its plain meaning and may not rely on extrinsic evidence. *L.W. Matteson, Inc. v. United States*, 61 Fed. Cl. 296, 307-08 (2004) (citing *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996); *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988)). In addition, the instrument must be read as a whole and interpreted so as to harmonize and give a reasonable meaning to all of its parts. *NVT Techs.*, 370 F.3d at 1159 (citation omitted). Thus, an interpretation of a contract giving meaning to all of its provisions is favored over one leaving "a portion of the contract useless, inexplicable, void, or superfluous." *Id.* Importantly, in this regard, it is well established that "[t]he United

States are as much bound by their contracts as are individuals." *Union Pac. R.R. v. United States*, 99 U.S. 700, 719 (1878); *see also Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002) ("Once the United States waives its immunity and does business with its citizens, it does so much as a party never cloaked with immunity."); *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) ("[W]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.") (quoting *Lynch v. United States*, 292 U.S. 571, 579 (1934)); *Perry v. United States*, 294 U.S. 330, 352 (1935) ("When the United States, with constitutional authority, makes contracts, it has rights and incurs responsibilities similar to those of individuals who are parties to such instruments. There is no difference . . . except that the United States cannot be sued without its consent.") (citation omitted); *United States v. Bostwick*, 94 U.S. 53, 66 (1876) ("The United States, when they contract with their citizens, are controlled by the same laws that govern the citizen in that behalf."); *Cooke v. United States*, 91 U.S. 389, 398 (1875) (observing that when the United States "comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there"); *see also Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1575 (Fed. Cir. 1997) ("The Government-as-contractor cannot exercise the power of its twin, the Government-as-sovereign, for the purpose of altering, modifying, obstructing, or violating the particular contracts into which it had entered with private parties.").

1. *Automatic annual adjustment of rents.*

In the HAP contracts at issue in the instant case, Section 1.8 plainly manifests the parties' intent that HUD would *automatically* adjust the contract rents on the contracts' anniversary dates absent a determination by the *government* that such adjustments would result in rental amounts *materially* different from those for comparable unassisted units. However, the 1994 amendments to the Housing Act go well beyond those contractual terms in two respects. First, those amendments condition HUD's duty to perform on the *owner's* demonstration, rather than the government's, that the amount of an adjusted rent would not exceed that of a comparable unassisted unit. Second, the revisions require the owner to disprove the existence of *any* difference, rather than a material difference, between the rent for an assisted unit to be adjusted and that for a comparable unassisted unit (where the former amount would be higher than the latter).

As the Supreme Court observed, the automatic annual adjustment factors are "the presumptive adjustment called for under the contract." *Cisneros*, 508 U.S. at 19. That is because Section 1.8b of the contracts requires that the "*Automatic* Annual Adjustment Factors will be determined by the Government at least annually" and that "the Contract Rents *shall be adjusted* [by HUD on the contract's anniversary date] by applying the applicable Automatic Annual Adjustment Factor." Def.'s App. 64, 125 (quoted in full *supra*, at 3) (emphasis added). By using the word "shall," Section 1.8b plainly demonstrates the parties' intent that making the adjustments was mandatory on the part of HUD. *See Black's Law Dictionary* 1233 (5th ed. 1979) ("[T]he term 'shall' is a word of command, and one which has always or which must be

given a compulsory meaning; as denoting obligation. . . . It has the invariable significance of excluding the idea of discretion."); *see also Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751, 759 n.12 (2003) ("*Cuyahoga I*"). In addition, "[t]he 'automatic' references in these provisions, as well as the annual periodicity established therein, plainly reveal an intent that the adjustments would occur without [the owner] having to take any significant action." *Cuyahoga I*, 57 Fed. Cl. at 759 (citing *American Heritage Dictionary of the English Language* 122 (4th ed. 2000) (defining "automatic" as "[a]cting or operating in a manner essentially independent of external influence or control")).

HUD's duty to perform in this regard is qualified only by Section 1.8d of the contracts, which provides, in part, that "[n]otwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, *as determined by the Government*." Def.'s App. 64, 125 (quoted in full *supra*, at 3-4) (emphasis added). Opining on this language, the Supreme Court noted that "[i]t is only in those presumably exceptional cases where the Secretary [of HUD] has reason to suspect that the adjustment factors are resulting in materially inflated rents that a comparability study would ensue." *Cisneros*, 508 U.S. at 19. Moreover, in Section 1.8d the phrase "*adjustments as provided in this Section shall not* result in material differences" refers to HUD's affirmative duty to make such adjustments as provided in Section 1.8b[12] and places on HUD a concomitant negative duty. Def.'s App. 64, 125 (emphasis added). The plain text of Section 1.8d, read in relation to Section 1.8b, "places on HUD, and only on HUD, the burden of coming forward to show that a particular adjustment would violate the limitation." *Cuyahoga I*, 57 Fed. Cl. at 760 (collecting cases that have taken this proposition as a premise). This contractual duty on HUD's part is reinforced by amendments made in 1988 to Section 1437f(c)(2)(C) that contemplate that HUD will perform the comparability analyses:

> If *the Secretary* or appropriate State agency *does not complete* and submit to the project owner *a comparability study* not later than 60 days before the anniversary date of the assistance contract under this section, the automatic adjustment factor shall be applied.

42 U.S.C. § 1437f(c)(2)(C) (sixth sentence) (emphasis added). By shifting the burden of coming forward with a study to the owners, the 1994 amendments require the owners to prove a negative–that an adjusted rent would not exceed a comparable unassisted rent–and thus reverse the thrust of Section 1.8 of the contracts.

The phrase "as determined by the Government" "affords the Secretary [of HUD] sufficient discretion to design and implement comparability studies as a reasonable means of effectuating its mandate." *Cisneros*, 508 U.S. at 21. The government reasons that such

---

[12]The phrase also refers to "special additional adjustments" described in Section 1.8c, quoted and discussed *infra*, at 13-14.

discretion "includes the discretion to place the onus of conducting such studies upon the project owner." Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Defendant's Opposition to Plaintiffs' Cross-Motion for Summary Judgment upon Liability Issues ("Def.'s Reply") at 26. The text of Section 1.8d, however, is not as malleable as the government's interpretation would require. Instead, in regard to the discretion vested in HUD by Section 1.8d, the Supreme Court "observe[d] that § 1.[8]d expressly assigns to '*the Government*' the determination of whether there exist material differences between the rents charged for assisted and comparable unassisted units." *Cisneros*, 508 U.S. at 21 (emphasis added); *see also Park Village Apartments v. United States*, 32 Fed. Cl. 441, 446-47 (1994) ("Although that phrase[, 'as determined by the Government,'] admittedly grants HUD discretion, the determination to which this phrase refers relates to the determination of whether material differences exist between contract rents and rents charged for comparable unassisted units."), *aff'd*, 152 F.3d 943 (Fed. Cir. 1998) (table). There is no dispute that HUD may exercise its discretion in effecting its mandate to determine "which units are comparable, what rents are charged for those comparable units, and whether AAAF-based adjustments would result in differences between assisted and comparable unassisted rents that are 'material.'" *Park Village*, 32 Fed. Cl. at 447. However, the text of Section 1.8d does not suggest that HUD could abdicate its duty to make any or part of these determinations or could impose that duty on its contracting counterparties by first requiring them to conduct studies and then requiring that the studies show no material differences. As noted previously, this contractual interpretation was reinforced by the 1988 amendments to Section 1437f(c)(2)(C). The 1994 amendments, in addressing comparability studies and thus the overall cap on annual rents explicated in the contracts, state that HUD "shall adjust the rent *only to the extent that* the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted" comparable unit. *See* Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994) (amending 42 U.S.C. § 1437f(c)(2)(A)) (emphasis added). This limitation amounts to an expression by the government of its refusal to perform its part of the bargain except upon a condition extraneous to the boundaries of the contractual instrument.

The plain meaning of Sections 1.8b and 1.8d is further evident from reading those Sections in relation to Section 1.8c and to other pertinent provisions of the contracts. For items for which the duty of performance is placed on the owner, the language of the contract makes the existence of the duty, and the party to which that duty is assigned, explicit. Section 1.8c, entitled "Special Additional Adjustments," for example, provides as follows:

> Special additional adjustments shall be granted, when approved by the Government, to reflect increases in the actual and necessary expenses of owning and maintaining the Contract Units which have resulted from substantial general increases in real property taxes, utility rates, or similar costs (i.e., assessments, and utilities not covered by regulated rates), *but only if and to the extent that the Owner clearly demonstrates* that such general increases have caused increases in the Owner's operating costs

> which are not adequately compensated for by automatic annual adjustments. *The Owner shall submit* to the Government financial statements which clearly support the increase.

Def.'s App. 64, 125 (emphasis added).[13] In other provisions, the parties to the contract likewise use the word "shall" to denote mandatory performance of an act on the part of the owner and describe in detail the requirements for that action. For example, Section 1.6f(1), addressing HUD's monthly assistance payments to owners, provides:

> *The Owner shall submit monthly requests* to the Government for housing assistance payments. *Each such request shall set forth*: (i) the name of each Family and the address and/or number of the unit leased by the Family; (ii) the address and/or the number of units, if any, not leased to Families for which the Owner is claiming payments; (iii) the Contract Rent as set forth in Exhibit A for each unit for which the Owner is claiming payments; (iv) the amount of rent payable by the Family leasing the unit (or, where applicable, the amount to be paid the Family in accordance with Section 1.3b(2)); and (v) the total amount of housing assistance payments requested by the Owner.

Def.'s App. 63, 124 (emphasis added).[14] *See also id.* (Section 1.6f(2)) (requiring that the owners' monthly requests for payment "shall contain a certificate").

In yet another category of contractual provisions placing the duty of performance on the owner, rather than set out in detail all of the requirements of the act to be performed, the contracts require that the act be performed "in accordance with schedules and criteria established by the Government." Def.'s App. 64, 126 (Section 1.9c(1)); *id.* at 64-65, 126 (Section 1.9c(3)); *see also id.* at 63, 124 (Section 1.7b(1)) ("*[T]he Owner* and the Family *shall inspect* the unit and both *shall certify, on forms prescribed by the Government*, that they have inspected the unit and have determined it to be Decent, Safe, and Sanitary *in accordance with the criteria provided in the prescribed forms*.") (emphasis added); *id.* at 65, 126 (Section 1.9e) ("*The Owner shall process* applications for admission, notifications to applicants, and complaints by applicants *in accordance with applicable Government requirements* and *shall maintain* records and *furnish* such copies or other information *as may be required by the Government*.") (emphasis added).

In contrast to these provisions, Section 1.8d does not refer to the owner, nor does it either describe in detail the requirements of the act to be performed or mandate performance in

---

[13]In the Statesman II contract, the words "(i.e., assessments, and utilities not covered by regulated rates)" appear in italics. *See* Def.'s App. 64.

[14]In the Statesman II contract, the parenthetical text "(or, where applicable, the amount to be paid the Family in accordance with Section 1.3b(2))" is italicized. *See* Def.'s App. 63.

accordance with applicable schedules or criteria or with prospective requirements. Instead, Section 1.8d refers to "material differences . . . as determined by the Government." Def.'s App. 64, 125. This phraseology places no duty on the owner to perform any act. Moreover, even assuming *arguendo* that it could place a duty of performance on the owner, it gives the owner no direction respecting the manner in which to perform, nor does it indicate that any such direction may be set out prospectively by the government.[15] In short, Section 1.8d places the duty of enforcing the overall limitation on the government; that subsection does not call on the owner to perform any act in that regard.

HUD Notice 95-12 and the provision of the 1994 amendments to Section 1437f(c)(2)(A) at issue constitute a repudiation by the government of the Statesman II and Beach House contracts. A repudiation is "a statement or 'voluntary affirmative act' indicating that the promisor 'will commit a breach' when performance becomes due." *Franconia Assocs.*, 536 U.S. at 143 (quoting *Restatement (Second) of Contracts* § 250); *see also id.* at 148 ("If legislation passed by Congress and signed by the President is not a statement by the obligor capable of triggering a repudiation, it is difficult to imagine what would constitute such a statement.") (internal quotation marks and citations omitted). Language that amounts to a "statement of

---

[15]In support of its contrary interpretation of Section 1.8d, the government points to Section 2.6a of the contracts. That provision of the Statesman II contract is entitled "Reports and Access to Premises and Records," and it provides that "[t]he Owner shall furnish such information and reports pertinent to the Contract as reasonably may be required from time to time by the Government." Def.'s App. 68. (The Beach House contract includes the term "by PHA ["public housing agency"] or the Government." *Id.* at 130. A "public housing agency" is generally defined as "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of low-income housing," although this definition is slightly different for the purposes of the Section 8 program. 42 U.S.C. § 1437a(b)(6) (1994); *see generally Brown Park Estates-Fairfield Dev. v. United States*, 127 F.3d 1449, 1451 (Fed. Cir. 1997). In addition, Section 2.6 of the Beach House contract is entitled "PHA and Government Access to Premises and Owner's Records." Def.'s App. 130. The government asserts that Section 2.6a "is consistent with and buttresses the discretion afforded the Government by the overall limitation provision to require that the Owners provide HUD with rent comparability studies in order to receive an annual rent adjustment." Def.'s Reply at 27. However, because Section 1.8d vests in the government no such discretion, it is not reasonable to construe the term "reports" in Section 2.6a as including rent comparability studies. Furthermore, in contrast to Section 1.8d, Section 2.6a expressly places on the owner the duty of performance by using the phrase "[t]he Owner shall," and it indicates that the government will provide the owner with instruction on a prospective basis. *See Cuyahoga II*, 65 Fed. Cl. at 542 n.10 ("[T]aken in the context of the entire contract, and particularly given the detailed adjustment provisions therein, there is no way that [Section 2.6a] could reasonably be construed to require owners to provide comparability studies as part of a revised adjustment regime.").

intention not to perform except on conditions which go beyond the contract constitutes a repudiation." *Id.* at 143 (quoting *Restatement (Second) of Contracts* § 250 cmt. b).

A repudiation of a contract "ripens into a breach prior to the time for performance only if the promisee 'elects to treat it as such.'" *Id.* (quoting *Roehm v. Horst*, 178 U.S. 1, 13 (1900)). Statesman II has chosen to base its claims on the government's non-performance beginning on November 14, 1995[16] rather than to treat the government's repudiation as an immediate breach. HUD's failure to adjust the contract rent automatically each year breached Statesman II's contract on November 14 of each of the years 1995 through 2000. *See Franconia Assocs.*, 536 U.S. at 142-43 (quoting *Restatement (Second) of Contracts* § 235(2)) ("When performance of a duty under a contract is due[,] any non-performance is a breach."); *Cuyahoga I*, 57 Fed. Cl. at 762.

Beach House likewise did not treat HUD Notice 95-12 and the 1994 amendments at issue as a present breach but rather filed claims for breach of its contract in 2004. The government did make a rent adjustment for Lakeshore Village effective on the contract's anniversary date of October 4, 1994, but failed to perform that duty for each remaining year of the contract. PRDPFUF ¶ 15. Such non-performance breached Beach House's contract on October 4 of each of the years 1995 through 2002. *See Franconia Assocs.*, 536 U.S. at 142-43; *Cuyahoga I*, 57 Fed. Cl. at 762.

The court consequently holds that the effect of the 1994 amendments to Section 1473f(c)(2)(A) and of HUD Notice 95-12 was to abrogate the provisions of the contracts regarding automatic annual adjustment of rents and to breach the contracts. In this respect, the court adopts and follows the well-reasoned opinion of Judge Allegra in *Cuyahoga I*.

2. *The "material difference" cap.*

The 1994 amendments condition the government's performance in a second respect, which condition is also remote from the parties' manifest intentions at the time they entered into the contracts. As already observed, Section 1.8d of the contracts sets an overall limitation on the

---

[16]The record is not specific as to the date of HUD's first failure to adjust the contract rent for Statesman II Apartments. Statesman II's complaint identifies 1995 as the first year of non-performance. *See* First Amended Complaint of Plaintiff Statesman II Apartments, Inc. ("Statesman II Compl.") ¶ 18. Similarly, Plaintiffs' Proposed Findings of Uncontroverted Fact ("PPFUF") aver that HUD performed its duty to make rent adjustments "[b]etween contract inception and 1994." PPFUF ¶ 10. However, plaintiffs agree with the government that "[t]he last rent adjustment received by Statesman II for Statesman Apartments under the Statesman II HAP Contract was effective on November 14, 1992," PRDPFUF ¶ 6, which would seem to indicate that the government failed to perform beginning on November 14, 1993. In all events, the issue is not material, given that any claims based on non-performance in 1993, 1994, or 1995 would be barred by the statute of limitations. *See infra*, at 24.

rents established in the automatic annual adjustment process by proscribing "*material* differences between the rents charged for assisted and comparable unassisted units." Def.'s App. 64, 125 (quoted in full *supra*, at 3-4) (emphasis added). The material-difference cap is set out in 42 U.S.C. §1437f(c)(2)(C) as well as in the contracts. The 1994 amendments, however, added a much more rigorous capping restriction on rents to an earlier subparagraph of the Act, 42 U.S.C. § 1437f(c)(2)(A). The new text in Subparagraph (A) constrains *any* difference where an adjusted contract rent exceeds the fair market rental for an existing unit in the pertinent market area. In the event that such a difference exists, the revised statutory provision further requires the owner to disprove that an adjustment to a contract rent would result in an amount higher than that for a comparable unassisted unit. The provision states, in relevant part:

> where the maximum monthly rent[] . . . to be adjusted using an annual adjustment factor *exceeds* the fair market rental for an existing dwelling unit in the market area, the Secretary [of HUD] shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not *exceed* the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary.

Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994) (emphasis added) (amending 42 U.S.C. § 1437f (c)(2)(A), quoted more fully *supra*, at 5).

The prior analysis considers the effect on the contracts of the shift made by this amendment of the obligation to perform comparability studies from the government to the private contracting party and the accompanying constraint that rent increases occur only after performance of such studies. *See id.* ("shall adjust the rent only to the extent that"); *see also supra*, at 13-15. The analysis which follows focuses on the effect of the same 1994 amendments to Section 1437f(c)(2)(A) on the overall cap on rents. Here again, plaintiffs argue that the 1994 statutory provision amounts to a "statement of intention not to perform except on conditions which go beyond the contract [and thus] constitute[] a repudiation," *Franconia Assocs.*, 536 U.S. at 143 (quoting *Restatement (Second) of Contracts* § 250), and that the repudiation ripened into a breach of contract on each date that HUD was obligated to perform under each contract. *See* Pls.' Cross-Mot. at 17-18; Plaintiffs' Reply to Defendant's Response to Cross-Motion for Summary Judgment ("Pls.' Reply") at 3-5.

HUD Notice 95-12 reflects that the 1994 amendments to Section 1437f(c)(2)(A) effectively eliminated the qualifier "material" from the operative term "material differences" in Section 1437f(c)(2)(C) of the statute, at least where the adjusted assisted rent would exceed the unassisted rent for a comparable unit. In this respect, Notice 95-12 does not mention the term "material difference," except in a quotation of Section 1.8d of the contracts. The discussion of Section 1.8d in the Notice ignores and fails to analyze or apply the triggering term "material

differences" and instead focuses on the qualifications in the second half of Section 1.8d dealing with initial differences:

> In determining whether or not the AAF [Annual Adjustment Factor] should be denied, the HAP contract provides for the following:
>
> > ". . . adjustments as provided in this Section shall not result in a material difference between the rents charged for assisted and comparable unassisted units, as determined by HUD; *provided that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial contract rents.*" (form HUD-52751, Paragraph 1.8(d), emphasis added).

Def.'s App. 4 (emphasis in original). Immediately thereafter, the Notice shifts to a consideration of "Initial Difference[s]":

> In protecting the difference which existed in the initial contract rents, HUD has developed a term known as the Initial Difference. This is a dollar figure which existed between the initial Section 8 contract rents and the original comparables . . . . The regulations permitted this difference to be between zero and 20% of the original comparables (or the FMRs [Fair Market Rents].) In order to provide a fair number to owners who may not be able to show proof of the initial difference which existed in the initial Section 8 contract/rents, HUD will use 10% of the initial Section 8 contract rent (plus the FAF, if applicable) where evidence of the initial difference cannot be provided by the owner.

*Id*. at 4.

The relationship of the initial difference to rent increases after 1994 is explained by Notice 95-12 as follows:

> Once HUD receives the form HUD 92273 evidencing rent levels in similar housing, Housing Development staff should review and approve the completed form if the Correlated Subject Rent listed on form HUD – 92273 is greater than 105% of the current contract rent level for that unit type, or if there is concern regarding the comparable properties. . . . Once approved (if necessary), Loan Management staff will apply the published AAF in Table 1 to answer the question for each unit type, **"Will the**

> **resulting rent level still be lower than the owner submitted comparable rent?"**. . .
>
> A. **If yes**, then the published AAF factor in Table One . . . is the factor that would be applied to all units in which turnover occurred since the last HAP anniversary date . . . .
>
> B. **If no**, then Loan Management Staff would need to assure that the initial difference which existed in the initial contract rents is protected, as required by the contract.

*Id.* at 3 (emphasis in original). As a consequence, in Notice 95-12, HUD has replaced the concept of "material differences" as set out in the contracts with "maximum permissible rent level" or "Adjusted Comparable Rent," determined by adding the initial difference to the comparable rent. *See Cuyahoga II*, 65 Fed. Cl. at 550. Despite the change in nomenclature, it is, of course, conceptually possible that HUD has effectively continued to apply the same overall limitation as contemplated by the contracts, and that possibility must be examined.

In contrast to Notice 95-12, HUD's prior interpretations of the overall limitation focused on the word "material," defined the term "material difference," and set forth different procedures the agency would follow to determine whether to make an adjustment. For example, in 1986, HUD described the procedures governing its duty in this regard as follows:

> A. So long as the adjusted Section 8 rent would NOT exceed 120 percent times the sum of the comparable rent and the initial difference, the difference between a Section 8 rent and a correlated unassisted rent is "material" only if BOTH of the following conditions are met.
>
> 1. The adjusted Section 8 rent would exceed the correlated unassisted rent for comparable units by more than the initial difference for that unit type.
>
> AND
>
> 2. The adjusted Section 8 rents would exceed the amount needed to "operate" comparable projects.
>
> B. A material difference exists whenever the adjusted Section 8 rent would exceed 120 percent times the sum of the comparable rent and the initial difference.
>
> C. You must show that the rent adjustment will not cause a material difference. To do so, you must show that either Condition #1 or Condition #2 in Answer 2A would NOT be met.

Def.'s Supp. App. 3 (Mem. from Silvio J. DeBartolomeis, Deputy Assistant Secretary for Multifamily Housing Programs, to various HUD staff (Jan. 14, 1986)). HUD's interpretation of "material difference" in 1986 was not its first attempt to construe the term as used in these contracts. As Judge Allegra noted in *Cuyahoga II*, HUD "has periodically shifted its position,

employing at least three different formulations within the last twenty years." *Cuyahoga II*, 65 Fed. Cl. at 551. Among other things, HUD proposed a regulation in 1992 that would have defined a material difference between the assisted and comparable unassisted rent "as a dollar amount equal to five percent of the comparable rent plus one dollar, or the initial difference plus one dollar, whichever is greater." 57 Fed. Reg. 49,120, 49,125 (Oct. 29, 1992). That proposal was never adopted. *See Cuyahoga II*, 65 Fed. Cl. at 550. Still earlier interpretations by HUD included some form of the 20% variance reflected in one of the two approaches set out in the 1986 Memorandum. *See Acacia Villa v. United States*, 36 Fed. Cl. 277, 279 (1996) (discussing HUD's policy in effect from 1984 through 1986); *Park Village*, 32 Fed. Cl. at 448 (addressing HUD's policy that the material-difference overall limitation served only as a ceiling and not also as a floor on contract rents); *National Leased Housing Ass'n v. United States*, 22 Cl. Ct. 649, 663 (1991) (addressing a 1978 handbook that was rescinded in 1981, and an internal memorandum from 1980). In short, HUD's interpretations are remarkable for their inconsistency rather than for their consistency, and HUD's current approach does not rest conformably on the template established by the earlier interpretations or the pre-1994 statute.

The government maintains that the court should defer to HUD's interpretation in Notice 95-12 because that interpretation is reasonable. *See* Def.'s Reply at 19-21. It argues that HUD's interpretation tracks the language of the statute and accordingly "should be interpreted in light of the interpretation by the agency responsible for administering the statute." Def.'s Mot. at 19 (citing *United States v. City of Fulton*, 475 U.S. 657, 672 (1986)). In essence, this argument draws upon the deference doctrines explicated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). In *Chevron*, the Supreme Court held that courts must apply a two-pronged analysis to an agency's interpretation of a statute that the agency has responsibility for administering. *Chevron*, 467 U.S. at 842-44. First, if the meaning of the statute is plain and not ambiguous, that meaning must be applied. Second, if the statute is ambiguous, the agency's interpretation is accorded deference if the agency's interpretation is reasonable. *Id*. However, "[i]nterpretations such as those in opinion letters–like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law–do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000).

In this instance, both parties concede that the term "material difference" is ambiguous as applied to the facts at hand. Thus, the first prong of *Chevron* does not apply. Moreover, the second prong of the *Chevron* doctrine is not applicable because HUD's interpretation expressed in Notice 95-12 does not have the binding legal force of a regulation. *Compare America Online, Inc. v. United States*, 64 Fed. Cl. 571, 580 (2005), *with Cuyahoga II*, 65 Fed. Cl. at 549-53. Interpretations such as those in HUD's Notice 95-12 "'are entitled to respect,' . . . but only to the extent that those interpretations have the 'power to persuade.'" *Christensen*, 529 U.S. at 587 (quoting *Skidmore*, 323 U.S. at 140). This limited form of deference, denominated "*Skidmore* deference," considers "'the thoroughness evident in [the agency interpretation's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *United States v. Mead*

*Corp.*, 533 U.S. 218, 228 (2001) (quoting *Skidmore*, 323 U.S. at 140). Importantly, "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (quoting *Watt v. Alaska*, 451 U.S. 259, 273 (1981)); *see also Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) ("[T]he consistency of an agency's position is a factor in assessing the weight that position is due.").

Notice 95-12 lacks "the power to persuade" for at least two reasons. First, it is inconsistent with HUD's various earlier interpretations of Section 1.8d of HAP contracts and of Section 1437f(c)(2)(C) of the statute, for the reasons discussed previously. Second, its reasoning is invalid because it reads out the key term "material differences," triggering the overall limitation mechanism whenever any difference exists over the fair market rent or over the comparable rent plus initial difference. *See supra*, at 17-19. For these reasons, HUD's interpretation of the term "material differences" in Notice 95-12 is not entitled to *Skidmore* deference, and the court must construe the term without taking into consideration the agency's interpretation in Notice 95-12.

Finally, plaintiffs make an argument that would substantially obviate the questions that arise respecting the dispute over "material difference." Plaintiffs contend that the government's position regarding the material-difference cap is foreclosed by the doctrine of judicial estoppel. *See* Plaintiffs' Supplemental Response to Filing by Defendant of Supplemental Authority ("Pls.' Supp.") at 5-6. Plaintiffs assert that in several cases before this court and its predecessor, the government argued successfully that a "material" difference is one differing by 120% from the sum of the comparable, unassisted rent and the initial difference, and that the government should be estopped from advancing an alternative interpretation in the instant proceeding. *See id.*; *see also* Pls.' Reply at 5-8 (citing *Norfolk S. Ry. v. Shankin*, 529 U.S. 344, 356 (2000)). The *Norfolk Southern* decision, however, applied a variant of the *stare decisis* doctrine to refuse to accord deference to an agency's interpretation that was at variance with a different interpretation that was previously adopted by the court at the urging of the agency. By contrast, judicial estoppel generally bars a party "from prevailing in one phase of a case on an argument and then relying on a contrary argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Neither doctrine would appear to apply in this instance. *Stare decisis* does not appertain because HUD's change in position was prompted by a statutory amendment, and the court must consider the newly revised statute. Similarly, an exception to the judicial estoppel doctrine provides that the doctrine does not apply where the change in the government's position is "'the result of a change in public policy.'" *New Hampshire*, 532 U.S. at 755 (quoting *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995)). There is no dispute that HUD's interpretation of "material difference" set out in Notice 95-12 was premised upon the 1994 amendments to the Housing Act. There is thus no basis for applying either *stare decisis* or judicial estoppel to lock HUD into an interpretation that "material" means a greater than 20% variation from the sum of the comparable rent and the initial difference. *See Cuyahoga II*, 65 Fed. Cl. at 553-60 (discussion of judicial estoppel).

On the documentary record generated by these cross-motions for summary judgment, the court cannot complete its task of construing the term "material differences" because the record is insufficient for that purpose. Section 1.8d states explicitly that the overall limitation shall not be construed to eliminate any initial difference that may have existed, and consequently the interpretation of "material differences" must take into account the amounts of the initial differences. *Cf. Cuyahoga II*, 65 Fed. Cl. at 552. The parties dispute the amounts of the initial differences for both properties in the instant case, and the resulting disagreement constitutes a genuine dispute of material fact that must be remitted to trial.[17]

3. *A one-percent annual reduction of rents for non-turnover tenants.*

As noted earlier, the 1994 amendments added to 42 U.S.C. § 1437f(c)(2)(A) yet a further new requirement. Specifically, the amendments reduced adjustment factors for units occupied by the same tenant during the past year by one percent:

> For any unit occupied by the same family at the time of the last annual rental adjustment, where the assistance contract provides for the adjustment of the maximum monthly rent by applying an annual adjustment factor and where the rent for a unit is otherwise eligible for an adjustment based on the full amount of the factor, 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0.

Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994) (codified as part of 42 U.S.C. § 1437f(c)(2)(A)). Plaintiffs argue that this provision breached their contracts because the contracts do not provide for a reduction of the factors in any situation other than "where utilities are paid directly by the Families." Pls.' Cross-Mot. at 14 (citing Section 1.8b(1) of the contracts (Def.'s App. 64, 125)). The government responds that "Section 1.8b(1) of the HAP contracts gives the Government the discretion to establish different AAFs for a given type of dwelling unit such as, for example, a one-bedroom apartment, depending upon the circumstances." Def.'s Reply at 17. The government reasons from this premise that such discretion allows HUD to differentiate between adjustment factors for turnover units and those for non-turnover units. *Id.*

---

[17]Additionally, the materials provided with the parties' briefs are in disagreement as to HUD's limitations on an initial difference at the time the Statesman II and Beach House contracts were entered (November 14, 1980 and October 4, 1982, respectively). *See supra*, at 8 & nn. 8-10. *Compare* Pls.' Reply at 8 (contending that the governing limitation is 20% in accord with 42 U.S.C. § 1437f(c)(1)), *with* Def.'s Supp. App. 13-14, 17, 19 (applying a 10% special adjustment to the comparable unassisted rents).

On its surface, Section 1.8b(1) does not expressly provide that HUD may establish different factors based on turnover of a dwelling unit. Rather, that section provides:

> Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

Def.'s App. 64, 125. The provision does not mention "turnover" or "non-turnover." In this respect, Section 1.8b(1) stands in sharp contrast to Section 1.8d. The Supreme Court "th[ought] it clear that [the latter section]–which by its own terms clearly envisions some comparison 'between the rents charged for assisted and comparable unassisted units'–affords the Secretary sufficient discretion to design and implement comparability studies as a reasonable means of effectuating its mandate." *Cisneros*, 508 U.S. at 21. In short, turnover is not a stated factor within the text of Section 1.8b(1).

Realistically, the question thus becomes one of whether HUD has discretion to include turnover within the constellation of factors it may take into account in setting AAFs. In this respect, Section 1.8b(1) requires that the adjustment "[f]actors and *the basis for their determination* will be published in the Federal Register." Def.'s App. 64, 125 (emphasis added). HUD has not complied with this requirement as it concerns the one-percent reduction for non-turnover tenants. HUD published separate tables for factors for turnover and non-turnover units in Notice 95-12, but it provided no basis for that determination. The notice merely declares that "[i]n Federal Fiscal Year 1995, HUD is publishing two tables of AAFs. Table One for turnover units and Table Two for non-turnover units." Def.'s App. 1. HUD has not published any findings that correlate the one-percent reduction to an owner's costs and expenses associated with turnover. HUD merely adopted the statutory reduction introduced by the 1994 amendments. On a different record, HUD might argue that its determination was based upon its adoption of congressional findings that a one-percent reduction in allowable rents for non-turnover tenants was justified by cost considerations. However, Congress's action to amend the statute in 1994 was not accompanied by findings stated in the statute itself about turnover costs, and the parties have not pointed to any pertinent legislative history. The court's review of the legislative history suggests that Congress was primarily concerned with reducing the overall cost of the program. *See Cuyahoga I*, 57 Fed. Cl. at 777-79 (quoting the report of the Senate Committee on Appropriations, S. Rep. 103-311 at 70, to the effect that "the limitations on automatic adjustments will 'generate [] $110,000,000 in outlay savings in 1995' and . . . the Committee 'believes that the projects can absorb this freeze on the [A]AAF.'"). In these circumstances, the statutory amendment, standing alone, cannot trump a binding contract entered by the government and a private party some years before the amendment was enacted. *See Franconia*, 536 U.S. at 141-42; *Winstar*, 518 U.S. at 868-71. *But cf. Cuyahoga II*, 65 Fed. Cl. at 542.

For these reasons, HUD has breached Statesman II's and Beach House's contracts for each year from 1995 through 2000 and 2002, respectively, with relation to the announced one-percent reduction for non-turnover tenants' rents.

4. *Application of the statute of limitations.*

Plaintiffs filed their complaints on May 11, 2004. In light of the six-year statute of limitations, 28 U.S.C. § 2501, plaintiffs have specified that they "do not claim any damages for breach of contract for the years 1995 through 1997." Pls.' Cross-Mot. at 22. Statesman II's claims for breach of contract accruing on November 14 of the years 1998 through 2000 and Beach House's claims accruing on October 4 of the years 1998 through 2002 are not time-barred, and the court possesses jurisdiction over them. *See Brown Park*, 127 F.3d at 1455-56; *Brighton Village Assocs. v. United States*, 52 F.3d 1056, 1060 (Fed. Cir. 1995).

A disputed question nonetheless arises whether the annual adjustments in rents that would have occurred during years 1995 through 1997 may be taken into account in providing a baseline for assessing damages for the years 1998 and thereafter. The government argues that the statute of limitations bars consideration of any pre-1998 adjustment factors to contract rents in the later years. Def.'s Reply at 32-34 (discussing *Brown Park*, 127 F.3d at 1457-58 (holding that the continuing-claim doctrine is inapplicable to claims for breaches of HAP contracts that had accrued more than six years prior to filing of the complaint)). The government's contention is supported by *Brown Park*, which precedent is binding on this court. Consequently, in considering the damages for breach during the years 1998 and thereafter, the court is foreclosed from taking into account any adjustments of rent that might have been due during the years 1995 through 1997.

B. *The Unmistakability Doctrine*

The government seeks to invoke the "unmistakability doctrine" in endeavoring to avoid liability for breach of the instant contracts. In *Winstar*, as a plurality of the Supreme Court explained, the unmistakability doctrine is a canon of construction instructing that

> a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent *sovereign* act (including an Act of Congress), nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of *sovereign* power.

*Winstar*, 518 U.S. at 878 (emphasis added). The doctrine "provides that, absent a clear statement to the contrary, a contract entered into by a private party with the government will not be interpreted to exempt the private party from the operation of a subsequent *sovereign* act by the government." *Centex Corp. v. United States*, 395 F.3d 1283, 1306-07 (Fed. Cir. 2005) (emphasis added). Importantly, then, "[a] prerequisite for invoking the unmistakability doctrine is that a

*sovereign* act must be implicated." *Id.* at 1307 (emphasis added); *accord Yankee Atomic*, 112 F.3d at 1579 ("[A]pplication of the unmistakability doctrine turns on whether enforcement of the contractual obligation would effectively block the exercise of a *sovereign* power.") (emphasis added).

The government does not attempt to satisfy the requirements of the unmistakability doctrine. Rather, it asserts that "the requirements of the sovereign acts doctrine have no place in the operation of the unmistakability doctrine." Def.'s Reply at 31. The government is apparently unwilling to accept that it lost precisely the same argument in *Winstar* and that, as one would expect, its argument has not had success in courts ever since. *See, e.g.*, *Centex*, 395 F.3d at 1307 ("In addressing the government's argument in *Winstar* that the sovereign acts doctrine provided a separate defense [from the unmistakability doctrine] against the breach of contract claim, the plurality opinion distinguished between acts of general legislation and acts that are more particularly directed at relieving the government of its contractual responsibilities."). Instead, the government denies that its exercise of power must be sovereign in nature, *i.e.*, "a power peculiar to the Government," *Winstar*, 518 U.S. at 880, before the unmistakability doctrine is triggered. In words redolent of its contentions in *Winstar*, the government asserts that the doctrine applies here merely because "[t]he HAP contracts do not expressly exempt the Owners from the application of the 1994 amendment or otherwise purport to shift the risk of any future legislative acts to the Government." Def.'s Reply at 28. The government's position stands squarely at odds with the Supreme Court's teachings in *Winstar*.

As the *Winstar* plurality explained, the fundamental flaw in the government's reasoning is that "allowing the Government to avoid contractual liability merely by passing any 'regulatory statute' would flout the general principle that, '[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." 518 U.S. at 895 (quoting *Lynch*, 292 U.S. at 579). The plurality further observed that "the sovereign acts doctrine was meant to serve this principle, not undermine it." *Id.* In all events, "sovereign power" does not include governmental actions that would "abrogate one of [the government's] contracts by a statute abrogating the legal enforceability of that contract, Government contracts of a class including that one, or simply all Government contracts." *Id.* at 878-79 n.22.

The *Winstar* plurality further taught that as long as a contract with the government "is reasonably construed to include a risk-shifting component that may be enforced without effectively barring the exercise of [sovereign] power, the enforcement of the risk allocation raises nothing for the unmistakability doctrine to guard against, and there is no reason to apply it." *Id.* at 880. In the instant case, enforcement of the Statesman II and Beach House contracts would not limit the government's exercise of one of its sovereign powers, "*e.g.,* to tax." *Id.* at 878-79. *See also id.* at 879 ("the criterion [for application of the unmistakability doctrine] looks to the effect of a contract's enforcement"); *cf. Yankee Atomic*, 112 F.3d at 1579 (applying the unmistakability doctrine because plaintiff's claim would "effectively block the exercise of th[e] sovereign power to tax."). Plaintiffs' claims for damages as compensation for the government's breach of these

contracts do not involve claims that the government "has surrendered a sovereign power" or claims "that cannot be recognized without creating an exemption from the exercise of such a power." *Winstar*, 518 U.S. at 878-79. Rather, the court reads the government's promise automatically to make annual rent adjustments pursuant to Section 1.8b in a manner consistent with Section 1.8d of the parties' contracts "as the law of contracts has always treated promises to provide something beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence." *Winstar*, 518 U.S. at 868-69. Because enforcement of the contracts at issue here does not affect "a power peculiar to the Government," the unmistakability doctrine does not apply. *Id.* at 880.

**CONCLUSION**

For the reasons stated, the government's motion for summary judgment is DENIED. Plaintiffs' cross-motion for summary judgment is GRANTED IN PART and DENIED IN PART. Statesman II is entitled to a summary judgment that HUD Notice 95-12 and successor notices, and the provisions of the 1994 amendments to the Housing Acts at issue in this case, constituted a breach of the Statesman II contract for each of the years 1998 through 2000 and that the government is liable for that breach. Beach House is similarly entitled to a summary judgment that the same notices and statutory provisions engendered a breach of its contract with the government for each of the years 1998 through 2002, for which the government is liable. The parties are ordered to file a joint status report on or before August 19, 2005, addressing the matters encompassed by RCFC Appendix A, ¶¶ 5 and 12 (last sentence), with respect to trial on damages.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge