Nos. 04-805C, 04-806C (consolidated)
(Judge Lettow)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STATESMAN II APARTMENTS, INC.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(FAX)(202) 514-8624

Attorneys for Defendant

OF COUNSEL:

C. ALLEN VILLAFUERTE
Trial Attorney
Office of General Counsel
Department of Housing
and Urban Development
Washington, DC

MARCH 31, 2006

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES . . . iv

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW . . . 1

I. Nature Of The Case . . . 1

II. The Section Housing Assistance Payments Program . . . 2

A. The Section 8 Statute . . . 2

B. The Section 8 HAP Programs For New Construction And Substantial Rehabilitation . . . 3

C. Fair Market Rents . . . 5

D. Initial HAP Contract Rents . . . 6

(1) HUD Regulations . . . 6

(2) HUD Handbooks . . . 7

(a) HUD Handbook 7420.1 CHG (May 1978) (Section 8 HAP Program New Construction Processing Handbook) . . . 7

(i) Fair Market Rent Limitation . . . 8

(ii) Reasonableness Of Rents . . . 9

(iii) Special Additional Adjustments to the Comparable Rent For A Unit Type . . . 11

(iv) File Documentation . . . 12

(v) Correlation of Rental Values . . . 12

(vi) Comparison of Proposed Rents and Market Rental Values . . . 13

**TABLE OF CONTENTS (CONT'D)**

(b) HUD Handbook 7420.2 CHG (May 1978) (Section 8 HAP Program Substantial Rehabilitation Processing Handbook) . . . . . 13

(i) Fair Market Rent Limitation . . . . . 13

(ii) Reasonableness Of Rents . . . . . 14

(iii) Special Additional Adjustments to the Comparable Rent For A Unit Type . . . . . 15

(iv) File Documentation . . . . . 17

(v) Correlation of Rental Values . . . . . 17

(vi) Comparison of Proposed Rents and Market Rental Values . . . . . 17

E. Rent Subsidy Payments Under The Section 8 HAP Program . . . . . 18

F. Annual Rent Adjustments Under The Owners' HAP Contracts . . . . . 18

G. The Initial Differences To Be Preserved In Applying The Rent Comparability Limitation To Rent Adjustments . . . . . 20

H. The 1994 Amendments To The Section 8 Statute . . . . . 23

I. HUD's Implementation Of The 1994 Amendments To The Section 8 Statute . . . . . 24

III. Contentions Of Fact . . . . . 26

A. Fair Market Rents – Newly-Constructed Rental Housing (1979-1981) . . . . . 26

B. Fair Market Rents – Existing Rental Housing (1998-2001) . . . . . 27

C. Contract Rent Annual Rent Adjustment Factors . . . . . 27

D. Statesman Apartments . . . . . 28

**TABLE OF CONTENTS (CONT'D)**

E. Lakeshore Village . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

IV. The Court's Decision Upon The Parties' Cross Motions for Summary Judgment . . . . . 36

V. Contentions Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

A. Initial Difference To Be Preserved In Contract Rent Adjustments . . . . . . . . . . . 37

B. Initial Differences For The Statesman II HAP Contract . . . . . . . . . . . . . . . . . . . 42

C. Initial Differences For The Beach House HAP Contract . . . . . . . . . . . . . . . . . . . 42

D. Expiration Of The Beach House HAP Contract . . . . . . . . . . . . . . . . . . . . . . . . . 44

E. Owners' Claim Pertaining To Contract Years 1995, 1996, And 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

F. Response To Owners' Contention That There Is No Need For A Trial In This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

G. The Cost Of Rent Comparability Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

## TABLE OF AUTHORITIES

### CASES

Asociacion Colombiana de Exportadores v. United States,
903 F.2d 1555 (Fed. Cir. 1990) .......... 41

Barrington Manor Apartments Corp. v. United States,
198 Ct. Cl. 298, 459 F.2d 499 (1972) .......... 41

Bluebonnet Savings Bank v. United States,
339 F.3d 1341 (Fed. Cir. 2003) .......... 46

Bowles v. Seminole Rock & Sand Co.,
325 U.S. (l945) .......... 41

Chris Berg, Inc. v. United States,
192 Ct. Cl. 176, 426 F.2d 314 (1970) .......... 50

Cisneros v. Alpine Ridge Group,
508 U.S. 10 (1993) .......... 47, 48, 49

Cuyahoga Metropolitan Housing Authority v. United States,
57 Fed. Cl. 751 (2003) .......... 53

Cuyahoga Metropolitan Housing Authority v. United States,
65 Fed. Cl. 534 (2005) .......... 53

Federal Housing Administration v. The Darlington, Inc.,
358 U.S. 84 (1958) .......... 52

Federal Housing Partners IV v. Cisneros,
55 F.3d 362 (8th Cir. 1995) .......... 48,49

Graham Oil Co. v. ARCO Products, Inc.,
43 F.3d 1244 (9th Cir. 1994) .......... 49, 50

Hart v. United States,
218 Ct. Cl. 212, 585 F.2d 1025 (1978) .......... 52

Hills Transportation Co. v. United States,
204 Ct. Cl. 51, 492 F.2d 1394 (1974) .......... 50

## TABLE OF AUTHORITIES (CONT'D)

## CASES (CONT'D)

Home Building & Loan Ass'n v. Blaisdell,
290 U.S. 398 (1934) .......... 50

Honeywell, Inc. v. United States,
228 Ct. Cl. 591, 661 F.2d 182 (1981) .......... 41, 42

ITT Industries, Inc. v. Rayonier, Inc.,
2005 WL 1744988 (S.D.N.Y.) .......... 50, 51

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) .......... 46

LaSalle Tallman Bank v. United States,
317 F.3d 1363 (Fed. Cir. 2003) .......... 47

Mayflower Transit Co. v. United States,
162 Ct. Cl. 233 (1963) .......... 38

National Leased Housing Ass'n v. United States,
105 F.3d 1423 (Fed. Cir. 1997) .......... 20

National Leased Housing Ass'n v. United States,
22 Cl. Ct. 649 (1991) .......... 6

Park Village Apartments v. United States,
32 Fed. Cl. 441 (1994), aff'd, 152 F.3d 943 (Fed. Cir.) (Table),
cert. denied, 525 U.S. 962 (1998) .......... 20, 43, 44

Port Authority of St. Paul v. United States,
193 Ct. Cl. 108, 432 F.2d 455 (1970) .......... 41

Rainier View Associates v. United States,
848 F.2d 988 (9th Cir. 1988), cert. denied, 490 U.S. 1066 (1989) .......... 48

Red Lion Broadcasting Co. v. FCC,
395 U.S. 367 (1969) .......... 52

Robertson v. Methow Valley Citizens Council,
490 U.S. 332 (1989) .......... 41

## TABLE OF AUTHORITIES (CONT'D)

## CASES (CONT'D)

Santa Fe Engineers, Inc. v. United States,
801 F.2d 379 (Fed. Cir. 1986) .......... 42

Seaboard Lumber Co. v. United States,
19 Cl. Ct. 310 (1990) .......... 42

S.J. Amoroso Construction Co., Inc. v. United States,
26 Cl. Ct. 759 (1992), aff'd, 12 F.3d 1072 (Fed. Cir. 1993) .......... 41

Statesman II Apartments, Inc. v. United States,
66 Fed. Cl. 608 (2005) .......... 36,37,39,46

Torrance v. AAMES Funding Corp.,
242 F.Supp.2d 862 (D. Or. 2002) .......... 49, 50

Udall v. Tallman,
380 U.S. 1 (1965) .......... 41

United States v. Price,
361 U.S. 304 (1960) .......... 53

Von Hoffman v. City of Quincy,
71 U.S. (4 Wall.) 535 (1866) .......... 50

Winston Bros. Co. v. United States,
198 Ct. C l. 37, 458 F.2d 49 (1972) .......... 50

## STATUTES

United States Code:

12 U.S.C. § 1715*l*(d)(4)) .......... 30, 33

42 U.S.C. § 1437a(a) (1994) .......... 18

42 U.S.C. § 1437a(b)(6)(A) (2000) .......... 4

42 U.S.C. § 1437f .......... 2, 46

42 U.S.C. § 1437f(a) (Supp. IV 1974) .......... 2

## TABLE OF AUTHORITIES (CONT'D)

## STATUTES (CONT'D)

United States Code (cont'd):

42 U.S.C. § 1437f(a) (Supp. IV 1974) .......... 2

42 U.S.C. § 1437f(c)(1) (Supp. IV 1974) .......... 3, 5, 6

42 U.S.C. § 1437f(c)(1) (Supp. IV 1974) .......... 3

42 U.S.C. § 1437f(c)(2)(A) (2000) .......... 36

42 U.S.C. § 1437f(c)(2)(A) (2000) .......... 23

42 U.S.C. § 1437f(c)(2)(A) (1994) .......... 23, 24

42 U.S.C. § 1437f(c)(3)(A) (1994) .......... 18

42 U.S.C. § 1437f(c)(2)(C) .......... 36, 46

42 U.S.C. § 1437f(c)(2)(C) (Supp. IV 1974) .......... 50

Public Laws:

Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298 .......... 23

Housing and Community Development Act of 1974, § 201(a), Pub. L. No. 93-383, 88 Stat. 633, 653-67 (1974) .......... 2

Housing and Community Development Act of 1987, § 142(c)(2)(B), Pub. L. No. 100-242, 101 Stat. 1850 (1988) .......... 51, 52

Housing and Urban-Rural Recovery Act of 1983, § 209(a)(1), Pub. L. No. 98-181, 97 Stat. 1155, 1183 (1983) .......... 2

Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-2806 .......... 50

**TABLE OF AUTHORITIES (CONT'D)**

**REGULATIONS**

Code of Federal Regulations:


24 C.F.R. § 813.102 (1994) .......... 25

24 C.F.R. Part 880 (1979) .......... 3

24 C.F.R. § 880.102 (1979) .......... passim

24 C.F.R. § 880.108 (1979) .......... 7, 8, 38

24 C.F.R. § 880.108(a) (1979) .......... 14

24 C.F.R. § 880.108(b) (1979) .......... 38

24 C.F.R. § 880.109(b) (1979) .......... 45

24 C.F.R. § 880.109(c) (1979) .......... 44

24 C.F.R. § 880.110(d) (1979) .......... 20, 50

24 C.F.R. § 880.201 (1994) .......... 18

24 C.F.R. § 880.203(a) .......... 4

24 C.F.R. § 880.203(c)(4) .......... 4

24 C.F.R. § 880.208(h) (1979) .......... 4

24 C.F.R. § 880.210(c)(1) (1979) .......... 4

24 C.F.R. § 880.211(a) (1979) .......... 4

24 C.F.R. § 880.211(b) (1979) .......... 4

24 C.F.R. § 880.216(d) (1979) .......... 4

24 C.F.R. § 880.217(a) (1979) .......... 5

24 C.F.R. § 880.501(d)(1) (1994) .......... 18

**TABLE OF AUTHORITIES (CONT'D)**

**REGULATIONS (CONT'D)**

Code of Federal Regulations (cont'd):

24 C.F.R. Part 881 (1979) .... 7

24 C.F.R. § 881.102 (1979) .... 3, 4, 14, 25

24 C.F.R. § 881.108(a) (1979) .... 14, 29

24 C.F.R. § 881.108(b) (1979) .... 38

24 C.F.R. § 881.110(d) (1979) .... 20, 50

24 C.F.R. § 881.201 (1994) .... 18

24 C.F.R. § 881.203(a) (1979) .... 4

24 C.F.R. § 881.203(c)(4) (1979) .... 4

24 C.F.R. § 881.208(h) (1979) .... 4

24 C.F.R. § 881.210(c)(1) (1979) .... 4

24 C.F.R. § 881.211(a) (1979) .... 4

24 C.F.R. § 881.211(b) (1979) .... 4

24 C.F.R. § 881.216(d) (1979) .... 4

24 C.F.R. § 881.217(a) (1979) .... 5

24 C.F.R. § 888.203(b) (1994) .... 19

Federal Register:

42 Fed. Reg. 60508 (11/25/77) .... 19

44 Fed. Reg. 21769 (4/12/79) .... 19

45 Fed. Reg. 2560 (1/11/80) .... 27

## TABLE OF AUTHORITIES (CONT'D)

## REGULATIONS

Federal Register (cont'd):

45 Fed. Reg. 58064 (8/29/80) .......... 27

46 Fed. Reg. 57860 (11/25/81) .......... 27

46 Fed. Reg. 63256 (12/31/81) .......... 27

63 Fed. Reg. 51224-51247 (9/24/98) .......... 28

63 Fed. Reg. 52898 (10/1/98) .......... 27

64 Fed. Reg. 53490 (10/1/99) .......... 27

64 Fed. Reg. 72730-72754 (12/28/99) .......... 28

65 Fed. Reg. 57698 (9/25/00) .......... 27

65 Fed. Reg. 66888-66912 (11/7/00) .......... 28

66 Fed. Reg. 50065 (10/1/99) .......... 27

66 Fed. Reg. 59052-59078 (11/26/01) .......... 28

68 Fed. Reg. 3116-3140 (1/22/03) .......... 28

## MISCELLANEOUS

HUD Handbook 7420.1 CHG (May 1978) .......... passim

HUD Handbook 7420.1 REV-1 (Feb. 1981) .......... 7, 8

HUD Handbook 7420.2 CHG (May 1978) .......... passim

Notice H 95-12 (HUD) (3/7/95) .......... passim

Notice H 97-14 (HUD) (3/17/97) .......... 24

Notice H 998-3 (HUD) (1/23/98) .......... 24

## TABLE OF AUTHORITIES (CONT'D)

## MISCELLANEOUS (CONT'D)

Notice H 99-17 (HUD) (7/8/99) .......... 24

Notice H 00-14 (HUD) (8/9/00) .......... 24

Notice H 2002-10 (HUD) (5/17/02) .......... 24

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| STATESMAN II APARTMENTS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Nos. 04-805C, 04-806C (consolidated) |
| v. | ) | |
| | ) | (Judge Lettow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Pursuant to ¶ 14(b) of Appendix A to the Rules of the Court of Federal Claims and ¶ 3 of the Court's September 2, 2005 Scheduling Order, defendant, the United States, respectfully submits the following contentions of fact and law:[1]

I. Nature Of The Case

In this consolidated proceeding, plaintiffs, Statesman II Apartments, Inc. (Statesman II) and Beach House Development Company (Beach House) (collectively "the Owners"), own low-income rental housing projects in the Cleveland, Ohio area. The rents of the low-income tenants in these housing projects were subsidized by the Government through rent subsidy agreements between the Owners and the Government known as "Housing Assistance Payments Contracts" (HAP contracts). The Owners seek damages for alleged breaches of these contracts based upon the failure of HUD to adjust the contract rents annually on the contract anniversary dates – for the years 1995-2000, in the case of Statesman II, and for the years 1995-2002, in the case of Beach

[1] In this memorandum of contentions of fact and law, "Stip. ¶ ____" refers to the referenced paragraph(s) of the "Joint Stipulations of Fact – Corrected Copy" deemed by the Court's March 21, 2006 Order to have been filed on March 24, 2006; "Pl. Mem. ____" refers to the referenced page(s) of "Plaintiffs' Memorandum of Contentions of Fact and Law" dated March 10, 2006.

House. Statesman II seeks $63,000 in damages and Beach House seeks $384,000 in damages. Statesman II Compl., at 6; Beach House Compl., at 6.

II. The Section Housing Assistance Payments Program

A. The Section 8 Statute

Section 8 of the United States Housing Act of 1937, as amended (42 U.S.C. § 1437f) (the Section 8 statute),[2] creates a statutory scheme pursuant to which the United States, through the Department of Housing and Urban Development (HUD), directly or indirectly subsidizes the rents of low-income individuals and families living in privately-owned buildings. This litigation concerns claims by owners of "newly constructed" or "substantially rehabilitated" housing with respect to which, at all relevant times, the Section 8 statute provided that "assistance payments" "may be made . . . in accordance with the provisions" of that statute for "the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a) (Supp. IV 1974).[3]

As originally enacted and at the time the Owners' HAP contracts were executed, the Section 8 statute specified that "[a]n assistance contract entered into pursuant to this section shall establish the maximum monthly rent (including utilities and all maintenance and management charges) which the owner is entitled to receive for each dwelling unit to which such assis-

---

[2] Section 8 was enacted as part of section 201(a) of the Housing and Community Development Act of 1974, Pub. L. No. 93-383, 88 Stat. 633, 653-67 (1974), which amended the United States Housing Act of 1937 in this and other respects.

[3] In 1983, Congress amended 42 U.S.C. § 1437f(a) by repealing the Section 8 "newly constructed, and substantially rehabilitated" programs, but grandfathering existing Section 8 New Construction and Substantial Rehabilitation HAP projects, such as the Owners' projects in this case, as being subject to the Section 8 laws. See section 209(a)(1) of the Housing and Urban-Rural Recovery Act of 1983, Pub. L. No. 98-181, 97 Stat. 1155, 1183 (1983).

tance payments are to be made." 42 U.S.C. § 1437f(c)(1) (Supp. IV 1974). In addition, section 8(c)(2) provided, in part, with respect to the adjustment of contract rents:

> (A) The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.
>
> * * * * *
>
> (C) Adjustments in the maximum rents as hereinbefore provided shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary.

42 U.S.C. § 1437f(c)(2) (Supp. IV 1974).

B. The Section 8 HAP Programs For New Construction And Substantial Rehabilitation

HUD implemented the Section 8 statute through several housing assistance programs established by regulations, including project-based rent subsidy programs addressed to "newly constructed" and "substantially rehabilitated" rental housing projects, such as Lakeshore Village ("newly constructed") and Statesman Apartments ("substantially rehabilitated") in the this case. See 24 C.F.R. Part 880 (1979) ("Section 8 Housing Assistance Payments Program for New Construction"); 24 C.F.R. Part 881 (1979) ("Section 8 Housing Assistance Payments Program for Substantial Rehabilitation"[4]). Under each program, proposals were solicited for the construction

---

[4] "Substantial Rehabilitation" is defined as "[t]he improvement of a property to Decent, Safe, and Sanitary condition and in accord with HUD requirements from a condition requiring more than routine or minor repairs or improvements of such extent as to necessitate execution of an [Agreement to Enter a HAP Contract] prior to the performance of the work" and it "may vary in degree from gutting and extensive reconstruction to cosmetic improvements coupled with cure of substantial accumulation of deferred maintenance." 24 C.F.R. § 881.102 (1979).

or rehabilitation of housing the rents for which would be subsidized under agreements entered into pursuant to the Section 8 statute.[5]

Upon HUD's selection and approval of a proposal,[6] the owner (developer) and HUD or a "public housing agency,"[7] as the case may be, would execute an "Agreement to Enter into a Housing Assistance Payments Contract" (AHAP), "a written agreement between the Owner and HUD that, upon satisfactory completion of the housing in accordance with the HUD-approved Final Proposal, HUD will enter into a [HAP contract] with the Owner." 24 C.F.R. §§ 880.102, 881.102 (1979) ("Agreement" defined); see also 24 C.F.R. §§ 880.214, 881.214 (1979). Upon the owner's completion and HUD's acceptance of the project,[8] the owner (developer) and HUD

---

[5] HUD would issue a Notification of Fund Availability (NOFA), inviting proposals from developers. 24 C.F.R. §§ 880.203(a),(c)(4), 881.203(a),(c)(4) (1979). In response to a NOFA, a developer would submit a Preliminary Proposal containing basic information about the proposed project, including, among other things, a description of the proposed housing, contract rent by unit type, equipment to be included in the contract rent, and utilities and services to be included in the contract rent. Id., §§ 880.205(c)-(f), 881.205(c)-(f).

[6] HUD would send a Notification of Selection to a developer whose Preliminary Proposal HUD selected, requesting that the developer submit a Final Proposal. 24 C.F.R. §§ 880.208(h), 881.208(h) (1979). Upon HUD's notification to the developer of its approval that the Final Proposal and the developer's acceptance of such notification, id., §§ 880.210(c)(1), 880.211(a); 881.210(c)(1), 881.211(a), the developer would provide HUD with an architect's certification that the working drawings and specifications for the project were consistent with the Final Proposal and permissible under applicable local regulations, along with a certified copy of the working drawings and specifications. Id., §§ 880.211(b), 881.211(b).

[7] A "public housing agency" is defined as "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing." 42 U.S.C. § 1437a(b)(6)(A) (2000).

[8] "If HUD determines from the review and inspection that the project has been completed in accordance with the [AHAP], the project shall be accepted." 24 C.F.R. §§ 880.216(d), 881.216(d) (1979).

would enter a HAP contract. Id., §§ 880.217(a), 881.217(a).

C. Fair Market Rents

The Section 8 statute required that HUD publish periodically but not less than annually in the Federal Register "fair market rentals" established by HUD for "existing or newly constructed rental dwelling units" of "various sizes and types in the market area suitable for occupancy by persons assisted under this section." See 42 U.S.C. § 1437f(c)(1) (Supp. IV 1974). The Section 8 New Construction HAP Program regulations defined "fair market rent" as follows:

> The rent, including utilities (except telephone), ranges, refrigerators, parking, and all maintenance, management, and other services, which, as determined at least annually by HUD, would be required to be paid in order to obtain privately developed and owned, newly constructed rental housing of modest (non-luxury) nature with suitable amenities and sound architectural design meeting the objectives of the HUD Minimum Property Standards.

24 C.F.R. § 880.102 (1979). The regulations further provided:

> Separate Fair Market Rents will be established for dwelling units by various sizes (number of bedrooms) and types (e.g., elevator, row, detached, mobile homes; housing designed for the elderly or handicapped shall be a separate type for this purpose). The Fair Market Rents will be published in the FEDERAL REGISTER, and, in order to allow for the period of construction, computation of the published Fair Market Rents will include HUD's estimate of anticipated rent increases during an appropriate future period as stated in the publication. Accordingly, for any given project for which the scheduled construction time will be less than such future period, an appropriate reduction will be made in determining the approvable Contract Rent.

Id.

The fair market rents published by HUD periodically in the Federal Register are not to be confused with comparable unassisted rents for dwelling units covered by HAP contracts. As

the court in National Leased Housing Ass'n v. United States, 22 Cl. Ct. 649 (1991), observed:

> The market survey HUD uses to establish [fair market rents] . . . differs from the survey its uses when performing a comparability study. Inter alia, the comparability study involves substantially fewer units and a smaller geographic area and is not limited to the use of recently constructed or substantially rehabilitated buildings. In addition, the comparability study sets rents based upon actual as opposed to "trended" rents.

Id. at 657-58.

D. Initial HAP Contract Rents

(1) HUD Regulations

Under the regulations governing the Section 8 New Construction and Substantial Rehabilitation HAP Programs, the initial HAP contract rents were subject to the Fair Market Rent limitation established by the Section 8 statute[9] and a "rent reasonableness" test:

> (a) *Fair Market Rent Limitation*. The sum of the Initial Contract Rent[[10]] and any Allowance for Utilities and Other Services[[11]] for

[9] The Section 8 statute provided that a HAP contract "establish the maximum monthly rent (including utilities and all maintenance and management charges) which the owner is entitled to receive for each dwelling unit with respect to which such assistance payments are to be made" and it imposed the following limitation upon that rent: "The maximum monthly rent shall not exceed by more that 10 per centum the fair market rental established by the Secretary periodically but not less than annually for existing or newly constructed rental dwelling units of various sizes and types in the market area suitable for occupancy by persons assisted under this section, except that the maximum monthly rent may exceed the fair market rental (A) by more than 10 but not more than 20 per centum where the Secretary determines that special circumstances warrant such higher maximum rent or that such higher rent is necessary to the implementation of a local housing assistance plan as defined in section 213(a)(5) of the Housing and Community Development Act of 1974." 42 U.S.C. § 1437f(c)(1) (Supp. IV 1974).

[10] "Contract Rent" is "[t]he rent payable to the Owner under [the HAP contract] including the portion of the rent payable by the Family." 24 C.F.R. § 880.102 (1979).

[11] The "Allowance for utilities and other services" is "[a]n amount determined by HUD as
(continued...)

> any unit shall not exceed the Fair Market Rent for newly constructed rental housing, except that it may be exceeded (1) by up to 10 percent if the field office director determines that special circumstances warrant such higher rent and the higher rent meets the test of reasonableness in paragraph (b) of this section, or (2) by up to 20 percent, where the Regional Administrator determines that special circumstances warrant such higher rent or determines that such higher rent is necessary to the implementation of a Local Housing Assistance Plan, and that such higher rent meets the test of reasonableness in paragraph (b) of this section.
>
> (b) *Reasonableness of Rents*. In any case, the Contract Rent as proposed must be determined by HUD to be reasonable in relation to the quality, location, amenities, and management and maintenance services of the project, and any proposed rent shall be subject to reduction if it is found to be higher than such reasonable rent. Appropriate reductions to reflect any savings where tax-exempt financing is involved may be made.

24 C.F.R. § 880.108 (1979). The initial HAP contract rents under the Section 8 Substantial Rehabilitation HAP Program were subject to the same restrictions. See id., § 881.108.

(2) HUD Handbooks

(a) HUD Handbook 7420.1 CHG (May 1978)
(Section 8 HAP Program New Construction Processing Handbook)

Chapter 9 of the Section 8 HAP Program New Construction Processing Handbook contained valuation processing instructions for proposals submitted by developers for Section 8 New Construction HAP projects. The May 1978 version of this handbook applied to the proposal for Lakeshore Village submitted by Beach House. See HUD Handbook 7420.1 CHG (May 1978).[12]

---

[11](...continued)
an allowance for the cost of utilities (except telephone) and charges for other services payable directly by the Family." 24 C.F.R. § 880.102 (1979).

[12] In February 1981, HUD issued Handbook 7420.1 REV-1 ("Section 8 Housing Assistance Payments Program – New Construction Processing"). This handbook also contained a chapter 9 (continued...)

(i) Fair Market Rent Limitation

The Section 8 HAP Program New Construction Processing Handbook required that the HUD appraiser determine whether the gross rents proposed for a project were "within the bounds permitted by the applicable Fair Market Rents (FMR)." HUD Handbook 7420.1 CHG, ¶ 9-2b.[13] In the case of "non-elderly dwelling units," the Gross Rents may not exceed the published FMR, "except that the Gross Rents may in some circumstances be permitted to exceed FMR by up to 10% (prerogative of the Field Office Director) or by up to 20% (prerogative of the Regional Administrator) as provided in [24 C.F.R. § 880.108(a)]." Id. In the case of 0-, 1-, and 2-bedroom dwelling units designed for occupancy by the elderly/handicapped, the Gross Rents may not exceed 1.05 times the published FMR. For such units, exercise of the 10% or 20% prerogatives would allow the Gross Rents to exceed the published FMR by as much as 15.5% (1.05 *x* 1.10 - 1.00) or by as much as 26% (1.05 *x* 1.20 - 1.00). Id.

---

[12](...continued)
that was addressed to "Valuation Processing Instructions for Review of Proposals." But HUD Handbook 7420.1 REV-1 only applied to the processing of proposals for projects that were subject to the revised regulations for the Section 8 New Construction Program effective on November 5, 1979, codified at 24 C.F.R. Part 880 (1980). As for projects for which HUD issued Notifications of Selection (NOS) prior to November 5, 1979, such as the NOS for Lakeshore Village issued by HUD on September 12, 1977, HUD Handbook 7420.1 REV-1 provided that "[t]he development provisions of the revised regulation do not apply to projects for which Notifications of Selection were issued prior to November 5, 1979," and that, "[a]ccordingly, the previous edition of the Section 8 New Construction Processing handbook will continue to apply to the processing of such projects." HUD Handbook 7420.1 REV-1, chapter 1, ¶ 1-2.

[13] "Gross Rent" was defined as "[t]he Contract Rent plus any Allowance for Utilities and Other Services." 24 C.F.R. § 880.102 (1979).

(ii) Reasonableness Of Rents

The Section 8 HAP Program New Construction Processing Handbook provided that "Contract Rents approved for new dwelling units assisted under Section 8, must, in addition to compliance with the FMRLs, be determined by HUD to be reasonable in relation to the quality, location, amenities, and management and maintenance services of the project." HUD Handbook 7420.1 CHG, ¶ 9-2c(4). "Regardless of the level of the FMRs, rents shall not be increased beyond the lower of the rents determined to be reasonable by HUD or the rents proposed to be charged by the developer in his/her initial proposal; except, as otherwise provided in [24 C.F.R. § 880.209(b)[14]] or when repatterning of the rents is required (see paragraph 9-3n(2))." Id., ¶ 9-2c(5). The HUD field office's Valuation Staff was to "assess the reasonableness of rents" for a proposed Section 8 project and that this entailed "the comparison of the proposed unit rents with the rents obtainable in the market for comparable units, which provide equivalent living accommodations and services, without benefit of public housing assistance or other subsidy." Id., ¶ 9-3a. The Handbook required that "[a]n estimate of the market rental value of each proposed Section 8 dwelling unit must be made by the appraiser" and further provided:

---

[14] Section 880.209(b) provided, in pertinent part, that "the Owner may request, with the submission of his Final Proposal or architect's certification, an increase in Contract Rents over those approved in the Preliminary Proposal; and HUD, in its discretion, may approve such an increase if HUD determines" that: (1) the need for increased rents is due to factors beyond the Owner's control which the Owner reasonably could not have foreseen or an erroneous finding by HUD as to reasonableness of rents because of increases in construction costs, real property taxes, utility rates, or similar costs that exceed the costs taken into account by HUD in determining the reasonableness of the Contract Rents proposed in the Preliminary Proposal; (2) the requested rents are reasonable; (3) the contract authority for the allocation area was sufficient to select all approvable Preliminary Proposals or HUD determines that "the Preliminary Proposal clearly would have been selected even without regard to any weight being given by reason of its rents;" and (4) the requested rents do not exceed the Fair Market Rent Limitations in effect at the time of HUD's decision upon the request for rent increases.

> Where differences between units of the same size by bedroom count are minimal, an estimate of the rental value of one of the units may serve as a benchmark for the purpose of estimating the rental value of the other units of that size by bedroom count. In estimating market rental values, the appraiser should not be influenced by the currently applicable Schedules of Fair Market Rents. The appraiser shall respond separately to the question concerning reasonableness of rents and the question of compliance with Fair Market Rent limits. Whereas Fair Market Rents are gross rents which include utilities, ranges and refrigerators, parking, and all maintenance and management services, the estimates of market rental values will reflect only the utilities, equipment, and services which are expected to be furnished at the owner's expense.

Id., ¶ 9-3d (emphasis in original).

HUD Handbook 7420.1 CHG provided that, for the purpose of evaluating the reasonableness of proposed rents, the HUD appraiser could obtain rent comparables by unit type "from recently constructed rental housing, either conventionally financed or insured by HUD under the non-subsidized [housing programs]." Id., ¶ 9-3e. The "estimate of rental value" for a unit size and type was "preferably [to] be based on five market rent comparables, but in no event shall an estimate be based on fewer than three market rent comparables." Id.

The HUD appraiser was to make adjustments to the rents charged for rent comparables to reflect "significant differences between each comparable unit and the subject unit, taking into consideration such things as location, age, condition, size of units (overall square feet), number and furnishability of rooms, equipment, amenities (including special design features for the elderly/handicapped), utilities and services included in the rent, quality, management and maintenance services, and all other significant differences the appraiser notes." Id., ¶ 9-3f.[15]

---

[15] The HUD appraiser also was required to make a "time and trend adjustment" to the market rent "to reflect anticipated changes, if any, from the effective date of each comparable rent to the

(continued...)

(iii) Special Additional Adjustments to the Comparable Rent For A Unit Type

HUD Handbook 7420.1 CHG mandated special additional adjustments to the market rental value for a proposed Section 8 project unit type in certain enumerated circumstances to compensate an owner for "the increased security services and higher costs of owning and maintaining assisted family housing, and for both the additional management costs and costs for additional amenities and design features, such as ramps and grab bars, which are required in units planned for elderly/handicapped occupancy." HUD Handbook 7420.1 CHG, ¶ 9-3i(1)(i) (emphases in original). A 10% adjustment was to be made for all assisted units in HUD-insured projects in which 100% of the revenue producing units were assisted (Lakeshore Village). Id. A 10% adjustment was to be made for all assisted units in projects that were not HUD-insured. Id. A 5% adjustment was to be made for all units in HUD-insured projects in which fewer than 100% of the revenue producing units were assisted. Id. The effect of this adjustment was "to permit . . . Contract Rents . . . for a Section 8 assisted project to exceed normal comparability . . . by 5% or 10%, as appropriate." Id., ¶ 9-3i(1)(ii).

HUD Handbook 7420.1 CHG also required an additional "upward adjustment of 5%" "to compensate for the payment of mortgage discounts when HUD-insured financing is used or to compensate for the higher debt service payments that generally must be paid to obtain conventional mortgage loans when conventional mortgage loan financing is used." HUD Handbook 7420.1 CHG, ¶ 9-3i(2).

---

[15](...continued)
anticipated date of execution of the Housing Assistance Payments Contract (i.e., after completion and acceptance of the project)." HUD Handbook 7420.1 CHG, ¶ 9-3g.

In addition to the mandatory special adjustments discussed above, HUD Handbook 7420.1 CHG permitted "an additional discretionary 5% adjustment . . . under exceptional circumstances, when properly authorized by the Field Office Director" and stated that, "[w]hen this occurs, the composite effect will be to increase all of the rents illustrated in subparagraph (3) above by an additional 5%." HUD Handbook 7420.1 CHG, ¶ 9-3i(4).

(iv) File Documentation

HUD Handbook 7420.1 CHG required that the HUD field office document in its file for the Section 8 new construction proposal "the comparables used, adjustments made, and the market rental value assigned to each unit type" and that this was to be "accomplished" by use of the "Form FHA-2273, Estimates of Market Rent by Comparison[[16]], for each unit type[.]" HUD Handbook 7420.1 CHG, ¶ 9-3j.

(v) Correlation of Rental Values

HUD Handbook 7420.1 CHG provided that "[t]he adjusted rent of each of the comparables used to estimate the rental value of a dwelling unit is an indicator of rental value" and that "[c]orrelation is the term which describes the analytical and reasoning process employed by an appraiser to derive a single estimate of value from various value indicators." HUD Handbook 7420.1 CHG, ¶ 9-3m. "Correlations of acceptable quality are based on comprehensive analysis and sound reasoning, not on purely mechanical or mathematical processes." Id. "[I]dentification of the most defensible single value estimate is a subjective judgment based on the Appraiser's total store of knowledge." Id.

[16] A copy of FHA Form 2273 (3/75) ("Estimates of Market Rent by Comparison") is Exhibit A to Chapter 9 of HUD Handbook 7420.1.

(vi) Comparison of Proposed Rents and Market Rental Values

HUD Handbook 7420.1 CHG provided that, "[i]f the Contract Rents proposed are in reasonable conformity with the level and pattern of market rental values assigned by the Appraiser, giving due consideration to the degree and range of accuracy expected of appraisers in the estimation of rental values, the Appraiser shall find the proposed Contract Rents reasonable and they shall become the HUD estimates." HUD Handbook 7420.1 CHG, ¶ 9-3n(1). However, if, in the appraiser's judgment, the proposed rents "materially" exceed market rents plus any special adjustments, the Handbook provided that "the Appraiser shall find the proposed rents not reasonable and the Appraiser's estimates shall be the rents determined by HUD to be reasonable . . . ." Id., ¶ 9-3n(3).

(b) HUD Handbook 7420.2 CHG (May 1978)
(Section 8 HAP Program Substantial Rehabilitation Processing Handbook)

The valuation instructions contained in chapter 9 of the May 1978 version of the Section 8 HAP Program Substantial Rehabilitation Processing Handbook applicable to Statesman Apartments are substantially the same as the valuation processing instructions contained in the Section 8 HAP Program New Construction Processing Handbook for new construction project proposals discussed above.

(i) Fair Market Rent Limitation

The Section 8 HAP Program Substantial Rehabilitation Processing Handbook required that the HUD appraiser determine whether the gross rents proposed for a project were "within the bounds permitted by the applicable Fair Market Rents (FMRs)." HUD Handbook 7420.2 CHG,

¶ 9-2b.[17] The handbook provided that "the Gross Rents may not exceed the FMRs, except that the Gross rents may in some circumstances be permitted to exceed the FMRs by up to 10% (prerogative of the Field Office Director) or by up to 20% (prerogative of the Regional Administrator) as provided in [24 C.F.R. § 881.108(a)]." Id., ¶ 9-2b(1)(i).

(ii) Reasonableness Of Rents

The Section 8 HAP Program Substantial Rehabilitation Processing Handbook provided that "[t]he Valuation Staff shall assess the reasonableness of rents" for each proposed Section 8 substantial rehabilitation project and that this entailed "the comparison of the proposed unit rents after rehabilitation with the rents obtainable in the market for comparable units, which provide equivalent living accommodations and services, without benefit of public housing assistance or other subsidy." HUD Handbook 7420.2 CHG, ¶ 9-3a. The handbook required that "[a]n estimate of the market rental value of each rehabilitated Section 8 dwelling unit must be made by the Appraiser" and further provided:

> Where differences between units of the same size by bedroom count are minimal, an estimate of the rental value of one of the units may serve as a benchmark for the purpose of estimating the rental value of the other units of that size by bedroom count. In estimating market rental values, the appraiser should not be influenced by the currently applicable Schedules of Fair Market Rents. The appraiser shall respond separately to the question concerning reasonableness of rents and the question of compliance with Fair Market Rent limits. Whereas Fair Market Rents are gross rents which include utilities, ranges and refrigerators, parking, and all maintenance and management services, the estimates of market rental values will reflect only the utilities, equipment, and services which are expected to be furnished at the Owner's expense.

[17] "Gross Rent" was defined as "[t]he Contract Rent plus any Allowance for Utilities and Other Services." 24 C.F.R. § 881.102 (1979).

Id., ¶ 9-3d (emphasis in original).

HUD Handbook 7420.2 CHG provided that, for the purpose of evaluating the reasonableness of proposed rents, the HUD appraiser could obtain rent comparables by unit type "from existing rental housing which will compete with the subject housing after its rehabilitation, either conventionally financed or insured by HUD under the non-subsidized [HUD housing programs]." Id., ¶ 9-3e. The "estimate of rental value" for a unit size and type was "preferably [to] be based on five market rent comparables, but in no event shall an estimate be based on fewer than three market rent comparables." Id.

The HUD appraiser was to make adjustments to the rents charged for rent comparables to reflect "significant differences between each comparable unit and the subject unit, taking into consideration such things as location, age, condition, size of units (overall square feet), number and furnishability of rooms, equipment, amenities (including special design features for the elderly/handicapped), utilities and services included in the rent, quality, management and maintenance services, and all other significant differences the Appraiser notes." HUD Handbook 7420.2 CHG, ¶ 9-3f.[18]

(iii) Special Additional Adjustments to the Comparable Rent For A Unit Type

HUD Handbook 7420.2 CHG mandated special additional adjustments to the market rental value for a proposed Section 8 project unit type in certain enumerated circumstances to compensate an owner for "the increased security services and higher costs of owning and main-

[18] The HUD appraiser also was required to make a "time and trend adjustment" to the market rent "to reflect anticipated changes, if any, from the effective date of each comparable rent to the anticipated date of execution of the Housing Assistance Payments Contract (i.e., after completion and acceptance of the project)." HUD Handbook 7420.1 CHG, ¶ 9-3g.

taining assisted family housing; and for both the additional management costs and costs for additional amenities and design features, such as ramps and grab bars, which are required in units planned for elderly/handicapped occupancy." HUD Handbook 7420.2 CHG, ¶ 9-3i(1)(i) (emphases in original). A 10% adjustment was to be made for all assisted units in HUD-insured projects in which 100% of the revenue producing units were assisted (Statesman Apartments). Id. A 10% adjustment was to be made for all assisted units in projects that were not HUD-insured. Id. A 5% adjustment was to be made for all units in HUD-insured projects in which fewer than 100% of the revenue producing units were assisted. Id. The effect of this adjustment was "to permit both Contract Rents and rents used in processing a mortgage insurance application for a Section 8 assisted project to exceed normal comparability . . . by 5% or 10%, as appropriate." Id.,¶ 9-3i(1)(ii).

HUD Handbook 7420.2 CHG also required an additional "upward adjustment of 5%" "to compensate for the payment of mortgage discounts when HUD-insured financing is used or to compensate for the higher debt service payments that generally must be paid to obtain conventional mortgage loans when conventional mortgage loan financing is used." HUD Handbook 7420.2 CHG, ¶ 9-3i(2).

In addition to the mandatory special adjustments discussed above, HUD Handbook 7420.2 CHG permitted "an additional discretionary 5% adjustment . . . under exceptional circumstances, when properly authorized by the Field Office Director" and stated that, "[w]hen this occurs, the composite effect will be to increase all of the rents illustrated in subparagraph (3) above by an additional 5%." HUD Handbook 7420.2 CHG, ¶ 9-3i(4).

(iv) File Documentation

HUD Handbook 7420.2 CHG required that the HUD field office document in its file for the Section 8 substantial rehabilitation proposal "the comparables used, adjustments made, and the market rental value assigned to each unit type" and that this was to be "accomplished by use of Form FHA-2273, Estimates of Market Rent by Comparison, for each unit type[.]" Id., ¶ 9-3j.

(v) Correlation of Rental Values

HUD Handbook 7420.2 CHG provided that "[t]he adjusted rent of each of the comparables used to estimate the rental value of a dwelling unit is an indicator of rental value" and that "[c]orrelation is the term which describes the analytical and reasoning process employed by an Appraiser to derive a single estimate of value from various value indicators." HUD Handbook 7420.2 CHG, ¶ 9-3m. "Correlations of acceptable quality are based on comprehensive analysis and sound reasoning, not on purely mechanical or mathematical processes." Id. "[I]dentification of the most defensible single value estimate is a subjective judgment based on the Appraiser's total store of knowledge." Id.

(vi) Comparison of Proposed Rents and Market Rental Values

HUD Handbook 7420.2 CHG provided that, "[i]f the Contract Rents proposed are in reasonable conformity with the level and pattern of market rental values assigned by the Appraiser, giving due consideration to the degree and range of accuracy expected of appraisers in the estimation of rental values, the Appraiser shall find the proposed Contract Rents reasonable and they shall become the HUD estimates." HUD Handbook 7420.1 CHG, ¶ 9-3n(1). However, if, in the appraiser's judgment, the proposed rents "materially" exceed market rents plus any special adjustments, the handbook provided that "the Appraiser shall find the proposed rents not reason-

able and the Appraiser's estimate shall be the rents determined by HUD to be reasonable . . . ." Id., ¶ 9-3n(3).

E. Rent Subsidy Payments Under The Section 8 HAP Program

The rent subsidy is provided in one of two ways. HUD enters a HAP contract directly with the owner of a housing project, or it enters into an "annual contributions contract" with a "public housing agency" (PHA) which, in turn, enters into a HAP contract with a project owner. In either case, the HAP contract is the vehicle for payment of the Section 8 rent subsidy ("housing assistance payment") to the project owner.

The HAP contract specifies the monthly rent for each of the different sizes of dwelling units covered by the agreement, i.e., the "contract rent." The tenant pays the owner a portion of the contract rent, which is based upon the tenant's income. 42 U.S.C. § 1437a(a) (1994); 24 C.F.R. §§ 880.201 & 881.201 (1994) ("tenant rent" defined). The governmental entity with which the owner contracts (either HUD or a PHA) pays a rent subsidy to the owner equal to the difference between the tenant rent and the contract rent. 42 U.S.C. § 1437f(c)(3)(A) (1994); 24 C.F.R. §§ 880.501(d)(1) & 881.501(d)(1) (1994).

F. Annual Rent Adjustments Under The Owners' HAP Contracts

The rent adjustment provisions contained in the Owners' HAP contracts are virtually identical. The HAP contracts provided:

b. Automatic Annual Adjustments

(1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced

> appropriately by the Government where utilities are paid directly by the Families.
>
> (2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

HAP Contracts, Part I, § 1.8b.

This formula-based method of adjusting contract rents is subject to the following "Overall Limitation" provision contained in the Owners' HAP contracts:

> Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

HAP Contracts, Part I, § 1.8d.

HUD regulations specify how annual rent adjustments pursuant to section 1.8b(2) of the Owners' HAP contracts were to be made:

> The adjusted monthly amount of the Contract Rent of a dwelling unit shall be determined by multiplying the Contract Rent in Effect on the anniversary date of the contract by the applicable Automatic Annual Adjustment Factor . . . and rounding the result to the next higher whole dollar amount.

See 24 C.F.R. § 888.203(b) (1994).[19] For example, if the monthly contract rent for a dwelling unit in effect on the HAP contract anniversary date is $100 per unit and the applicable AAF is

---

[19] This regulation was initially issued on November 25, 1977, and amended on April 12, 1979. See 42 Fed. Reg. 60508 (11/25/77); 44 Fed. Reg. 21769 (4/12/79).

1.05, the new monthly contract rent adjusted in accordance with the AAF would be $105 (1.05 *x* $100).

G. The Initial Differences To Be Preserved In Applying The Rent Comparability Limitation To Rent Adjustments

As noted above, the Owners' HAP contracts provided that the overall limitation upon rent adjustments "shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents." See HAP Contracts, Part I, § 1.8d.[20] The "initial difference" is the mathematical difference, expressed in dollars, between the initial HAP contract rents and the rents charged for comparable, unassisted units when HUD established the initial HAP contract rents. National Leased Housing Ass'n v. United States, 105 F.3d 1423, 1435 (Fed. Cir. 1997); Park Village Apartments v. United States, 32 Fed. Cl. 441, 446-47 (1994), aff'd, 152 F.3d 943 (Fed. Cir.) (Table), cert. denied, 525 U.S. 962 (1998).

HUD consistently has construed the initial differences proviso to refer to the difference between the initial HAP contract rent for a unit and the comparable, unassisted rent for that unit type *determined by HUD* in establishing the initial HAP contract rent for the unit. In a January 1986 memorandum from Silvio J. DeBartolomeis, HUD Deputy Assistant Secretary for Multifamily Housing Programs, to HUD field offices concerning "Questions and Answers on Section 8 Annual Rent Adjustments," the Deputy Assistant Secretary provided the following guidance for determining the initial difference to be preserved in rent adjustments under HAP contracts

---

[20] The "initial differences" proviso contained in the overall limitation in the Owners' HAP contracts mirrors the "initial differences" proviso in the overall limitation contained in the Section 8 regulations applicable to Beach House and Statesman II. See 24 C.F.R. §§ 880.110(d), 881.110(d) (1979).

such as the Owners' HAP contracts in the present case:

> QUESTION #1. What is initial difference? What documents do we use to make the calculation? What should we do if the needed documents are lost or incomplete?
>
> ANSWER. Initial difference is any dollar amount by which a Section 8 contract rent initially exceeded the correlated rent of the comparable unassisted unit. The initial difference is computed separately for each unit type.
>
> NOTE: Since Section 8 rents at Property Disposition Resale projects were usually set at the comparables' rents, most PD resales will not have an initial difference. For other projects, the initial difference will generally be between 10% and 20% but may be zero.
>
> A. Initial Section 8 Contract Rents. Obtain these amounts from Exhibit A of the HAP contract. If the project has a utility allowance, be sure to use the contract rent – not the gross rent.
>
> * * * * * *
>
> B. Initial Correlated Rents
>
> 1. For Property Disposition Resales, use the Adjusted Subject Rents as shown on the last line of the Form HUD-92273, Estimate of Market rents by Comparison. The HUD-92273 should be attached to the Disposition Recommendation (Form HUD-9650). If you cannot find the HUD-92273, use the Market Comparable Rents in Section III of Form HUD-9650.
>
> 2. For other projects, obtain these amounts from the Form HUD-92264 and HUD-92273 prepared at firm commitment. Usually, these forms will show the same rents because Development Handbook 7420.1 directs the Valuation staff to transfer the HUD-92273 rents to the HUD-92264. However, if the HUD-92273 was revised and the HUD-92264 was not updated, the forms will show different rents. In these instances, use the HUD-92273 rents.
>
>    - On the HUD-92264, use Line [H-7] – Unit Rents by Comparison.
>
>    - On the HUD-92273, use the line that shows the correlated unassisted rents, trended to the expected date of initial occupancy. (NOTE: This is Line 22 on the 9/78 version of

the form.)

If a HUD-92264 or HUD-92273 is lost or Line H-7 of the HUD-92264 is blank, do the following.

- If the HUD-92264 or HUD-92273 data is missing, ask the owner for a copy.

- If the owner cannot provide you with either form, generally set the initial dollar difference at 10% of the initial contract rent. Set the initial difference at a lower amount only if your office usually set initial Section 8 rents at less than 110 percent of the correlated unassisted rent.

January 1986 Memo, at 1-2.

HUD Notice 95-12, which implemented the 1994 amendments to the Section 8 statute, discussed below, similarly provided:

> The initial difference is the dollar amount by which the initial Section 8 contract rents exceeded the original comparable rents (or the Fair Market Rents if they were originally used instead of comparables). The owner must submit evidence of the initial difference which existed in the initial contract rents. If the owner does not submit evidence of this figure to HUD and the initial difference is not documented in the project file maintained by the local HUD Office, then the Loan Management Staff should use the amount equal to 10% of the initial Section 8 contract rent for that unit, as a substitute for the initial difference.
>
> * * * *
>
> In protecting the difference which existed in the initial contract rents, HUD has developed a term known as the Initial Difference. This is the dollar figure which existed between the initial Section 8 contract rents and the original comparables. (For Financial Adjustment Factor (FAF) properties, this should also include the dollar figure of the FAF, if the FAF has not been removed as part of a refinancing transaction.) The regulations permitted this difference to be between zero and 20% of the original comparables (or the FMRs). In order to provide a fair number to owners who may not be able to show proof of the initial difference which existed at the initial Section 8 contract

> rents, HUD will use 10% of the initial Section 8 contract rent (plus the FAF, if applicable) where evidence of the initial difference cannot be provided by the owner.

Notice 95-12, at 3-4.

H. The 1994 Amendments To The Section 8 Statute

The Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. No. 103-327, 108 Stat. 2298 (the 1994 Act or 1994 Amendments), enacted on September 28, 1994,[21] amended the Section 8 statute in two respects. First, the 1994 Act provided that, "[w]here the maximum monthly rent, for a unit in a new construction, substantial rehabilitation, or moderate rehabilitation project, to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary. . . ." 42 U.S.C. § 1437f(c)(2)(A) (1994). The 1994 Act, thus, established a trigger for invoking the rent comparability limitation applicable to rent adjustments under the Owners' HAP contracts: when the existing contract rent is greater than the published fair market rent for an existing dwelling unit in the relevant housing market. In that case, HUD may increase the HAP contract rent only to the extent that the Owner demonstrates that the adjusted rent would not exceed the rent for a comparable, unassisted hous-

[21] The 1994 Act provided that these amendments to the Section 8 statute "shall apply to all contracts for new construction, substantial rehabilitation, and moderate rehabilitation projects under which rents are adjusted under [section 1437f(c)(2)(A)] by applying an annual adjustment factor," 108 Stat. at 2315, such as the Owners' HAP contracts. The amendments are effective prospectively "during fiscal year 1995, during fiscal year 1996 prior to April 26, 1996, and fiscal years 1997 and 1998, and during fiscal year 1999 and thereafter." 42 U.S.C. § 1437f(c)(2)(A) (2000).

ing unit, as determined by HUD.

Second, the 1994 Act provided, with respect to annual rent adjustment factors, that, "[f]or any unit occupied by the same family at the time of the last annual rental adjustment, where the assistance contract provides for the adjustment of the maximum monthly rent by applying an annual adjustment factor and where the rent for the unit is otherwise eligible for an adjustment based on the full amount of the factor, 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0." 42 U.S.C. § 1437f(c)(2)(A) (1994).

I. HUD's Implementation Of The 1994 Amendments To The Section 8 Statute

On March 7, 1995, HUD issued Notice H 95-12 (HUD) ("Annual Adjustment Factor Rent Increase Requirements Pursuant to the Housing Appropriations Act of 1995") (HUD Notice 95-12), which implemented the 1994 amendments to the Section 8 statute.[22] Notice 95-12 recited that, "[a]mong the many measures developed [in the 1994 Act], emphasis was placed on utilizing the mechanism in the Section 8 contract language which permits an analysis on the reasonableness of the [annual adjustment factor (AAF)] formula as it is applied to each project unit type."

Consistent with the 1994 Act, Notice 95-12 stated that "review of AAF under the Overall Limitation clause of the HAP Contract would apply to Section 8 New Construction and Substantial Rehabilitation Properties where Section 8 rent levels for a unit type presently exceed the published Existing Housing Fair Market Rents (FMR) . . . ." A subsequent document, Notice

---

[22] Although HUD Notice 95-12 expired on September 30, 1995, subsequent notices reinstated and extended its policies and procedures. See Notice H 97-14 (HUD) (3/17/97), Notice H 98-3 (HUD) (1/23/98), Notice H 99-17 (HUD) (7/8/99), Notice H 00-14 (HUD) (8/9/00), and Notice H 2002-10 (HUD) (5/17/02), reproduced at pp. 25-60 of the appendix to "Defendant's Motion for Summary Judgment" dated November 5, 2004.

H 97-14 (HUD) ("Fiscal Year 1997 Annual Adjustment Factor (AAF) Requirements") (HUD Notice 97-14), clarified that the 1994 Act's rent comparability provisions would apply where "the pre-adjustment *gross rent* (current contract rent plus any allowances for tenant-paid utilities) is above the published [fair market rent]." (Emphasis added.).[23]

Under HUD Notice 95-12 (as clarified by HUD Notice 97-14), thus, if the current gross rent for a unit covered by a HAP contract *exceeds* the applicable fair market rent for the area in which the subsidized unit is located, HUD will not make an annual rent adjustment determination unless the Section 8 project owner submits to HUD a study of the rent charged for a comparable, unassisted unit. If the rent comparability study provided by the project owner indicates that the comparable, unassisted rent exceeds the contract rent for the assisted unit by more than five percent, HUD will set the contract rent at the lesser of (1) the contract rent adjusted in accordance with the applicable AAF or (2) the comparable, unassisted rent plus any "initial difference" to be preserved in rent adjustments.

Under HUD Notice 95-12, where the owner provided the rent comparability information 60 days prior to the HAP contract anniversary date, HUD will increase the HAP contract rent for a covered unit effective on the HAP contract anniversary. If, however, the owner provides the rent comparability study less than 60 days before the HAP contract anniversary date, HUD will

---

[23] As parenthetically noted in HUD Notice 97-14, "gross rent" is the sum of the HAP contract rent and any allowances for tenant-paid utilities. See 24 C.F.R. §§ 880.102 & 881.102 (1979) ("Gross Rent" is "[t]he Contract Rent plus any Allowance for Utilities and Other Services" and "Allowance for Utilities and Other Services" is "[a]n amount determined or approved by HUD as an allowance for the cost of utilities (except telephone) and charges for other services payable directly by the Family"); see also 24 C.F.R. § 813.102 (1994) (defining "gross rent" as "[t]he total monthly cost of housing an eligible Family which is the sum of the Contract Rent and any Utility Allowance").

increase the HAP contract rent effective upon the date 60 days after the owner submitted the rent comparability information. But where the owner does not provide the rent comparability data by the *next* HAP contract anniversary, HUD will not increase the HAP contract rent for the preceding year.

HUD Notice 95-12 (as clarified by HUD Notice 97-14) provided that, where the gross rent for an assisted unit *did not exceed* the applicable fair market rent, the HAP contract rent would be adjusted using the "appropriate AAF." However, Notice 95-12 required that, in order to receive a AAF-based rent adjustment, the project owner provide HUD with "the number of units in which turnover occurred since the last HAP contract anniversary date." If the owner did not submit the tenant turnover data at least 60 days before the HAP contract anniversary date, the contract rents would not be adjusted effective on the contract anniversary date, but would "go into effect 60 days after" HUD's receipt of the required turnover data. But if the owner failed to submit the turnover information by the *next* HAP contract anniversary, HUD would not increase contract rents for the preceding year.

III. Contentions Of Fact

A. Fair Market Rents – Newly-Constructed Rental Housing (1979-1981)

HUD published in the Federal Register the following Fair Market Rents for newly-constructed rental housing applicable to one-bedroom, two-bedroom, and three-bedroom units in walk-up structures in the Cleveland, Ohio Market Area, in which Statesman Apartments and Lakeshore Village are located:

| Effective Date | 1-Bedroom | 2-Bedroom | 3-Bedroom |
|---|---|---|---|
| October 1, 1979 | $353 | $411 | $464 |

| | | | |
|---|---|---|---|
| October 1, 1980 | $397 | $425 | $494 |
| October 1, 1981 | $416 | $446 | $518 |

The Fair Market Rents effective on October 1, 1981, were trended ahead to October 1, 1983. Stip. ¶ 1; see also 45 Fed. Reg. 2560 (1/11/80); 45 Fed. Reg. 58064 (8/29/80); 46 Fed. Reg. 57860 (11/25/81); 46 Fed. Reg. 63256 (12/31/81).

B. Fair Market Rents – Existing Rental Housing (1998-2001)

HUD published in the Federal Register the following Fair Market Rents for existing rental housing for the PMSA Cleveland-Lorain-Elyria, Ohio area, in which Statesman Apartments and Lakeshore Village are located, for one-bedroom, two-bedroom, and three-bedroom units:

| | 1-BR | 2-BR | 3-BR |
|---|---|---|---|
| October 1998 | $480 | $594 | $755 |
| October 1999 | $500 | $619 | $787 |
| September 2000 | $521 | $645 | $820 |
| October 2001 | $587 | $726 | $924 |

See 63 Fed. Reg. 52898 (10/1/98); 64 Fed. Reg. 53490 (10/1/99); 65 Fed. Reg. 57698 (9/25/00); 66 Fed. Reg. 50065 (10/1/01).[24]

C. Contract Rent Annual Rent Adjustment Factors

HUD published in the Federal Register the following contract rent annual adjustment factors (highest cost utility excluded) for the PMSA Cleveland-Lorain-Elyria, Ohio area, in which Statesman Apartments and Lakeshore Village are located:

[24] The Owners do not dispute these Fair Market Rents. See "Plaintiffs' Response to Defendant's Proposed Findings of Uncontroverted Facts" dated January 7, 2005 (plaintiffs' response to Proposed Finding No. 25).

| Effective Date | Turnover Units | Non-Turnover Units |
|---|---|---|
| October 1, 1998 | 1.033 | 1.023 |
| October 1, 1999 | 1.051 | 1.041 |
| October 1, 2000 | 1.020 | 1.010 |
| October 1, 2001 | 1.022 | 1.012 |
| January 22, 2003 | 1.029 | 1.019 |

Stip. ¶ 2; see also 63 Fed. Reg. 51224-51247 (9/24/98) (AAFs, Fiscal Year 1999); 64 Fed. Reg. 72730-72754 (12/28/99) (AAFs, Fiscal Year 2000); 65 Fed. Reg. 66888-66912 (11/7/00) (AAFs, Fiscal Year 2001); 66 Fed. Reg. 59052-59078 (11/26/01) (AAFs, Fiscal Year 2002); 68 Fed. Reg. 3116-3140 (1/22/03) (AAFs, Fiscal Year 2003).

D. Statesman Apartments

Statesman II, an Ohio corporation, is the owner of Statesman Apartments, a low-income rental housing project located at 16705-16825 Van Aken Boulevard, Shaker Heights, Ohio. Mr. Jeffrey I. Friedman is (and from 1993 to the present has been) the President and Chief Executive Officer of Statesman II. Stip. ¶ 3. Statesman Apartments consists of five, two-story, walk-up apartment buildings containing a total of 20 one-bedroom units and 27 two-bedroom units. Stip. ¶ 4. Statesman II acquired Statesman Apartments on or about November 18, 1993, from Statesman Apartments Development Company II, an Ohio limited partnership (the Partnership). Stip. ¶ 5. The Partnership's general partners were Messrs. Jeffrey I. Friedman, Jerome Spevack, and Morris Fien. Id.[25]

[25] From 1980 until 1993, when Statesman II acquired Statesman Apartments from the Partnership, the A.E.C. Management Company was the managing agent for Statesman Apartments. Mr. Jeffrey I. Friedman was the President and a director of the A.E.C. Management Company. Stip. ¶ 16. From 1993 to the present, the Associated Estates Realty Corporation has been the managing agent for Statesman Apartments. Id. Mr. Friedman is the President and a director of the Associated Estates Realty Corporation. Id.

On or about June 7, 1979, the Partnership submitted to HUD a Preliminary Proposal under the Section 8 HAP Program for Substantial Rehabilitation for 47 units of substantially rehabilitated housing at Statesman Apartments. Stip. ¶ 6. By letter dated September 6, 1979, HUD notified the Partnership that its Preliminary Proposal for Statesman Apartments had been selected for approval. Id.

On April 9, 1980, HUD notified the Partnership that its Final Proposal dated November 5, 1979, to provide 47 units of substantially rehabilitated housing had been approved with contract rents of $420 for each of the one-bedroom apartment units and $489 per month for each of the two-bedroom apartment units. Stip. ¶ 8.

The Partnership also applied to HUD for a mortgage loan insured by HUD with which to finance the acquisition and construction of Statesman Apartments. Stip. ¶ 7. On April 11, 1980, HUD issued a commitment to insure a private loan of $1,738,500 to finance the acquisition and substantial rehabilitation of Statesman Apartments by the Partnership. Stip. ¶ 9.

On May 21, 1980, HUD's approval of the Partnership's of Final Proposal for Statesman Apartments was amended to provide that the approved monthly contract rent for each of the one-bedroom apartment units was $370 and the approved monthly contract rent for each of the two-bedroom apartment units was $424. Stip. ¶ 10.

On June 20, 1980, the Partnership and the United States, acting through HUD, executed an AHAP for Statesman Apartments. Stip. ¶ 11. The AHAP provided that the monthly contract rents for Statesman Apartments would be $370 for each of the one-bedroom units and $424 for each of the two-bedroom units. Id.

The Partnership acquired and substantially rehabilitated Statesman Apartments in 1980 with the proceeds of a $1,738,500 mortgage loan insured by HUD pursuant to section 221(d)(4) of the National Housing Act, as amended (12 U.S.C. § 1715*l*(d)(4)). Stip. ¶ 12. Statesman Apartments was developed by the Partnership under the Section 8 HAP Program for Substantial Rehabilitation. Id.

The Partnership and the United States, acting through HUD, entered a HAP contract for Statesman Apartments (the Statesman II HAP Contract). Stip. 13. The Statesman II HAP Contract, which was executed in stages beginning with Stage 1 effective on November 14, 1980, covered all of the 47 apartment units contained in the Statesman Apartments. Id.

The Statesman II HAP Contract was for an initial term of five years, renewable for three additional terms of five years each at the Owner's option, for a maximum of 20 years. Stip. ¶ 14; see also Statesman II HAP Contract, Part I, §§ 1.1c, 1.4a (Alternative 2). The anniversary date of the Statesman II HAP contract was November 14. Id. The Statesman II HAP Contract was terminated on November 30, 2000. Id.

The initial monthly contract rents under the Statesman II HAP Contract were $370 for each of the one-bedroom apartment units and $424 for each of the two-bedroom apartment units. Stip. ¶ 15; see also Statesman II HAP Contract, at Exhibit A. The Statesman II HAP Contract provided that "[a]pplicable contract rents do not include unit cost of gas and electric." Id. The initial monthly gross rent of $420 for the one-bedroom apartment units covered by the Statesman II HAP Contract consisted of the contract rent ($370) and a tenant utility allowance ($50). Id. The initial monthly gross rent of $489 for the two-bedroom apartment units covered by the Statesman II HAP Contract consisted of the contract rent ($424) and a tenant utility allowance

($65). Id.

The most recent rent adjustment for Statesman Apartments under the Statesman II HAP Contract was effective on November 14, 1992. Stip. ¶ 17. From November 14, 1992, until November 30, 2000, when the Statesman II HAP Contract was terminated, the monthly contract rents for Statesman Apartments were $586 for each of the one-bedroom apartment units and $671 for each of the two-bedroom apartment units. Id. Under the rent schedule for Statesman Apartments in effect from November 14, 1992, until November 30, 2000, the HUD-approved monthly tenant utility allowance for the one-bedroom apartment units was $76 and the HUD-approved monthly tenant utility allowance for the two-bedroom apartment units was $100. Id., ¶ 18.

On April 2, 2004, Statesman II made a request to HUD for additional housing assistance payments for the years 1998 through 2000 and submitted comparability studies for the years 1998 through 2000 and other documents required by HUD Notice 95-12 and the notices that extended it. On April 23, 2004, that request was denied by HUD. Stip. ¶ 19.

Under the Statesman II HAP Contract, the cost of gas and electricity for the one-bedroom units and the two-bedroom units were not included in the contract rents for those units. Stip. ¶ 20. The tenants were given a utility allowance by HUD that was distributed to them by Statesman II. Id. The one-bedroom units and the two-bedroom units in Statesman Apartments were individually metered for gas and electricity usage. Id. The tenant, not Statesman II, was billed directly by the gas and electric utility companies for gas and electrical service to the tenant's unit and the tenant, not Statesman II, was responsible for payment of those utility charges. Id.

HUD's determination of the initial contract rents for Statesman Apartments is reflected in two Form 2273s ("Estimates of Market Rent by Comparison") prepared in connection with Statesman II's Section 8 substantial rehabilitation proposal and related application for mortgage insurance for Statesman Apartments submitted to HUD by Statesman II's predecessor-in-interest (the Partnership). These forms, which were prepared by a HUD staff appraiser, are addressed to the initial contract rents for the one-bedroom units and the two-bedroom units in Statesman Apartments. These HUD forms reflect the following determinations by HUD with respect to the initial HAP contract rents for Statesman Apartments:

| | 1-BR | 2-BR |
|---|---|---|
| Correlated Subject Rent .............................. | $310 | $355 |
| Subject Rent With Trend ............................ | $336 | $385 |
| Special Adjustments .................................. | $ 34 | $ 39 |
| Adjusted Subject Rent ................................ | $370 | $424 |
| Mortgage Insurance Processing Rent .......... | $370 | $424 |
| Section 8 Rent Estimate ............................. | $370 | $424 |

The monthly contract rents for comparable unassisted dwelling units for the years 1998 through 2000 for the one-bedroom units and the two-bedroom units covered by the Statesman II HAP Contract are as follows:

| Year | One-Bedroom Units | Two-Bedroom Units |
|---|---|---|
| 1998 | $518 | $576 |
| 1999 | $527 | $581 |
| 2000 | $527 | $582 |

Stip. ¶ 21.

E. Lakeshore Village

Beach House, an Ohio limited partnership, is the owner of Lakeshore Village, a low-income rental housing project located at 16151 Lake Shore Boulevard, Cleveland, Ohio. Stip. ¶ 22. Lakeshore Village consists of five, three-story, walk-up apartment buildings containing a total of 102 two-bedroom units and six three-bedroom units. Stip. ¶ 23. From 1982 until 1993, Mr. Jeffrey I. Friedman was one of the general partners of Beach House. Stip. ¶ 22. From 1993 to the present, Associated Estates Realty Corporation and OSF Properties, Inc., have been the general partners of Beach House. Id.[26]

On or about July 29, 1977, Beach House submitted to HUD a Preliminary Proposal under the Section 8 Housing Assistance Program for New Construction to provide the newly-constructed housing project known as Lakeshore Village. Stip. ¶ 24. On September 12, 1977, HUD notified Beach House that its Preliminary Proposal for Lakeshore Village had been selected for approval. Id.

Beach House applied to HUD for a mortgage loan insured by HUD with which to finance the acquisition and construction of Lakeshore Village. Stip. ¶ 25. On January 25, 1982, HUD issued a commitment to insure a private loan of $4,732,300 to finance the acquisition and construction of Lakeshore Village by Beach House. Stip. ¶ 26.

Beach House acquired the land for and constructed Lakeshore Village in 1982 with the proceeds of a $4,732,300 mortgage loan insured by HUD pursuant to section 221(d)(4) of the National Housing Act, as amended (12 U.S.C. § 1715*l*(d)(4)). Stip. ¶ 27. Lakeshore Village

---

[26] From 1982 until the present, the managing agent for Lakeshore Village has been either A.E.C. Management Company or Associated Estates Realty Corporation. Stip. ¶ 28.

was developed by Beach House under the Section 8 HAP Program for New Construction. Id.

Beach House and the United States, acting through HUD, entered a HAP contract for Lakeshore Village (the Beach House HAP Contract). Stip. ¶ 29. The Beach House HAP Contract, which was executed in two stages. The effective date of the Beach House HAP Contract with respect to Stage 1, which included 60 units, October 4, 1982. See Beach House HAP Contract, Part I, p. 6. The effective date of the Beach House HAP Contract with respect to Stage 2, which included 48 units, was October 25, 1982. Id.

The Beach House HAP Contract was for an initial term of five years, renewable for three additional terms of five years each at the Owner's option, for a maximum of 20 years. Stip. ¶ 30; see also Beach House HAP Contract, Part I, §§ 1.1b, 1.1c, 1.1d, 1.4a (Alternative 1). Id. The anniversary date of the Beach House HAP Contract was October 4. Id.

The initial monthly contract rents under the Beach House HAP Contract were $474 for each of the two-bedroom apartment units and $537 for each of the three-bedroom apartment units. Stip. ¶ 31; see also Beach House HAP Contract, at Exhibit A. The initial monthly gross rent of $524 for the two-bedroom apartment units covered by the Beach House HAP Contract consisted of the contract rent ($474) and a tenant utility allowance ($50). Id. The initial monthly gross rent of $597 for the three-bedroom apartment units covered by the Beach House HAP Contract consisted of the contract rent ($537) and a tenant utility allowance ($60). Id.

The most recent rent adjustment for Lakeshore Village under the Beach House HAP Contract was effective on October 4, 1994. Stip. ¶ 32. From October 4, 1994, until October 3, 2002, when the Beach House HAP Contract expired, the monthly contract rents for Lakeshore Village were $662 for each of the two-bedroom apartment units and $779 for each of the three-

bedroom apartment units. Id. Under the rent schedules for Lakeshore Village in effect from October 4, 1994, until October 3, 2002, the HUD-approved monthly tenant utility allowance for the two-bedroom apartment units was $98 and the HUD-approved monthly tenant utility allowance for the three-bedroom apartment units was $118. Stip. ¶ 33.

On April 2, 2004, Beach House made a request to HUD for the payment of additional housing assistance payments for the years 1998 through 2002 and submitted comparability studies for the years 1998 through 2002 and other documents required by HUD Notice 95-12 and the notices that extended it. Stip. ¶ 34. On April 23, 2004, that request was denied by HUD. Id.

Under the Beach House HAP Contract, the cost of gas and electricity for the two-bedroom units and the three-bedroom units was not included in the contract rents for those units. Stip. ¶ 35. The tenants were given a utility allowance by HUD that was distributed to them by Beach House. Id. The two-bedroom units and the three-bedroom units in Lakeshore Village were individually metered for gas and electricity usage. Id. The tenant, not Beach House, was billed directly by the gas and electric utility companies for gas and electrical service to the tenant's unit and the tenant, not Beach House, was responsible for payment of those utility charges. Id.

The Form 2273s ("Estimates of Market Rent by Comparison") prepared in connection with Beach House's Section 8 new construction proposal and related application for mortgage insurance for Lakeshore Village are not available. The HUD Cleveland Office searched for but could not find those forms.

The monthly contract rents for comparable unassisted dwelling units for the years 1998 through 2002 for the two-bedroom units and the three-bedroom units covered by the Beach House HAP Contract are as follows:

| Year | Two-Bedroom Units | Three-Bedroom Units |
|---|---|---|
| 1998 | $450 | $555 |
| 1999 | $460 | $565 |
| 2000 | $470 | $585 |
| 2001 | $490 | $595 |
| 2002 | $520 | $645 |

Stip. ¶ 36.

IV. The Court's Decision Upon The Parties' Cross Motions for Summary Judgment

In Count III of each of the amended complaints filed in this case, the Owners allege that HUD breached their HAP contracts "by failing to apply the appropriate Overall Limitation of 120% of the sum of comparable rent and initial difference for the years 1995 through 2002." Statesman II Compl. 25; Beach House Compl. ¶ 25. As to that claim, the Court ruled, in its decision upon the parties' cross motions for summary judgment with respect to liability, that "HUD Notice 95-12 reflects that the 1994 amendments to Section 1437f(c)(2)(A) effectively eliminated the qualifier 'material' from the operative term 'material differences' in Section 1437f(c)(2)(C) of the statute, at least where the adjusted assisted rent would exceed the unassisted rent for a comparable unit." Statesman II Apartments, Inc. v. United States, 66 Fed. Cl. 608, 621 (2005). The Court held that "HUD's interpretation of the term 'material differences' in Notice 95-12 is not entitled to Skidmore deference, and the court must construe the term without taking into consideration the agency's interpretation in Notice 95-12." Id. at 623.

The Court, however, held that, on the documentary record generated by the parties' cross motions, it could not "complete its task of construing the term 'material differences' because the record is insufficient for that purpose." Statesman II, 66 Fed. Cl. at 624. In that regard, the Court stated:

> Section 1.8d states explicitly that the overall limitation shall not be construed to eliminate any initial difference that may have existed, and consequently the interpretation of "material differences" must take into account the amounts of the initial differences. The parties dispute the amounts of the initial differences for both properties in the instant case, and the resulting disagreement constitutes a genuine dispute of material fact that must be remitted to trial.

Id. (emphasis added). The Court additionally noted that "the materials provided with the parties' briefs are in disagreement as to HUD's limitations on an initial difference at the time the Statesman II and Beach House contracts were entered (November 14, 1980 and October 4, 1982, respectively)." Id. at 624 n.17.

The purpose of the trial in this case, thus, is to determine the "initial differences" to be preserved in rent adjustments under the Owners' HAP contracts, in order that the Court may complete its task of construing the term "material differences" contained in the HAP contracts' overall limitation upon rent adjustments and then apply the overall limitation, so construed, to those annual rent adjustment claims of Statesman II and Beach House which the Court has held are not barred by the statute of limitations.

V. Contentions Of Law

A. Initial Difference To Be Preserved In Contract Rent Adjustments

As noted above, the Owners' HAP contracts provide that the overall limitation upon rent adjustments "shall not be construed to prohibit differences in rents between assisted and compar-

able unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents." See HAP Contracts, Part I, § 1.8d. The Government contends that the initial difference to be preserved in applying the overall limitation provision to rent adjustments is the difference between the initial contract rents for the various unit types under the Statesman II and Beach House HAP Contracts and the comparable unassisted rents *determined by HUD* in developing the initial HAP contract rents. As discussed above, HUD has consistently interpreted initial differences in this manner. See January 1986 DeBartolomeis Memo, at 1-2; HUD Notice 95-12, at 3-4.

This construction of initial differences is the more natural reading of the clause, considering the context in which the initial HAP contract rents were established. As discussed above, the practice was for *HUD* (not an appraiser selected by the developer) to determine comparable unassisted rents as part of HUD's evaluation of the reasonableness of the contract rents contained in proposals by developers (such as the Owners here) under the Section 8 HAP Programs for New Construction and Substantial Rehabilitation. See 24 C.F.R. §§ 880.108(b), 881.108(b) (1979); HUD Handbook 7420.1 CHG, ¶¶ 9-2c(4), 9-2(5), 9-3a, 9-3d (May 1978); HUD Handbook 7420.2 CHG, ¶¶ 9-3a, 9-3d (May 1978).

When construing a contract, a court should eschew twisted or strained, out-of-context analysis. Mayflower Transit Co. v. United States, 162 Ct. Cl. 233, 237 (1963). The Owners' interpretation of the initial differences proviso, under which original comparable unassisted rents may be determined independently of and without deference to HUD's estimate of comparable unassisted rents as part of its evaluation of Section 8 proposals by developers, leads to an absurd or anomalous result: the initial rents under the Owners' HAP contracts exceed what the Owners

contend are the original comparable unassisted rents by more than the 20% *maximum* difference permitted by HUD rent reasonableness instructions applicable to the Owners' Section 8 project proposals.

The Owners contend that, for purposes of the initial differences proviso in the HAP contract's overall limitation upon rent adjustments, the Court should adopt the results of analyses of original comparable unassisted rents for Statesman Apartments and Lakeshore Village performed in 2004 and 2005 by Richard G. Racek, Jr., MAI, a real estate appraiser retained by the Owners. Pl. Mem. 10. The initial differences that result from Mr. Racek's estimates of original comparable rents for Statesman Apartments are $73 for the one-bedroom units and $87 for the two-bedroom units. The initial differences that result from his estimates of original comparable rents for Lakeshore Village are $214 for the two-bedroom units and $227 for the three-bedroom units.[27]

Mr. Racek estimated the following comparable unassisted for Statesman Apartments as of January 1, 1981, and for Lakeshore Village as of January 1, 1983:[28]

| | 1-BR | 2-BR | 3-BR |
|---|---|---|---|
| Statesman Apartments | $297 | $337 | |
| Lakeshore Village | | $260 | $310 |

---

[27] In the case of the Beach House HAP Contract, the Owners contend that the initial differences are "no less than $95 for 2 BR units and $107 for 3 BR units," i.e., no less than 20% of the initial contract rents under the Beach House HAP Contract. Pl. Mem. 10.

[28] These estimated original market rents for Statesman Apartments and Lakeshore Village are lower than the estimated market rents by Mr. Racek referred to in the Court's decision upon the parties' cross motions for summary judgment. See Statesman II, 66 Fed. Cl. at 614. In formulating the earlier market rent estimates, Mr. Racek erroneously assumed that the unit cost of gas and electricity was included in the contract rents under the Statesman II and Beach House HAP Contracts. In fact, those utility expenses were not included in the contract rents for Statesman Apartments and Lakeshore Village. See Stip. ¶¶ 20, 35. Mr. Racek has since made downward adjustments to his estimates of the original market rents for those projects to rectify this error in his rent comparability analyses.

The initial contract rents under the Statesman II HAP Contract exceed Mr. Racek's estimated market rent for the one-bedroom units by 24.6% ($370 ÷ $297) and the estimated market rent for the two-bedroom units by 25.8% ($424 ÷ $337). The initial contract rents under the Beach House HAP Contract exceed Mr. Racek's estimated market rent for the two-bedroom units by 82.3% ($474 ÷ $260) and the estimated market rent for the two-bedroom units by 73.2% ($537 ÷ $310).

Under the instructions for evaluating the reasonableness of contract rents contained in a Section 8 project proposal set forth in HUD Handbooks 7420.1 CHG (May 1978) and 7420.2 CHG (May 1978) discussed above, the initial contract rents could not exceed the comparable unassisted rents determined by HUD by more than 20%. Thus, if the comparable unassisted rents for Statesman Apartments and Lakeshore Village at the time of initial processing were the rents estimated by the Owners' appraiser, *none* of the initial rents in the Statesman II HAP Contract or the Beach House HAP Contract could have been approved because they would have exceeded the 20% ceiling imposed by the HUD rent reasonableness instructions.

The Owners enjoyed the immediate benefit of HUD's *higher* determination of original comparable unassisted rents: *higher* initial HAP contract rents. Without that determination, the Owners' Section 8 projects would not have come to fruition. They should not now be heard to argue that HUD's determination of original comparable unassisted rents does not obtain when applying the HAP contract's overall limitation to contract rent adjustments.

Moreover, HUD's reasonable and consistent interpretation of the initial differences proviso as referring to the difference between the initial HAP contract rent and HUD's determination of original comparable rents is entitled to deference because it not only is an interpretation

of the initial differences proviso in the HAP contract, but is also an interpretation of the identical provision contained in the Section 8 regulations that govern the HAP contracts. When presented with a question as to the meaning of a regulation, "a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt." Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413-14 (1945). The "ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Bowles, 325 at 413-14; accord Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989); Asociacion Colombiana de Exportadores v. United States, 903 F.2d 1555, 1559 (Fed. Cir. 1990).

Therefore, "to sustain an administrative interpretation of a regulation issued by [an agency], it is not necessary to find that the agency construction is the only reasonable one, or even that it is the result the court would have reached had the question arisen in the first instance in judicial proceedings." S.J. Amoroso Construction Co., Inc. v. United States, 26 Cl. Ct. 759, 767 (1992), aff'd, 12 F.3d 1072 (Fed. Cir. 1993) (quoting Port Authority of Saint Paul v. United States, 193 Ct. Cl. 108, 120, 432 F.2d 455, 461 (1970)); accord Udall v. Tallman, 380 U.S. 1, 4 (1965). The contractor (the Owners here) has the burden of demonstrating that an agency's construction of its regulations is "plainly erroneous or inconsistent with the regulation." Barrington Manor Apartments Corp. v. United States, 198 Ct. Cl. 298, 304, 459 F.2d 499, 503 (1972); Honeywell, Inc. v. United States, 228 Ct. Cl. 591, 596, 661 F.2d 182, 186 (1981).

Where, as in the present case, the content of the initial differences proviso is drawn directly from a regulation, the import of the contract turns upon the meaning of the regulation, and the interpretation of regulations is governed by different principles than those applicable to the

construction of contracts. Santa Fe Engineers, Inc. v. United States, 801 F.2d 379, 381 (Fed. Cir. 1986); Seaboard Lumber Co. v. United States, 19 Cl. Ct. 310, 316 (1990). Agency regulations are not governed by the contra proferentem principle but rather by deference to the reasonable and consistent administrative interpretation. Honeywell, 228 Ct. Cl. at 596, 661 F.2d at 186.[29]

B. Initial Differences For The Statesman II HAP Contract

The differences between the initial contract rents under the Statesman II HAP Contract and the rents charged for comparable unassisted rents are reflected in the HUD Form 2273s for Statesman Apartments prepared by the HUD Cleveland Office. In each case, it is the difference between the initial HAP contract rent for the unit type and the trended "correlated subject rent" for the unit type. See January 1986 DeBartolomeis Memo, at 1-2. For the one-bedroom units, the initial difference is $34 ($370 – $336). For the two-bedroom units, the initial difference is $39 ($424 – $385). These initial difference values reflect 10% special additional adjustments to the comparable unassisted rents, consistent with HUD Handbook 7420.2 CHG, ¶ 9-3i(1)(ii) (May 1978), discussed above.

C. Initial Differences For The Beach House HAP Contract

The HUD Form 2273s for the dwelling units covered by the Beach House HAP Contract are not available. In those circumstances, HUD policy is to assume an initial difference of 10%.

---

[29] In Honeywell, the Court of Claims observed: "Assuming ambiguity in the [Armed Services Procurement Regulation], which we do not find, plaintiff would have us to invoke the contra proferentem rule against defendant for creating the ambiguity. Plaintiff misunderstands the difference between interpretation of a contract clause and interpreting a regulation or statute. In the case of the latter, the court's duty is to effectuate the intent of the promulgators of the regulation or statute. A contract clause is construed in order to give it the effect intended by both parties. These are mutually exclusive rules of construction. The fact that a regulation may be incorporated into a contract does not require a different rule for regulation interpretation." Id., 228 Ct. Cl. at 596, 661 F.2d at 186.

That is consistent with HUD Handbook 7420.1 CHG (May 1978), which mandates a 10% special additional adjustment.[30] It is also consistent with the approach taken by the court in Park Village where the HUD Form 2273s also were unavailable.

Park Village involved a rent adjustment claim under a Section 8 HAP Contract that contained rent adjustment provisions similar to those contained in the Beach House HAP Contract. See 32 Fed. Cl. at 443-44. One of the issues in Park Village was the amount of the difference between the initial contract rent and the rent charged for comparable unassisted units when HUD established the initial contract rent. Id. at 450. The court noted that "[t]he pertinent documents have apparently been destroyed." Id. at 451. The court resolved the question of the amount of the initial difference by determining the percentage special additional adjustment(s) to the comparable unassisted rent mandated by the applicable HUD Handbook and applying that percentage to the initial HAP contract rent. Id. ("HUD based plaintiff's $285 initial contract rent on a 15 percent upward adjustment to comparable rents. The amount of rent that would yield a $285 initial contract rent after a 15% increase is $248. Therefore, comparable rents at the time HUD established plaintiff's initial contract rent were $248 and the difference in dollars between comparable rents and the initial contract rent was $37.").

---

[30] An additional 5% adjustment also was required for the payment of any mortgage discounts when HUD-insured financing was used, but there is no evidence that Beach House was entitled to such an adjustment, i.e., that Beach House paid any such discounts as part of its HUD-insured mortgage loan transaction. No such adjustment is reflected in the determination of the rents for the Statesman II HAP Contract, which also involved a HUD-insured mortgage loan. Another 5% adjustment was permitted at the discretion of the HUD field office director, but there is no evidence that any such adjustment was approved by the HUD Cleveland field office for Lakeshore Village. No such adjustment is reflected in HUD's determination of initial contract rents under the Statesman II HAP Contract.

The Government contends that, in the absence of the HUD Form 2273s for the original comparables for Lakeshore Village, the initial differences for the Beach House HAP Contract should be determined, similar to the determination in Park Village, by applying the 10% special additional adjustment mandated by HUD Handbook 7420.1 CHG (May 1978) to the initial contract rents under the Beach House HAP Contract. The amount that would yield a $474 initial HAP contract rent after a 10% increase would be $43 ($474 – 90% of $474). The amount that would yield a $537 initial HAP contract rent after a 10% increase would be $54 ($474 – 90% of $537). The initial differences under the Beach House HAP Contract, thus, are $43 for the two-bedroom units and $54 for the three-bedroom units.

D. Expiration Of The Beach House HAP Contract

The Owners appear to contend that the damages interval for the alleged breach by the Government of the Beach House HAP Contract extends through October 2002. The Government disagrees.

The Beach House HAP Contract was executed in two stages. The effective date of the Beach House HAP Contract with respect to the 60 units covered by Stage 1 was October 4, 1982. See Beach House HAP Contract, Part I, p. 6. The effective date of the Beach House HAP Contract with respect to the 48 units covered by Stage 2 was October 25, 1982. Id.

The HUD regulations applicable to the Beach House HAP Contract provided that, "[i]n the case of a [HAP contract] under which housing assistance payments are made with respect to a project not covered by [24 C.F.R. § 880.109(c)[31/]] which is financed with the assistance of a

[31] Section 880.109(c) provided that, "[i]n the case of a [HAP contract] under which housing assistance payments are made with respect to a project owned by, or financed by a loan or guar- (continued...)

loan made by, or insured, guaranteed or intended for purchase by, the Federal Government, other than pursuant to Section 244 of the National Housing Act, the total contract term, including all renewals, shall not exceed 20 years for any dwelling unit." 24 C.F.R. § 880.109(b) (1979). In keeping with that regulation, the Beach House HAP Contract provided that it was for an initial term of five years, renewable for three additional terms of five years each at the Owner's option, for a maximum of 20 years. Beach House HAP Contract, Part I, §§ 1.1b, 1.1c, 1.1d, 1.4a (Alternative 1); see also Stip. ¶ 30.

The Government, therefore, contends that the Beach House HAP Contract expired on October 3, 2002, with respect to the 60 units included in Stage 1, and it expired on October 24, 2002, with respect to the 48 units included in Stage 2. Consequently, the damages interval for the 60 units included in Stage 1 ends on October 3, 2002, and the damages interval for the 48 units included in Stage 2 ends on October 24, 2002. Moreover, for the alleged improper failure of the Government to adjust contract rents under the Beach House HAP Contract on October 4, 2002, the only potentially recoverable damages are damages for the 48 units included in Stage 2 for the October 4-24, 2002 period.

E. Owners' Claim Pertaining To Contract Years 1995, 1996, And 1997

The Owners persist in their attempt to have the Court consider, for damages purposes, contract rent adjustments that, the Owners allege, should have been made on the HAP contract anniversary dates for the years 1995, 1996, and 1997. See Pl. Mem. 6-7, 10. But the Court has ruled that, "in considering the damages for breach during the years 1998 and thereafter, the court

[31](...continued)
antee from a State or local agency, the total Contract term may be equal to the term of such financing but may not exceed 40 years for any dwelling unit."

is foreclosed from taking into account any adjustments of rent that might have been due during the years 1995 through 1997." Statesman II, 66 Fed. Cl. at 626. Therefore, the Owners' attempt to revive this aspect of their damages claim should be rejected.

F. Response To Owners' Contention That There Is No Need For A Trial In This Case

The Owners contend that the following stipulation by the parties obviates the need for a trial in this case: "HUD Notice 95-12 and the HUD notices that extend it contain the only definition by HUD of what constitutes a 'material difference' for the purposes of the 'overall limitation' upon rent adjustments contained in [the Owners'] HAP Contracts after the enactment of the 1994 Amendments to 42 U.S.C. § 1437f." Pl. Mem. 2 (quoting Stip. ¶ 37). They argue that "based on [this stipulation] that the Notice is HUD's only determination of Material Difference and the Court's finding that the Notice improperly read an integral term out of the Overall Limitation provision,[[32]] HUD cannot enforce the Overall Limitation provision and limit the adjusted rent increases." Id. "Consequently," the argument goes, "there is no need for a trial in this case because the presumptive [factor-based] adjusted rent must become the Contract Rent," which, in turn, "obviates the need to try the factual issue of Initial Difference because Initial Difference is part of the Overall Limitation." Id. We disagree.

The remedy for a breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed. E.g., Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005); Bluebonnet Sav-

[32] In ruling upon the parties' cross motions for summary judgment, the Court held that the 1994 Amendments to the Section 8 statute, as implemented by HUD Notice 95-12, "effectively eliminated the qualifier 'material' from the operative term 'material differences' in [42 U.S.C. § 1437f(c)(2)(C)], at least where the adjusted assisted rent would exceed the unassisted rent for a comparable unit." Statesman II, 66 Fed. Cl. at 623.

ings Bank v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003). The non-breaching party "is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred." LaSalle Tallman Bank v. United States, 317 F.3d 1363, 1371 (Fed. Cir. 2003).

The Owners seek to recover expectancy damages corresponding to the rent adjustments they would have received but for the breach (found by the Court) of their HAP contracts. The Government contends that such damages are subject to the overall limitation upon rent adjustments, to be applied by the Court based upon its construction of the term "material differences," which, the Court has found, cannot be resolved without a trial to resolve a factual dispute as to the amount of the "initial differences" to be preserved in applying the overall limitation to rent adjustments under the Owners' HAP contracts. To disregard the overall limitation upon rent adjustments in fashioning damages would place the Owners in a better position through the award of damages than if there had been no breach.

The overall limitation upon rent adjustments contained in the Owners' HAP contracts provides that, "[n]otwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences . . . ." HAP Contracts, Part I, § 1.8d. As the Supreme Court opined in Cisneros v. Alpine Ridge Group, 508 U.S. 10, 21 (1993), "no project owner may claim entitlement to formula based rent adjustments that materially exceed market rents for comparable units." The Owners, thus, "have no contract right to unobstructed formula-based rent adjustments." Id.

Contrary to the Owners' apparent claim, see Pl. Mem. 19, there is no legal presumption under the HAP contracts in favor of the factor-based method of adjusting contract rents. Alpine

Ridge, cited by the Owners, did not so hold. In Alpine Ridge, the Supreme Court observed:

> The rent adjustments indicated by the automatic adjustment factors remain the presumptive adjustment called for under the contract. It is only in those presumably exceptional cases where the Secretary has reason to suspect that the adjustment factors are resulting in materially inflated rents that a comparability study would ensue.

508 U.S. at 19. By that statement, the Supreme Court was not construing the HAP contracts as creating a legal presumption with respect to factor-based rent adjustments that must be rebutted. Rather, the Supreme Court was presuming, as a *factual* matter, that it would be an exceptional situation when the overall limitation provision would have to be invoked, in order to rebut the statement by the Ninth Circuit in Rainier View Associates v. United States, 848 F.2d 988, 991 (9th Cir. 1988), cert. denied, 490 U.S. 1066 (1989), that HUD's interpretation of the overall limitation, supposedly, would "render the formula method [of adjusting rents] authorized by the [Section 8 statute] and elected in the [HAP] contract a nullity."

The notion that the annual adjustment factors (AAFs) are the presumptive method of adjusting rents under the HAP contracts was rejected by the Eighth Circuit in Federal Housing Partners IV v. Cisneros, 55 F.3d 362 (8th Cir. 1995). In that case, the plaintiffs, owners of Section 8 rental housing projects with HAP contracts that contained rent adjustment provisions similar to the rent adjustment provisions contained in HAP contracts in the present litigation, argued that HUD's failure to establish national standards for performing rent comparability studies violated their constitutional right to due process, rendering the rent comparability studies applied to them unconstitutional. The plaintiffs in Federal Housing asserted that their purported right to factor-based rent adjustments vested because the AAF-based method of adjusting rents was the "presumptive" method of adjusting rents under the HAP contracts. The Eighth Circuit, however,

disagreed:

> The contention that the AAAFs are the presumptive method of adjusting rents is incorrect by the terms of the contracts. While AAAFs might be the norm for practical reasons, the overriding principle set forth in the contracts is that "[AAAFs] shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government[.]" Because of this contractual clause, "no project owner may claim entitlement to formula-based rent adjustments that materially exceed market rents for comparable units." [Alpine Ridge, 508 U.S. at 21]. HUD's discretion to make rental comparisons and rent adjustments under the contracts prevented AAAFs from ever becoming a property right vested in landlords whose rents were materially different from comparable unassisted units.

Id. at 367-68.

None of the judicial precedents cited by the Owners supports their contention that the overall limitation upon rent adjustments cannot be enforced. Torrance v. AAMES Funding Corp., 242 F.Supp.2d 862 (D. Or. 2002), involved a suit by homeowners against a finance company, arising from a refinancing transaction, alleging claims for fraud and violation of a State unfair trade practices law. The finance company sought to enforce an Agreement to Arbitrate that the plaintiffs had signed in connection with the refinancing transaction. The court refused to enforce the arbitration agreement, finding that it contained three provisions that were unconscionable. Id. at 865-66. The court concluded that the offending provisions could not be severed from the arbitration agreement because they "permeated" the agreement. Id. at 875-76. Accordingly, the plaintiffs were allowed to prosecute their claims in court.

Graham Oil Co. v. ARCO Products, Inc., 43 F.3d 1244 (9th Cir. 1994), also involved an arbitration agreement. The plaintiff (Graham) refused to submit to arbitration as required by an arbitration clause contained in its distributorship agreement with the defendant (ARCO). The

district court dismissed Graham's suit against ARCO alleging claims under the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-2806 (PMPA), because Graham refused to submit to arbitration as required by the arbitration clause. Graham contended that the arbitration clause was invalid because it required the surrender of certain rights under the PMPA. On appeal, the Ninth Circuit agreed, holding that the arbitration clause purported to forfeit certain important statutorily-mandated rights or benefits afforded to Graham and other franchisees by the PMPA. Id. at 1246-48. The court of appeals concluded that the arbitration clause could not be enforced without the offending provisions because they were an integrated part of the arbitration clause. Id. at 1248-49.

Torrance and Graham are inapposite. Those cases involved agreements that contained unlawful provisions and addressed whether the agreements could be enforced without the illegal provisions. By contrast, the HAP contracts in the present litigation – including the overall limitation upon rent adjustments – are lawful. The overall limitation provision tracks the Section 8 statute and implementing HUD regulations. See 42 U.S.C. § 1437f(c)(2)(C) (Supp. IV 1974); 24 C.F.R. §§ 880.110(d), 881.110(d) (1979).[33]

ITT Industries, Inc. v. Rayonier, Inc., 2005 WL 1744988 (S.D.N.Y.), was an action to have an arbitration award vacated. The petitioner (ITT) and respondent (Rayonier) had entered

[33] Even if the HAP contracts had not contained the overall limitation provision upon rent adjustments, they could not have been be enforced without regard for the rent comparability limitation set forth in the Section 8 statute and implementing HUD regulations. "Laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." Von Hoffman v. City of Quincy, 71 U.S. (4 Wall.) 535, 550 (1866); accord Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 429-30 (1934); Hills Transportation Co. v. United States, 204 Ct. Cl. 51, 55, 492 F.2d 1394, 1396 (1974); Winston Bros. Co. v. United States, 198 Ct. Cl. 37, 44, 458 F.2d 49, 52 (1972); Chris Berg, Inc. v. United States, 192 Ct. Cl. 176, 182, 426 F.2d 314, 317 (1970).

a Distribution Agreement which provided that the recoveries from various environmental indemnification suits jointly prosecuted by ITT and Rayonier would be shared upon such basis as ITT, in its sole discretion, determined, taking into account certain enumerated factors. Rayonier made a demand for arbitration, its claims were arbitrated, and ITT sought to have the arbitration award vacated, in part, upon the ground that the arbitrator deprived ITT of sole discretion under the Distribution Agreement to allocate the recoveries contemplated by the Agreement. The district court disagreed, holding that it was not error for the arbitrator to allocate the recoveries: "ITT now claims that the Arbitrator should have referred the matter back to ITT to exercise its sole discretion over again . . . . Having once failed to correctly make the allocation in its sole discretion, ITT was in breach of the contract and had no right to insist on doing it again." Id. at 4.

ITT Industries simply stands for the proposition that, where a contracting party vested with discretion to make a determination fails to exercise that discretion or does so improperly, there is no requirement that the arbitrator refer the matter back to the breaching party to make a new determination. In that case, the arbitrator may make the determination called for by the contract. Here, having held that deference is not owed the Government's interpretation of "material differences," the Court similarly is proceeding to construe that component of the HAP contract's overall limitation upon rent adjustments.

The Owners also contend that their "position that the presumptive adjusted rent must be awarded is further supported" by a 1988 amendment of the Section 8 statute which provided that, "[i]f the Secretary . . . does not complete and submit to the project owner a comparability study not later than 60 days before the anniversary date of the assistance contract under this section, the automatic annual adjustment factor shall be applied." Housing and Community Development

Act of 1987, Pub. L. No. 100-242, § 142(c)(2)(B), 101 Stat. 1850 (1988). Pl. Mem. 19. They argue that the requirement in this legislation that contract rents be adjusted using annual adjustment factors if HUD does not provide the project owner with a timely rent comparability study "reflects a clear Congressional understanding that HUD's failure to properly exercise its discretion to effectuate the Overall Limitation transforms the presumptive adjusted rent into the actual Contract Rent." Id. We disagree.

Occasionally, courts, in interpreting a statute, have accorded weight to subsequent legislation that expressly declares the intent of the earlier statute. See, e.g., Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380-81 (1969) (1959 amendment of requirement of section 315 of Communications Act of 1934 that equal time be accorded political candidates to except certain appearances on news programs with a proviso that this constituted no exception "from the obligation imposed upon them under this Act to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance"); Federal Housing Administration v. The Darlington, Inc., 358 U.S. 84, 90 (1958) (1954 amendment of the National Housing Act declaring "intent" of Congress "since the enactment of the National Housing Act" in 1934 with respect to the use of insured housing for "transient or hotel purposes").[34/]

The 1988 amendment of the Section 8 statute, unlike the statutes in Red Lion Broadcasting and Darlington, does not purport to declare the intent of the Congress that enacted the Section 8 statute in 1974. Moreover, "the views of a subsequent Congress form a hazardous basis for in-

[34] But see Hart v. United States, 218 Ct. Cl. 212, 225, 585 F.2d 1025, 1032 (1978) ("courts have consistently stated that the expression of opinion by a subsequent Congress on the meaning of an act adopted by an earlier Congress [has] little, if any, significance" because, "[i]n effect, such statements represent an attempt to usurp the role of the judiciary in interpreting the intent of the [earlier] enactment.").

ferring the intent of an earlier one." United States v. Price, 361 U.S. 304, 313 (1960).

Apart from that problem, the Owners' attempt to demonstrate the intent of the Section 8 statute, as originally enacted in 1974, by selective reference to the 1988 amendment founders upon the subsequent enactment of the 1994 Amendments at issue in the present case,[35] the provisions of which are totally *inconsistent* with the notion that the Government may not invoke the rent comparability limitation in connection with a rent adjustment unless HUD provides the owner with a rent comparability study prior to the HAP contract's anniversary date.

G. The Cost Of Rent Comparability Studies

In Cuyahoga, the court held that the plaintiff could recover, as an element of damages, "the reasonable costs associated with any of the [rent comparability] studies it conducted with respect to [the Section 8 projects] prior to filing suit." 65 Fed. Cl. at 561. Under that standard, the Owners in the present case would be entitled to recover the reasonable costs associated with the rent comparability studies performed by Mr. Racek in 2004, prior to the commencement of this litigation, for the years 1998, 1999, and 2000, in the case of Statesman Apartments, and for the years 1998-2002, in the case of Lakeshore Apartments. The Owners, however, would not be entitled to recover the costs of studies performed by Mr. Racek in 2004 with respect to Statesman

---

[35] The Court has ruled that the 1994 Amendments of the Section 8 statute breached, or resulted in the breach of, the Owners' HAP contracts. But that does not mean the 1994 Amendments are unlawful. See Cuyahoga Metropolitan Housing Authority v. United States, 65 Fed. Cl. 534, 544 (2005) ("There is no real debate that the 1994 Act is the law of the land."); Cuyahoga Metropolitan Housing Authority v. United States, 57 Fed. Cl. 751, 781 (2003) ("this court does not hold that either the 1994 amendments or the 1995 HUD directive are inapplicable to [the plaintiff], as would be the case, for example, were such amendments unconstitutional or the directive invalid").

Apartments and Lakeshore Village for any year before 1998[36] or for the analyses performed by Mr. Racek for those projects in 2005, after the commencement of this litigation.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(FAX)(202) 514-8624

Attorneys for Defendant

OF COUNSEL:

C. ALLEN VILLAFUERTE
Trial Attorney
Office of General Counsel
Department of Housing
and Urban Development
Washington, DC

MARCH 31, 2006

[36] The Owners should not recover any costs incurred by them for rent comparability studies with respect to the claims for rent adjustments prior to 1998 which the Court has ruled are barred by the statute of limitations. Nor should the Owners recover any costs incurred by them with respect to Mr. Racek's analyses of original comparable unassisted rents for Statesman Apartments and Lakeshore Village, inasmuch as, for the reasons discussed above, such studies are irrelevant upon the question of the amount of the initial differences to be preserved in applying the comparability limitation to rent adjustments.