# In the United States Court of Federal Claims

Nos. 04-805C and 04-806C (consolidated)

(Filed: June 29, 2006)

| | | |
|---|---|---|
| STATESMAN II APARTMENTS, INC., *et al.*, Plaintiffs, | ) | Trial on stipulated facts; damages for breach of contract; interpretation of contracts for Housing Assistance Payments; HUD Section 8 housing program |
| v. | ) | |
| UNITED STATES, Defendant. | ) | |

Fred J. Livingstone, Taft, Stettinius & Hollister LLP, Cleveland, OH, for plaintiffs. With him on the briefs were Mark J. Valponi and Majeed G. Makhlouf, Taft, Stettinius & Hollister LLP, Cleveland, OH.

John E. Kosloske, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, and C. Allen Villafuerte, Trial Attorney, Office of General Counsel, Department of Housing and Urban Development, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

These consolidated cases involve contracts to provide low-income housing under the United States Housing Act of 1937, Pub. L. No. 75-412, 50 Stat. 888 (1937) (codified as amended at 42 U.S.C. §§ 1404a - 1440) (also known as the Wagner-Steagall Housing Act) ("Housing Act"). Statesman II Apartments, Inc. ("Statesman II"), plaintiff in No. 04-805C, and

Beach House Development Company ("Beach House"), plaintiff in No. 04-806C, each entered into a contract with the Department of Housing and Urban Development ("HUD") to provide housing for low-income tenants under this statutory scheme. In a prior decision rendered July 20, 2005, this court held that the government repudiated the contracts in 1994 when Congress amended the Housing Act to, among other things, statutorily override contractual provisions governing how certain adjustments to owners' properties' rents were to be determined. *Statesman II Apartments, Inc. v. United States*, 66 Fed. Cl. 608, 619-20 (2005) ("*Statesman*"). The court further determined that the repudiation ripened into a breach of the contracts on each date on which HUD failed to make an adjustment to rents as required by the contracts. *Id*. at 620 (citing *Franconia Assocs. v. United States*, 536 U.S. 129, 142-43 (2002); *Restatement (Second) of Contracts* § 235(2) (1981)).

In *Statesman*, however, the court was unable to resolve the extent of the breach. Pending before the court at the time of that decision were cross-motions for summary judgment, and genuine disputes of material fact prevented the court from acting definitively on the scope of the breach and damages. Consequently, a trial was scheduled to address the disputed facts and to assess the damages, if any, incurred as a result of the breach. On the eve of trial, at the final pretrial conference, the parties announced that they had reached agreement on a stipulation of the disputed facts, obviating the need for trial. In accord with the ensuing stipulations filed by the parties, the court has proceeded with the case as a trial on stipulated facts.[1]

## BACKGROUND

A rudimentary recitation of the evolution of HUD's administration of the tenant-assistance program under the Housing Act is necessary to provide a context for the parties' stipulations.

The contracts entered by Statesman II and Beach House with HUD called for a "maximum monthly rent" to be established and for HUD to supplement the tenant's payments by making "assistance payment[s]" to the landlord up to the amount of that rent. 42 U.S.C. §§ 1437a(a), 1437f(c)(3). The "maximum monthly rent" was to be based upon the "fair market rental" value of the pertinent dwelling unit based upon the market rate plus an upward adjustment to compensate for the expenses attendant to participation in the Housing Act's "Section 8" program. *Statesman*, 66 Fed. Cl. at 610. The contracts provided for "[a]utomatic [a]nnual [a]djustments" to be made to the rents. *Id*. at 610-11 (quoting Section 1.8b of Statesman II's Housing Assistance Payment ("HAP") contract). The annual adjustments were "to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary [of HUD] determines, on the basis of a reasonable

---

[1]Joint Stipulations of Fact ("Stipulations" or "Stip.") were filed by the parties on March 10, 2006 pursuant to Paragraph 17 of Appendix A to the Rules of the Court of Federal Claims ("RCFC"). The trial was obviated by Joint Supplemental Stipulations of Fact ("Supplemental Stipulations" or "Supp. Stip.") submitted on April 11, 2006.

formula." 42 U.S.C. § 1437f(c)(2)(A) (1976). The contract rents were, however, subject to an "overall limitation" which provided that "[a]djustments in the maximum rents . . . shall not result in *material differences* between the rents charged for assisted and comparable unassisted units, as determined by the Secretary." *Statesman*, 66 Fed. Cl. at 611 (quoting 42 U.S.C. § 1437f(c)(2)(C) (1982) (emphasis added)). The "overall limitation" in turn was subject to the proviso "that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents." *Statesman*, 66 Fed. Cl. at 611 (quoting Section 1.8d of the Statesman II and Beach House contracts).[2]

Beginning in the 1980s, HUD implemented these contractual provisions by conducting "comparability studies" in markets in which it believed annual adjustments would generate rents that were materially higher than those for comparable unassisted units. *See Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 14 (1993). Landlords challenged the conduct and use of comparability studies by HUD,[3] but Congress acted in 1988 to authorize HUD to employ such studies in its implementation of these housing-assistance contracts. Housing and Community Development Act of 1987, Pub. L. No. 100-242, § 142(c)(2)(B), 101 Stat. 1815, 1850 (1988); *see Statesman*, 66 Fed. Cl. at 611. Shortly thereafter, Congress specifically authorized HUD to use comparability studies to limit automatic annual increases in rents. *See Statesman*, 66 Fed. Cl. at 611-12 (quoting Department of Housing and Urban Development Reform Act of 1989, Pub. L. No. 101-235, § 801(c), 103 Stat. 1987, 2058). In *Cisneros*, the Supreme Court held that HUD's use of comparability studies for this purpose did not breach the Section 8 housing assistance contracts. 508 U.S. at 21.

The statutory context was significantly revised in 1994 when Congress shifted to owners the burden of proving that the adjusted rent for an assisted unit would not exceed the rent for a comparable unassisted unit. *See Statesman*, 66 Fed. Cl. at 612 (quoting Departments of Veterans

---

[2]Section 1.8d of each contract states in full:

> Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

*Statesman*, 66 Fed. Cl. at 611.

[3]In *Rainier View Assocs. v. United States*, 848 F.2d 988 (9th Cir. 1988), *cert. denied*, 490 U.S. 1066 (1989), *superseded by statute*, Pub. L. No. 101-235, § 801, 103 Stat. at 2058 (1989), a court of appeals held that the standard tenant-assistance contract prohibited use of comparability studies in capping rents under the overall-limitation provision of the contract.

Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994) (amending 42 U.S.C. § 1437f(c)(2)(A)). HUD thereafter issued Notice 95-12, Annual Adjustment Factor Rent Increase Requirements Pursuant to the Housing Appropriations Act of 1995 (March 7, 1995), which provided that increases in rent would be allowed only if owners submitted comparability studies prior to the HAP contract anniversary date. *Statesman*, 66 Fed. Cl. at 612-13. "Any adjustment to the contract rent would be limited to the *lesser* of (1) the 'adjusted comparable rent,' determined by adding to the comparable rent the initial difference (the amount by which the original contract rent exceeded the original comparable rent), or (2) the rent level adjusted by the appropriate annual adjustment factor." *Id*. at 613 (citing HUD Notice 95-12). The 1994 amendments also "reduced by one percent the annual adjustment factor for units occupied by the same tenant during the previous year." *Statesman*, 66 Fed. Cl. at 612 (citing 42 U.S.C. § 1437f(c)(2)(A), as amended). In *Statesman*, this court ruled that these portions of the 1994 amendments breached the contracts between HUD and Statesman II and Beach House.

The Statesman II and Beach House contracts were both affected by these changes in contractual implementation and the governing statute. The Statesman II contract became effective on November 14, 1980; this date represents the "anniversary date" of that contract. *Statesman*, 66 Fed. Cl. at 613. The Beach House contract took effect on October 4, 1982 with respect to 60 of 108 total units; this became the Beach House contract's anniversary date with respect to those 60 units. *Id.*; *see* Defendant's Motion for Summary Judgment, Defendant's Appendix ("Def.'s App.") at 128 (Beach House contract's execution page).[4] The Beach House contract took effect on October 25, 1982 with respect to the remaining 48 units; this became the Beach House contract's anniversary date with respect to those 48 units. *See* Def.'s App. at 128. At the dates of origin of each contract, the initial contract rents for each property were higher than those for comparable properties by the following initial differences:

---

[4]This court previously stated that "[t]he Beach House contract took effect on October 4, 1982, the contract's anniversary." *Statesman*, 66 Fed. Cl. at 613. This recitation is correct in part. The government observes that the Beach House contract called for the project to be completed and accepted in stages. Defendant's Memorandum of Contentions of Fact and Law ("Def.'s Mem.") at 44-45. As a consequence, Beach House has two different anniversary dates -- October 4, 1982 for 60 units and October 25, 1982 for the other 48 units. Thus, the government's breach with respect to the Beach House contract occurred on October 4 of each year from 1995 through 2002 with respect to 60 units and on October 25 of each year with respect to the other 48 units. *See Statesman*, 66 Fed. Cl. at 620.

The parties have not addressed phasing of the Statesman II contract. However, the court observes that the Statesman II contract appears to have been completed and accepted in three different stages, with three different effective dates. *See* Def.'s App. at 66 (Statesman II contract's execution page).

| | Statesman II | | Beach House | |
|---|---|---|---|---|
| | 1BR Apt. | 2BR Apt. | 2BR Apt. | 3BR Apt. |
| Initial Difference | $34 | $39 | $71 | $81 |

Supp. Stip. ¶¶ 1-4. At the time of contracting, the initial differences "permit[ted] the property owners to be compensated for the additional costs of complying with and participating in the Section 8 program." *National Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1435 (Fed. Cir. 1997).

The last rent adjustment Statesman II received from HUD pursuant to the contract was effective on November 14, 1992. *Statesman*, 66 Fed. Cl. at 613. From that date through November 30, 2000, the date on which the contract was terminated, the monthly rents amounted to $586 for one-bedroom apartments and $671 for two-bedroom apartments. *Id.* Correspondingly, Beach House received its final rent adjustment for its Lakeshore Village property effective October 4, 1994. *Id.* at 613-14. From that date through the termination of the Beach House contract in October 2002, two-bedroom apartments rented at $662 and three-bedroom units at $779. *Id.* at 614.[5]

The Statesman II and Beach House HAP contracts each provided that the government would determine an Automatic Annual Adjustment Factor ("AAAF") at least annually, and that the contract rents could be adjusted annually on the contract "anniversary date" by applying the applicable AAAF. Def.'s App. 64 (Statesman II's contract), 125 (Beach House's contract); *see Statesman*, 66 Fed. Cl. at 610-11. The AAAFs during the years 1998 - 2003, for the Cleveland-Lorain-Elyria, Ohio areas in which the apartments at issue in this case are located were as follows:

[5]This court's prior decision indicated that the Beach House contract was terminated in September 2002. *Statesman*, 66 Fed. Cl. at 614. However, given the fact that the Beach House contract had effective dates of October 4 and 25, respectively, *see supra*, at 4 n.4, it now appears that the Beach House contract terminated on October 4, 2002 with respect to 60 units and on October 25, 2002 with respect to the other 48 units.

| Effective Date | "Turnover AAAF"[6] |
|---|---|
| Oct. 1, 1998 | 1.033 |
| Oct. 1, 1999 | 1.051 |
| Oct. 1, 2000 | 1.020 |
| Oct. 1, 2001 | 1.022 |
| Jan. 22, 2003 | 1.029 |

Stip. ¶ 2.

In *Statesman*, the parties chiefly contested the effect of the "overall limitation" on the Statesman II and Beach House HAP contracts. 66 Fed. Cl. at 616-24. The primary disagreement between the parties in applying the "overall limit" involved the proper interpretation of the term "material difference[]" in Section 1.8d of the contracts. *See* Plaintiffs' Memorandum of Contentions of Fact and Law ("Pls.' Mem.") at 13-19; Def.'s Mem. at 24-27. Crucially, Section 1.8d proscribes "material differences between the rents charged for assisted and comparable unassisted units." *Statesman*, 66 Fed. Cl. at 611. The court determined that it must construe the term "material difference[]" without reference to HUD's interpretation of the term in Notice 95-12 because that interpretation was not entitled to deference by the court. *Id*. at 622-23. However, the court could not determine the proper implementation of the "overall limitation" as applied to these contracts because the "initial differences" were disputed for each property. *Id*. at 624. That difficulty has now been overcome; the parties have stipulated to the initial differences, *see* Supp. Stip. ¶¶ 1-4, and the court thus can proceed to address the Statesman II and Beach House contracts in light of the stipulated initial differences.

## ANALYSIS

### A. Implementation of the "Overall Limitation"

The plain language of Section 1.8d of the contracts indicates that the caps imposed by the "overall limitation" clause are to supercede any other rent adjustments called for in the contracts. *See* Def.'s App. 64, 125 ("[n]otwithstanding *any* other provisions" (emphasis added)); *accord Cisneros*, 508 U.S. at 17 ("the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section."). The overall limitation set out in Section 1.8d of the contracts thus acts as a separate, independent cap on the allowable rents that may be charged under the contracts.

---

[6]HUD published AAAFs for so-called "turnover units" and "nonturnover units" during these years. However, in *Statesman*, the court determined that the 1% reduction in the AAAF for non-turnover units prescribed by the 1994 amendments breached the contracts. 66 Fed. Cl. at 624-25. Consequently, the court will apply the "turnover AAAF" to all of the units covered by the Statesman II and Beach House contracts.

Nonetheless, plaintiffs aver that the overall limitation constitutes no constraint on plaintiffs' allowable rents because the government failed properly to invoke that contractual provision at the time performance was due. Plaintiffs refer to the fact that the government did not put forward comparability studies as a factual predicate for triggering the overall limitation but rather relied on the 1994 amendments to place the onus on plaintiffs to conduct such studies. As a result, plaintiffs contend that they were automatically entitled to the rent increases indicated by the AAAFs. *See* Pls.' Mem. at 13 ("For the years in question, the presumptive adjusted contract rent applies without limitation because of HUD's failure to appropriately exercise its discretion to make a determination of material difference." (capitalization omitted)). However, plaintiffs' argument ignores that the purpose of expectancy damages is to put a plaintiff in the position it would have held had the other party not breached. It is a basic tenet of contract law that "[t]he remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562 (Fed. Cir. 1997)). The court cannot simply read a term out of the contract because the government misapplied that term. Ignoring the "overall limitation" clause in calculating damages would put plaintiffs in a better position than they would have held had the breach not occurred. *See Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003); *see also Restatement (Second) of Contracts* § 347. Plaintiffs' attempt to reduce the overall limitation to a nullity must therefore be rejected. Instead, the resulting issue for the court is how the government would or should have applied that contractual term in the absence of the breach, *i.e.*, how the government would have applied the "overall limitation" clause absent the 1994 amendments to 42 U.S.C. §1437f(c)(2)(A).

Over time, HUD has implemented the "overall limitation" in a number of ways. A review of HUD's past implementation of the term through regulations and proposed regulations shows great inconsistency, generally revolving around two different types of interpretations of the term by HUD. First, conceptually, at various times in the past HUD defined the material difference for a given rent as the comparable unassisted rent for an apartment (*i.e.*, one- , two- or three-bedroom) plus the initial difference allowed for that apartment, multiplied by a given percentage. One of these positions appeared in a 1986 memorandum issued by HUD that defined "material difference" as comparable unassisted rent plus initial difference, multiplied by 20%. *Statesman*, 66 Fed. Cl. at 622.[7] A second generic approach taken by HUD appeared in a

---

[7]The 1986 memorandum stated that, if a rent difference is not "material" using this "120%" test, the

> difference between a Section 8 rent and a correlated unassisted rent is "material" only if BOTH of the following conditions are met.
> 1. The adjusted Section 8 rent would exceed the correlated unassisted rent for comparable units by more than the initial difference for that unit type.
> AND
> 2. The adjusted Section 8 rents would exceed the amount needed to

proposed regulation that was never adopted. Under this proposal, HUD would have simply added a percentage increase to the comparable unassisted rent and applied the initial difference only by way of a cross-check on the adequacy of the resulting rent. As that interpretation would have had it, "[a] material difference between the assisted and comparable unassisted rent is defined as a dollar amount equal to five percent of the comparable rent plus one dollar, or the initial difference plus one dollar, whichever is greater." Annual Adjustments of Contract Rents for Section 8 Assisted Housing; Comparability Studies, 57 Fed. Reg. 49,120, 49,125 (Oct. 29, 1992) (to be codified at 24 C.F.R. parts 880-84, 886, and 888); *see Statesman*, 66 Fed. Cl. at 622 (citing *Cuyahoga Metro. Hous. Auth. v. United States*, 65 Fed. Cl. 534, 550 (2005)).

As shown by this truncated description of HUD's two differing conceptual approaches to defining the term "material difference[]" in the overall limitation, HUD had demonstrated a strong preference for incorporating the initial difference in its assessment of materiality. Indeed, other cases in this court show that prior to 1986 HUD had adopted tests that implemented the overall limitation by reference to comparable rents plus the "initial difference" plus a percentage. *See Statesman*, 66 Fed. Cl. at 622 (citing *Acacia Villa v. United States*, 36 Fed. Cl. 277, 279 (1996) (discussing HUD's policy in effect from 1984 through 1986); *Park Village Apartments v. United States*, 32 Fed. Cl. 441, 448 (1994) (addressing HUD's policy that the material-difference overall limitation served only as a ceiling and not also as a floor on contract rents); *National Leased Hous. Ass'n v. United States*, 22 Cl. Ct. 649, 663 (1991) (addressing a 1978 handbook that was rescinded in 1981, and an internal memorandum from 1980)).

Other formulations using "initial difference" to help determine the "material difference[]" in implementing the overall limitation are possible. The most restrictive reading of the overall limitation would equate "material difference[]" with the "initial difference," and would find that any rent in excess of comparable unassisted rents plus the initial difference constitutes a material difference. This definition is untenable, however, as it would make the "overall limitation" clause superfluous, *i.e.*, under this reading of the term, the initial difference must always be maintained, but any rent in excess of the initial difference would not be allowed. This interpretation must therefore be rejected. *See Cuyahoga*, 65 Fed. Cl. at 552.

The overall limitation also could be construed such that a material difference is defined to equal or approximate the percentage by which the initial rent exceeded the comparable market rent at the time the initial rents were set. *See Statesman*, 66 Fed. Cl. at 614. For example, it appears that HUD calculated the initial differences for Statesman Apartments by applying a 10% special adjustment to the comparable unassisted rents. *Id*. at 614 n.9 (citing Defendant's Supplemental Appendix at 13-14, 17, 19 (Declaration of Dennis Morton, director of the Multifamily Program Center at the Cleveland HUD Office, and two attachments to that declaration)). However, this interpretation was in essence rejected by the Federal Circuit in

---

"operate" comparable projects.

*Statesman*, 66 Fed. Cl. at 622. However, the court does not have before it any evidence showing the manner in which "operating" costs of "comparable projects" was to be calculated.

*National Leased Housing*. There, the court of appeals interpreted the proviso of the overall limitation, which proviso addresses the initial difference, to refer simply to the "mathematical difference, expressed in dollars, between the original contract rent and the initial rental value of a comparable unassisted unit." *National Leased Hous.*, 105 F.3d at 1435. The court of appeals explicitly rejected interpreting the initial difference to mean a percentage rather than a fixed dollar amount. *Id*. In the context of this case, it would be anomalous to construe the term "material difference[]" in the main clause of the overall limitation to reflect a percentage based on the initial difference, while concurrently interpreting the initial difference in the proviso to mean a fixed dollar amount.

In all events, defining "material difference[]" in the main clause of the overall limitation based upon the initial difference appears to run counter to the plain language of the text of that provision of the contracts. The reference to the initial difference in the proviso is separated by a semicolon from the reference to material difference in the main clause of Section 1.8d. Looking just at the language of the main clause, it appears that the determination of a material difference was to be judged in comparison *only* to the rents for assisted and comparable unassisted units. If a material difference appeared between rents for assisted and comparable unassisted units, rents for the assisted properties could be adjusted downward to eliminate the material difference, subject to the proviso. In short, after a comparison between assisted and market rents and elimination of any increase in assisted rent that was materially in excess of comparable unassisted rents, the proviso would be applied to insure that the initial difference between the assisted and comparable rents was preserved. If the adjusted assisted rents did not preserve the initial difference, then the assisted rents would need to be revised upward until the initial difference was restored. This two-step interpretation of the overall limitation ensures that the government is not paying materially more for assisted housing than it would pay if it acquired such housing on the open market and concurrently that the owners of assisted housing units are assured that they will continue to be compensated for the extra costs of maintaining rental units in the Section 8 program. *See Cuyahoga*, 65 Fed. Cl. at 553.

The resulting question concerns what difference between assisted rent and comparable unassisted market-based rent should be deemed to constitute a "material difference[]" for the purposes of the overall limitation clause. The contracts specified that the existence of a "material difference[]" was to be "determined by the government." *See* Def.'s App. at 64 (Contract § 1.8d). However, since 1994, HUD has abandoned any effort to interpret the term "material difference[]," and its interpretations prior to that time suffered both from inconsistency and from incorporation of the initial difference into consideration of materiality. Consequently, HUD has not made the necessary determinations, nor are its earlier interpretations of materiality entitled to deference by the court. *See Statesman*, 66 Fed. Cl. at 622-23 (citing and applying *Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

In general usage, "material" is broadly defined as "'having real importance' or 'great consequences.'" *Kungys v. United States*, 485 U.S. 759, 786 (1988) (Stevens, J., concurring)

(quoting Webster's Ninth New College Dictionary 733 (1983)). Whether a difference will be considered material depends largely upon the context of the particular case. For example, a fifteen percent cost overrun was determined to be material in a government construction case in which a contractor was required to spend more than originally estimated to clear an area of land. *Schutt Constr. Co. v. United States*, 353 F.2d 1018, 1022-23 (Ct. Cl. 1965) (upholding the determination of the Corps of Engineers Claims and Appeals Board that any overrun exceeding fifteen percent was considered a material change, where the contractor was warned in advance that acreage estimates were "approximate."). In the context of securities law, omissions or misrepresentations ranging from 1.09% of reported results to 9% of reported results have been found *not* to be material as a matter of law when determining if such omissions or misrepresentations are actionable. *See Taubenfeld v. Hotels.com*, 385 F.Supp.2d 587, 593-94 (N.D. Tex. 2004) (citing *Romine v. Acxiom Corp*., 296 F.3d 701, 706-07 (8th Cir. 2002); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997); *Glassman v. Computervision*, 90 F.3d 617, 633 (1st Cir. 1996); *In re Convergent Tech. Sec. Litig*., 948 F.2d 507, 514 (9th Cir. 1991)).

HUD used a twenty percent threshold in its 1986 memorandum in defining a material difference although it applied that percentage to comparable unassisted rents plus the initial difference. *See supra*, at 7 & n.8. In light of this circumstance, the court concludes that a twenty-percent difference would be considered material when used with reference only to comparable unassisted rents and not to those rents plus the initial difference.

B. Calculating Damages

In enabling this court to try the case on stipulated facts, the parties expressed a preference that the task of calculating damages be remitted to them after the court had completed the work of resolving mixed questions of fact and law. *See* Hr'g Tr. 12:21 to 13:9 (Apr. 11, 2006). The court will honor that request. The parties shall calculate damages based upon the court's interpretation of the "overall limitations" clause in the contracts, as follows:

(1) For each of the years for which plaintiffs may recover (see below), apply that year's AAAF (as stipulated) to the previous year's assisted rent for each unit to find the "presumptive rent" for that unit. For the AAAFs from 1998 to 2002, *see supra*, at 5 (quoting Stip. ¶ 2).

(2) Compare the presumptive rent for each unit to the comparable rent for that type of unit (e.g., one-, two-, or three-bedroom), multiplied by 120%. For comparable rents for each unit type from 1996 to 2002, see Stip. at ¶¶ 21, 36.

(3) If the presumptive rent calculated by applying the AAAF is greater than the comparable rent multiplied by 120%, then the presumptive rent must be reduced such that it does not exceed 120% of the comparable rent.

(4) Such reduction as described in (3) may not reduce the presumptive rent to an amount less than the comparable rent plus the initial difference for each unit. For the initial differences for each plaintiff, see *supra*, at 4 (Supp. Stip. ¶¶ 1-4).

(5) The presumptive rent as modified in (3) and (4) becomes the assisted rent for a given year.

(6) Each year's calculated assisted rent is then used in deriving the next year's assisted rent, repeating steps (1) through (5) for each "compensable" year (see below).

(7) Damages will equal the total amounts, if any, that the calculated assisted rent for each year exceeds the actual rents that plaintiffs charged during the "compensable" years.

As determined by this court in *Statesman*, Statesman II may recover damages accruing on November 14 of the years 1998 through 2000. 66 Fed. Cl. at 625-26. Beach House may recover for claims accruing on October 4 of the years 1998 through 2002 for 60 of the units, and on October 25 of those years for the other 48 units. *Id.*; *see also supra*, at 4 n.4. Additionally, in considering the damages for breach during the years 1998 and thereafter, the parties may not take into account any adjustments of rent that might have been due under the terms of the contract for years 1995 through 1997. *Statesman*, 66 Fed. Cl. at 626. Therefore, the "base" rents for calculating presumptive rents for the year 1998 (and thereafter, as calculated above) should be equal to the last adjusted rents in effect prior to 1998. For Statesman II, those rents were set on November 14, 1992; for Beach House, the last prior adjustment took place on October 4, 1994. *See id.* at 613-14; Stip. at 4, 7.

C. Cost of Rent Comparability Studies

Plaintiffs retained a professional appraiser to conduct comparability studies for the purpose of requesting rent adjustments from HUD. *See* Def.'s App. at 76-120 (request for rent increases for Statesman II), 150-194 (request for rent increases for Beach House). The government concedes that plaintiffs may recover as an element of damages "'the reasonable costs associated with any of the studies [they] conducted with respect to the subject properties prior to filing suit.'" Def.'s Mem. at 53 (quoting *Cuyahoga*, 65 Fed. Cl. at 561). Plaintiffs may recover the costs of performing comparability studies "as another form of expectation damages, that is, to put plaintiff in as good a position as it would have been had the contract been performed." *Cuyahoga*, 65 Fed. Cl. at 561 (citing *Glendale Fed. Bank FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001); *Restatement (Second) of Contracts* §§ 344(1)(a), 347). Defendant requests that the court limit plaintiffs' recovery of these expenses only to those that were necessitated by defendant's breach. *See* Def.'s Mem. at 53-54. Contractually, the costs of performing such studies should not have been imposed on the plaintiffs, and plaintiffs must be allowed to recover such costs to be put in as good a position as they would have been but for the breach. The comparability studies are reimbursable insofar as they were prepared to recover compensable damages, regardless of whether the studies were performed contemporaneously

with the time period for which damages are sought. The parties, in their detailed damages calculations, should allocate the costs of the comparability studies accordingly.

## CONCLUSION

The parties shall calculate damages in accord with the instructions set out above and shall file a report with the court on or before August 15, 2006, providing the results of their calculations. In the report, the parties shall also address interest due under Section 12 of the Contract Disputes Act, 41 U.S.C. § 611.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge